UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                      Case No.: 1:21-cr-00371-BMC-TAM

AL MALIK ALSHAHHI, et al.

                Defendants.

**MEMORANDUM IN SUPPORT OF THOMAS J. BARRACK'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

Introduction.................................................................................................................... 1

Background ..................................................................................................................... 4

    A.    Tom Barrack ..................................................................................................... 4

    B.    Trump Campaign And Administration ............................................................. 4

    C.    The Government's Investigation........................................................................ 5

    D.    The July 2021 Indictment ................................................................................. 6

Argument ........................................................................................................................ 7

I.    The Section 951 Charges Must Be Dismissed................................................................ 7

    A.    Section 951 Requires That The Government Allege Mr. Barrack Owed A Duty To A Foreign Government......................................................................... 7

        1.    Section 951's Definition Of "Agent" Requires That The Defendant Owe The Foreign Government A Duty To Follow That Government's Directions..................................................................................................... 8

        2.    Section 951's Context Confirms That A Violation Requires Proof Of A Duty....................................................................................................... 10

        3.    Construing Section 951 To Require A Duty Avoids Rendering The Statute Unconstitutionally Overbroad........................................................ 12

    B.    The Indictment Fails To Allege That Mr. Barrack Owed A Duty To The UAE.. 14

    C.    Section 951 Cannot Be Applied To Mr. Barrack Without Contravening The Void-for-Vagueness Doctrine. ....................................................................... 20

        1.    Section 951 Invites Arbitrary Enforcement. .............................................. 21

        2.    The Text Of Section 951 Failed To Give Mr. Barrack Adequate Notice That His Alleged Conduct Was Proscribed. ............................................. 23

    D.    The Section 951 Charges Must Be Dismissed With Prejudice........................... 25

II.    The False Statement Charges Must Be Dismissed. ....................................................... 26

    A.    Counts 3, 4, 5, 6, And 7 Must Be Dismissed For Failure To Make A Record. ..... 27

    B.    Count 5 Must Be Dismissed For Failure To State An Offense............................. 34

III.    The Government's Prejudicial And Unjustifiable Pre-indictment Delay Requires Dismissal Of All Counts. ............................................................................................. 36

    A.    The Legal Standard ......................................................................................... 36

B.    The Government's Pre-indictment Delay Severely Prejudiced Mr. Barrack And Has No Valid Justification. ......................................................................... 38

Conclusion ..................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barker v. Wingo,*
    407 U.S. 514 (1972)....................................................................................... 37

*Brady v. Maryland,*
    373 U.S. 83 (1963)......................................................................................... 37

*Bronston v. United States,*
    409 U.S. 352 (1973)................................................................................. 30, 32

*City of Chi. v. Morales,*
    527 U.S. 41 (1999)......................................................................................... 20

*Copeland v. Vance,*
    893 F.3d 101 (2d Cir. 2018) ......................................................................... 23

*Dean v. United States,*
    137 S. Ct. 1170 (2017).................................................................................. 11

*Farrell v. Burke,*
    449 F.3d 470 (2d Cir. 2006) .................................................................... 21, 22

*First Nat'l Bank v. Belloti,*
    435 U.S. 765 (1978)...................................................................................... 12

*Howell v. Barker,*
    904 F.2d 889 (4th Cir. 1990) ....................................................................... 37

*Johnson v. Priceline.com, Inc.,*
    711 F.3d 271 (2d Cir. 2013) ........................................................................... 9

*Kolender v. Lawson,*
    461 U.S. 352 (1983)...................................................................................... 22

*McCormick v. United States,*
    500 U.S. 257 (1991)...................................................................................... 13

*McDonnell v. United States,*
    136 S. Ct. 2355 (2016).................................................................................. 13

*NAACP v. Patterson,*
    357 U.S. 449 (1958)...................................................................................... 12

*Russell v. United States,*
369 U.S. 749 (1962) ........................................................................... 14

*Smith v. Goguen,*
415 U.S. 566 (1974) ..................................................................... 20, 21

*Smith v. Phillips,*
455 U.S. 209 (1982) ........................................................................... 37

*Texas v. Johnson,*
491 U.S. 397 (1989) ........................................................................... 12

*United States v. Abel,*
258 F.2d 485 (2d Cir. 1958) ............................................................. 22

*United States v. Anderson,*
579 F.2d 455 (8th Cir. 1978) ........................................................... 32

*United States v. Angwang,*
2020 WL 5947187 (E.D.N.Y. Oct. 7, 2020) ..................................... 22

*United States v. Bonacorsa,*
528 F.2d 1218 (2d Cir. 1976) ........................................................... 30

*United States v. Brown,*
2011 U.S. Dist. LEXIS 93549 (W.D. Penn. Aug. 19, 2011) ............... 29

*United States v. Campa,*
529 F.3d 980 (11th Cir. 2008) ......................................................... 13

*United States v. Clifford,*
426 F. Supp. 696 (E.D.N.Y. 1976) ................................... 28, 29, 32, 33

*United States v. Davis,*
139 S. Ct. 2319 (2019) ...................................................................... 14

*United States v. Dumeisi,*
2003 WL 22757747 (N.D. Ill. Nov. 20, 2003) ............................. 20, 24

*United States v. Dumeisi,*
424 F.3d 566 (7th Cir. 2005) ........................................................... 13

*United States v. Dumeisi,*
No. 1:03-cr-664 (N.D. Ill. Oct. 29, 2003) ........................................ 20

*United States v. Duran,*
596 F.3d 1283 (11th Cir. 2010) ....................................................... 24

*United States v. Egorov,*
    232 F. Supp. 732 (E.D.N.Y. 1964) ........................................................... 22

*United States v. Ehrlichman,*
    379 F. Supp. 291 (D.D.C. 1974) ....................................................... 27, 29

*United States v. Fried,*
    450 F. Supp. 90 (S.D.N.Y. 1978) ........................................................... 35

*United States v. Gatewood,*
    173 F.3d 983 (6th Cir. 1999) ................................................................. 32

*United States v. Gonzalez,*
    686 F.3d 122 (2d Cir. 2012) ................................................................. 14

*United States v. Gross,*
    165 F. Supp. 2d 372 (E.D.N.Y. 2001) ........................................ 36, 37, 39

*United States v. Huet,*
    665 F.3d 588 (3d Cir. 2012) ..................................................... 2, 15, 35

*United States v. Hung,*
    629 F.2d 908 (4th Cir. 1980) ................................................................. 25

*United States v. Ji Chaoqun,*
    2020 WL 1689826 (N.D. Ill. Apr. 7, 2020) ......................................... 24

*United States v. Kerik,*
    615 F. Supp. 2d 256 (S.D.N.Y. 2009) ............................................ 29, 30

*United States v. Latchin,*
    2005 WL 8160638 (N.D. Ill. July 26, 2005) ................................... 20, 25

*United States v. Latchin,*
    No. 1:04-cr-661 (N.D. Ill. Dec. 1, 2004) ........................................... 20

*United States v. Lindauer,*
    2004 WL 2813168 (S.D.N.Y. Dec. 6, 2004) ................................... 23, 24

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015) ................................................................. 34

*United States v. Lovasco,*
    431 U.S. 783 (1977) ........................................................... 36, 37, 39

*United States v. Maionica,*
    No. 1:07-cr-20999 (S.D. Fla. June 20, 2008) ..................................... 21

*United States v. Marion,*
404 U.S. 307 (1971)...............................................................................36

*United States v. Melekh,*
190 F. Supp. 67 (S.D.N.Y. 1960) ..........................................................22

*United States v. Migliaccio,*
34 F.3d 1517 (10th Cir. 1994) ...............................................................32

*United States v. Nader,*
Case No. 20-cr-103 (D.D.C.)..................................................................26

*United States v. Nagi,*
254 F. Supp. 3d 548 (W.D.N.Y. 2017)....................................................2

*United States v. Pimenta,*
2015 WL 6502098 (D.N.J. Oct. 27, 2015) ...............................15, 16, 35

*United States v. Poutre,*
646 F.2d 685 (1st Cir. 1980) ..................................................................28

*United States v. Race,*
632 F.2d 1114 (4th Cir. 1980) ...............................................................32

*United States v. Rafiekian,*
991 F.3d 529 (4th Cir. 2021) ..........................................................passim

*United States v. Razzaia,*
370 F. Supp. 577 (D. Conn. 1973).........................................................33

*United States v. Ricard,*
922 F.3d 639 (5th Cir. 2019) ..................................................................29

*United States v. Ruzicka,*
333 F. Supp. 3d 853 (D. Minn. 2018).....................................................28

*United States v. Sainz,*
772 F.2d 559 (9th Cir. 1985) ..................................................................32

*United States v. Scully,*
108 F. Supp. 3d 59 (E.D.N.Y. 2015) ......................................................14

*United States v. Shotts,*
145 F.3d 1289 (11th Cir. 1998) ..............................................................30

*United States v. Soriano,*
401 F. Supp. 3d 396 (E.D.N.Y. 2019) ....................................................34

*United States v. Stevens,*
    559 U.S. 460 (2010) ....................................................................... 13

*United States v. Valdez-Molina,*
    2015 WL 13346843 (S.D. Tex. June 8, 2015) ................................. 28

*United States v. Valle,*
    807 F.3d 508 (2d Cir. 2015) ........................................................... 14

*United States v. Vesaas,*
    586 F.2d 101 (8th Cir. 1978) .......................................................... 30

*United States v. Walters,*
    963 F. Supp. 2d 125 (E.D.N.Y. 2013) ............................................ 35

*United States v. Watts,*
    72 F. Supp. 2d 106 (E.D.N.Y. 1999) ........................................ 30, 32

*United States v. Webb,*
    24 F. Supp. 3d 432 (M.D. Penn. 2014) ............................... 15, 35, 36

*United States v. X-Citement Video, Inc.,*
    513 U.S. 64 (1994) ......................................................................... 13

*United States v. Ying Lin,*
    2018 WL 5113139 (E.D.N.Y. Oct. 19, 2018) ............................ 19, 22

