UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AL MALIK ALSHAHHI, et al.<br><br>        Defendants. | Case No.: 1:21-cr-00371-BMC-TAM |

**REPLY IN SUPPORT OF THOMAS J. BARRACK, JR.'S MOTION TO DISMISS**

O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
(310) 553-6700

400 South Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000

Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000

*Counsel for Thomas J. Barrack, Jr.*

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 5

I.  THE SECTION 951 CHARGES MUST BE DISMISSED ................................... 5

    A.  Section 951 Requires That The Government Allege Mr. Barrack Owed A Duty To A Foreign Government Or Official. ............................................... 5

        1.  Statutory Construction Principles Confirm The Requirement Of A Duty ....................................................................................................... 5

        2.  The Cases That Have Allowed Section 951 Charges To Survive A Motion To Dismiss Are Distinguishable ......................................... 8

        3.  Section 951 Should Be Construed To Require Proof Of A Duty To Avoid Overbreadth Problems. ..................................................... 11

    B.  The Indictment Does Not Plead That Mr. Barrack Owed A Duty To The UAE. ....................................................................................................... 15

    C.  If Applied To Mr. Barrack's Conduct, Section 951 Is Unconstitutionally Vague. ...................................................................................................... 17

        1.  Section 951 Authorizes And Encourages Arbitrary Enforcement.17

        2.  The Text Of Section 951 Failed To Give Mr. Barrack Adequate Notice That His Alleged Conduct Was Proscribed...................... 21

    D.  The Government's Late-Breaking Theories Of Liability Do Not Salvage The Indictment. ....................................................................................... 22

        1.  The Indictment Fails To State A Section 951 Offense Under An Aiding-And-Abetting Theory Of Liability. ................................... 23

        2.  The Indictment Fails To State A Section 951 Offense Under Pinkerton. .................................................................................... 25

II.  THE FALSE STATEMENT CHARGES MUST BE DISMISSED .................... 27

    A.  Counts 3 Through 7 Must Be Dismissed Based On The Government's Intentional Failure To Make A Record. ................................................. 27

    B.  Count 5 Must Be Dismissed For Failure To State An Offense ................ 34

III.  THE GOVERNMENT'S PREJUDICIAL AND UNJUSTIFIABLE PRE-INDICTMENT DELAY REQUIRES DISMISSAL OF ALL COUNTS............ 36

CONCLUSION .............................................................................................................. 38

i

## **TABLE OF AUTHORITIES**

**Cases**

*City of Chi. v. Morales*,
  527 U.S. 41 (1999) ...................................................................................................... 17

*Clark v. Martinez*,
  543 U.S. 371 (2005) .................................................................................................... 13

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .................................................................................................... 13

*Kunz v. New York*,
  340 U.S. 290 (1951) .................................................................................................... 14

*Leopold v. U.S. Dep't of Justice*,
  No. 19-CV-01278 (D.D.C.) ........................................................................................ 29

*Marinello v. United States*,
  138 S. Ct. 1101 (2018) ................................................................................................ 12

*NLRB v. Catholic Bishop of Chi.*,
  440 U.S. 490 (1978) .................................................................................................... 13

*Pinkerton v. United States*,
  328 U.S. 640 (1946) ...................................................................................................... 3

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) ................................................................................................ 23

*Rosemond v. United States*,
  572 U.S. 65 (2014) ...................................................................................................... 24

*Russell v. United States*,
  369 U.S. 749 (1962) .................................................................................................... 15

*Saia v. New York*,
  334 U.S. 558 (1948) .................................................................................................... 14

*Shuttlesworth v. City of Birmingham*,
  394 U.S. 147 (1969) .................................................................................................... 14

*Smith v. Goguen*,
  415 U.S. 566 (1974) .................................................................................................... 17

*Staples v. United States*,
  511 U.S. 600 (1994) .................................................................................................... 22

*Thibodeau v. Portuondo*,
  486 F.3d 61 (2d Cir. 2007) ......................................................................................... 17

*United States v. Abouammo*,
  No. 19-CR-621 (N.D. Cal) ............................................................................................ 8

*United States v. Amirnazmi*,
  2009 WL 32481 (E.D. Pa. Jan. 5, 2009) ..................................................................... 13

*United States v. Amirnazmi,*
　　No. 08-cr-429 (E.D. Pa.) .................................................................................. 9

*United States v. Arsan,*
　　21-CR-00159 (C.D. Cal.) ................................................................................ 29

*United States v. Baaklini,*
　　21-CR-00160 (C.D. Cal) ................................................................................ 29

*United States v. Baca,*
　　No. 16-CR-00066 (C.D. Cal) .......................................................................... 29

*United States v. Bonacorsa,*
　　528 F.2d 1218 (2d Cir. 1976) .......................................................................... 31

*United States v. Bonanno Organized Crime Fam. of La Cosa Nostra,*
　　879 F.2d 20 (2d Cir. 1989) ................................................................................ 7

*United States v. Brandt,*
　　546 F.3d 912 (7th Cir. 2008) .......................................................................... 30

*United States v. Bronson,*
　　2007 WL 2455138 (E.D.N.Y. Aug. 23, 2007) ................................................. 9

*United States v. Brown,*
　　2011 WL 3678682 (W.D. Pa. Aug. 19, 2011) ............................................... 29

*United States v. Bruno,*
　　383 F.3d 65 (2d Cir. 2004) .............................................................................. 25

*United States v. Butenko,*
　　384 F.2d 554 (3d Cir. 1967), *vacated on other grounds by Alderman v. United States,* 394 U.S.
　　165 (1969) ......................................................................................................... 8

*United States v. Carll,*
　　105 U.S. 611 (1881) ........................................................................................ 15

*United States v. Chung,*
　　633 F. Supp. 2d 1134 (C.D. Cal. 2009) ........................................................... 8

*United States v. Claiborne,*
　　No. 17-CR-00069 (D.D.C.) ............................................................................ 29

*United States v. Clifford,*
　　426 F. Supp. 696 (E.D.N.Y. 1976) ................................................................. 28

*United States v. Coplan,*
　　703 F.3d 46 (2d Cir. 2012) .............................................................................. 25

*United States v. Dumeisi,*
　　424 F.3d 566 (7th Cir. 2005) ............................................................................ 8

*United States v. Dumiesi,*
　　2003 WL 22757747 (N.D. Ill. Nov. 20, 2003) .............................................. 13

*United States v. Duran,*
　　596 F.3d 1283 (11th Cir. 2010) ...................................................................... 19

*United States v. Ehrlichman,*
   379 F. Supp. 291 (D.D.C. 1974) ................................................................ 28, 33

*United States v. Enmons,*
   410 U.S. 396 (1973) ............................................................................................... 1

*United States v. Farhane,*
   634 F.3d 127 (2d Cir. 2011) ............................................................................... 11

*United States v. Fortenberry,*
   No. 21-CR-00491 (C.D. Cal.) ............................................................................ 28

*United States v. Graziano,*
   616 F. Supp. 2d 350 (E.D.N.Y. 2008) .............................................................. 26

*United States v. Gregg,*
   612 F.2d 43 (2d Cir. 1979) ................................................................................. 24

*United States v. Gross,*
   165 F. Supp. 2d 372 (E.D.N.Y. 2001) .......................................................... 37, 38

*United States v. Gyamfi,*
   357 F. Supp. 3d 355 (S.D.N.Y. 2019) .............................................................. 24

*United States v. Heine,*
   151 F.2d 813 (2d Cir. 1945) ..................................................................... 7, 8, 11

*United States v. Ho,*
   3:16-cr-46 (E.D. Tenn. Nov. 30, 2016) .............................................................. 9

*United States v. Hu Ji,*
   No. 21-cr-265 (E.D.N.Y.) ................................................................................... 9

*United States v. Huet,*
   665 F.3d 588 (3d Cir. 2012) ............................................................................ 9, 34

*United States v. Hung,*
   629 F.2d 908 (4th Cir. 1980) ........................................................................ 14, 19

*United States v. Ji Chaoqun,*
   2020 WL 1689826 (N.D. Ill. Apr. 7, 2020) .................................................. 14, 20

*United States v. Ji Chaoqun,*
   No. 18-cr-611 (N.D. Ill) ....................................................................................... 9

*United States v. Kerik,*
   615 F. Supp. 2d 256 (S.D.N.Y. 2009) ........................................................... 28, 31

*United States v. Kozminski,*
   487 U.S. 931 (1988) ............................................................................................ 12

*United States v. Latchin,*
   2005 WL 8160638 (N.D. Ill. July 26, 2005) ................................................... 20

*United States v. Lighte,*
   782 F.2d 367 (2d Cir. 1986) ............................................................................... 31

*United States v. Lindauer,*
    2004 WL 2813168 (S.D.N.Y. Dec. 6, 2004) ........................................................ 9, 19

*United States v. Lindauer,*
    448 F. Supp. 2d 558 (S.D.N.Y. 2006) ...................................................................... 9

*United States v. Lloyd,*
    947 F. Supp. 2d 259 (E.D.N.Y. 2013) .................................................................... 25

*United States v. Maionica,*
    No. 1:07-cr-20999 (S.D. Fla. June 20, 2008) ........................................................ 19

*United States v. McCoy,*
    995 F.3d 32 (2d Cir. 2021) ..................................................................................... 24

*United States v. Papadopoulous,*
    No. 17-CR-00182 (D.D.C.) ..................................................................................... 29

*United States v. Patel,*
    2022 WL 500567 (D.N.J. Feb. 18, 2022) ................................................. 10, 34, 35, 36

*United States v. Pimenta,*
    2015 WL 6502098 (D.N.J. Oct. 27, 2015) ..................................................... 10, 34, 36

*United States v. Powers,*
    19-CR-00213 (E.D. Va.) .......................................................................................... 29

*United States v. Prado,*
    815 F.3d 93 (2d Cir. 2016) ..................................................................................... 24

*United States v. Rafiekian,*
    991 F.3d 519 (4th Cir. 2021) ............................................................................ passim

United States v. Rafiekian,
    No. 18-cr-457 (E.D. Va.) ..................................................................................... 9, 20

*United States v. Rodriguez,*
    392 F.3d 539 (2d Cir. 2004) ............................................................................. 25, 26

*United States v. Sample,*
    565 F. Supp. 1166 (E.D. Va. 1983) ........................................................................ 37

*United States v. Sherin,*
    1987 WL 6146 (S.D.N.Y. Jan. 28, 1987) ............................................................... 15

*United States v. Sittenfeld,*
    522 F. Supp. 3d 353 (S.D. Ohio 2021) .................................................................. 11

*United States v. Sorich,*
    523 F.3d 702 (7th Cir. 2008) .................................................................................. 30