*United States v. Ying Lin,*
    No. 1:15-cr-601 (E.D.N.Y. Dec. 6, 2017) ....................................... 20

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ....................................................................... 12

**Statutes**

2 U.S.C. § 2148(a) ................................................................................. 10

18 U.S.C. § 215(a)(1) ............................................................................ 15

18 U.S.C. § 371 ....................................................................................... 7

18 U.S.C. § 951(a) ................................................................................... 7

18 U.S.C. § 951(d) ................................................................. 1, 8, 11, 23

18 U.S.C. § 1001 ..................................................................................... 3

18 U.S.C. § 1001(a)(2) .......................................................................... 34

18 U.S.C. § 1512(c)(2) ................................................................................. 3

22 U.S.C. § 611(c)(1) ................................................................................. 11

22 U.S.C. §§ 611-621 ................................................................................. 10

22 U.S.C. § 618(a)(1) ................................................................................. 13

22 U.S.C. § 9651(b) ................................................................................... 10

31 U.S.C. § 305 ........................................................................................... 10

31 U.S.C. § 503(a) ...................................................................................... 10

Pub. L. 98-473, § 1209, 98 Stat. 1837 (Oct. 12, 1984) ............................... 21

**Other Authorities**

1 Working Papers of the National Commission on Reform of Federal Criminal
  Laws 498 (1970) ..................................................................................... 21

*Agree*, Black's Law Dictionary (11th ed. 2019) ......................................... 23

*Communist Bloc Intelligence Gathering Activities on Capitol Hill*, Hearing Before
  the Subcommittee on Security and Terrorism of the Committee on the
  Judiciary, U.S. Senate (May 12, 1982) ............................................. 11, 22

*Direction & Control*, Black's Law Dictionary (11th ed. 2019) ...................... 9

FARA Unit, Dep't of Justice, *The Scope of Agency Under FARA* (May 2020) .......... 12

FBI Manual of Administrative Operations and Procedures (MAOP) 2007,
  https://archive.org/stream/FbiManualOfAdministrativeOperationsAndProcedur
  esmaop2007/ ........................................................................................... 29

Inquiry into the Matter of Billy Carter and Libya: Hearings Before the Subcomm.
  to Investigate the Activities of Foreign Governments, 96th Cong., 2d Sess.
  (1980) ...................................................................................................... 12

Michael Kranish, *"He's Better than this, says Thomas Barrack, Trump's loyal
  whisperer,"* Wash. Post (Oct. 11, 2017),
  https://www.washingtonpost.com/politics/hes-better-than-this-says-thomas-
  barrack-trumps-loyal-whisperer/2017/10/10/067fc776-a215-11e7-8cfe-
  d5b912fabc99_story.html ....................................................................... 18

Restatement (Second) of Agency § 1 (Am. L. Inst. 1958) .............................. 9

Restatement (Second) of Agency § 14 (Am. L. Inst. 1958) ............................ 9

*Subjection*, Black's Law Dictionary (11th ed. 2019)..................................................... 9

U.S. Dep't of Justice Manual § 9-13.001.......................................................... 2, 28

**Rules**

Fed. R. Crim. Proc. 7(c)(1) ................................................................ 14

Fed. R. Crim. Proc. 12(b)(3) .............................................................. 15

Fed. R. Crim. Proc. 48(b)................................................................... 36

**Regulations**

28 C.F.R. § 73.1 .............................................................................. 10

28 C.F.R. § 73.3(a)........................................................................... 10

# INTRODUCTION

Defendant Thomas J. Barrack, Jr. respectfully moves for dismissal of all seven counts in the indictment before the Court. The indictment accuses Mr. Barrack of failing to notify the U.S. Attorney General that he was acting as an agent of the United Arab Emirates, a longtime ally of the United States. Mr. Barrack was *never* an agent of the UAE, nor did he commit obstruction or make any false statements. There is no basis whatsoever for the charges against Mr. Barrack, and this indictment should be dismissed in its entirety.

Counts 1 and 2 are insupportable as a matter of law because they do not allege facts which, if true, would establish that Mr. Barrack was an agent of the UAE—*i.e.*, that he "agree[d] to operate . . . subject to [its] direction or control." 18 U.S.C. § 951(d). By its terms, and as recently held in *United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021), Section 951 requires an *agreement* by which the principal has the *right* to direct or control the agent's actions, and the agent the correlative *duty* to follow the principal's directions. Section 951 does not and cannot proscribe mere "willing[ness] to do something the foreign principal requests." *Id.* at 539.

Section 951's requirement that there be such an agreement distinguishes an agent for a foreign government from a private citizen who freely chooses to communicate with or about a foreign government, and separates unlawful conduct from lawful conduct. This requirement is a crucial safeguard against Section 951's criminalizing core First Amendment activity—a danger that could hardly be starker than in this case, in which Mr. Barrack stands accused of crimes for voicing long-held views about the Middle East and communicating with its leaders.

The indictment here sets out a number of Mr. Barrack's communications and public statements, but conspicuously omits any facts that he undertook these activities because he agreed to be directed or controlled by the UAE. The indictment does not allege any such agreement—whether by way of a written agreement, a confirmatory exchange of emails or texts, or even a

verbal understanding. It likewise fails to describe any terms of an agreement, such as its purpose, scope, duration, or the existence and nature of any obligations of Mr. Barrack. And it contains no allegation that Mr. Barrack bargained for or received any compensation or anything else of value for supposedly agreeing to act as an agent of the UAE—the sort of allegation that Section 951 indictments typically include to show that the defendant undertook an obligation to follow directions.

The government will no doubt urge that whether Mr. Barrack was an agent of the UAE is a jury question that cannot be decided at this stage, and that decisions of grand juries to indict are entitled to deference. But this Court need not "blindly accept a recitation in general terms of the elements of the offense," and instead must look at the specific facts alleged in the indictment to see if an offense has been alleged. *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). Further, such deference would be badly misplaced here, because this indictment would criminalize otherwise protected conduct without alleging it was undertaken by Mr. Barrack pursuant to an agreement to be directed or controlled by the UAE as its agent. *See United States v. Nagi*, 254 F. Supp. 3d 548, 559 (W.D.N.Y. 2017) (demanding "government proffer of anticipated trial evidence," on a motion to dismiss indictment, to ensure adequate support for element of offense that "respect[ed] the First Amendment line"). Counts 1 and 2 therefore fail to state an offense and should be dismissed.

Counts 3 through 7 are premised on Mr. Barrack's voluntary interview with prosecutors in June 2019. Department of Justice policy advises prosecutors to record witness interviews. U.S. Dep't of Justice Manual § 9-13.001. Although the interview was planned well in advance, prosecutors chose not to record or transcribe it. Instead, an FBI agent made handwritten notes that merged the questions and answers in a manner that fails to disclose key aspects and nuances of

Mr. Barrack's statements. The government nevertheless charged Mr. Barrack—more than two years later—with multiple felony counts of making false statements to federal officials, 18 U.S.C. § 1001, and one count of obstruction of justice, *id.* § 1512(c)(2). These charges should not go to a jury. Defenses to such charges hinge on the specific words used by the questioner and the defendant, and the government has deprived Mr. Barrack of the contemporaneous record he needs to defend himself. In addition, one of the false-statement counts (Count 5) must be dismissed because the indictment fails to plead a necessary element of the offense.

Finally, the government's unjustified two-year delay in charging Mr. Barrack also warrants dismissal of the indictment. The government had all the evidence on which the indictment was based in 2019. The indictment pleads the conspiracy terminated in April 2018, and the alleged false statements occurred in June 2019. Why the government waited more than two years, and until after a change in administration, is a question only it can answer, but it should answer it— especially given the paramount First Amendment interests at stake. Had the government brought this case when its investigation was complete in 2019, recollections regarding Mr. Barrack's June 2019 interview would have been fresh and the harm from the government's failure to make a contemporaneous record might have been mitigated. The lengthy delay has also prejudiced Mr. Barrack's ability to identify, preserve, and secure documentary evidence and obtain evidence from witnesses whose memories have faded. The government has provided no explanation for its delay, and the specter that the government intentionally delayed bringing this case for political reasons or tactical advantage hangs heavily over this case. Because Mr. Barrack has been deprived of a fair opportunity to defend himself, the indictment should be dismissed.

# BACKGROUND

### A. Tom Barrack

Mr. Barrack is a third-generation U.S. citizen whose grandparents came to the United States in 1900. He was born and raised in Culver City, California. After attending Loyola High School and earning an undergraduate degree from University of Southern California and a law degree from the University of San Diego School of Law, he worked for a Los Angeles-based law firm as a project finance lawyer on various international projects, including in the Middle East. In 1982, Mr. Barrack was appointed by President Ronald Reagan as Deputy Undersecretary of the U.S. Department of Interior, after which he returned to the business world.

As a highly-distinguished business leader for over 40 years, Mr. Barrack was the founder and CEO of a private equity and later public company with billions of dollars of assets under management all over the world, including sovereign wealth funds from across the Middle East—most notably Qatar, a nation in direct conflict with the UAE. In that capacity, Mr. Barrack served as a fiduciary to hundreds of investors from all over the world, and as a director of various public companies, trustee of the University of Southern California, and principal of financial institutions and other highly-regulated businesses. Throughout his career, Mr. Barrack has established relationships with government and business leaders all over the globe. In 2010, the French government honored Mr. Barrack with the National Order of Legion of Honour, its highest order of merit, for his work in international business and finance.

### B. Trump Campaign And Administration

From April to November 2016, in addition to his business activities, Mr. Barrack served as an informal advisor to presidential candidate Donald Trump and as a member of the campaign's National Security Advisory Team. After the election, he served as Chairman of the Presidential Inaugural Committee. Indictment ¶ 2. During this timeframe, Mr. Barrack communicated with

foreign officials from around the world, *see, e.g., id* ¶¶ 14, 29, 50, 67, as well as senior members of the President's White House staff and Cabinet.