*United States v. Stevens,*
    559 U.S. 460 (2010) ................................................................................................ 12

*United States v. Sunia,*
    643 F. Supp. 2d 51 (D.D.C. 2009) ......................................................................... 25

v

*United States v. Superior Growers Supply, Inc.*,
   982 F.2d 173 (6th Cir. 1992) ............................................................................... 23

*United States v. Thompson*,
   2017 WL 9325875 (W.D. Wis. Jan. 20, 2017) ................................................... 29

*United States v. Trie*,
   21 F. Supp. 2d 7 (D.D.C. 1998) ........................................................................ 32

*United States v. Urrego*,
   853 F. Supp. 646 (E.D.N.Y. 1994) .................................................................... 26

*United States v. Walton*,
   2021 WL 3615426 (9th Cir. Aug. 16, 2021), *pet. for cert. filed*, No. 21-7093 ....... 26

*United States v. Watts*,
   72 F. Supp. 2d 106 (E.D.N.Y. 1999) .................................................................. 31

*United States v. Webb*,
   24 F. Supp. 3d 432 (M.D. Pa. 2014) ......................................................... 10, 34, 36

*United States v. Winner*,
   17-CR-00034 (S.D. Ga.) ..................................................................................... 29

*United States v. Ying Lin*,
   No. 15-cr-601 (E.D.N.Y.) ..................................................................................... 9

**Statutes**

18 U.S.C. § 2(a) ...................................................................................................... 23

18 U.S.C. § 951 .............................................................................................. 8, 18, 24

18 U.S.C. § 951(d) ........................................................................................... passim

22 U.S.C. § 233 ........................................................................................................ 7

**Other Authorities**

Alex Kreit, *Vicarious Criminal Liability and the Constitutional Dimensions of Pinkerton*, 57
   Am. U. L. Rev. 585 (2008) ................................................................................. 26

Black's Law Dictionary (11th ed. 2019) ................................................................... 5

FBI Manual of Administrative Operations and Procedures (MAOP) 2007, R. 10-13.3(1l)(c) .... 28

Nat'l Security Division, U.S. Dep't of Justice, Advisory Opinion (Feb. 13, 2018) ................... 19

Nat'l Security Division, U.S. Dep't of Justice, Advisory Opinion (Mar. 18, 2020) .................. 19

Nat'l Security Division, U.S. Dep't of Justice, Advisory Opinion (Oct. 22, 2020) ................... 19

Office of the Inspector General, U.S. Dep't of Justice, *Audit of the National Security Division's
   Enforcement and Administration of the Foreign Agents Registration Act* 30 (Sept. 2016),
   https://oig.justice.gov/reports/2016/a1624.pdf .......................................................... 18

*Oversight of the Foreign Agents Registration Act and Attempts to Influence U.S. Elections:
   Lessons Learned from Current and Prior Administrations*, U.S. Sen. Comm. On the Judiciary
   2 (July 26, 2017) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).... 18

Restatement (Second) of Agency (Am. L. Inst. 1958) ............................................................... 2, 6

U.S. Dep't of Justice, Justice Manual § 9-13.001 ........................................................................ 28

U.S. Dep't of Justice, *The Scope of Agency Under FARA*, https://www.justice.gov/nsd-
fara/page/file/1279836/download (May 2020) .......................................................... 14

**Rules**

Fed. R. Crim. P. 7 .......................................................................................................... 34

## INTRODUCTION

The government misunderstands Mr. Barrack's motion:  It is not premised on arguing the facts or challenging the sufficiency of the evidence.  *Contra* Opp. 8.  Rather, the motion is predicated on bedrock legal principles that, taken together, show why each count of the indictment fails as a matter of law.  As in other cases where the government offers only legally deficient charges, this Court has a duty to ensure they do not go to a jury.  *See, e.g.*, *United States v. Enmons*, 410 U.S. 396, 412 (1973) (affirming dismissal of indictment where statute did not prohibit the conduct charged).[1]

1.  The substantive and conspiracy Section 951 counts fail for multiple reasons:

*First*, the government does not dispute that it cannot prove a Section 951 offense if a necessary element is proof that the alleged foreign agent owed a duty to his foreign principal.  And it does not dispute that the indictment nowhere alleges such a duty.  Instead, pushing the statute beyond all reasonable and constitutional bounds, the government seeks to criminalize conduct, including First Amendment-protected activity, freely undertaken by a person having no obligation to a foreign government.  In doing so, the government asks this Court to embrace the very same arguments that it recently advanced in *United States v. Rafiekian*, 991 F.3d 529) (4th Cir. 2021), and that the Court of Appeals squarely rejected.

*Second*, *Rafiekian* is the leading appellate decision on the requirements of Section 951, and there is no basis to depart from its well-reasoned analysis.  Section 951 makes an individual criminally liable as an "agent of a foreign government" only if he "agrees to operate within the United States subject to the direction or control of a foreign government or official."  18 U.S.C. § 951(d).  As *Rafiekian* held, the statute requires proof that the alleged foreign principal has the

---

[1] This reply refers to Mr. Barrack's opening motion to dismiss as "Mot." and the government's opposition to that motion as "Opp."

"power or authority to guide or manage" the agent or the power to "guid[e] or supervis[e]" the agent's "action, conduct, or operation." 991 F.3d at 539. This definition of agency parallels and incorporates the common law, *id.*, which provides that an agency relationship exists only if the "agent is subject to a duty not to act contrary to the principal's directions." Restatement (Second) of Agency § 14, cmt. a (Am. L. Inst. 1958). Being "willing to do something the foreign principal requests" is not enough. *Rafiekian*, 991 F.3d at 539. The agent and the principal must "mutual[ly] assent" to this agency relationship; it cannot arise unilaterally. *Id.* at 540  (citing Restatement (Second) of Agency § 1). It is this mutual assent that creates the agent's duty—without such a duty, no agency can exist. The indictment alleges no facts establishing a mutually-agreed upon agency relationship between Mr. Barrack and the UAE compelling him to act on behalf of the UAE. And while the indictment references various Emirati individuals, it never identifies any individual from the UAE who might have provided the required assent to the alleged agency relationship on behalf of the UAE.

*Third*, construing Section 951 to require proof of a duty is necessary to avoid serious First Amendment issues. If no proof of a duty to a foreign principal is required, then an individual can be criminally liable under Section 951 whenever he expresses opinions consistent with the interests of a foreign government—for example, advocating for Ukrainian membership in NATO or the need to protect Israeli sovereignty. The government never disputes that a broad construction of Section 951 would infringe on First Amendment freedoms. Nor could it:  In this very case, the government seeks to hold Mr. Barrack criminally liable for meetings with friends and colleagues, advice to the President, and public statements articulating foreign-policy views that Mr. Barrack had advocated long before the alleged agency relationship arose. *See, e.g.*, Indictment ¶¶ 18-23,

2

24, 43-50, 79-85. Such constitutionally-protected conduct should be criminalized only in narrow circumstances, where the defendant actually has a duty to follow a foreign principal's directions.

*Fourth*, to the extent Section 951 is nevertheless construed to apply to Mr. Barrack's conduct, the statute is unconstitutionally vague as applied to him, and that vagueness requires dismissal of the Section 951 charges. A statute is unconstitutionally vague if (1) it does not set clear standards that preclude arbitrary enforcement or (2) it is unclear enough that a person of ordinary intelligence does not understand what it prohibits. Both are true here: The government itself has acknowledged that Section 951's scope is confusing, *see infra* Part I.C.1, and thus the statute is unevenly enforced. And no one of ordinary intelligence would understand that Section 951 prohibits Mr. Barrack's conduct—occasional acquiescence to UAE requests, occasional inaction on such requests, and occasional action contrary to such requests—because that conduct is inconsistent with any notion that Mr. Barrack agreed to operate subject to the UAE's direction or control.

*Finally*, the government's late-breaking position that Mr. Barrack could be criminally liable under Section 951 under an aiding-and-abetting theory or under *Pinkerton v. United States*, 328 U.S. 640 (1946), does not salvage the indictment. To be liable under either theory, Mr. Barrack would need to be able to form the criminal intent necessary to help the other defendants, Mr. Grimes or Mr. Al Malik, violate Section 951. He could form that intent only if he knew that Mr. Grimes or Mr. Al Malik was an unregistered agent of the UAE. After all, being an agent of a foreign government or official is not unlawful; a crime occurs only if the agent is unregistered. But the indictment never alleges Mr. Barrack knew that Mr. Grimes or Mr. Al Malik were agents, let alone unregistered agents.

3

2.   The false-statement and obstruction charges should likewise be dismissed.   These charges are premised on a voluntary June 2019 interview of Mr. Barrack, which was attended by three FBI agents and three federal prosecutors.   Despite having ample opportunity and every incentive to create a complete and accurate record of Mr. Barrack's statements, the government did not record or transcribe the interview, but instead had only one agent take handwritten notes summarizing the content of the interview.   The government then waited two years and indicted Mr. Barrack on five felony charges based on the specific statements he made in 2019.   While the government highlights the total length of the notes (fifty notepad pages), that is a result of the fact that the interview went almost five hours, rather than a testament to the quality or detail of the notes themselves—particularly the portions related to the alleged false statements, which are summary and incomplete.   Due process cannot tolerate a prosecution for these charges, based on the nuanced interview questions asked years ago, which were pulled from a several-hours long interview, where neither the questions nor the answers were recorded or transcribed.   Greater specificity in the government's own records must be required before someone is allowed to face prison time for making allegedly false statements.

3.   The government's unexplained and prejudicial multi-year delay in charging Mr. Barrack also requires dismissal of all counts of the indictment.   The Section 951 charges are premised on acts that occurred intermittently in 2016 and 2017, and the false-statement and obstruction counts are premised on the 2019 interview that the government did not record.   Yet the government did not charge Mr. Barrack until July 2021.   The government offers no explanation for this delay beyond a boilerplate assertion that it was "investigating" the charges during that time, without identifying any actions it took from 2019 until the 2021 indictment.   This unsubstantiated assertion amounts to a bare plea that the Court should simply trust the government.   The Court should not.

4

Rather, because Mr. Barrack has shown specific, irreparable prejudice stemming from the government's unexplained and inexplicable delay, the Court should dismiss the indictment.

## ARGUMENT

### I.   THE SECTION 951 CHARGES MUST BE DISMISSED

The government does not dispute that the indictment fails to allege that Mr. Barrack owed a duty to his alleged former principal, the UAE; it simply contends that Section 951 does not require proof of a duty.  The government is incorrect.