At the 2016 Republican National Convention, Mr. Barrack delivered a keynote speech televised throughout the world. After the 2016 national election, he spent the next several months leading the inauguration effort and assisting the President-Elect and his team in the transition process. Thereafter, Mr. Barrack considered joining the new Administration, initially as a Special Envoy to the Middle East and later as an Ambassador in Latin America. Toward that end, in June 2017, Mr. Barrack prepared and submitted the required Form SF-86, an application used for background investigations of individuals under consideration for sensitive national security positions. This application spanned hundreds of pages and disclosed Mr. Barrack's contacts with foreign leaders and officials throughout the world, including the very UAE individuals referenced in the indictment. Mr. Barrack was extensively interviewed by U.S. State Department investigators about these contacts and interactions. In September 2017, Mr. Barrack withdrew his application for a government position, having decided instead to remain with his company.

*All* the foregoing activities by Mr. Barrack occurred at the very same time the indictment alleges he was supposedly an agent of the UAE.

### C. The Government's Investigation

As early as December 2017, Mr. Barrack voluntarily produced documents and met with prosecutors in the Special Counsel's Office investigation, which was led by Robert Mueller and included prosecutors from the Eastern District of New York. In June 2019, Mr. Barrack again voluntarily produced documents and was interviewed by Eastern District prosecutors. The government chose not to record either of these interviews or transcribe Mr. Barrack's statements. At no time did the prosecutors advise Mr. Barrack that he was a target of any investigation.

After that June 2019 interview, Mr. Barrack heard nothing more from the prosecutors.

They did not contact him or his counsel to express any concerns about the information he provided or to discuss potential charges or a pre-indictment presentation. Meanwhile, Mr. Barrack continued working as Executive Chairman of his company and in that role made dozens of trips overseas, including to the Middle East. He also continued to act as an informal advisor to the Administration on foreign and economic policy—with no indication by the government that he was supposedly an undisclosed foreign agent or national security threat.

On July 20, 2021, after two years of silence, more than a dozen armed FBI agents burst into a Los Angeles office where Mr. Barrack was attending a business meeting and took him into custody. He was incarcerated in a California general population prison for four days until he was released under extremely harsh and virtually unprecedented bail conditions.

### D. The July 2021 Indictment

There is no allegation in the indictment that Mr. Barrack undertook any of the activities detailed in the indictment because he was obligated to do so by virtue of an agreement with the UAE to act as its agent. There are likewise no allegations that he ever engaged in any activity against the interests of United States or that U.S. officials were unaware of his relationships and interactions with UAE officials or other foreign governments. And the indictment bears none of the hallmarks of other Section 951 indictments that have been allowed to proceed past a motion to dismiss, such as compensation or an express agreement. Finally, while the indictment alleges that Mr. Barrack conspired to violate Section 951 through April 2018, *see id.* ¶ 96, the last overt act alleged occurred in October 2017, *see id.* ¶ 97(a).

Although the indictment describes instances where Mr. Barrack offered to be helpful to UAE officials or where such officials made requests of him, it does not allege any directives, demands, commands, or anything Mr. Barrack was *required* to do. To the contrary, when, for example, an Emirati official "asked" Mr. Barrack for ideas or "asked" questions about presidential

6

appointments, *id.* ¶¶ 16, 54, or "propos[ed]" language for a speech, *id.* ¶ 18, there is no allegation

that Mr. Barrack complied. Nor is it alleged that he accomplished any item on the "wish list" the

UAE supposedly prepared, *id.* ¶ 62, or that he took steps to comply with the UAE's request that

the Muslim Brotherhood be listed as a foreign terrorist organization, *id.* ¶ 65. Similarly, while the

indictment alleges that the UAE asked Mr. Barrack to support a particular Congressman as the

U.S. ambassador to the UAE, *id.* ¶ 71, there is no allegation Mr. Barrack actually did so.

Even when the indictment describes instances when Mr. Barrack purportedly acted in

response to requests from the UAE, it is not alleged that he complied as requested. For example,

the indictment alleges that UAE officials sent Mr. Barrack "talking points" to convey during media

appearances, but does not say that he followed them, alleging only that Mr. Barack "praise[d]" the

UAE during his appearances. *Id.* ¶ 24. The indictment likewise alleges that, after receiving a set

of op-ed "talking points" from Mr. Rashid Al Malik, Mr. Barrack merely substituted the word

"regimes" for "dictatorships." *Id.* ¶ 50.

## ARGUMENT

## I. THE SECTION 951 CHARGES MUST BE DISMISSED.

Count 1, which charges Mr. Barrack as acting as an agent of the UAE without notification

to the U.S. Attorney General in violation of 18 U.S.C. § 951, and Count 2, which charges Mr.

Barrack with conspiracy to violate Section 951 in violation of 18 U.S.C. § 371, must be dismissed

because they fail to allege facts showing that Mr. Barrack agreed with the UAE to operate as its

agent subject to its direction or control.

### A. Section 951 Requires That The Government Allege Mr. Barrack Owed A Duty To A Foreign Government.

Section 951 applies only to "agent[s] of a foreign government." 18 U.S.C. § 951(a). The

text, common-law underpinnings, and statutory context all confirm that, to be an agent within the

meaning of Section 951, a defendant must be subject to a *duty* to comply with the foreign principal's directions. A request from a foreign country, or independent actions or speeches to help that country, are not enough to establish such a duty. Any contrary reading—that Section 951 could be satisfied without an obligation to do what the principal instructs—would criminalize a host of protected First Amendment activity, including the right to freely express and advocate views that may align with the interests of a foreign sovereign. Such activity is not and never has been illegal.

      1.     *Section 951's Definition Of "Agent" Requires That The Defendant Owe The Foreign Government A Duty To Follow That Government's Directions.*

An individual is an "agent of a foreign government" within the meaning of Section 951 only if he "agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d). In the only Court of Appeals decision to date to interpret this key language, the Fourth Circuit held that "to be an 'agent of a foreign government'" within the meaning of Section 951, there must be "mutual assent" that the individual agent owes a duty to act at the foreign government's instruction. *Rafiekian*, 991 F.3d at 540-41. The court rejected the government's "substantially more expansive construction" of the statute, *i.e.*, "that a person becomes an 'agent' for the purposes of § 951 whenever he 'is willing to do something the foreign principal requests.'" *Id.* at 539. As the court explained: "That interpretation is broad" and "rightly rejected," "not just on the bases of § 951's plain language and common-law likeness, but because Congress utilized a more sweeping definition of 'agent' in the Foreign Agents Registration Act, which includes far-reaching verbiage that § 951 lacks." *Id.* This Court should follow *Rafiekian*'s interpretation of Section 951.

To begin, *Rafiekian* faithfully construes the plain language of the statute. An agreement to operate "subject to the direction or control of a foreign government or official" exists only where

there has been a meeting of the minds that the foreign principal has the authority to instruct, direct, or command the defendant to take certain actions, *see Direction & Control*, Black's Law Dictionary (11th ed. 2019) ("Direction" means "an order; an instruction on how to proceed," and "control" means "[t]he direct or indirect power to govern the management and policies of a person or entity."), and the defendant is "obligat[ed]" to act accordingly, *Subjection*, Black's Law Dictionary (11th ed. 2019). Put simply, the government must establish that the defendant and the foreign official *agreed* that the defendant would be *subject* (*i.e.*, duty-bound) to the foreign entity's direction or control. It is not enough that a foreign official made requests and a defendant sometimes acted to fulfill them.

This construction of Section 951 is fully in accord with the common law. As *Rafiekian* explained, Section 951's definition of "agent" parallels the common law definition of an agent. 991 F.3d at 539 (quoting Restatement (Second) of Agency § 1, 14, cmt. a (Am. L. Inst. 1958)). Because Congress adopted a definition of "agent" in Section 951 that "resonates with the common law's [definition] in important respects," courts should be "counsel[ed]" by the common law of agency when interpreting Section 951. *Id.* That common law establishes that the principal's "right to control" the agent and the agent's corresponding "duty not to act contrary to the principal's directions" lie at the heart of the agency relationship. Restatement (Second) of Agency § 14, cmt. a (1958); *see also Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 277 (2d Cir. 2013) (explaining agency's necessary elements). This duty is precisely what separates an "agency relation" from other relationships sometimes confused with true agency in which the "so-called agent has no duty to respond to the will of the principal." Restatement (Second) of Agency § 1, cmt. c (1958).[1]

---

[1] This motion, like *Rafiekian*, primarily relies on Restatement (Second) because that version of the Restatement was in place when Section 951 was amended to include a definition of "agent." No material variation between the Second and Third Restatements appears relevant here.

2.    *Section 951's Context Confirms That A Violation Requires Proof Of A Duty.*

Statutory context confirms that Section 951 requires proof of a duty.  The phrase "subject to the direction" of another is consistently used throughout the U.S. Code to mean that one entity has an *obligation* to follow directions of another.  *See, e.g.*, 2 U.S.C. § 2148(a) ("Architect of the Capitol, subject to the direction of the Joint Committee of Congress on the Library, may enter into cooperative agreements . . ."); 22 U.S.C. § 9651(b) ("Subject to the direction of the Board [of the International Development Finance Corporation], the risk committee established under subsection (a) shall have oversight responsibility of [certain matters]."); 31 U.S.C. § 305 ("The Federal Financing Bank . . . is subject to the direction and supervision of the Secretary of the Treasury."); *id.* § 503(a) ("Subject to the direction and approval of the Director [of the Office of Management and Budget], the Deputy Director for Management shall . . .").[2]  This same language in Section 951 should be interpreted to require proof that a defendant was *obligated* to follow the directives of the alleged principal.

Requiring proof of a duty also accords with the regulations promulgated pursuant to Section 951, which contemplate an actual agency agreement with distinct legal obligations and terms:  the notice to the Attorney General must include "the identity of the foreign government or official for whom the agent is acting, and a brief description of the activities to be conducted for the foreign government or official and the anticipated duration of the activities."  28 C.F.R. § 73.3(a).

In another statutory context—the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611-621—Congress defined "agent" in a "more sweeping" way than in Section 951.  *Rafiekian*,

_____

[2] The Department of Justice's regulation defining "agent" uses slightly different language than the statute, but it still requires the government to show that the defendant owed a duty to a foreign principal and was "subject to the [foreign principal's] direction or control," 28 C.F.R. § 73.1.