#### A.   Section 951 Requires That The Government Allege Mr. Barrack Owed A Duty To A Foreign Government Or Official.

As Mr. Barrack explained in his opening motion, the text, common-law underpinnings, and statutory context all confirm that, to be an agent within the meaning of Section 951, a defendant must be subject to a *duty* to comply with the foreign principal's directions.  *See* Mot. 7-14.  A willingness or desire to help a foreign country or official is not enough.  *See id.*

##### 1.   *Statutory Construction Principles Confirm The Requirement Of A Duty.*

The government resists this conclusion by trotting out the same arguments that the Fourth Circuit rejected in *Rafiekian*.  Section 951 makes an individual criminally liable as an "agent of a foreign government" only if he "agrees to operate within the United States subject to the direction or control of a foreign government or official."  18 U.S.C. § 951(d).  As Mr. Barrack explained in his opening motion, an agreement to operate "subject to the direction or control of a foreign government or official" exists only where there is a *duty—i.e.,* where there has been a meeting of the minds that the foreign principal has the authority to instruct, direct, or command the defendant to take certain actions, and the defendant is "obligat[ed]" to act accordingly.  *See* Mot. 8-9 (citing Black's Law Dictionary (11th ed. 2019)).  Although the government here, as in *Rafiekian*, argues for an expansive definition of "agreement" that does not require proof of a duty, *see* Opp. 21;

5

*Rafiekian* Gov't Br. 35-39, the Fourth Circuit rightly rejected that "substantially more expansive construction" of the statute, *i.e.,* the notion "that a person becomes an 'agent' for the purposes of § 951 whenever he 'is willing to do something the foreign principal requests,'" *Rafiekian*, 991 F.3d at 539.

As in *Rafiekian*, the government also argues that Section 951's definition of agency does not incorporate the common-law requirement of a duty. *See Rafiekian* Gov't Br. 35-39; Opp. 25. The Fourth Circuit properly rebuffed that argument: "If [Section 951's] formulation rings a bell, it's because, under the common law, an agent is someone who agrees to 'act on [another's] behalf[,] subject to his control,' or at least not 'contrary to [his] directions.'" *Rafiekian*, 991 F.3d at 539 (quoting Restatement (Second) of Agency §§ 1, 14 cmt. a) (alterations in original); *see* Mot. 8-9. To be sure, the Fourth Circuit acknowledged that "there are bound to be some aspects of common-law agency that don't jibe with § 951's language and purpose." 991 F.3d at 539. But the requirement of a duty is not among them. Rather, the Fourth Circuit held that Section 951's definition "resonates with the common law's" in requiring "mutual assent" to the agency relationship and requiring *more* than that the agent be "willing to do something the foreign principal requests." *Id.* at 539-40 (citing Restatement (Second) § 1).

That leaves the government clinging to the notion that *Rafiekian* did not expressly use the word "duty." Opp. 25. But a duty by any other name is still a duty: *Rafiekian* held that Section 951 liability can exist only if there is an agreement to act "subject to [another's] control, or at least not contrary to [his] directions." 991 F.3d at 539 (second alteration in original). That *is* a duty, as the Restatement provisions cited in *Rafiekian* make clear: In an agency relationship, "the agent is subject to a *duty* not to act contrary to the principal's directions." Restatement (Second) of Agency § 14, cmt. a (emphasis added); *see id.* § 1, cmt. c ("Reciprocal duties between the parties together

6

with a power of the agent to bind the principal are normally created at the time of the agreement," even if "there is no binding contract between the parties.").[2]

Nor is there any merit to the government's argument—which was likewise rejected in *Rafiekian*, *see* 991 F.3d at 539—that the context and history of Section 951 warrant a "broad" construction of the statute, *see* Opp. 13-18. Congress may have "'intended to paint with a broad brush' when it enacted § 951," but that intent cannot override the plain language of the statute. *Rafiekian*, 991 F.3d at 539 (quoting Gov't *Rafiekian* Br. 39). Additionally, Congress knew how to adopt a truly "sweeping definition of 'agent,'" and did so "in the Foreign Agents Registration Act, which includes far-reaching verbiage that § 951 lacks." *Id.* That Congress did not use FARA's broad definition of agency in Section 951 counsels in favor of a *narrower* construction, not a broader one. *See* Mot. 11.

Finally, the cases the government cites to suggest that Section 951 does not require proof of a duty, *see* Opp. 22-24, do not stand for that proposition. None of the defendants in those cases argued that a duty was required—and thus the courts had no reason to address the issue.

Nor are the facts in those cases inconsistent with a duty requirement. In *United States v. Heine*, 151 F.2d 813 (2d Cir. 1945), for example, the defendant challenged the sufficiency of the evidence to show his guilt of violating Section 951's predecessor, 22 U.S.C. § 233. He conceded that he was employed by—*i.e.,* he owed a duty to—a German corporation, for which he collected

---

[2] The government is also wrong that the concept of a "duty to comply is illogical in this context" because "no duty can arise from" an illegal agreement. Opp. 25 n.8. It is the government's argument that is illogical—after all, Section 951 indisputably requires an agreement. Moreover, the statute condemns not the agreement, but the failure to notify the Attorney General of the agreement. *See* Opp. 21 (Section 951 "speaks of an agreement"); 18 U.S.C. § 951(d). And under the government's theory, no agreement could ever exist because it would be contrary to law, and illegal agreements are unenforceable. *See, e.g.*, *United States v. Bonanno Organized Crime Fam. of La Cosa Nostra*, 879 F.2d 20, 28 (2d Cir. 1989) ("Under both federal and state law, illegal agreements, as well as agreements contrary to public policy, have long been held to be unenforceable and void.").

information about the U.S. automobile and airplane industry.   151 F.2d at 814-15.   But he
challenged the lack of direct evidence that the corporation was controlled by the German Reich,
as required to show that the defendant was acting subject to the direction and control of a foreign
government or official.  *Id.* at 817.  The Second Circuit held that there was enough "circumstantial
proof" of a connection between the corporation and the Reich.  *Id.*  In other words, the issue in
*Heine* was not whether the government had proved that the defendant owed a duty at all—which
the defendant conceded—but only whether the government had proved that he owed a duty to a
foreign government (rather than a foreign corporation).

The government's other authority fares no better.  Some addressed only principles that are
irrelevant here.  *United States v. Butenko*, 384 F.2d 554 (3d Cir. 1967), *vacated on other grounds
by Alderman v. United States*, 394 U.S. 165 (1969), held only that a formal "contractual
relationship between" the defendant and the foreign principal was not required, *id.* at 565-66—a
point Mr. Barrack does not dispute.  In other cases the government cites, the defendants received
compensation for fulfilling directives from a government official—factual allegations that show a
duty and that are lacking here.  *See United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005);
*United States v. Chung*, 633 F. Supp. 2d 1134, 1140, 1142 & n.9 (C.D. Cal. 2009); Superseding
Indictment (Dkt. 53) ¶¶ 24, 27(b)-(c), (e), *United States v. Abouammo*, No. 19-CR-621 (N.D. Cal).
There has also been no ruling on the adequacy of the allegations in *Abouammo*, as the defendants
never challenged them.  *See also infra* Part I.C.1 (distinguishing remaining authority cited at Opp.
22-24).

> 2.    *The Cases That Have Allowed Section 951 Charges To Survive A Motion
>        To Dismiss Are Distinguishable.*

The government points to other courts that have allowed indictments charging offenses
under 18 U.S.C. § 951 to survive motions to dismiss.  *See* Opp. 10-12.  But those indictments were

different from the one here: They involved allegations of an *express* agreement to operate as the agent of a foreign principal,[3] or some form of compensation to the alleged agent from the foreign principal—which reflects the existence of the type of agency relationship required by Section 951.[4] Additionally, the defendants did not challenge their Section 951 charges on the same grounds that Mr. Barrack now raises, so the courts had no cause to address the merits of the issues before the Court now.[5]

Certain of these indictments may have been "bare-bones," *United States v. Lindauer*, 2004 WL 2813168, at *1 (S.D.N.Y. Dec. 6, 2004). But that does not help the government. As Mr. Barrack explained in his opening motion, where an indictment goes beyond bare-bones allegations, "the indictment fails to state an offense" if the more detailed "facts that are alleged fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." Mot. 35 (quoting *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012)). Because the government's indictment in this case, as the government itself stresses, "goes far beyond the limited legal requirements of tracking the statutory language and identifying the time and place of the offense," Opp. 12, the Court must assess whether its more detailed allegations are consistent with the charged Section 951 offenses. The government never even cites *Huet*, much less tries to distinguish it. And *Huet* continues to have ongoing vitality, including in the Second Circuit. *See, e.g.*, *United States v. Bronson*, 2007 WL 2455138, at *7 (E.D.N.Y. Aug. 23, 2007) (dismissing count that "tracks the

---

[3] Superseding Indictment (Dkt. 77) ¶¶ 6, 18, *United States v. Hu Ji*, No. 21-cr-265 (E.D.N.Y.); Superseding Indictment (Dkt. 141) ¶ 22, *United States v. Rafiekian*, No. 18-cr-457 (E.D. Va.) .

[4] Second Superseding Indictment (Dkt. 87) ¶¶ 5, 12, *United States v. Ying Lin*, No. 15-cr-601 (E.D.N.Y.); *United States v. Lindauer*, 2004 WL 2813168, at *1-2 (S.D.N.Y. Dec. 6, 2004); *United States v. Lindauer*, 448 F. Supp. 2d 558, 560 (S.D.N.Y. 2006); Indictment (Dkt. 32) ¶ 10, *United States v. Ji Chaoqun*, No. 18-cr-611 (N.D. Ill); Superseding Indictment (Dkt. 42) ¶ 15, *United States v. Dumeisi*, No. 03-cr-664 (N.D. Ill.).

[5] *See* Mot. to Dismiss (Dkt. 191) 6-17, *United States v. Rafiekian*, No. 18-cr-457; Mot. to Dismiss (Dkt. 30) 8-9, *United States v. Amirnazmi*, No. 08-cr-429 (E.D. Pa.); Mot. to Dismiss (Dkt. 36) 11-13, *United States v. Ho*, 3:16-cr-46 (E.D. Tenn. Nov. 30, 2016).

language of [the statute] and sets forth its elements," but the "crime alleged to have been committed is not viable under any legal theory"). And just last month, in *United States v. Patel*, 2022 WL 500567 (D.N.J. Feb. 18, 2022), the court cited *Huet* in dismissing an indictment that "track[ed] the statutory language," but alleged "facts" that did not "violate the statute," as the statute was construed by the court. *Id.* at *7-11.