991 F.3d at 539. Under FARA, an "agent of a foreign principal" includes not only someone who "acts . . . under the direction or control . . . of a foreign principal" but also one who acts "at the order, *request*, or under the direction or control of" a foreign principal. 22 U.S.C. § 611(c)(1) (emphasis added). By contrast, Section 951 defines agency more narrowly and requires acting at the "direction or control" of a foreign entity, making clear that a mere request is not enough. *See* 18 U.S.C. § 951(d). Because "Congress has shown that it knows how to" criminalize actions in the absence of proof of a duty "in express terms," *Dean v. United States*, 137 S. Ct. 1170, 1177 (2017), this Court should treat the omission of any reference to "requests" in Section 951 as a deliberate choice. In other words, this Court should hold that Section 951, unlike FARA, requires more than that the purported agent merely be "willing to do something the foreign principal requests." *Rafiekian*, 991 F.3d at 539. Construing Section 951 to require proof of a duty is particularly appropriate given that, when Congress enacted the statutory definition of "foreign agent" in Section 951, it expressly considered the statute's relationship with FARA.[3]

The Justice Department itself recently concluded that *even under FARA*, foreign agency entails "some level of power" or "authority" exercised by the principal    and correspondingly,

---

[3] *See Communist Bloc Intelligence Gathering Activities on Capitol Hill*, Hearing Before the Subcommittee on Security and Terrorism of the Committee on the Judiciary, U.S. Senate at 4 (May 12, 1982) (statement of Senator Denton noting that transferring responsibility for Section 951 from the State Department to the Justice Department would allow the Justice Department to administer Section 951 and FARA in tandem); *id.* at 5 (statement of Senator Thurmond lauding the proposed increase of penalties under Section 951 because of the perceived ineffectiveness of FARA); *id.* at 20 (statement of Deputy Assistant Attorney General Mark Richard noting that transferring administration of Section 951 to the Justice Department would "complement[] overall the registration system set forth in [FARA], which is now administered by the Criminal Division of the Department of Justice"); *id.* at 32 (Joel Lisker, Chief Counsel to the Subcommittee, noting recent efforts of the Justice Department to encourage an individual to register "under [FARA], not under § 951," and expressing a desire "to have some common understanding of just what it is we are seeking to achieve by either notification or by registration under the second statute").

"some sense of obligation" by the agent. *See* FARA Unit, Dep't of Justice, *The Scope of Agency Under FARA* (May 2020).[4] If "some sense of obligation" owed by the agent to the principal is required even in the context of FARA—which explicitly refers to "requests"—then a duty to obey the principal's directions must be required under Section 951. And, to be clear, even under FARA's broader definition of "agent," the facts alleged here do not establish a FARA violation because such a violation occurs only if the alleged agent has an *obligation* to take an action *on behalf of* a foreign principal, not where the agent is independently motivated to act.

3.   *Construing Section 951 To Require A Duty Avoids Rendering The Statute Unconstitutionally Overbroad.*

A broad interpretation of Section 951 would criminalize core First Amendment activity. "[E]xpression of dissatisfaction with the policies of this country" is "expression situated at the core of our First Amendment values." *Texas v. Johnson*, 491 U.S. 397, 411 (1989). Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *First Nat'l Bank v. Belloti*, 435 U.S. 765, 776-77 (1978) (alteration in original). This protection extends to discussion of "politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). It also protects the "freedom to engage in association for the advancement of beliefs and ideas." *NAACP v. Patterson*, 357 U.S. 449, 460 (1958).

---

[4] *See* Inquiry into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Foreign Governments, 96th Cong., 2d Sess. at 701 (1980) ("Heymann Testimony") (Assistant Attorney General testifying that, notwithstanding FARA's express reference to "requests," "the relationship between the agent and the foreign principal must be one that substantially *obligates* the agent to the foreign principal. Only then is it fair to draw the conclusion that an individual is not acting independently, is not simply stating his or her own views, but is acting as an agent or alter ego of the foreign principal.") (emphasis added).

The government's approach to Section 951 reflected in the indictment would impinge on these core freedoms. Whenever a foreign government adopts a policy position that concerns the United States and encourages individuals to work toward the realization of that policy, U.S. citizens who agree with the foreign government and work toward a common end could hazard violating Section 951 and face up to 10 years' imprisonment. Suppose the Vatican urged Catholic Americans, Israel urged Jewish Americans, or India urged Indian Americans to express views consistent with its position in newspapers or on street corners. Or imagine a foreign leader asked the U.S. ambassador to extol the virtues of a new business or policy initiative to other U.S. officials. In each instance, U.S. citizens engaging in that protected First Amendment activity could risk violating Section 951. And if the government asserts Section 951 is a general-intent offense, *see United States v. Campa*, 529 F.3d 980, 999 (11th Cir. 2008); *United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005), that exacerbates the risk of a conviction in these circumstances.[5]

To protect these First Amendment rights, this Court must construe Section 951 to require proof of a duty. The Court has a duty to construe statutes "where fairly possible so as to avoid substantial constitutional questions." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994); *see McDonnell v. United States*, 136 S. Ct. 2355, 2372-73 (2016); *McCormick v. United States*, 500 U.S. 257, 273 (1991). And Section 951 would be unconstitutionally overbroad if, in a "substantial number of its applications . . . , judged in relation to the statute's plainly legitimate sweep," it criminalized protected First Amendment activity. *United States v. Stevens*, 559 U.S. 460, 473 (2010) (invalidating law prohibiting creation, sale or possession of depictions of animal cruelty). That is precisely what would follow were Section 951 applied to criminalize the conduct

---

[5] In contrast, FARA contains an express willfulness requirement. *See* 22 U.S.C. § 618(a)(1) (penalizing one who "willfully violates any provision of this subchapter").

alleged in the indictment: public speeches and published statements; meetings and communications with government officials and business colleagues; and advice to the President and his team. *See, e.g.*, Indictment ¶¶ 18-24, 43-50, 79-85.

To the extent any doubt about the scope of Section 951 remains, the rule of lenity also demands that the statute be construed to require that an agent must be subject to a duty to comply with the foreign principal's direction or control. "[W]here . . . the Government and the defense both posit plausible interpretations of a criminal statute, the rule of lenity requires us to adopt the defendant's construction." *United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015); *see United States v. Davis*, 139 S. Ct. 2319, 2333 (2019) (similar).

## B. The Indictment Fails To Allege That Mr. Barrack Owed A Duty To The UAE.

When deciding a motion to dismiss counts of an indictment, the Court "must accept all the factual allegations in the indictment as true." *United States v. Scully*, 108 F. Supp. 3d 59, 117 (E.D.N.Y. 2015). However, "[a]n indictment that does not set out all of the essential elements of the offense charged is defective." *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012). It must also allege "the essential *facts* constituting the offense charged." Fed. R. Crim. Proc. 7(c)(1) (emphasis added). Although the defendant faces a "high standard in seeking to dismiss an indictment," the Court "may dismiss an indictment that is legally insufficient." *Scully*, 108 F. Supp. 3d at 116. "[W]here the definition of an offence . . . includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species, it must descend to particulars." *Russell v. United States*, 369 U.S. 749, 765 (1962).

The indictment here fails in two important ways to allege the requisite duty. *First*, it does not allege facts showing that Mr. Barrack entered into an agreement with the UAE in which it was understood he was under a duty to comply with its directions. A court considering a motion to

14

dismiss "need not blindly accept a recitation in general terms of the elements of the offense," but instead must look at the specific facts alleged in the indictment to see if an offense has been alleged. *Huet*, 665 F.3d at 595. Federal Rule of Criminal Procedure 12(b)(3) thus "allows a district court to review the sufficiency of the government's pleadings to … ensure that legally deficient charges do not go to a jury." *Id*. ("Although the Government is not required to set forth its entire case in the indictment, if the specific facts alleged fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation, the indictment fails to state an offense."). Accordingly, an indictment must be dismissed where it alleges facts that do not add up to a crime. *See id.* ; *see also, e.g.*, *United States v. Pimenta*, 2015 WL 6502098, at *5 (D.N.J. Oct. 27, 2015) (dismissing indictment before trial where factual allegations were insufficient to support essential allegation that the defendant was an agent of a financial institution); *United States v. Webb*, 24 F. Supp. 3d 432, 435 (M.D. Penn. 2014) (dismissing indictment before trial where factual allegations were insufficient to support wire fraud and Travel Act charges).

*United States v. Pimenta* is instructive. There, a district court dismissed bank bribery charges under 18 U.S.C. § 215(a)(1) because the factual allegations in the indictment did not, as a matter of law, support the essential element in the statute that the defendant was an agent of a bank. 2015 WL 6502098, at *5. Like here, the indictment "ha[d] no factual allegations relating to [the bank's] control  or right to control," which were needed to establish that the defendant was acting as an agent of a financial institution. *Id*. at *4. Nor did the indictment allege facts demonstrating that the defendant was "acting on behalf of" the bank or that "the relationship was one of a principal and an agent." *Id*. Without these basic factual allegations demonstrating an actual agency relationship, and where the indictment merely "assume[d]—without support" that the defendant's alleged control over a bank account somehow rendered them an "agent of" the bank, the *Pimenta*

court refused to "*infer* that some relationship existed" and dismissed the charges. *Id*. at \*4-5 (emphasis in original).

Those same principles require dismissal here: the government has conceded that its indictment "goes well beyond" pleading the bare elements of the charged offenses.[6] But the "requests" by the UAE alleged in the indictment fall far short of alleging an agreement with a duty to comply. *See id.* ¶ 16 (alleging that after Mr. Barrack's first meeting with Emirati Official 2, Emirati Official 2 "asked" [Mr. Barrack] for more ideas); *id.* ¶ 18 (alleging that Mr. Al Malik "propos[ed]" language to Mr. Barrack for a draft speech); *id.* ¶ 26 (alleging that Mr. Al Malik told Mr. Barrack that Emirati Official 4 "asked" that Mr. Al Malik meet with Mr. Barrack to develop a foreign relations strategy); *id.* ¶ 54 (alleging that Emirati Official 5 "asked" Mr. Barrack to provide insight on presidential appointments); *id.* ¶ 72 (alleging that Mr. Al Malik "asked" Mr. Barrack to assist the UAE with a presidential appointment). Moreover, the UAE officials who made the requests repeatedly thanked Mr. Barrack for taking certain actions, belying any notion that Mr. Barrack was obligated to take them. *See id.* ¶ 84 (alleging that Mr. Al Malik texted Mr. Barrack, "I have very special thanks and appreciations from the big guy. All respect for your efforts.").