Falling back, the government quibbles, *see* Opp. 12-13, with some of the other case law that Mr. Barrack cited to support the banal proposition that the factual allegations in the indictment must be consistent with the essential elements of the charged offense, *see* Mot. 15 (citing *United States v. Pimenta*, 2015 WL 6502098, at *5 (D.N.J. Oct. 27, 2015); *United States v. Webb*, 24 F. Supp. 3d 432, 435 (M.D. Pa. 2014)). The government contends that *Pimenta*—which dismissed an indictment because its factual allegations did not show the defendant was an agent of a bank, *see* 2015 WL 6502098, at *5—is irrelevant because the bank-bribery statute contained no definition of "agent," whereas Section 951(d) does. *See* Opp. 12-13. But this is a distinction without a difference: The *Pimenta* court assumed that "agent" took its common-law definition, such that "agency exists if the principal has the right to control the agent's performance." 2015 WL 6502098, at *4. In other words, the *Pimenta* court was assessing the sufficiency of an indictment to allege a form of agency materially identical to the form of agency required by Section 951—*i.e.,* one that exists if the agent "agrees to operate . . . subject to the direction or control of" the alleged principal. 18 U.S.C. § 951(d). And *Pimenta* held that the indictment's allegations fell short because the government did not "allege facts supporting that [the alleged agent] was acting on behalf of [the alleged principal] or that [the alleged agent] was subject to the control of [the alleged principal]." 2015 WL 6502098, at *4. So too here: Because the government has failed to

allege facts showing that agency relationship, and because such an agency relationship is a required element of a Section 951 offense, the indictment against Mr. Barrack must be dismissed.[6]

### 3. Section 951 Should Be Construed To Require Proof Of A Duty To Avoid Overbreadth Problems.

As Mr. Barrack explained in his opening motion, the Court should also construe Section 951 to require proof of a duty to avoid serious constitutional questions. *See* Mot. 12-14. Otherwise, the statute would "punish a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep." Opp. 48 (quoting *United States v. Farhane*, 634 F.3d 127, 136 (2d Cir. 2011)). The government's own cited authority recognizes as much: A broad construction of Section 951 threatens "so drastic a repression of the free exchange of information" that "it is wise carefully to scrutinize." *Heine*, 151 F.2d at 815.[7] And Mr. Barrack has provided multiple examples of routine, First Amendment activity that would be criminalized if Section 951 were construed not to require proof of a duty. *See* Mot. 13. As he explained, anytime a U.S. citizen advocates for the interests of a foreign power—for example, the interests of the Vatican or Israel, or the interests of Ukraine or Russia—engaging in that First Amendment-protected speech could risk violating Section 951.

The government does not directly address those examples, nor does it dispute that Section 951 criminalizes that conduct if interpreted not to require a duty. Instead, the government says

---

[6] Although the government notes that *United States v. Sittenfeld*, 522 F. Supp. 3d 353 (S.D. Ohio 2021), declined to dismiss the indictment in that case despite the defendant's citation to *Pimenta* and *Webb*, *Sittenfeld* is inapposite. There, the district court concluded that the factual allegations were sufficient to state (non-Section 951) offenses; the offenses at issue did not require an allegation of agency. *Id.* at 367. As to *Sittenfeld*'s suggestion that *Pimenta* and *Webb* are contrary to Sixth Circuit authority and *Huet*, the district court never explained the tension. To the extent *Sittenfeld* meant to suggest that Sixth Circuit authority blesses indictments that "failed entirely to allege facts relating to essential elements of the charged offenses" or "to the extent they alleged such facts, those facts were conclusory," *id.* at 366-67, that is certainly not the law in the Second Circuit, *see* Mot. 14.

[7] Although this part of the *Heine* opinion addressed the non-Section 951 charges, the conduct on which the Section 951 charges were premised is the same.

11

that is not "the type of conduct the statute is *designed to* prohibit," Opp. 49 (emphasis added), that "the majority of potential applications of Section 951 fit comfortably within constitutional bounds," Opp. 49-51, and "the First Amendment is not implicated" by Section 951 because that statute "regulates conduct . . . not speech," Opp. 49.  Each of these arguments is fatally flawed.

*First of all*, it does not matter whether the Department of Justice's current view of Section 951 is that it does not support prosecutions based on protected First Amendment activity.  "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*," and courts will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly."  *United States v. Stevens*, 559 U.S. 460, 480 (2010).  What matters is what the law prohibits.  *See, e.g.*, *Marinello v. United States*, 138 S. Ct. 1101, 1108 (2018) (rejecting government's interpretation of tax statute because it would criminalize paying babysitters in cash and "leav[ing] a large cash tip in a restaurant," without asking whether any such prosecutions had been brought); *United States v. Kozminski*, 487 U.S. 931, 949 (1988) (rejecting government interpretation of statute that would allow prosecution of parents for "threatening [to] withdraw[] affection" from their children, without asking whether any such prosecutions had been brought).

In any event, Section 951 is routinely used to prosecute First Amendment activity.  This case is a prime example:  The Section 951 charges against Mr. Barrack center on his meetings with friends and colleagues, advice to the President, and public statements on foreign-policy issues— which the indictment fails to mention Mr. Barrack had voiced long before the alleged agency relationship arose.  *See, e.g.*, Indictment ¶¶ 18-23, 24, 43-50, 79-85.  Nor is this case an outlier. The defendant in *Rafiekian* was prosecuted for an op-ed he placed and a documentary he planned to make.  991 F.3d at 534-35.  The prosecution in *United States v. Dumiesi*, 2003 WL 22757747

(N.D. Ill. Nov. 20, 2003), was based in part on the defendant's printing of newspaper articles. *Id.* at *1. And the defendant in *United States v. Amirnazmi*, 2009 WL 32481 (E.D. Pa. Jan. 5, 2009), was prosecuted for paying for the printing of materials to promote his software, among other activities. *See id.* at *2. The defendants in these cases did not argue that construing Section 951 to require proof of a duty was necessary to prevent chilling First Amendment activity, so these courts had no occasion to consider the arguments that Mr. Barrack now raises. But the cases show that the government routinely deploys Section 951 to prosecute individuals for their First Amendment-protected actions.

*Second*, it is irrelevant that *some* past prosecutions under Section 951 did not implicate First Amendment activity. What matters is whether Section 951 would raise serious constitutional issues in any of "the statute's applications." *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005) (due process); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (free speech); *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 499-504 (1978) (religious liberty). As the previous paragraph shows, that is exactly what a broad construction of Section 951 does—particularly if that broad construction does not require proof of a duty to the defendant's alleged foreign principal. Under that broad view of the law, an individual (like Mr. Barrack) may be criminally liable for voicing positions that align with those of a foreign government or official.

*Third*, the government cannot defend the charges in this case by arguing that Section 951 criminalizes conduct, not speech. Although the statute imposes criminal penalties premised on a failure to notify the Attorney General, the notification requirement applies only where someone engages in a purported agency relationship, which could entail exercising First Amendment freedoms. Just as a requirement to file a notice before holding a protest would implicate First Amendment freedoms, so too does Section 951's notice requirement implicate those same

freedoms.  *See, e.g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) (permit for parade);
*Kunz v. New York*, 340 U.S. 290 (1951) (permit for street meeting); *Saia v. New York*, 334 U.S.
558 (1948) (permit for use of amplifying device).  In fact, the government itself has recognized
the potential for similar notification requirements to violate First Amendment rights if construed
broadly.  For example, in the FARA context, Department of Justice guidance provides that "FARA
does not require registration simply because a person expresses views that are favorable to or
coincide with the interests of a foreign country or a foreign person.  And the First Amendment
protects the rights of U.S. persons to express such views."[8]

Although two courts have rejected overbreadth challenges to Section 951, *see* Opp. 50-51,
those specific challenges do not foreclose Mr. Barrack's arguments here.  The Fourth Circuit in
*United States v. Hung*, 629 F.2d 908 (4th Cir. 1980), held only that the term "agent" was "readily
understandable," without specifying whether that readily understandable definition entailed a duty,
*see id.* at 920—as Mr. Barrack argues is necessary to save Section 951 from being constitutionally
overbroad.  Similarly, the defendant in *United States v. Ji Chaoqun*, 2020 WL 1689826 (N.D. Ill.
Apr. 7, 2020), did not argue that proof of a duty between the agent and principal was required to
save Section 951 from overbreadth.  The court upheld and applied the statute against the defendant
simply because he had not addressed the statutory text or shown that a "substantial portion of the
cases" prosecuted under it criminalize protected First Amendment activity.  *Id.* at *3.  Mr.
Barrack's statutory overbreadth argument, however, explains why the statutory text does not cure
the overbreadth problem and demonstrates how Section 951—if interpreted not to require a duty—
can (and does) yield prosecutions that infringe on First Amendment freedoms.

---

[8]  U.S. Dep't of Justice, *The Scope of Agency Under FARA*, https://www.justice.gov/nsd-fara/page/file/1279836/download (May 2020).

Finally, to the extent any doubt about the proper construction of Section 951 remains, the rule of lenity commands that the doubt be resolved in Mr. Barrack's favor. *See* Mot. 14. The government never even mentions the rule of lenity, much less rebuts its application here.

## B.    The Indictment Does Not Plead That Mr. Barrack Owed A Duty To The UAE.

The government next contends that, regardless of whether Section 951 requires a duty, its Section 951 charges should survive this motion to dismiss because the indictment parrots the language of the statute. Opp. 8-9. The government is incorrect.

"In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Carll*, 105 U.S. 611, 611-13 (1881); *see also, e.g.*, *Russell v. United States*, 369 U.S. 749 (1962) (holding that indictments should have been dismissed because they failed to allege an element that was implicit in the statutory language, but which the Court construed the statute to require the government to prove); *United States v. Sherin*, 1987 WL 6146, at *8 (S.D.N.Y. Jan. 28, 1987) (same). In the context of this case, this authority dictates that an indictment charging a Section 951 offense must allege every essential ingredient of that offense— including that the defendant owed a duty to a foreign government or official.

It is no substitute for the government to reiterate various deficient factual assertions in the indictment, apparently hoping that some quantity of detail will foreclose the need for legally sufficient allegations. *See* Opp. 16 (citing Indictment ¶¶ 19, 22, 56-57, 60, 65, 67, 69, 71-74, 76-77, 81-82, 84-86); *id.* 26 (citing Indictment ¶¶ 20, 24(d), 78); *id.* 58-59 (citing Indictment ¶¶ 14-24, 35-42, 54, 60-62, 66, 76-77). For example, while the indictment alleges that Mr. Barrack spoke positively about the UAE in the media, *see* Indictment ¶ 24, those allegations do not show he was

15

the UAE's agent, *see* Mot. 7.  Otherwise, a U.S. citizen could never speak positively of a foreign government or its objectives without running afoul of Section 951, and could not flatter himself when he did so, *see* Indictment ¶ 24(d)—a result that would clearly run afoul of the First Amendment, *see supra* 11-14.  Similarly, the indictment alleges that UAE officials asked Mr. Barrack for information about certain U.S. officials, *see* Indictment ¶¶ 54, 56, and informed Mr. Barrack of certain UAE objectives, *id.* ¶¶ 57, 60-62, 65, 71-74, 81-87, but there is no allegation Mr. Barrack agreed to advance these objectives or complied with the UAE's requests, *see* Mot. 7, 17-18.  Merely receiving requests from a third party does not show a duty to act subject to the third party's direction or control; "mutual assent" to the agency relationship is required.  *See Rafiekian*, 991 F.3d at 539.