In describing a request from a UAE official, the indictment includes the conclusory allegation that in "June 2016, the defendants . . . , acting at the direction of United Arab Emirates officials, drafted materials proposing a strategy[.]" *Id.* ¶ 25. But there is no allegation that Mr. Barrack was *obligated* in this instance (or any other) to follow the UAE officials' wishes, nor are facts alleged establishing the existence of such an obligation. Although the indictment uses the

---

[6] Bowman Decl., Ex. 1 (August 18, 2021 letter from Assistant United States Attorney Ryan Harris to counsel for Mr. Barrack).

phrase "*at* the direction," without more, the surrounding context demonstrates that Mr. Barrack was not obligated to draft a strategy or that he did so while "subject to" the direction or control of the UAE. At most, this allegation describes another request or suggestion from the UAE. And that is not enough to satisfy Section 951.

*Second*, as to the *requests* the indictment alleges the UAE made to Mr. Barrack, Mr. Barrack is not alleged to have complied with most of them. For example, in November 2016, shortly after the presidential election, Emirati Official 5, a high-ranking UAE diplomat (*id.* ¶ 9), asked Mr. Barrack if he had any "indicators" as to whom the incoming administration might appoint to certain high-level posts. *Id.* ¶ 54. There is no allegation Mr. Barrack answered that inquiry. In December 2016, Mr. Al Malik allegedly sent a "wish list" of "foreign policy positions that would benefit the United Arab Emirates." *Id.* ¶ 62. But there is no allegation of what any of those "wish[es]" were, let alone that Mr. Barrack took steps to advance them. Similarly, the UAE wanted the United States to list the Muslim Brotherhood as a foreign terrorist organization, and requested Mr. Barrack's advocacy to that end. *Id.* ¶ 65. But Mr. Barrack is not alleged to have done so. As for the Qatar blockade, while the indictment alleges communications between Mr. Barrack and Mr. Al Malik during the time period of the blockade, it does not allege any facts demonstrating that Mr. Barrack followed instructions from UAE officials. *See id.* ¶¶ 79-87. Indeed, in highly exculpatory evidence just disclosed by the government, ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ Bowman Decl., Ex. 2.[7]

The few remaining allegations that Mr. Barrack *sometimes* took *some* actions consistent with *some* of the UAE's requests do not establish a duty. For example, the indictment discusses a draft energy speech to be delivered by candidate Trump. *See* Indictment ¶¶ 18-23. When Mr. Barrack "asked for feedback" from Mr. Al Malik on the speech, *id.* ¶ 18, Mr. Barrack also solicited feedback from others, including campaign officials in the United States, *id.* ¶ 22. That Mr. Barrack sought input from multiple sources, including individuals unaffiliated with the UAE, in no way suggests he had a duty to do so.[8]

Similarly, in describing six of Mr. Barrack's many media appearances over the course of 2016 and 2017, *id.* ¶¶ 24(a), 24(b), 24(c), 24(d), 24(e), 24(g), 24(h), the indictment alleges that UAE officials sent Mr. Barrack "talking points" in advance of some of them, *id.* ¶¶ 24(b), 24(f). But it does not allege that Mr. Barrack used anything at all from those talking points, instead vaguely alleging Mr. Barrack "praise[d]" the UAE. *Id.* ¶¶ 24(a), 24(c), 24(d), 24(e), 24(g). A

---

[7] ████████████████████████ Mr. Barrack's public support for ●atar during the blockade was well known. *See* Michael Kranish, *"He's Better than this, says Thomas Barrack, Trump's loyal whisperer,"* Wash. Post (Oct. 11, 2017), https://www.washingtonpost.com/politics/hes-better-than-this-says-thomas-barrack-trumps-loyal-whisperer/2017/10/10/067fc776-a215-11e7-8cfe-d5b912fabc99 story.html (quoting U.S. Ambassador to ●atar Dana Shell Smith that "Tom Barrack is perhaps one of the only people in the world who understands the parties well enough and knows all of them well enough, including our administration, to help bring an end to the crisis").

[8] ████████████████████████████████████████████

person who disregards another's instructions is not someone who is acting subject to the direction or control of a principal, with a duty to follow the principal's directions.

In yet another example, the indictment references an op-ed by Mr. Barrack in *Fortune* magazine, *id.* ¶¶ 43-50, and characterizes it as an instance in which Mr. Barrack worked as a UAE agent, *id.* ¶ 50. The op-ed is a lengthy, 26-paragraph foreign policy essay, and it refers to the UAE only once, 16 paragraphs in. There is no allegation that Mr. Barrack was under a duty to follow directions from the UAE about the content of this op-ed, and in light of the article's actual content, it is readily apparent Mr. Barrack wrote it based on decades of experience conducting business with government officials and companies in the Middle East, to share his perspective on geopolitics and historical events affecting the entire Middle East region.

Finally, where courts have allowed Section 951 charges to proceed, the indictments have unlike the indictment here alleged facts clearly showing a duty to comply with the foreign official's requests. In *Rafiekian*, for example, the indictment alleged that Rafiekian was retained for a campaign on behalf of the Turkish government, for which he was paid—there was an actual written contract. *See Rafiekian* Indictment ¶¶ 17-18, 22.

Other Section 951 charges that have proceeded past a motion to dismiss have included similar allegations. For example, in *United States v. Ying Lin*, 2018 WL 5113139 (E.D.N.Y. Oct. 19, 2018), the operative indictment alleged that the defendant

> agreed to operate within the United States subject to the direction and control of a foreign government and a foreign official by using her position as a counter agent with the Carrier to smuggle items onto Carrier flights departing from JFK Airport to the PRC and to carry out other tasks at the direction and under the control of PRC agents working at the PRC Mission and the PRC Consulate. In return, [defendant] received benefits from the PRC Mission and the PRC Consulate beyond her compensation as an employee of the Carrier.

Superseding Indictment ¶ 5 (Dkt. 87), *United States v. Ying Lin*, No. 1:15-cr-601 (E.D.N.Y. Dec. 6, 2017). "These benefits included tax-exempt purchases of discounted liquor and electronic devices, worth tens of thousands of dollars, as well as free contracting work by PRC construction workers at [defendant's] personal residences[.]" *Id.* ¶ 12.

Similarly, in *United States v. Latchin*, 2005 WL 8160638 (N.D. Ill. July 26, 2005), the superseding indictment alleged that the defendant "was compensated for his services as an [Iraqi Intelligence Service (IIS)] 'sleeper' agent and was paid through his handlers." First Superseding Indictment ¶ 8 (Dkt. 35), *United States v. Latchin*, No. 1:04-cr-661 (N.D. Ill. Dec. 1, 2004); id. Count Three, ¶ 2(e) (defendant "received payments from intelligence officers of the IIS"). And, in *United States v. Dumeisi*, 2003 WL 22757747 (N.D. Ill. Nov. 20, 2003), the pertinent indictment alleged that "the IIS paid [the defendant] for his services," which included collecting and reporting information on individuals and groups considered hostile to Saddam Hussein's regime. Superseding Indictment at ¶ 15 (Dkt. 42), *United States v. Dumeisi*, No. 1:03-cr-664 (N.D. Ill. Oct. 29, 2003). There are no comparable allegations in the indictment here.

### C. Section 951 Cannot Be Applied To Mr. Barrack Without Contravening The Void-for-Vagueness Doctrine.

If Section 951 were construed to cover Mr. Barrack's conduct alleged in the indictment— because it is construed not to require proof of a duty or for any other reason—the statute would be unconstitutionally vague as applied to him and require dismissal of Counts 1 and 2. A statute is unconstitutionally vague as applied unless it satisfies *both* prongs of a two-part test. *See City of Chi. v. Morales*, 527 U.S. 41, 56 (1999) (plurality op.). First, it must set clear "standards" that do not "allow[] policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974). Second, its prohibition must be sufficiently clear in scope that

"men of common intelligence" need not "guess at its meaning and differ as to its application." *Id.* at 572 n.8. As applied here, Section 951 fails to satisfy either prong.

### 1.    *Section 951 Invites Arbitrary Enforcement.*

Allowing conviction under Section 951 whenever someone follows the direction of a foreign principal would invite such arbitrary enforcement as to render the statute unconstitutional. Courts assess arbitrary enforcement claims by first asking whether the statute provides sufficiently clear standards to eliminate the risk of arbitrary enforcement. *Smith*, 415 U.S. at 575. This inquiry turns on the scope and clarity of the statutory text. *See, e.g., id.* at 578. If the statute lacks sufficient clarity, the Court asks whether "the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006). If so, the statute is constitutional; if not, it is void for vagueness. Here, because the statute would fail both inquiries if stretched to cover Mr. Barrack's conduct, Section 951 would be unconstitutionally vague if applied to him.[9]

When Congress added the current definition of "agent" to the statute in 1984, *see* Pub. L. 98-473, § 1209, 98 Stat. 1837 (Oct. 12, 1984), the statutory language left ample room for arbitrary

---

[9] Before statutory amendments in 1984, the government itself acknowledged the risk of arbitrary enforcement attending Section 951's indefinite language. In an April 30, 1972 memorandum, the State Department described the statute as "an uncommonly murky law" and admitted to giving "inconsistent answers . . . to those casually inquiring about" the registration requirement due to confusion about its applicability. *See* Mot. to Dismiss, Ex. 1, at 2, 10 (Dkt. 173-1), *United States v. Maionica*, No. 1:07-cr-20999 (S.D. Fla. June 20, 2008). Similarly, a February 9, 1976 letter from the State Department to the Attorney General recognized that Section 951 "is very unclear as to when notification is required," as the statute "does not contain a definition of the activity which requires registration." Mot. to Dismiss, Ex. 1, at 1 (Dkt. 173-2), *United States v. Maionica*, No. 1:07-cr-20999 (S.D. Fla. June 20, 2008). And a 1970 study commission by Congress stated that Section 951's criminal penalties "cannot be rationally justified on the basis of the conduct with which the statute on its face purports to deal" and recommended that it be repealed. 1 Working Papers of the National Commission on Reform of Federal Criminal Laws 498-99 (1970).

enforcement. Take, for example, a U.S. citizen who has befriended a foreign official. If the foreign official asks the U.S. citizen to drive the official's car (located in the United States) around the block once a month to keep the car's battery alive, and the U.S. citizen agrees and acts accordingly (without providing the requisite notice), he would apparently violate the government's conception of Section 951. Just like Mr. Barrack is alleged to have done, the U.S. citizen would have carried out actions at the specific request of a foreign official. But whether or not to enforce Section 951 against this citizen would depend entirely on a prosecutor's subjective judgment. Just so with Mr. Barrack: ███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ [10] If Section 951 were deemed to criminalize such conduct, it would lack "minimal guidelines to govern law enforcement," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983), and invite arbitrary enforcement.