The remaining allegations highlighted by the government fare no better.  The indictment alleges that Mr. Barrack's contacts in the Middle East sought his views about President Trump and understood him to be knowledgeable about and personally familiar with the President, *see* Indictment ¶¶ 14-17; that Mr. Barrack "asked for feedback" from Mr. Al Malik on a speech for Mr. Trump—while soliciting feedback from others, including U.S. officials, *id.* ¶¶ 18-23; that Mr. Al Malik described himself and Mr. Barrack as "heroes" for commenting on the draft speech, *id.* ¶ 20;[9] and that Mr. Barrack facilitated introductions between UAE officials and U.S. officials, *see id.* ¶¶ 66, 67, 69, 76, 77.  None of these actions shows that Mr. Barrack agreed to operate subject to the UAE's direction and control.  *See* Mot. 18, 23-24.  Nor do the allegations that those *other than* Mr. Barrack communicated about having a dedicated phone or secure messaging application. *See* Indictment ¶ 35-42; Mot. 34-35.  And, in any event, the allegation that certain defendants used

---

[9] Similarly, the indictment's allegation that Mr. Al Malik described Mr. Grimes as a "hero" of UAE officials, Indictment ¶ 78, hardly shows that Mr. *Barrack* had a duty to the UAE.  *Contra* Opp. 26.

16

particular methods to communicate does not plead that they owed a duty to a principal.  Otherwise, anyone who followed an international friend's instruction to download an application that allows for reduced-fee, overseas communication (such as Skype or WhatsApp) would be liable under Section 951 if their friend happened to be a foreign official.

### C.    If Applied To Mr. Barrack's Conduct, Section 951 Is Unconstitutionally Vague.

If Section 951 were nevertheless construed to cover Mr. Barrack's alleged conduct, the statute would be unconstitutionally vague as applied to him, and that vagueness would require dismissal of Counts 1 and 2.  "[W]hen examining laws that impose criminal penalties," courts in this circuit apply a "more stringent" vagueness analysis "because the consequences of imprecision are qualitatively more severe" than they are in civil matters.  *Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2d Cir. 2007).  A criminal statute must meet two criteria to survive an as-applied vagueness challenge:  It must (1) set clear standards such that it does not "authorize and even encourage arbitrary and discriminatory enforcement" *and* (2) "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits."  *City of Chi. v. Morales*, 527 U.S. 41, 56 (1999) (plurality op.); *see* Mot. 20-21.  Neither requirement is satisfied here.

#### 1.    Section 951 Authorizes And Encourages Arbitrary Enforcement.

Section 951's text does not set standards clear enough to eliminate the risk of enforcement based on a government official's "personal predilections," *Smith v. Goguen*, 415 U.S. 566, 575 (1974).  As Mr. Barrack explained, Section 951 could be interpreted to impose criminal liability on a U.S. citizen who befriends a foreign official and, at the foreign official's request, agrees to drive the official's car around the block once a month to keep the battery from dying.  Mot. 22. The government dismisses this example as nothing more than a hypothetical, Opp. 59 n.22, failing to grapple with the heart of Mr. Barrack's argument: that Section 951's use of vague terms such

17

as "agrees to operate" and "subject to the direction and control" invites arbitrary enforcement. Mot. 22.

Indeed, the government itself has recognized that Section 951's application is unclear.  The Department of Justice's Office of the Inspector General has noted that Section 951 and FARA are often "mistaken[ly] conflat[ed],"[10] and that government officials do "not have a common understanding of . . . the relationship between FARA and 18 U.S.C. § 951.  It is [the National Security Division]'s opinion that a key difference between FARA and 18 U.S.C. § 951 is that FARA covers agents of foreign principals who engage in political activity on behalf of that principal, while 18 U.S.C. § 951 covers agents of foreign governments who engage in non-political activity, such as 'espionage-lite' or clandestine behavior."[11]  That interpretation is different than the one the Department of Justice now offers—*i.e.,* that Section 951 is not limited to espionage-like behavior, *see, e.g.*, Opp. 14-15, 63-64.  The government may try to discount its prior interpretation of Section 951 as the view of merely "one Department of Justice official."  Opp. 15 n.3 (discussing a different Department of Justice official's similar interpretation of the statute). Yet the government provides no explanation why a "person of ordinary intelligence" would be able to discern the murky outer boundaries of Section 951 better than a lawyer tasked by the government with administering the statute.  That is particularly true given that the Department of

---

[10] Office of the Inspector General, U.S. Dep't of Justice, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act* 30 (Sept. 2016), https://oig.justice.gov/reports/2016/a1624.pdf.

[11] *Oversight of the Foreign Agents Registration Act and Attempts to Influence U.S. Elections: Lessons Learned from Current and Prior Administrations*, U.S. Sen. Comm. On the Judiciary 2 (July 26, 2017) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

Justice has opined in other cases that no agency relationship exists, even under FARA's broader definition of agency, in circumstances analogous to those here.[12]

The government fares no better in pointing to cases rejecting vagueness challenges to Section 951 charges in different settings.  In *Lindauer*, for example, the defendant argued only that Section 951 was unconstitutional because it was facially vague and did not include an express scienter requirement, 2004 WL 2813168, at *4-5—an argument Mr. Barrack does not raise. *United States v. Duran*, 596 F.3d 1283 (11th Cir. 2010), considered only whether Section 951 was vague as applied to the facts of that case, *id.* at 1290, which are markedly different from those here—including because the defendant was formally employed by a corporation controlled by a foreign government, *id.* at 1287.  And *Hung* held that the word "agent" in itself was not vague or overbroad because it is "readily understandable," 629 F.2d at 919-20, without explaining what that "readily understandable" word entails or whether it entails a duty.  *Hung* also construed the 1977 version of the statute—which the government itself recognized contemporaneously was "very unclear" because the statute "does not contain a definition of the activity which requires registration."  Mot. to Dismiss, Ex. 1 (Dkt. 173-2) 1, *United States v. Maionica*, No. 1:07-cr-20999 (S.D. Fla. June 20, 2008) (February 9, 1976 letter from the State Department to the Attorney

---

[12] *See* Nat'l Security Division, U.S. Dep't of Justice, Advisory Opinion (Oct. 22, 2020) (president of global consulting firm who wrote articles about foreign official and solicited that official's input on the article before publication did not need to register); Nat'l Security Division, U.S. Dep't of Justice, Advisory Opinion (Mar. 18, 2020) (individual had no duty to register where he engaged in dialogue with international organization "in furtherance of a specific request made by the United States, through" the State Department); Nat'l Security Division, U.S. Dep't of Justice, Advisory Opinion (Feb. 13, 2018) (organization had no duty to register where it encouraged U.S. officials to meet with foreign government officials to assist in the release of an individual incarcerated by the foreign government).

General).  Mr. Barrack distinguished this authority in his opening motion, *see* Mot. 24-25, and the government offers no response to those arguments.[13]

Retreating from this case law, the government argues that—even if Section 951 does not provide clear standards—Section 951 is not unconstitutionally vague because Mr. Barrack's alleged conduct falls squarely within the statute's prohibition.  *See* Opp. 63-64.  But the proof is in the prosecutions:  As discussed above, there has never been another Section 951 case like this one, where the government seeks to hold an individual liable who received no compensation for publicly articulating his foreign-policy positions, which sometimes happened to align with the interests of his alleged foreign principal and sometimes did not, *see supra* 8-10—and which *always* aligned with U.S. objectives, and were vetted, discussed, and often sought out by high-ranking U.S. officials.  *See* Mot. 25-26.  The alleged conduct here falls especially outside the bounds of the statute's "core prohibition" because all agree that the White House was well aware of Mr. Barrack's contact with UAE officials.  *See* Mot. 22 & n.10; Indictment ¶ 74 (alleging a text message from Mr. Barrack stating that President Trump "had discussed appointing Barrack as either United States Ambassador to the United Arab Emirates or as Special Envoy to the Middle East").

---

[13] *See also Ji Chaoqun*, 2020 WL 1689826, at *4 (rejecting an as-applied vagueness challenge that "fail[ed] because" the defendant—unlike Mr. Barrack here—did "not articulate any basis on which the statute is vague or standardless as to him"); Mot. to Dismiss (Dkt. 191) 17-21, *United States v. Rafiekian*, No. 18-cr-457 (E.D. Va.) (arguing that Section 951 was vague as applied to the defendant—an argument that necessarily depends on the particular allegations in the indictment); *United States v. Latchin*, 2005 WL 8160638, at *2 (N.D. Ill. July 26, 2005) (rejecting defendant's "facial" vagueness challenge, which argued only that the Section 951 count was deficient "because it does not provide the dates of [the defendant's] alleged communications, the identities of the [foreign] officers with whom he met or communicated, or the dates he traveled overseas and/or received payment").

2.      *The Text Of Section 951 Failed To Give Mr. Barrack Adequate Notice That His Alleged Conduct Was Proscribed.*

Separately, the text of Section 951 fails to give a person of ordinary intelligence adequate notice that Mr. Barrack's alleged conduct is prohibited.  As explained above and in Mr. Barrack's opening motion, none of Mr. Barrack's alleged activities could reasonably have been said to involve his "agree[ment] to operate . . . subject to the direction or control" of the UAE.  18 U.S.C. § 951(d); *see supra* 15-17; Mot. 23-24.  The government responds by mischaracterizing a series of allegations in the Indictment.  Opp. 58-59.  First, the government asserts that Mr. Barrack, "at the direction of the UAE," inserted favorable language into a policy speech delivered by then-candidate Trump.  Opp. 58.  But the indictment itself states simply that Mr. Barrack, without being prompted, simply "asked for feedback" on the speech—not that he was in any way ordered to implement the UAE's preferences.  Indictment ¶ 18.  Second, the allegations regarding coordination with UAE officials, *see id.* ¶¶ 14-17, 24, 35-42, 60-62, provide no factual basis for an agreement between Mr. Barrack and UAE officials that the former would operate *as a UAE agent*.  *See supra* 15-17.  Similarly, Mr. Barrack's alleged willingness to share information on presidential appointments, Indictment ¶ 54, and to arrange a meeting between senior White House and UAE officials, *id.* ¶¶ 76-77, signals nothing more than that he was willing to act on requests from the UAE when they independently overlapped with his or the United States' interests.  But acting on another's request is not tantamount to agreeing to operate subject to that person's direction or control.  *See supra* 5-6.  And the indictment alleges, at most, that Mr. Barrack's actions were taken in response to *requests* from UAE officials.  *See* Opp. 59 (noting an arranged phone call between President Trump and a senior UAE official "at the request of UAE officials").  No person of ordinary intelligence would read Section 951 as prohibiting Mr. Barrack's alleged

21

conduct—*i.e.,* occasional acquiescence to UAE requests, occasional inaction on such requests, and occasional action contrary to such requests.