Furthermore, Mr. Barrack's conduct falls outside "the core of the statute's prohibition," *Farrell*, 449 F.3d at 494. The core of Section 951's "usefulness" is in "espionage prosecutions, where its violation [was] often used as a secondary offense and as an investigative predicate for the FBI." *Communist Bloc Intelligence Gathering Activities on Capitol Hill*, Hearing Before the Subcommittee on Security and Terrorism of the Committee on the Judiciary, U.S. Senate at 4 (May 12, 1982). This core purpose of Section 951 is reflected in how the government has used it in prior cases: To our knowledge, every reported Section 951 decision in this circuit involved espionage-related activities on behalf of foreign intelligence agents or assets. *See, e.g., United States v. Abel*, 258 F.2d 485 (2d Cir. 1958); *United States v. Egorov*, 232 F. Supp. 732 (E.D.N.Y. 1964); *United States v. Melekh*, 190 F. Supp. 67 (S.D.N.Y. 1960); *United States v. Angwang*, 2020 WL 5947187 (E.D.N.Y. Oct. 7, 2020); *United States v. Ying Lin*, 2018 WL 5113139 (E.D.N.Y. Oct. 19, 2018);

---

[10] ███████████████████████████████████████████████████████████ Bowman Decl., Ex. 3.

*United States v. Lindauer*, 2004 WL 2813168 (S.D.N.Y. Dec. 6, 2004). Here, by contrast, the indictment contains no allegation that Mr. Barrack was involved in espionage or subversive conduct against the United States. If Section 951 nevertheless were interpreted to cover his alleged conduct, that would only confirm that the statute is unconstitutionally vague because its application in this case "turns on the law enforcement officer's unguided and subjective judgment." *Copeland v. Vance*, 893 F.3d 101, 120 (2d Cir. 2018).

### 2. The Text Of Section 951 Failed To Give Mr. Barrack Adequate Notice That His Alleged Conduct Was Proscribed.

As discussed, Section 951 defines an "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d). If that language covers the allegations here, then two terms in this statutory definition failed to give Mr. Barrack adequate notice that his alleged conduct was proscribed: (1) "agrees to operate" and (2) "subject to the direction or control."

The plain meaning of "agree" is "[t]o unite in thought; to concur in opinion or purpose" or "[t]o exchange promises; to unite in an engagement to do or not do something." *Agree*, Black's Law Dictionary (11th ed. 2019). Reading Section 951's proscription with that definition in mind, no ordinary person would have received adequate notice that Mr. Barrack's alleged conduct involved an "agree[ment] to operate" as an agent of the identified principals. The indictment alleges that Mr. Barrack's contacts in the Middle East sought his views about President Trump, *see* Indictment ¶¶ 16, 18, 36, 54; that Mr. Barrack publicly praised the Middle East, *id.* ¶ 50; and that he expressed his views and connected officials in the UAE to people in the United States, *id.* ¶¶ 29, 62-67. The indictment further acknowledges that Mr. Barrack sometimes acted *contrary* to his supposed principals' interests. *See id.* ¶¶ 83, 85. To the extent the term "agrees to operate"

can be construed to cover this conduct at all, that term is unconstitutionally vague as applied to the facts of this case.

Extending Section 951's "subject to the direction or control" language to cover Mr. Barrack's alleged actions would create similar problems. As discussed above, "direction" means "an order; an instruction on how to proceed," and "control" means the "direct or indirect power to govern the management and policies of a person or entity." *See supra* Part I.A.1. The ordinary person in Mr. Barrack's position would fail to comprehend that his public expressions about Middle East policy and related political conduct would subject him to prosecution on the theory that he was "subject to the direction or control" of a foreign government. *See supra* Part II.B. As a result, if Section 951 were interpreted to apply to Mr. Barrack's conduct, the statute would be unconstitutionally vague as applied to him.

Although some other courts have rejected vagueness challenges to Section 951, each of those decisions is distinguishable. Some rejected as-applied vagueness challenges where the defendant's "conduct was not innocent" while expressing no "opinion as to the constitutionality of possible applications of § 951 to completely innocent conduct." *United States v. Duran*, 596 F.3d 1283, 1296 n.9 (11th Cir. 2010); *see Lindauer*, 2004 WL 2813168, at *1, 4 (rejecting vagueness challenge to Section 951 because "[t]he conduct charged in the indictment is clearly proscribed by the statute" and allegations were — unlike here — "bare-bones"). Others rejected vagueness challenges because the "[d]efendant ma[de] no effort to demonstrate that § 951 is vague or standardless as applied to his conduct." *United States v. Ji Chaoqun*, 2020 WL 1689826, at *4 (N.D. Ill. Apr. 7, 2020); *Dumeisi*, 2003 WL 22757747, at *2 (defendant "fail[ed] to provide any legal or factual support for his" vagueness argument). And others rejected vagueness challenges to different terms in the statute or different deficiencies in the indictment. *See United States v.*

*Hung*, 629 F.2d 908, 920 (4th Cir. 1980) (rejecting claim that term "agent" itself was unconstitutionally vague); *Latchin*, 2005 WL 8160638, at *2 (rejecting vagueness challenge premised on the idea that the Section 951 count "does not provide the dates of [the defendant's] alleged communications, the identities of the IIS officers with whom he met or communicated, or the dates he traveled overseas and/or received payment").

### D. The Section 951 Charges Must Be Dismissed With Prejudice.

The failings of the government's Section 951 charge cannot be cured by a superseding indictment. Just this month, and despite its persistent disavowal of any exculpatory evidence, the government disclosed evidence that irrefutably demonstrates Mr. Barrack was not an agent of the UAE.



Bowman Decl., Ex. 2. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*See* Government's Sentencing Memorandum, ████████████████████

(Dkt. No. 34) at 1, 3-4, 6-9. Further, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Bowman Decl., Ex. 3.[11]

Putting aside why this *Brady* evidence was not disclosed in the previous six months of this case and the government's inexplicable insistence even now that it is not exculpatory, this evidence alone proves Mr. Barrack ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ And it also proves that ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ No viable claim under Section 951 could ever be asserted in the face of such dispositive evidence.

## II.     THE FALSE STATEMENT CHARGES MUST BE DISMISSED.

In Counts 3 through 7, the indictment claims that Mr. Barrack made various false statements to the government and thereby obstructed a federal investigation. These counts must be dismissed because the government failed to make an adequate record of Mr. Barrack's

---

[11] Despite our requests, ████████████████████████████████████
████████████████████████████

statements. Count 5 must be dismissed for the independent reason that the indictment fails to state a Section 1001 offense.

### A. Counts 3, 4, 5, 6, And 7 Must Be Dismissed For Failure To Make A Record.

The false-statement and obstruction-of-justice charges all suffer the same fatal defect: the government chose not to record the interview for which it seeks to prosecute five felony charges, thereby depriving Mr. Barrack of any meaningful record of his statements and prejudicing his ability to defend himself. Dismissal is the only appropriate remedy to protect Mr. Barrack's rights to due process and a fair trial.

The circumstances surrounding the June 20, 2019 interview underlying Counts 3 through 7 are straightforward: After learning of the government's investigation, Mr. Barrack approached the government and volunteered to answer questions for several hours in a pre-scheduled interview. Although the government knew Mr. Barrack was the target of its investigation, the government (i) did not tell Mr. Barrack he was a target, (ii) chose not to record the interview, (iii) neglected to take basic notes that documented the specific questions it asked and Mr. Barrack's answers, and then (iv) waited for more than two years (while memories faded) before indicting Mr. Barrack without an accurate record of the questions asked and the answers given that are the basis for the false statement counts. Moreover, the sole record the government chose to create are the handwritten notes of a single case agent that reflect little more than the agent's subjective commingling of the questions and answers into shorthand assertions, wholly devoid of the actual questions asked and answers given. Bowman Decl., Ex. 4; *see also United States v. Ehrlichman*, 379 F. Supp. 291, 292 (D.D.C. 1974) (entering judgment of acquittal for Section 1001 conviction where the defendant was "faced with the difficult task of arguing that his statements to the F.B.I.

were literally true on the sole basis of the agent's sketchy notes, which do not purport to be a verbatim record of either the questions or the answers at issue").

Due to the government's own actions, the record available at trial is not sufficient to submit these charges to a jury. Although no *per se* rule requires a verbatim transcript or written statement as a predicate for these offenses, the "absence of a verbatim record . . . raises serious difficulties" in false statement cases, *United States v. Clifford*, 426 F. Supp. 696, 701 (E.D.N.Y. 1976), at times warranting dismissal because "what is actually said by a defendant becomes a critically important part of any prosecution under § 1001," *United States v. Poutre*, 646 F.2d 685, 688 (1st Cir. 1980) (en banc). That is why Department of Justice policy creates a presumption that custodial statements will be electronically recorded and encourages the recording of witness interviews whenever the presumption does not apply. *See* U.S. Dep't of Justice, Justice Manual § 9-13.001; *see also United States v. Ruzicka*, 333 F. Supp. 3d 853, 869 n.6 (D. Minn. 2018) (finding "no reason to defend an unsupportable policy of not recording interviews when the Department of Justice itself" envisions that U.S. Attorneys and the FBI will tape witness interviews).