In the end, perhaps the best evidence of the statute's indeterminacy, as the government would have this Court construe it, is that the government never offers any definition of what it means to "agree[] to operate . . . subject to the direction or control" of a foreign agent.  18 U.S.C. § 951(d).  Faced with Mr. Barrack's argument that this statutory language requires proof of a duty, the government responds essentially with silence.  If the government is unable (or unwilling) to define the key terms of a statute, then an individual should not be deemed to have understood when he might have transgressed it.  Nor will there be any good way for the jury to make any such determination.

**D.    The Government's Late-Breaking Theories Of Liability Do Not Salvage The Indictment.**

In a last-ditch effort to save its Section 951 charges, the government points to general principles of criminal law that allow the government to prove a defendant's guilt of a substantive offense by showing he aided or abetted another's commission of the offense or by showing his liability under *Pinkerton*.  The indictment does not contain the allegations necessary to state an offense under these theories.

As an initial matter, Section 951 is best understood as a specific-intent crime, requiring knowledge of an obligation to register.  *See* Mot. 13; Grimes Mot. to Dismiss 10.  Here, the underlying conduct—having allegedly agreed to act in the United States as an agent of a foreign principal—is not inherently blameworthy.  Only a failure to register converts this otherwise "entirely innocent" conduct, *cf. Staples v. United States*, 511 U.S. 600, 614-15 (1994), into a criminal offense.  This Court should accordingly apply the "longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state

regarding 'each of the statutory elements that criminalize otherwise innocent conduct,'" *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019), and hold that a defendant can be convicted of a Section 951 offense only if he knew that agreeing to operate subject to a foreign government's direction or control required him to notify the Attorney General of the agency relationship. Because the indictment nowhere alleges such knowledge, it fails to allege that Mr. Barrack committed a Section 951 offense.

Even if Section 951 were a general-intent crime, the indictment would still be insufficient. The indictment nowhere alleges that Mr. Barrack knew that Mr. Grimes or Mr. Al Malik were agents, let alone unregistered agents, as would be required to hold Mr. Barrack liable as a principal under either aiding-and-abetting or *Pinkerton* theories of liability.

> 1. *The Indictment Fails To State A Section 951 Offense Under An Aiding-And-Abetting Theory Of Liability.*

An individual is liable for aiding and abetting a crime only if the scheme he furthered was an offense (or would have been an offense if consummated). *See* 18 U.S.C. § 2(a); *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 178 (6th Cir. 1992) (explaining that an aiding and abetting offense "doesn't exist without [the underlying substantive offense]"). In this context, that means that the government must show that Mr. Barrack aided or abetted Mr. Al Malik's or Mr. Grimes's commission of a Section 951 offense. Because an element of a Section 951 offense is that the defendant owed a duty to a foreign official, and because the indictment fails to allege that Mr. Grimes or Mr. Al Malik owed such a duty, *see supra* 15-17, the indictment never pleads a substantive Section 951 offense—and thus the Section 951 counts cannot be sustained on an aiding-and-abetting theory.

Even setting that issue aside, the indictment fails to plead that Mr. Barrack aided and abetted a Section 951 offense committed by Mr. Grimes or Mr. Al Malik because it never pleads

that Mr. Barrack knew that either of them was an agent or knew of their unregistered status.  "For the aiding-and-abetting theory of liability to apply, the underlying federal crime must have been committed by someone other than the defendant; and the defendant himself must either have acted, or have failed to act, with the specific intent of aiding the commission of that underlying crime." *United States v. McCoy*, 995 F.3d 32, 58 (2d Cir. 2021).  "An intent to advance some different or lesser offense is not, or at least not usually, sufficient:  Instead, the intent must go to the specific and entire crime charged."  *Rosemond v. United States*, 572 U.S. 65, 76 (2014); *see United States v. Prado*, 815 F.3d 93, 102 (2d Cir. 2016) (holding jury instructions "erroneous under *Rosemond* because they provide no instruction that the jury must find that the defendants had advance knowledge of the gun at a time that they could have chosen not to participate in the crime"); *United States v. Gyamfi*, 357 F. Supp. 3d 355 (S.D.N.Y. 2019) (holding prosecution had to prove defendant subjectively knew, in advance of attempted robbery, that there was genuine risk someone would be killed during the robbery in order to convict him of felony murder under aiding-and-abetting theory).

In the context of Section 951, then, a defendant can be guilty of the substantive offense under an aiding-and-abetting theory only if he knew in advance that one of his confederates planned to act as an agent of a foreign government or official *without providing the required notification to the Attorney General*.  After all, being an agent of a foreign government or official is not unlawful; a crime occurs only if the agent is unregistered.  *See* 18 U.S.C. § 951.  And if knowledge of the principal's unregistered status is not required to show aiding and abetting liability, a defendant could be guilty of aiding and abetting a Section 951 offense without any knowledge of the conduct that made the action illegal.  That is not the law.  *United States v. Gregg*, 612 F.2d 43, 51 (2d Cir. 1979) (for aiding-and-abetting counts, the defendant "must not only know

24

about the criminal nature of the other person's acts but (he must) share that evil purpose himself" (alteration in original)).

Because the indictment fails to plead that Mr. Barrack knew that Mr. Al Malik or Mr. Grimes were agents, let alone that he knew either one was an *unregistered* agent, it does not allege the mental state requisite to plead aiding-and-abetting liability for Mr. Barrack. As a result, this late-breaking theory of liability cannot save the government's pleading, and the Section 951 charges should be dismissed. *Cf. United States v. Sunia*, 643 F. Supp. 2d 51, 81 (D.D.C. 2009) (dismissing two obstruction-of-agency-proceedings counts because, although the counts tracked the statutory language, they failed to allege knowledge, which "is an essential element of the offense").

2. *The Indictment Fails To State A Section 951 Offense Under Pinkerton.*

The government similarly fails to save its Section 951 charges by arguing that they are adequate to state an offense under a *Pinkerton* theory of liability. The indictment does not plead the allegations necessary to state an offense under that theory. First, *Pinkerton* requires the government to allege all the elements of the offense that is the object of the conspiracy, *see, e.g.*, *United States v. Lloyd*, 947 F. Supp. 2d 259, 268-69 (E.D.N.Y. 2013)—which, in the context of Section 951, includes a duty to a foreign principal. Because the indictment does not plead that Mr. Barrack agreed that he, Mr. Grimes, or Mr. Al Malik would owe a duty to the UAE, the indictment fails to plead a necessary element of conspiracy and thus *Pinkerton* liability.

*Second*, "even *Pinkerton* liability . . . is premised on a mental state," and "does not dilute or erode the basic requirement that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Coplan*, 703 F.3d 46, 71 (2d Cir. 2012) (quoting *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004)); *see also, e.g.*, *United States v. Bruno*, 383 F.3d 65, 89-90 (2d Cir. 2004)

(defendants' convictions for obstruction of justice could not be sustained under *Pinkerton* theory because government provided inadequate proof of intent to commit underlying conspiracy); *Rodriguez*, 392 F.3d at 545 (explaining that conspiracy is a specific-intent crime).  Mr. Barrack could know of the scheme alleged in the indictment and knowingly join it only if he knew that Mr. Al Malik or Mr. Grimes was unregistered—which (again) the indictment never alleges.  For this additional reason, the indictment's allegations are inadequate to state a Section 951 offense under a *Pinkerton* theory of liability.  *See, e.g.*, *United States v. Graziano*, 616 F. Supp. 2d 350, 366-75 (E.D.N.Y. 2008) (granting directed verdict to defendant because the government's evidence of defendant's knowledge of alleged co-conspirator's planned crime was insufficient to sustain conviction under *Pinkerton* theory of liability); *United States v. Urrego*, 853 F. Supp. 646, 650-51 (E.D.N.Y. 1994) (similar).[14]

*Finally*, the *Pinkerton* rule "is unsound."  *United States v. Walton*, 2021 WL 3615426, at *4 (9th Cir. Aug. 16, 2021) (Watford, J., concurring), *pet. for cert. filed*, No. 21-7093; *see also, e.g.*, Alex Kreit, *Vicarious Criminal Liability and the Constitutional Dimensions of Pinkerton*, 57 Am. U. L. Rev. 585, 597-98 (2008) (noting that academics, the Model Penal Code, and LaFave's treatise on criminal law all reject *Pinkerton* liability).  The U.S. Supreme Court recently called for a response to the petition filed in *Walton*, indicating a willingness by at least one Justice to reconsider the viability of *Pinkerton*.  Although Second Circuit precedent currently forecloses this argument, Mr. Barrack raises it to preserve it for appeal.

---

[14] For the same reasons, the conspiracy charges against Mr. Barrack fail to the extent the government claims Mr. Barrack conspired to help Mr. Grimes or Mr. Al Malik violate Section 951.  Because the indictment nowhere alleges that Mr. Barrack knew they were unregistered, he could not have formed the intent necessary to conspire to help those principal offenders violate Section 951.

## II.    THE FALSE STATEMENT CHARGES MUST BE DISMISSED

### A.    Counts 3 Through 7 Must Be Dismissed Based On The Government's Intentional Failure To Make A Record.

In its opposition, the government does not dispute the facts raised in Mr. Barrack's motion to dismiss the false statement and obstruction counts.  Specifically, the government does not dispute that it chose not to record Mr. Barrack's June 20, 2019 interview, even though it knew about the interview weeks in advance and considered Mr. Barrack a target of its investigation.  Nor does the government dispute that it controlled the circumstances of the interview, which was attended by three FBI special agents and three federal prosecutors, and that *only one of the six government participants present at the interview* took any notes.  The government also makes no attempt to defend the fragmentary notes that were taken or deny that they do not reflect the specific questions asked or the specific answers that Mr. Barrack gave.  And the government does not contest that the FBI Form 302 memorandum documenting Mr. Barrack's interview was not completed until more than a month after the interview took place or that it included statements attributed to Mr. Barrack that do not appear in its agent's notes from the day of the interview.