Although the government's failure to record an interview may not always be grounds for dismissal of an indictment, dismissal is warranted here for three reasons:

First, the government had ample notice of Mr. Barrack's interview and the ability to either record it or take comprehensive notes documenting the questions asked and Mr. Barrack's answers. There was nothing about the location or circumstances of the interview that would have precluded an electronic recording. *Cf. United States v. Valdez-Molina*, 2015 WL 13346843, *1-2 (S.D. Tex. June 8, 2015) (denying motion to dismiss false statement charges based on DHS's failure to record an interview at the border). Nor was there any time restriction that would have prevented the case agent from taking detailed notes documenting the questions asked and answers given. Yet, the

government has offered no explanation for its failure to record the interview or memorialize the statements sufficiently to permit a jury to weigh the evidence fairly, and render a verdict grounded in a record. *Ehrlichman*, 379 F. Supp. at 292. And while FBI policy requires that preparation of an FBI-302 memorandum "be effected within five days following the final interview session,"[12] the memorandum of Mr. Barrack's June 20, 2019 interview was not completed until more than *four weeks* after the interview took place. Bowman Decl., Ex. 5.

Second, the government's specific questions and Mr. Barrack's answers during the June 2019 interview necessarily form the core of any defense to the false-statement and obstruction-of-justice charges premised on that interview. By failing to record or memorialize the statements, the government has impeded Mr. Barrack's ability to advance "two of the few available defenses to a false statement charge," including that he "was responding to a fundamentally ambiguous question or that [his] answer was literally true." *United States v. Ricard*, 922 F.3d 639, 652 (5th Cir. 2019). "Both of those defenses hinge heavily on the specific words spoken by the defendant and the questioner." *Id.* (citing *Clifford*, 426 F. Supp. at 701, and *Ehrlichman*, 379 F. Supp. at 292).

Courts in this Circuit have dismissed false-statement charges pretrial where the meaning of a single phrase or term is not "sufficiently clear to be placed before a jury." *United States v. Kerik*, 615 F. Supp. 2d 256, 271, 273-74 (S.D.N.Y. 2009). For example, *Kerik* dismissed false-statement charges before trial where the defendant allegedly lied when responding to questions about whether he had any "questionable" business relationships or information "that might cause

---

[12] R. 10-13.3(11)(c), FBI Manual of Administrative Operations and Procedures (MAOP) 2007, https://archive.org/stream/FbiManualOfAdministrativeOperationsAndProceduresmaop2007/ MAOPP2 Sec 10 WRITTEN COMMUNICATIONS djvu.txt (last visited Jan. 25, 2022); *see also United States v. Brown*, 2011 U.S. Dist. LEXIS 93549, at *24 (W.D. Penn. Aug. 19, 2011) ("Under [FBI] policy, a special agent is expected to memorialize interviews of witnesses on an FD-302 form within five days of the interview.").

embarrassment to himself or to the President." *Id.* at 262, 273 n.19. The court held that these questions were "fundamentally ambiguous," and thus failed to state a Section 1001 offense. *Id.* at 272. Second Circuit courts have consistently held that such "fundamental ambiguity or impreciseness in the questioning" should preclude false-statement charges from reaching a jury. *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir. 1976); *see also, e.g., United States v. Watts*, 72 F. Supp. 2d 106, 109 (E.D.N.Y. 1999) (an answer to a fundamentally ambiguous question "may not, as [a] matter of law, form the basis of a prosecution for perjury or false statement").

It is also well established that a defendant cannot be convicted for making false statements where their responses to the government's questions were literally true. S*ee Bronston v. United States*, 409 U.S. 352, 362 (1973) (any "special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution"). Following *Bronston*, courts have reversed convictions where a defendant's statements were literally true, even where the statements were misleading or non-responsive. *See, e.g., United States v. Shotts*, 145 F.3d 1289, 1299-300 (11th Cir. 1998) ("Even if [the defendant's] answer was evasive, non-responsive, intentionally misleading and arguably false, it was literally true and cannot support a conviction" for making false statements); *United States v. Vesaas*, 586 F.2d 101, 104 (8th Cir. 1978) ("An indictment premised on a statement which on its face is not false cannot survive").

Those defenses are critical in this case. For example, Count 4 alleges that Mr. Barrack falsely stated that Mr. Al Malik "did not ask [him] to do anything for the United Arab Emirates." Indictment ¶ 101. The government's only record reflecting that alleged statement is an FBI-302 memorandum and the case agent's notes, both of which omit the question that was asked and the

specific answer Mr. Barrack provided. Instead, these materials subjectively combine the question and answer into a single assertion: "███████████████████████████████████████

███████████████████"[13] But the exact wording of the question and answer is crucial for the jury: Did the government merely ask Mr. Barrack if he "felt" that Mr. Al Malik asked him to do anything for the UAE, thus asking only for his subjective view of their interactions? If so, did the government ask any follow up questions to clarify Mr. Barrack's response and determine if he was making an objective assertion about a specific request from Mr. Al Malik that was false under Section 1001? Or did Mr. Barrack simply respond relaying his subjective interpretation of his interactions with Mr. Al Malik based on the government's ambiguous question? Count 4 hinges on these nuances, but the government chose to leave the jury without the evidence it needs to determine whether Mr. Barrack answered truthfully. And the government—not Mr. Barrack— should suffer the consequences of those choices.

Similarly, Count 6 alleges that Mr. Barrack "falsely stated [that he] had no role in facilitating communications between the President-Elect and officials from the United Arab Emirates[.]" Indictment ¶ 105. The indictment alleges that this statement was false because Mr. Barrack supposedly "arrang[ed] one or more telephone calls between the President-Elect and Emirati Official 1 and Emirati Official 2" and because he "provid[ed] contact information" for Emirati officials to the President-Elect's assistant. As with Count 4, however, the record does not reflect whether the ambiguous term "facilitating communications" was used by *the government* in its question or instead whether those were words used by *Mr. Barrack* in his response. The specific language used in the question and Mr. Barrack's response are critical: "facilitating communications" can mean different things, and it is hardly clear that such language would

[13] Bowman Decl., Ex. 4, at 3 (emphasis added).

31

necessarily encompass something as routine as providing contact information to the President-Elect's assistant. Where the government's question or the defendant's answer is ambiguous and no evidence other than the statement itself—is presented as to what the defendant meant, a defendant cannot be convicted unless the government has negated "any reasonable interpretation that would make the defendant's statement factually correct." *Watts*, 72 F. Supp. 2d at 114; *see also United States v. Gatewood*, 173 F.3d 983, 988 (6th Cir. 1999); *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994); *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980); *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978); *Clifford*, 426 F. Supp. at 705. And if it was the government that used the ambiguous phrase "facilitating communications" in its question, it had the obligation to ask follow up questions to ensure that Mr. Barrack understood what it was asking. "[T]he consequences of imprecision in the language used to question a witness must be laid at the table of the questioner, not the questioned." *United States v. Sainz*, 772 F.2d 559, 564 (9th Cir. 1985); *see also Bronston*, 409 U.S. at 362 (precise questioning by the government agent "is imperative"). Nor does the indictment allege facts demonstrating that Mr. Barrack's statement was actually false, *i.e.*, that he actually arranged any calls between the President-Elect and Emirati officials. Instead, the only facts alleged in the indictment are that (1) Mr. Grimes remarked to Mr. Al Malik that a call between the President-Elect and Emirati officials was arranged shortly after Mr. Grimes had raised such a call with Mr. Barrack, and (2) Mr. Grimes believed that they could "take credit for [that] phone call." Indictment ¶ 66. Neither allegation shows that Mr. Barrack was actually responsible for arranging the call. Thus, even if factual allegations in the indictment were true, those allegations would still not establish that Mr. Barrack's alleged responses to the government during his interview were false.

Because the government chose to neither record nor memorialize the questions and answers here, the Court should not permit the charges to reach a jury where there is "no basis, other than pure speculation upon which a reasonable juror could determine what question was asked and what response was given." *Clifford*, 426 F. Supp. at 703. Here, the government *chose* to proceed in a manner that prevented the Court from having a record to assess the ambiguity of the questions and the literal truth of Mr. Barrack's responses.

Third, the government waited two years    long after memories of the precise language used during the interview would have faded—to charge Mr. Barrack with multiple felony counts premised on allegedly false statements. Because technical points about a defendant's exact statements can make a "vast[] differen[ce], not only in form, but in substance, especially if a determination of literal-truthfulness vel non is to be made," this delay in prosecution is especially harmful here. *Clifford*, 426 F. Supp. at 702; *see also, e.g.*, *United States v. Razzaia*, 370 F. Supp. 577, 579 (D. Conn. 1973) (in false swearing cases, "the careful use of words becomes important"). For example, the government alleges that Mr. Barrack made false statements that supposedly concealed his contacts and role with the UAE. But the government's failure to record or adequately memorialize Mr. Barrack's interview has led to material gaps in the record about information that Mr. Barrack volunteered during his interview regarding those contacts, including his affirmative disclosure that Mr. Al Malik and George Nader were both vying to be the main channel of communications between the UAE and the Trump Administration (disclosures that have been corroborated by information the government recently produced to the defense). Thus, fading recollections and the absence of a complete record (both results of the government's choices) have not only prejudiced Mr. Barrack's defenses based on fundamental ambiguity and

literal truth, but also led to critical gaps in the record that directly undercut the government's theory of its case.