Without disputing any of these facts, the government essentially argues that it is allowed to do what it did.  Opp. 43-46.  The government believes it can take isolated statements from a several-hours-long interview, assert that those statements were not accurate, and pursue multiple felony charges on that basis years after the interview took place, even where it failed to make a contemporaneous record of the questions or the defendant's responses.  To the government, the Court has no power to disturb charges brought under these circumstances, and a defendant has no safeguard against such practices short of a jury verdict of acquittal.

The relevant cases do not support the government's disturbing view of its authority.  Courts in this district and elsewhere have declined to permit the government to hold a defendant criminally

liable on felony false-statement and obstruction-of-justice charges where, as here, the circumstances that led to the "absence of a transcript of what was said" place that defendant in an "untenable situation" to defend himself. *United States v. Clifford,* 426 F. Supp. 696, 702 (E.D.N.Y. 1976); *see also United States v. Ehrlichman*, 379 F. Supp. 291, 292 (D.D.C. 1974) (finding that Section 1001 was improperly invoked where the government agent's "sketchy notes [did] not purport to be a verbatim record of either the questions or the answers at issue"). And contrary to the government's assertion, dismissing false-statement charges—which hinge on the precise words spoken and which the government here *chose* not to record or transcribe—is not only an appropriate motion for resolution pretrial, but a proper exercise of the Court's duty to ensure that deficient charges do not go to the jury. *United States v. Kerik*, 615 F. Supp. 2d 256, 277 (S.D.N.Y. 2009) (dismissing false statement counts pretrial).

Not surprisingly, the government's investigatory practices in this case directly contradict DOJ's own recommendations on recording and memorializing custodial interviews, and epitomize the concerns that the policy was designed to prevent. *See* U.S. Dep't of Justice, Justice Manual § 9-13.001; *see also* FBI Manual of Administrative Operations and Procedures (MAOP) 2007, R. 10-13.3(1l)(c). The government says this case is different because the interview was not custodial. Opp. 43, n. 15. But the same policy encourages recording in non-custodial settings too. *See* U.S. Dep't of Justice, Justice Manual § 9-13.001. And in contrast to the government's interview of Mr. Barrack, prosecutors and their agents in districts throughout the country regularly follow this guidance, choosing to record interviews with targets in non-custodial settings—including cases where, as here, the interviews took place at defense counsel's office.[15]

---

[15] *See, e.g.*, Opp. to Mot. to Suppress, Ex. 2 (Dkt. 47-2), *United States v. Fortenberry*, No. 21-CR-00491 (C.D. Cal.) (transcript of recorded voluntary interview conducted at defense attorney's office in false statements case); Deferred Prosecution Agreement (Dkt. 3) 6, *United States v. Arsan*, 21-CR-00159 (C.D.

The government resists dismissal on two grounds, neither of which is sufficient to save these counts.

*First*, the government poses a straw man to Mr. Barrack's challenge to Counts 3 through 7, arguing that the government is not required to record or fully transcribe an interview in order to bring false-statement charges.  Opp. 43-46.  But Mr. Barrack has not argued that these charges should be dismissed solely because the interview was not recorded or because there is no verbatim transcript.  Instead, Mr. Barrack seeks dismissal on the grounds that, despite having ample time and opportunity to prepare, the government deliberately created a situation where there would be no contemporaneous record of the questions asked or the answers given.  Mot. 28-33.  The government then exacerbated the prejudice it created when it delayed more than a month before finalizing the FBI-302 memorandum[16] (which included statements not reflected in the agent's

_____

Cal.) (DPA requiring defendant to participate in an "in-person, recorded interview" with prosecutors and the F.B.I.); Deferred Prosecution Agreement (Dkt. 4) 7, *United States v. Baaklini*, 21-CR-00160 (C.D. Cal) (same); Opp. to Mot. to Suppress, Ex. 1 (Dkt. 55-1), *United States v. Powers*, 19-CR-00213 (E.D. Va.) (transcript of recorded, non-custodial F.B.I. interview with defendant); Criminal Complaint (Dkt. 1) 47, *United States v. Claiborne*, No. 17-CR-00069 (D.D.C.) (defendant "participated in a voluntary interview" that "was recorded, and a transcript was subsequently made"); Criminal Complaint, Ex. 1 (Dkt. 1-1) 4, *United States v. Papadopoulous*, No. 17-CR-00182 (D.D.C.) (defendant "agreed to a voluntary interview" and the agents, "using an FBI recording device, taped the interview"); Opp. to Mot. for Custody Release, Ex. 1 (Dkt. 100-1), *United States v. Winner*, 17-CR-00034 (S.D. Ga.) (transcript of recorded, non-custodial F.B.I. interview with defendant); *United States v. Thompson*, 2017 WL 9325875, at *1-2 (W.D. Wis. Jan. 20, 2017) (noting that F.B.I. agents recorded a voluntary non-custodial interview with the defendant); *see also, e.g.*, *Leopold v. U.S. Dep't of Justice*, No. 19-CV-01278 (D.D.C.) (FOIA Releases 7, 11, and 16 containing FBI-302 memoranda of multiple voluntary interviews that were electronically recorded during the Special Counsel Investigation into 2016 election interference), https://vault.fbi.gov/special-counsel-mueller-investigation-records; Mot. in Limine, Ex. 1 (Dkt. 179-1), *United States v. Baca*, No. 16-CR-00066 (C.D. Cal) (transcript of April 2013 recorded voluntary interview conducted at defense attorney's office in false statements and obstruction case).

[16] While the government concedes that the July 19, 2019 "Date of Entry" of the FBI-302 memorandum was not finished until one month after the interview, the government argues that the agent abided by policy that requires such memoranda to be "effected within five days" because the "Date Drafted" was four days after the interview.  Opp. 43, n. 14.  The government is incorrect.  The FBI-302 memorandum is 23 pages long—if the agent only started the memorandum within the first five days, but did not complete the rest of the memorandum for a month, it complied with neither the letter nor spirit of the policy.  *See United States v. Brown,* 2011 WL 3678682, at *9 (W.D. Pa. Aug. 19, 2011) ("Under [FBI] policy, a special agent is expected

notes[17]) and then delayed more than two years before filing five felony charges based on this deliberately woeful record.  Mr. Barrack learned in July 2021, for the first time and while being held in a state prison, that the government believed he had made false statements during his four-hour June 2019 interview.  *Id*.

The government's pursuit of charges under these circumstances is meaningfully distinguishable from every other false-statements case that the government relies on in its opposition.  Opp. 43-44.  In *United States v. Sorich*, for example, the Seventh Circuit upheld a Section 1001 conviction based on the defendant's responses to questions during a voluntary interview that the government did not record.  523 F.3d 702 (7th Cir. 2008).  Unlike here, however, the case agent's notes in *Sorich* clearly documented both the government's question and the answer that made up the false statement conviction.  *Id*. at 716 (summarizing excerpts of the agent's notes showing that the questions and answers were contemporaneously documented).  In *United States v. Brandt*, the Seventh Circuit upheld a Section 1001 conviction based on unrecorded statements that the defendant made to F.B.I. agents during a voluntary interview regarding illegal arms trafficking.  546 F.3d 912 (7th Cir. 2008).  But unlike here, the interview in *Brandt* was not planned or scheduled, the government had articulable reasons to excuse its decision not to record, and the false-statement charges were filed within ten months of the interview.  *Id*. at 913-15.  Here, by contrast, the interview was scheduled well in advance, the government has no explanation for its

---

to memorialize interviews of witnesses on an FD-302 form within five days of the interview.").  That delay is particularly significant here, given the government's failure to otherwise document the actual questions or answers underlying the false statement counts.

[17] Count Five of the Indictment alleges that Mr. Barrack falsely stated at the interview that, among other things, he was "never asked to download any messaging application by anyone associated with the Middle East[.]"  Indictment ¶ 103.  While this statement appears in the FBI-302 memorandum that was finalized one month after the interview, that statement is not recorded anywhere in the contemporaneous notes taken by the agent at the interview.  Bowman Decl. ISO Mot. to Dismiss, Ex. 4 at 3.

failure to record, and the government inexplicably delayed bringing the charges for over two years. The government has not pointed to a single Section 1001 case involving circumstances like those here, likely due to the fact that the government has exercised its discretion in such cases not to proceed with legally unsound charges.

Where a defendant learns years after the fact that the government contends he made false statements during an earlier, lengthy interview, he is at a significant disadvantage defending himself against those accusations.  The government thus limited Mr. Barrack's ability to raise common and appropriate defenses to the false-statement charges, such as ambiguity of the questions or the literal truth of his answers.  Mot. 30-32.  The government counters that fundamental ambiguity and literal truth are factual issues to be resolved by a jury at trial.  Opp. 45. Not so.  Although the meaning Mr. Barrack ascribed to the government's questions and the truthfulness of his answers are ordinarily matters for a jury, Second Circuit courts have held that such issues should reach a jury only in the absence of "fundamental ambiguity or impreciseness in the questioning," and are otherwise properly decided as a matter of law.  *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986); *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir. 1976); *see also United States v. Watts*, 72 F. Supp. 2d 106, 109 (E.D.N.Y. 1999) (an answer to a fundamentally ambiguous question "may not, as [a] matter of law, form the basis of a prosecution for perjury or false statement").  "This proscription holds even where the answer is unquestionably false or fraudulent." *Kerik*, 615 F. Supp. 2d at 271 (holding that the determination of fundamental ambiguity is a question of law).

Even if the government were correct that fundamental ambiguity and literal truth are solely trial defenses (which they are not), that rule would lead to an absurd result in this case:  The government's failure to make a record, coupled with its unexplained two-year, pre-indictment

delay severely constrains Mr. Barrack's ability to challenge a question as ambiguous or demonstrate the literal truth of his answer.  The government makes no effort to explain how Mr. Barrack should mount these challenges, other than its flippant suggestion that, if Mr. Barrack wanted an accurate record of what was said, he should have taken it upon himself to record the interview.  Opp. 43, n. 15.  That suggestion turns the government's burden on its head:  It is the government's responsibility (consistent with DOJ policy) to create an adequate false-statements record and then "provide [the] information as to exactly what the false statements are, what about them is false, who made them, and how [the defendant] caused them to be made."  *United States v. Trie*, 21 F. Supp. 2d 7, 22 (D.D.C. 1998).  That is especially true here, where the government (and not Mr. Barrack) knew that he was a target of the investigation and had every reason to memorialize the statements made in the interview, but chose not to do so.  The government should not be rewarded for failing to create an adequate record, delaying two years, and then asserting for the first time (when Mr. Barrack had been arrested and was in custody) that it believed he had been untruthful during his interview.