As a result, "[t]he defense has been irreparably crippled," as "even an accurate assessment of the extent of" Mr. Barrack's alleged conduct is "unknown as a result of purposeful conduct by a government actor. Under such circumstances, it seems that a discussion of good faith is really beside the point. The damage is done. It cannot be undone." *United States v. Soriano*, 401 F. Supp. 3d 396, 404 (E.D.N.Y. 2019). In these circumstances, the government should not be permitted to benefit by buttressing the indictment with false statement charges predicated on an inadequate record; instead, Counts 3 through 7 must be dismissed. *See id.* at 405.

## B.  Count 5 Must Be Dismissed For Failure To State An Offense

Count 5 must be dismissed for the additional reason that it fails to allege a necessary element of a Section 1001 offense. "[I]n order to secure a conviction under [18 U.S.C.] § 1001(a)(2), the Government must prove that a defendant (1) knowingly and willfully, (2) made a materially false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent." *United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015). With respect to Count 5, the indictment fails to allege Mr. Barrack had knowledge of falsity, and thus fails to allege a violation of Section 1001.

Count 5 charges Mr. Barrack with falsely stating to federal agents that he was "never asked to download any messaging application by anyone associated with the Middle East [and] never had a dedicated telephone to communicate with anyone associated with the Middle East," even though he allegedly knew the opposite to be true. Indictment ¶ 103. But none of the dozen text messages and emails described in the indictment in support of Count 5 alleges *Mr. Barrack* was

34

aware of any request to use a dedicated phone or secure messaging application. Instead, the indictment alleges only that *others* including Mr. Grimes, Mr. Al Malik, and UAE officials communicated about those matters, without alleging that Mr. Barrack participated in or had any knowledge of those communications. *See id.* ¶¶ 35-42. In the absence of such allegations, the indictment fails to plead that Mr. Barack's statement was false or that he knew of its falsity.

An indictment ordinarily need not specify evidence or details of how an offense was committed. *United States v. Walters*, 963 F. Supp. 2d 125, 130 (E.D.N.Y. 2013). But where it *does* allege those specific details, "the indictment fails to state an offense" "if the specific facts that are alleged fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *Huet*, 665 F.3d at 595; *see also, e.g., Pimenta*, 2015 WL 6502098, at *5; *Webb*, 24 F. Supp. 3d at 435. That is precisely the case here: The government chose to include detailed factual allegations in its charging documents. But those detailed allegations nowhere suggest that Mr. Barrack was aware of a request to use a messaging application or dedicated phone, nor that he complied with such a request. Indictment ¶¶ 35-42. To the contrary, the indictment makes clear that Mr. Barrack continued to send text messages and communicate by phone with Mr. Grimes, Mr. Al Malik, and UAE officials for at least a year after the alleged discussions about using encrypted applications and dedicated devices. *See, e.g., id.* ¶ 97(a) (listing only "text messages" between Mr. Barrack, Mr. Grimes, and Mr. Al Malik through October 2017).

As such, the indictment fails to allege other than through *pro forma* language unsupported by the indictment's specific factual allegations—that Mr. Barrack made a false statement or knew he was doing so. *See id.* ¶ 103; *see also id.* ¶ 92. Because Count 5 fails to plead necessary elements of a Section 1001 offense, this count should be dismissed. *See United States v. Fried*, 450 F. Supp. 90, 94 (S.D.N.Y. 1978) (dismissing false statement counts because

allegations contained no "literally false statement"); *see also Webb*, 24 F. Supp. 3d at 440 (dismissing indictment based on review of "specific facts alleged in the indictment" and rejecting government's argument that the motion to dismiss was "based on the sufficiency of the evidence, not on the sufficiency of the government's pleading").

## III. THE GOVERNMENT'S PREJUDICIAL AND UNJUSTIFIABLE PRE-INDICTMENT DELAY REQUIRES DISMISSAL OF ALL COUNTS.

The government appears to have taken few investigative steps following Mr. Barrack's June 2019 interview, waiting for two years before bringing charges. This delay is even more inexplicable given that the government's actions since Mr. Barrack's interview do not reflect any apparent concern that he was a foreign agent or national security threat, even though he traveled overseas more than a dozen times and continued to have access to senior White House personnel and the President. The Due Process Clause protects defendants against such prejudicial, unjustified pre-indictment delay. *See United States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Marion*, 404 U.S. 307, 324 (1971); *see also* Fed. R. Crim. Proc. 48(b) (allowing dismissal of indictment for pre-indictment delay). To establish such a due process violation, a defendant must show both that he was prejudiced by the delay and that the government acted with an impermissible *mens rea* in delaying the indictment. Because both are present here, the indictment must be dismissed in full. Or, at the very least, the Court should allow discovery into the reasons for the government's extended delay.

### A. The Legal Standard

Prejudice in this context is often shown by the loss of documentary evidence or the unavailability of a key witness. For example, in *United States v. Gross*, 165 F. Supp. 2d 372 (E.D.N.Y. 2001), the court found prejudice because "documents and other evidence were lost, businesses in possession of critical documents collapsed, and witnesses died," and were this

evidence available, "it would be used to show that some of the representations attributed to Defendants were made by other parties and that [the alleged victim] was aware" of the facts relevant to its transactions with the defendants. *Id.* at 380-81. Similarly, in *Howell v. Barker*, 904 F.2d 889 (4th Cir. 1990), the court granted habeas relief based on a 27-month pre-indictment delay, where the defendant's key alibi witness could no longer be located and the government "candidly stated that [its] justification for the preindictment delay was mere convenience." *Id.* at 895.

Upon a finding of actual prejudice, the Court must next consider the government's proffered reasons for the delay. *Lovasco*, 431 U.S. at 789-90; *Gross*, 165 F. Supp. 2d at 378. The Second Circuit has not taken a clear position, however, on what the defendant must show about the government's reasons for delay in order to establish a due process violation. *See Gross*, 165 F. Supp. 2d at 378-80. Some courts hold that "negligence or reckless disregard on the part of the government" is sufficient to shows a due process violation; others hold that a defendant must show the delay was "an intentional device to gain tactical advantage over the accused." *Id.* at 378-79.

The former is the correct test. The Due Process Clause protects a defendant's right to a fair trial, *see, e.g.*, *Smith v. Phillips*, 455 U.S. 209, 219 (1982), and the fairness of a trial does not turn on the prosecution's subjective intent to harm the defendant's case. Rather, it turns on how the trial is conducted—for example, what evidence is available to the defendant and can be evaluated fairly by the jury—and the objective justifications for any prejudicial conduct. For this reason, many trial-related due process doctrines, such as *Brady v. Maryland*, 373 U.S. 83 (1963), and speedy-trial claims, *see Barker v. Wingo*, 407 U.S. 514 (1972), do not require proof of the prosecution's subjective intent to show a due process violation. The right to a trial free from prejudicial, unjustified delay stands on the same due process footing.

## B. The Government's Pre-indictment Delay Severely Prejudiced Mr. Barrack And Has No Valid Justification.

The government's pre-indictment delay has severely prejudiced Mr. Barrack's defense and the government has no valid justification for its delay under either standard.

As described above, the two-year delay in charging Mr. Barrack has prevented him from obtaining important evidence. The lack of an adequate record of his 2019 interview denies Mr. Barrack critical proof to establish what he was asked and how he answered. This delay is particularly problematic in the context of this case, where — as discussed above — the alleged falsity of Mr. Barrack's statements turns on the exact words used. *See supra* Part II.A. Additionally, as to all the charges against him, the two-year delay hamstrings Mr. Barrack's ability to obtain text or email evidence from key witnesses. Mr. Barrack had no reason to believe he was the target of an investigation during that two-year period and had no reason to take steps to obtain or preserve this evidence. Mr. Barrack was in phone and text communication with high-ranking members of the Trump campaign and later the Trump Administration regarding his activities in the Middle East, and no doubt those individuals communicated with others about Mr. Barrack's role. Such communications would disprove the government's theory that Mr. Barrack acted as a secret agent of the UAE to betray the United States and instead demonstrate his activities were undertaken with the knowledge of the Trump campaign and Administration. Because of the government's delay, this evidence is no longer reasonably available, if at all.

To that point, the government has not produced, or perhaps not even searched for, internal memoranda or communications in government offices such as the White House or the intelligence agencies that were in the possession of key individuals in the campaign and Administration with whom Mr. Barrack was in communication about the matters alleged in the indictment. Moreover,

it is doubtful that texts and emails once in the possession of such witnesses can now be reasonably obtained, especially with the change of administration.

This loss of memories, loss of evidence, and loss of ability to obtain evidence all suffice to show prejudice. *See supra* Part III.A. Because Mr. Barrack has shown prejudice, this Court should inquire into the government's reasons for its delay. *See, e.g., Gross*, 165 F. Supp. 2d at 378-80. To the extent that more than negligence is deemed necessary to show unconstitutional delay, Mr. Barrack has made the requisite showing because it is evident that the Department of Justice delayed indictment until a new presidential administration came into power. And, the very real potential that politics was a motivating force for the belated charges against Mr. Barrack offends "fundamental conceptions of justice which lie at the base of our civil and political institutions." *Lovasco*, 431 U.S. at 790. The Court should therefore dismiss the indictment based on the government's prejudicial delay, or, at minimum, convene an evidentiary hearing to ascertain why the charges were not filed until long after Mr. Barrack's 2019 interview.

## CONCLUSION

The government has not alleged—and cannot allege—the facts requisite to stating a Section 951 offense. Even if Section 951 could be stretched to cover the routine conduct here, the statute would unconstitutionally invite arbitrary enforcement and invade protected First Amendment activity. The government has forced Mr. Barrack to defend himself against the false statement and obstruction charges without the contemporaneous record that it chose not to create, silently waiting two years, while memories faded, to indict him. This Court should dismiss the indictment in full.

Dated: January 31, 2022
      Los Angeles, CA

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Daniel M. Petrocelli*
Daniel M. Petrocelli, Esq. (admitted *pro hac vice*)
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
E-mail: dpetrocelli@omm.com

James A. Bowman (admitted *pro hac vice*)
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-mail: jbowman@omm.com

Nicole M. Argentieri
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: nargentieri@omm.com

*Attorneys for Thomas Joseph Barrack, Jr.*