The government's suggestion that Mr. Barrack will have "every opportunity" to explore ambiguity and literal truth at trial is also disingenuous.  Opp. 45.  In the same week it filed its opposition to this motion, the government also declined Mr. Barrack's repeated requests for basic discovery relating to the interview, including prior drafts of the FBI-302 memorandum, as well as revisions, comments, or changes to it, and even the identity of the agent who took the notes of the interview.  Bowman Reply Decl. ISO Mot. to Dismiss, Ex. 1.  The government thus appears to want it both ways: in one breath, it argues that the deficient record of the questions and answers underlying the false-statements counts should survive because Mr. Barrack can challenge those deficiencies (including ambiguity and literal truth of his answers) at trial.  Opp. 45.  In the next

breath, the government refuses to provide basic and fundamental discovery or turn over what little record it possesses regarding Mr. Barrack's statements at the interview.

*Second*, the government repeatedly highlights the unremarkable fact that the case agent's notes of the interview are fifty pages long, as if to demonstrate that the interview was in fact adequately documented. *See, e.g.*, Opp. 5, 43. But the length of the notes (which covered a four- or five-hour interview) is a red herring. What matters is whether the *specific portions of the notes related to the alleged false-statement charges* accurately captured and made a record of the government's questions and Mr. Barrack's responses. *See Ehrlichman*, 379 F. Supp. at 292 (entering judgment of acquittal for Section 1001 conviction where the defendant was "faced with the difficult task of arguing that his statements to the F.B.I. were literally true on the sole basis of the agent's sketchy notes, which do not purport to be a verbatim record of either the questions or the answers at issue"). They do not, a fact the government does not and cannot dispute. *See* Bowman Decl. ISO Mot. to Dismiss, Ex. 4.

The fundamental problem with the agent's notes is not limited to one or even two counts either. For every count, the agent's notes subjectively combine the question and answer into a single assertion, wholly devoid of the actual questions asked and answers given. Mot. 30-32 (citing examples of case agent's subjective combination of actual words used for Counts 4 and 6 into single assertions). But the actual words used in the question, as well as those used in Mr. Barrack's responses, are crucial to his ability to vindicate himself. The Court should therefore not permit a jury to render a verdict on a charge where it is clear (before trial) that the jury will not have what it needs to decide guilt or innocence and where the false-statement and obstruction charges are deficient as a matter of law.

33

**B.      Count 5 Must Be Dismissed For Failure To State An Offense.**

Count 5 must be dismissed for the independent reason that it recites extensive and specific facts that do not, when taken as true, allege a necessary element of a Section 1001 offense: knowledge of falsity.  Mot. 34-35.  For Count 5, the indictment cites boilerplate language from the statute and a number of communications (but none involving Mr. Barrack) to purportedly establish that he intentionally and falsely stated that he "was never asked to download any messaging application" and "never had a dedicated telephone to communicate with anyone in the Middle East."  Indictment ¶ 103.  But out of all the communications alleged in the indictment, the government *does not allege a single communication with Mr. Barrack* regarding the secure messaging application or dedicated telephone.  Mot. 34 (citing Indictment ¶¶ 35-42).  These allegations accordingly do not plead any false statement.  *See Huet*, 665 F.3d at 595 (when an indictment goes beyond reciting the elements of the offense and relies on particular factual allegations, the court has a duty to dismiss the charges if those allegations are legally insufficient to state an offense); *supra* 9-11 (citing *Patel*, *Pimenta*, and *Webb*).

The government's opposition relies on inapplicable authority and misconstrues the facts alleged in its own indictment.

*First*, the government cites authority that stands for the uncontroversial proposition that, in general, an indictment is sufficient as long as it includes "pro forma" language from the statute. Opp.  46-47.  This may be enough to satisfy the requirement that an indictment contain a "plain, concise and definite written statement" of the charged offense, *see* Fed. R. Crim. P. 7, but "[t]hat is not the end of the inquiry."  *Patel*, 2022 WL 500567, at *7.  Instead, where the government has articulated specific facts in support of the charged offense, the "facts plead in the indictment that form the basis for the offense must violate the statute" as a matter of law.  *Id*.; *see also Webb*, 24 F. Supp. 3d at 440 (rejecting government argument that the court's review of the specific facts

34

alleged in the indictment was "based on the sufficiency of the evidence, not on the sufficiency of the government's pleading").  The facts alleged in support of Count 5 plainly fail that test.

*Second*, the government argues that dismissal is inappropriate because the government intends to present "significant additional evidence at trial" for each of the counts in the indictment. Opp. 47.  But that does nothing to cure the defect in Count 5.  Count 5 is defective because, while the government cites text messages and emails involving people *other than* Mr. Barrack regarding an encrypted application and mobile device, the pleaded facts, even taken as true, do not establish Mr. Barrack's knowledge of falsity that is necessary to sustain a Section 1001 offense as a matter of law. Mot. 34-35.  To the contrary, the indictment cites a number of communications from Mr. Barrack to Mr. Grimes, Mr. Al Malik, and UAE officials that were apparently made without use of any secure or encrypted applications for well over a year after the alleged communications regarding use of a dedicated device (none of which involved Mr. Barrack).  *Id.* (citing Indictment ¶ 97(a)).  If Mr. Barrack was acting as an agent of the UAE and had obtained a dedicated device and was using a secure messaging application to conceal his communications, as the government implies but never actually alleges, then why did he continue to use a regular mobile phone or email to communicate with Mr. Grimes, Mr. Al Malik and UAE officials?  The indictment has no answer. Because the indictment's allegations contradict the alleged offense, the Court operates well within its authority at this stage to conclude that the government is "legally unable to prove" a violation of the statute.  *Patel*, 2022 WL 500567, at *8.

*Finally*, the government misconstrues the evidence it cites to support Count 5, arguing that even if the allegations constituted a "full proffer" of the government's evidence, the allegations implicate Mr. Barrack's knowledge of falsity.  Opp. 47.  But a plain reading of the two examples the government cites demonstrates exactly the opposite.  In the first example, the government

points to a communication between two Emirati individuals—not including Mr. Barrack—where one allegedly tells the other that he sent Mr. Barrack "a link for a secure application."  Indictment ¶ 37.  In the other example, the same two Emirati individuals—again not including Mr. Barrack—allegedly discuss that Mr. Barrack had acquired a phone.  *Id.* ¶ 42.  None of these allegations demonstrates Mr. Barrack's knowledge of falsity because neither example (or any other) involves Mr. Barrack directly.  The fact that the government cannot find support in its own indictment for this charge, and must instead invent such support, speaks volumes about the strength of the government's case (or lack thereof) and the merit of Mr. Barrack's legal challenge to Count 5.

These challenges do not, as the government tries to suggest, go merely to the weight of the evidence.  These are proper challenges to the sufficiency of allegations in the indictment.  And because the indictment fails to state a Section 1001 offense as a matter of law, Count 5 must be dismissed.  *Patel*, 2022 WL 500567, at *8; *Pimenta*, 2015 WL 6502098, at *2, *4-5; *Webb*, 24 F. Supp. 3d at 440.

## III.   THE GOVERNMENT'S PREJUDICIAL AND UNJUSTIFIABLE PRE-INDICTMENT DELAY REQUIRES DISMISSAL OF ALL COUNTS

Both parties agree that pre-indictment delay violates due process when it prejudices the defense and the government delayed for an impermissible reason.  *See* Mot. 36-37; Opp. 79.  Because Mr. Barrack satisfies both prongs of this test, the indictment must be dismissed.

As to prejudice, Mr. Barrack explained in his opening motion how the government's delay in charging him "prevented him from obtaining important evidence," including any approximation of a verbatim version of his allegedly false statements in 2019.  *See* Mot. 38-39.  The government claims that the loss of an exact record of those statements is immaterial because Mr. Barrack "was represented by multiple attorneys who took notes" of Mr. Barrack's statements.  Opp. 81.  But notes are not a transcription.  And two years passed between the statements and the indictment.

36

*See supra* 27.   Although the government retorts that Mr. Barrack's attorney's notes would not "have been more helpful to the defendant if the charges were brought earlier," Opp. 81, the point is that Mr. Barrack would not have had to rely exclusively on the notes—or seek to rely on the other materials now lost to him due to the government's pre-indictment delay, *see* Mot. 38-39— had the charges been brought earlier, *see* Mot. 38.

For this reason, the case law the government cites for the proposition that faded memories cannot show prejudice, *see* Opp. 82-83, is inapposite:  There, the criminal charges did not depend on those memories.   But here, the *only* record of Mr. Barrack's allegedly false statements is his, his counsel's, and the government's recollections.   In these circumstances, the loss of memory demonstrates the prejudice required to show unconstitutional pre-indictment delay.   *See, e.g.*, *United States v. Gross*, 165 F. Supp. 2d 372, 380-81 (E.D.N.Y. 2001) (finding prejudice where key evidence that would have been "used to show that some of the representations attributed to Defendants were made by other parties" had been lost because of government's pre-indictment delay); *United States v. Sample*, 565 F. Supp. 1166, 1178 (E.D. Va. 1983) ("[I]f defendants are able to show who would be their witnesses, that these witnesses' memories have been impaired, what the general content of their testimony would have been had they not lost their memories, that the testimony would have been material to defendants' defense, and that the loss of witnesses' memories resulted from the government's pre-indictment delay, then actual prejudice will have been established.").

As to the government's reasons for delay, the government never responds to Mr. Barrack's authority holding that proof that the delay was "intentional and deliberate to gain a strategic advantage" is not required.   *See* Mot. 37.   Instead, it merely asserts—without support—that its delay in charging Mr. Barrack "was the result of continued investigation and evaluation of the

evidence." Opp. 85. The government offers no examples of any investigatory work between 2019 and the time of this indictment in July 2021. This boilerplate, unsubstantiated assertion of justified delay cannot insulate the government. *See Gross*, 165 F. Supp. 2d at 384 (rejecting government's unsupported assertion that pre-indictment delay was justified by "legitimate investigation"). That is particularly true if simple government negligence can show unjustified delay and require dismissal of an indictment, as many courts have held. *See* Mot. 37. To the extent the government's point is that Mr. Barrack has not yet provided evidence that the government intentionally delayed its indictment to gain a tactical advantage in this case, the government implicitly concedes that this is an appropriate area for discovery.

<u>**CONCLUSION**</u>

For the reasons above and in Mr. Barrack's opening motion, this Court should dismiss the indictment in full.

38

Dated: Los Angeles, California
March 14, 2022

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Daniel M. Petrocelli*
Daniel M. Petrocelli (admitted *pro hac vice*)
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
E-mail: dpetrocelli@omm.com

James A. Bowman (admitted *pro hac vice*)
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-mail: jbowman@omm.com

Nicole M. Argentieri
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: nargentieri@omm.com

*Attorneys for Thomas J. Barrack, Jr.*