UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                        :

UNITED STATES OF AMERICA,          :

                                     :      **MEMORANDUM DECISION AND**

                          Plaintiff,       :      **ORDER**

                                     :

             - against -           :      21-cr-371 (BMC)

                                     :

   AL MALIK ALSHAHHI, et al.,        :

                                     :

                    Defendants.     :

                                     :
--------------------------------------------------------- X

**COGAN**, District Judge.

In August 2021, a grand jury returned a seven-count indictment charging Thomas Joseph Barrack and Matthew Grimes, along with their co-defendant Rashid Sultan Rashid Al Malik Alshahhi ("Al Malik"), with acting as agents of a foreign government without prior notification to the Attorney General in violation of 18 U.S.C. § 951(a)[1], and conspiracy to commit the same in violation of 18 U.S.C. § 371.  Barrack was also charged with four counts of making false statements in violation of 18 U.S.C. § 1001(a)(2) and one count of obstruction of justice in violation of 18 U.S.C. § 1512(c)(2).  Trial is set to begin on September 7, 2022.

Grimes and Barrack have since filed multiple pretrial motions seeking to dismiss portions of the indictment, unseal certain materials related to the motion to dismiss, release certain grand jury materials, and compel discovery.[2]  After the parties fully briefed these motions, a grand jury returned a first (S1) superseding indictment, charging Barrack with two additional counts of

---

[1] Defendants were alternatively charged with aiding and abetting in violation of 18 U.S.C. § 2.

[2] Barrack filed the motion to compel; Grimes moved for joinder.  Grimes filed the motion for the grand jury materials, and Barrack moved for joinder.  Both motions for joinder are granted.

making false statements under the same statute.  Defendants subsequently renewed their prior motions.

This decision resolves all of defendants' fully briefed and currently pending pretrial motions.  For the reasons that follow, the Court DENIES defendants' motions to dismiss the S1 superseding indictment in whole or in part; GRANTS in part, and DENIES in part the motion to unseal; DENIES the motion to compel; and DENIES the motion for grand jury materials.

## Motion to Dismiss

### I.  Background

### A.  Charges Under Section 951

Barrack previously served as the Executive Chairman of a global investment management firm ("Company A").  During that time, he was an informal advisor to the presidential campaign of Donald J. Trump, and later, the Trump Administration.  Grimes reported directly to Barrack at Company A, first as an Analyst, and then as a Vice President.

In Count One of the superseding indictment, the Government alleges that together, with Al Malik, "between April 2016 and April 2018 . . . within the Eastern District of New York and elsewhere" defendants "did knowingly and intentionally act in the United States as agents of a foreign government, to wit: the United Arab Emirates, without prior notification to the Attorney General of the United States, as required by law."  Count Two similarly alleges that they conspired to do so, identifying numerous overt acts, in the form of both e-mails and text messages.

The superseding indictment goes on to lay out additional factual allegations underlying these charges.  During the pendency of the Trump Campaign, Barrack and Grimes, working through Al Malik, allegedly made contact with senior UAE national security officials and, at their direction, agreed to: influence public opinion and the foreign policy positions of the Trump

Campaign; relay non-public information about the foreign policy positions and decisions of the Trump Campaign; develop a backchannel line of communication with the Trump Campaign on behalf of the UAE government; and design plans to increase the UAE's political influence and promote its foreign policy preferences.

The Government contends that the defendants' work for the UAE continued after the inauguration of President Trump in January 2017. As part of these continued efforts, the Government alleges that, among other actions: Grimes agreed to seek to list the Muslim Brotherhood as a foreign terrorist organization at Al Malik's direction; defendants arranged for President Trump to speak on the telephone with a senior UAE official; Barrack and Grimes agreed to advocate for a UAE-favored individual to be appointed to a senior position in the Trump Administration; and Barrack divulged non-public information to Al Malik and UAE officials about his potential appointment to a senior position in the Trump Administration and about internal discussions in the Trump Administration concerning the blockade of Qatar by the UAE and other Middle Eastern governments.

Despite being required to do so, Barrack, Grimes, and Al Malik never notified the Attorney General that they were acting as agents of the UAE government.

### B. Charges Stemming from FBI Interview

In 2019, Barrack became aware that he was being investigated by the FBI (although he asserts that he was not advised that he was the target) for his actions in connection with the instant matter. Through counsel, he contacted the Government and affirmatively requested an interview. On June 20, 2019, FBI special agents interviewed him in the presence of his counsel.

During the course of the interview, the Government alleges that he knowingly made numerous materially false statements relating to the investigation, including that: (1) Al-Malik

had not asked him to assist the UAE; (2) Al-Malik had never proffered any policies or requests to him; (3) that he had never used any messaging application with anyone associated with the Middle East, and that he had never been asked to download any messaging application by anyone associated with the Middle East; (4) that he never had a dedicated telephone to communicate with anyone associated with the Middle East, was never asked to acquire a dedicated telephone to communicate with anyone associated with the Middle East and has had only one telephone; (5) after the 2016 election, he had no role in facilitating communications, including arranging telephone calls, between the President-Elect and officials from the UAE; and (6) that he did not provide any guidance or input into U.S. Person 2's meeting with Emirati Official 1 in or about September 2017 and that he did not learn of U.S. Person 2's meeting with Emirati Official 1 until after the meeting. He was additionally charged with obstruction of justice.

Per FBI policy, the interview was memorialized by agents in an FBI-302 memorandum.[3] A verbatim recording or transcript of the interview was not taken.

## II.     Discussion

### A.     Legal Standard

"Under the Fifth Amendment to the Constitution, a defendant has a substantial right to be tried only on charges presented in an indictment returned by a grand jury." United States v. Dupree, 870 F.3d 62, 70 (2d Cir. 2017). Fed. R. Crim. P. Rule 7(c)(1) provides that an

---

[3] Barrack makes much of the fact that, despite FBI policy requiring that preparation of an FBI-302 memorandum "be effected within five days following the final interview session," the one memorializing his interview "was not completed until more than four weeks after the interview took place." See United States v. Brown, No. 2:08-cr-299, 2011 WL 3678682, at *9 (W.D. Pa. Aug. 19, 2011), aff'd, 534 F. App'x 132 (3d Cir. 2013) ("Under [FBI] policy, a special agent is expected to memorialize interviews of witnesses on an FD-302 form within five days of the interview."). This is good cross-examination at trial, but disputes about the FBI's compliance with its internal policy are irrelevant to a motion to dismiss..

indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. Rule 7(c)(1).

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974) (citation omitted); see also United States v. Frias, 521 F.3d 229, 235 (2d Cir. 2008) ("Typically, to state an offense, an indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state time and place in approximate terms.") (internal quotation marks and citation omitted). "[I]n an indictment for conspiring to commit an offense – in which the conspiracy is the gist of the crime – it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." United States v. Bout, 731 F.3d 233, 240 (2d Cir. 2013). Indictments generally do not "have to specify evidence or details of how the offense was committed." United States v. Wey, No. 15-cr-611, 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017).

Notably, "[t]he dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citing United States v. Nai Fook Li, 206 F.3d 56, 62 (1st Cir. 2000) (en banc)). Dismissal of charges is an "extreme sanction," United States v. Fields, 592 F.2d 638, 647 (2d Cir. 1978), that has been upheld "only in very limited and extreme circumstances," and should be "reserved for the truly extreme cases," "especially where serious criminal conduct is involved." United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979).

In reviewing a motion to dismiss an indictment, the court must take the allegations of the indictment as true. <u>Boyce Motor Lines v. United States</u>, 342 U.S. 337, 343 n.16 (1952). "At the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." <u>United States v. Wedd</u>, 993 F.3d 104, 121 (2d Cir. 2021).

## III. Defendants' Motion to Dismiss Counts One and Two

### A. Failure to State an Offense

Both defendants move to dismiss Counts One and Two, charging substantive and conspiratorial violations under Section 951, respectively, for failure to state an offense.

A person violates 18 U.S.C. § 951(a) when he "acts in the United States as an agent of a foreign government without prior notification to the Attorney General." 18 U.S.C. § 951(a). The statute defines the term "agent of a foreign government" to mean "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." <u>Id</u>. § 951(d).[4] Importantly, this term does not include duly accredited diplomatic or consular officers, official or representatives of a foreign government; non-American employees of such officers, officials, or representatives; or persons engaged in a legal commercial transaction." 18 U.S.C. § 951(d)(4).

Count One of the superseding indictment tracks the language of Section 951 and identifies the time period and place where the offense was committed:

> In or about and between April 2016 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RASHID SULTAN RASHID AL MALIK ALSHAHHI, also known as "Rashid Al Malik" and "Rashid Al-Malik," THOMAS JOSEPH BARRACK and MATTHEW GRIMES, together with others, did knowingly and intentionally

---

[4] Congress added the definition of "agent of a foreign government" in 1984. <u>See</u> Pub. L. 98–473, title II, § 1209, Oct. 12, 1984, 98 Stat. 2164. The "legal commercial transaction" exception was also added at this time. <u>Id</u>. For purposes of Section 951(d)(4), a "legal commercial transaction" means "any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations." 28 C.F.R. § 73.1(f).

act in the United States as agents of a foreign government, to wit: the United Arab Emirates, without prior notification to the Attorney General of the United States, as required by law.

Similarly, Count Two alleges that defendants, "together with others, did knowingly and intentionally conspire to" commit the underlying offense and identifies numerous overt acts in furtherance.

Under Second Circuit law, that is all that is required to withstand dismissal for failure to state an offense. See United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002) (citation omitted); see also Frias, 521 F.3d at 235.

    *i.    Agency Under Section 951*

Faced with a superseding indictment that clearly and explicitly fulfills the Second Circuit's requirements to state a substantive and conspiratorial offense under Section 951, both defendants argue instead that the superseding indictment insufficiently alleges that they acted as "agents" of the UAE within the meaning of the statute. See United States v. Willis, 844 F.3d 155, 162 (3d Cir. 2016) ("[A] defendant may move to dismiss on the grounds that 'the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation.'") (quoting United States v. Stock, 728 F.3d 287, 292 (3d Cir. 2013)).

At the outset, the Court notes that many of defendants' arguments here are inappropriately premised on the sufficiency of the Government's evidence, and not on statutory interpretation. See Wedd, 993 F.3d at 121. At this stage, the Court will consider only defendants' arguments that are premised on legal rather than factual grounds.

    *a.    Section 951 Does Not Require a Duty*

Barrack argues that Section 951 must be construed to define "agent" such that a defendant must be subject to a *legal duty* to comply with the foreign principal's directives. And,

as the superseding indictment fails to allege that Barrack was subject to such a duty, Counts One and Two must be dismissed.

To make his argument, Barrack relies heavily on a recent Fourth Circuit decision. See United States v. Rafiekian, 991 F.3d 529, 538 (4th Cir. 2021). In Rafiekian, the Court opined on the definition of "agent" under Section 951, considering the term's relationship to the common law of agency. Id. Although the Fourth Circuit found that "§ 951's definition at least resonates with the common law's in important respects," it also determined that "there are bound to be some aspects of common-law agency that don't jibe with § 951's language and purpose." Id. Ultimately, the Court determined that "[t]o fall within § 951's ambit, a person must do more than act in parallel with a foreign government' interests or pursue a mutual goal." Id. To wit:

> In sum, to be an "agent of a foreign government," a person must "agree[ ] to operate . . . subject to [foreign] direction or control." 18 U.S.C. § 951(d). That agreement cannot be one-sided, and a person does not become an "agent" for purposes of § 951 simply by acting in accordance with foreign interests or by privately pledging allegiance. Nonetheless, a foreign principal's involvement does not need to mirror an employer's control over the workings of an employee; a lesser degree of "direction" is sufficient, as it would be under the common law.

Id. at 540-41.

However, Barrack takes Rafiekian's analysis and does exactly what that Court cautioned him not to do, which is "force term-of-art definitions into contexts where they plainly do not fit." Id. at 539 (quoting Johnson v. United States, 559 U.S. 133, 139 (2010)). Nowhere in the Court's decision did it find that a "duty" was necessary to state an offense under Section 951. The Court chose explicitly not to wade into the murky waters of defining what exactly the degree of a foreign principal's direction or control need be, other than that such direction need not rise to the level of a formalized employer-employee relationship. Instead, what Rafiekian emphasized was the necessity of mutuality and agreement.

Other courts to consider the issue have also stressed the primacy of having an agreement. United States v. Chung, 659 F.3d 815, 823 (9th Cir. 2011) (providing that the Government must prove that "Defendant acted pursuant to an agreement to operate subject to the direction or control" of the foreign principle). But as existing case law also clarifies, this agreement need not be contractual or formalized, see United States v. Butenko, 384 F.2d 554, 565 (3d Cir. 1967) (rejecting contention that defendant could not be an agent because "there was shown no contractual relationship between himself and the Soviet Union"), nor must renumeration be received. See United States v. Hung, 629 F.2d 908, 912 (4th Cir. 1980) (defendant acted as an agent because he wanted to "improve relations between the North Vietnamese government and the United States so that he could be reunited with a woman whom he loved who was a prisoner of the North Vietnamese government."). Moreover, given the clandestine nature of conduct that is sometimes prosecuted under Section 951, and the difficulty of proving explicit agreements generally, such an agreement can be proven by "circumstantial evidence." Chung, 659 F.3d at 823.[5]

Neither does Barrack's reliance on definitions of "agent" in other statutory contexts necessitate construing Section 951 to require a duty. Barrack is correct that agency is defined under the Foreign Agents Registration Act ("FARA") in a "more sweeping" way, Rafiekian, 991 F.3d at 539, to additionally include "requests." See 22 U.S.C. § 611(c)(1) (defining an agent, in part, as someone who acts "at the order, request, or under the direction or control, of a foreign principal."). As Section 951 explicitly does not include "requests" in its definition, it follows

---

[5] To the extent defendants claim that the superseding indictment alleges that there was no evidence that they agreed to act as agents, or that they deny the existence of an agreement, the Government is entitled to present its evidence at trial. Alleging that they had agreed to act as agents is all that was required at this stage. See United States v. Sampson, 898 F.3d 270, 279-80 (2d Cir. 2018) (there is no "analogue for summary judgment" in federal criminal procedure, and therefore "although a judge may dismiss a civil complaint pretrial for insufficient evidence, a judge generally cannot do the same for a federal criminal indictment.").

then that to be an agent under Section 951, a person must do more than merely be "willing to do something the foreign principal requests." Rafiekian, 991 F.3d at 539.

Barrack also points out that the Justice Department recently clarified that to be an agent under FARA, the agent must feel "some sense of obligation" to the foreign principal. See FARA Unit, Dep't of Justice, The Scope of Agency Under FARA (May 2020). Therefore, he argues that an even higher degree of obligation and control must apply to agents under Section 951 since its statutory definition is less sweeping. However, even if this Court were to accept this argument, there still exists quite a bit of daylight between the requirement that there be "some sense of obligation" and a "duty." And, at this stage, the Court need not resolve exactly what the degree of obligation and control need be.

Barrack contends that it is necessary to construe Section 951 to require a duty to avoid rendering the statute constitutionally overbroad. Other courts considering the question have already rejected such arguments. See, e.g., Hung, 629 F.2d at 920 ("The defendants also contend that § 951 is impermissibly vague and overbroad. Their principal objection is to the word "agent." "Agent" as used in this context, however, is a readily understandable term which provides adequate notice of the conduct proscribed by the statute."); United States v. Ji Chaoqun, No. 18-cr-611, 2020 WL 1689826, at *3 (N.D. Ill. Apr. 7, 2020).

A law is overbroad "if it punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep." United States v. Farhane, 634 F.3d 127, 136 (2d Cir. 2011) (internal quotation marks and citations omitted). Importantly, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." Virginia v. Hicks, 539 U.S. 113, 119 (2003); see also United States v. Thompson, 896 F.3d 155,

163 (2d Cir. 2018) ("Notably, overbreadth doctrine has developed primarily in the context of laws that include within their ambit a substantial amount of *speech* protected by the First Amendment.") (emphasis in original).

Section 951 regulates conduct, that is, *acting* as a foreign agent.  Therefore, its "effect on speech would be only incidental to its primary effect on conduct."  <u>Expressions Hair Design v. Schneiderman</u>, 137 S. Ct. 1144, 1150-51 (2017).

The Court declines to read into the statute an additional requirement that the Government allege a duty.[6]

### ii.    Agency and Legal Commercial Transaction

Likewise, Grimes argues that he too cannot be an "agent" under Section 951 for multiple reasons.

Most of his arguments are premature as they go to the factual sufficiency of the indictment.  <u>See</u> <u>United States v. Perez</u>, 575 F.3d 164, 166 (2d Cir. 2009) (defendants had no basis to challenge "sufficiency of the indictment before trial because it met the basic pleading requirements").  Even if, as Grimes argues, the facts additional alleged in the superseding indictment do show that he was an agent of Company A, and that he did not agree to act as an agent of the UAE, the Government is entitled to make its case at trial that he was an agent of the

---

[6] For substantially the same reasons, the Court also rejects Grimes' three other First Amendment challenges involving Section 951, namely, that it (1) unduly burdens political speech; (2) constitutes speaker-based discrimination; and (3) is an unconstitutional prior restraint.  To the extent Section 951 proscribes speech at all, it is content-neutral, requiring only that the statute "advances important government interests" and does not "burden substantially more speech than necessary to further those interests."  <u>Turner Broadcasting Sys., Inc. v. FCC</u>, 520 U.S. 180, 189 (1997) (citing <u>United States v. O'Brien</u>, 391 U.S. 367, 377 (1968)).  The important national security interests, combined with the reasonable time, place, and manner restrictions, easily survive intermediate scrutiny.  <u>See</u> <u>United States v. Aref</u>, 533 F.3d 72, 83 (2d Cir. 2008) ("no governmental interest is more compelling than the security of the Nation.").  Further, as the Government notes, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  <u>Rumsfeld v. Forum for Academic and Institutional Rights, Inc.</u>, 547 U.S. 47, 62 (2006) (quoting <u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490, 502 (1949)).

UAE and that he agreed to serve as such. The Court also need not determine at this point whether Section 951 includes employees of agents because the Government has alleged that Grimes himself was an agent or, alternatively, that he aided and abetted an agent.

Grimes' argument that his conduct falls under the statutes' legal commercial transaction exception, and that Counts One and Two should be dismissed as to him, also fails for two reasons.

First, without deciding the issue, the Court notes that this exception likely provides only for an affirmative defense rather than an element that must be alleged in an indictment. Although the Second Circuit has yet to consider the issue, other courts have so found. See Rafiekian, 991 F.3d at 544 ("[T]he "legal commercial transaction" exception provides for an affirmative defense – which must be raised first, if at all, by a defendant – rather than an essential element of the offense."); see also United States v. Duran, No. 07-cr-20999, 2008 WL 11333989, at *2 (S.D. Fla. Oct. 10, 2008) ("Section 951(d) encompasses exceptions which must be raised and proven by a defendant as affirmative defenses to the crime described in Section 951(a)").

Second, even if this Court were to ultimately determine that the legal commercial transaction exception is not an affirmative defense, the Government's assertion in the superseding indictment that Grimes' activities did not constitute a legal commercial transaction is sufficient. Moreover, even if his conduct falls under the exception, he might still be convicted for aiding and abetting or under a Pinkerton theory of liability.[7] Grimes is welcome to renew his motion on this point following trial if he desires.

---

[7] Both defendants challenge the Government's use of both theories of liability. However, as the Court finds that Counts One and Two are properly pled, and that there were no additional issues with the aiding and abetting theory, see infra, it will not further consider these arguments at this time.

**B. Other Charging Defects**

Grimes also contends that the superseding indictment suffers from a host of other charging defects. These arguments can quickly be discarded.

*i.   Duplicity*

Grimes claims that Count One of the superseding indictment must be dismissed as duplicitous because it alleges that he violated both 18 U.S.C. § 951(a) and 18 U.S.C. § 2.

"An indictment is invalidly duplicitous when it joins in a single count two or more distinct, separate offenses." United States v. Droms, 566 F.2d 361, 363 (2d Cir. 1977). A count should be found duplicitous only when "the policy goals underlying this doctrine are offended, i.e., 'if a general verdict of guilty might actually conceal findings as to different alleged crimes, or if an appropriate basis for sentencing is not provided.'" United States v. Parker, 165 F. Supp. 2d 431, 447 (W.D.N.Y. 2001) (quoting United States v. Margiotta, 646 F.2d 729, 732-33 (2d Cir. 1981)).

However, the Second Circuit has previously determined that "[t]he aiding and abetting statute, 18 U.S.C. § 2, does not in itself define a crime." United States v. Swinton, 797 F. App'x 589, 598 (2d Cir. 2019) (citing United States v. Campbell, 426 F.2d 547, 553 (2d Cir. 1970)). Accordingly, as "'[t]here can be no violation of 18 U.S.C. § 2 alone,'" then "[j]oining aiding and abetting to a substantive crime is therefore not duplicitous." Id. (citing Campbell, 426 F.2d at 553).

Moreover, duplicity is a rule of pleading, and its violation does not warrant dismissal. Droms, 566 F.2d at 363 n.1. Rather, the appropriate remedy is to require the Government, prior to trial, to elect between the duplicitous charges.

*ii. Specific Intent*

Grimes also argues that Count One and Two must be dismissed because both fail to allege that he had the required specific intent to aid and abet or conspire with anyone to violate Section 951.

Aiding and abetting is a "specific intent crime." United States v. Khalupsky, 5 F.4th 279, 297 (2d Cir. 2021) (citing Rosemond v. United States, 572 U.S. 65, 77 (2004)). Thus, "'[u]nder 18 U.S.C. § 2, a defendant may be convicted of aiding and abetting a given crime" only "where the government proves that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime.'" United States v. Willis, 14 F.4th 170, 183 (2d Cir. 2021) (quoting United States v. Hamilton, 334 F.3d 170, 180 (2d Cir. 2003)).

Regardless of what the Government might be required to prove at trial as to specific intent, by alleging that defendants acted "together with others", and by citing to 18 U.S.C. § 2, the Government has fulfilled its pleading obligations. Indeed, a defendant can be convicted on an aiding and abetting theory even when the indictment does not indicate that he is charged under 18 U.S.C. § 2 if the government makes known its intention to prosecute on that theory.. See United States v. Damsky, 740 F.2d 134, 140 (2d Cir. 1984).

The Government also fulfilled its obligations to adequately plead a conspiracy offense in Count Two by alleging that defendants "knowingly and intentionally conspire[d]" to violate Section 951. Courts have made clear that use of the phrase "knowingly and intentionally" satisfies any requirement to plead specific intent. See, e.g., Guzman v. United States, 02-cr-5672, 2003 WL 22023985, at *3 n. 4 (S.D.N.Y. Aug. 27, 2003) ("Guzman's indictment, through

the phrase 'intentionally and knowingly,' sufficiently alleged the specific intent required for a conspiracy charge.").

### iii. *Wharton's Rule*

Grimes contends that Count Two must be dismissed because it violates Wharton's Rule.[8]  For substantially the same reasons that the Government identified in its motion, the Court holds that Count Two does not violate Wharton's Rule.

### iv. *Venue*

Finally, Grimes moves to dismiss Counts One and Two of the superseding indictment on the ground that venue is improper in the Eastern District of New York.  He notes that the superseding indictment fails to lay out specific acts that took place in this district, which it must do.

Grimes is incorrect.  The superseding indictment alleges facts sufficient to support venue because it alleges that the criminal activity occurred "within the Eastern District of New York and elsewhere."  "The law of this Circuit is clear that the Government's burden is satisfied with regard to pleading venue by alleging that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information."  United States v. Bronson, No. 05-cr-714, 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007); see also United States v. Lange, No. 10-cr-968, 2012 WL 511448, at *1 (E.D.N.Y. Feb. 15, 2012) ("[A]n indictment, alleging on its face that the offenses occurred 'within the Eastern District of New York and elsewhere,' suffices to sustain it against a pretrial attack on venue.").

---

[8] Wharton's Rule states that '[a]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission,' such as dueling."  United States v. Hoskins, 902 F.3d 69, 79 (2d Cir. 2018) (quoting Iannelli v. United States, 420 U.S. 770, 773 n.5 (1975).

As a matter of pleading, that is sufficient.  Should the Government fail to prove venue at trial, the Court will take it up then.

### C.  Implementing Regulations

Grimes argues that he cannot be prosecuted under Section 951 because its implementing regulations are invalid due to inconsistencies with the statute.  See United States v. Larionoff, 431 U.S. 864, 873 (1977) ("[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated.").

As previously discussed, *supra*, Section 951 provides for the imposition of criminal liability for the failure of "an agent of a foreign government" to provide notification "if required in subsection (b)."  18 U.S.C. § 951(a).  Subsection (b) directs the Attorney General to "promulgate rules and regulations establishing requirements for notification."  Id. at § 951(b). These implementing regulations are contained in 28 C.F.R. § 73 *et seq*.

Grimes bases his argument on the fact that the definitions of the term "agent" differ between the statute and the implementing regulations.  Compare id. at § 951(d) ("For purposes of this section, the term "agent of a foreign government" means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official") with 28 C.F.R. § 73.1(a) ("the term agent means all individuals acting as representatives of, or on behalf of, a foreign government or official, who are subject to the direction or control of that foreign government or official, and who are not specifically excluded by the terms of the Act or the regulations thereunder.").  The definition of agent in the regulation does not include the agreement element, and therefore, Grimes argues, it impermissibly broadens the reach of the statute.

Putting aside whether these definitions are actually "synonymous", as the Government maintains they are, both parties appear to agree that to be charged under Section 951, Grimes would need to meet the criteria of the statutory definition. The Court also endorses this view and will rely on the statutory definition of "agent" to the extent that the statutory definition is narrower than that of the definition under the regulations.

### D. Due Process Challenges

*i. Specific Intent*

Grimes asserts that Section 951 requires specific intent as to the notification requirement so as not to violate due process, and to conform to the norms of statutory interpretation.

Although Section 951 is silent on scienter, see 18 U.S.C. § 951, other Circuits have found that it is a general intent crime for which knowledge of the notification requirement is not required. See, e.g., Duran, 596 F.3d at 1295 (11th Cir. 2010) (Section 951 is a "general intent crime, and Duran did not need to know of the notification requirement before acting."); United States v. Dumeisi, 424 F.3d 566, 581 (7th Cir. 2005).

But these courts considered the issue before the Supreme Court's recent decision in Rehaif v. United States, 139 S. Ct. 2191 (2019). In Rehaif, the defendant was prosecuted under a statute which made possessing a firearm unlawful for certain categories of persons, including illegal aliens. The text of the statute only provided for a scienter requirement as to the possession element, and not as to the status element. Nevertheless, the Supreme Court held that, under Section 922(g), the Government must prove not only that the defendant knew he possessed a firearm, but also that "he knew he belonged to the relevant category of persons barred from possessing a firearm." Id. at 2200.

In reaching this conclusion, the Supreme Court clarified that it would "apply the presumption in favor of scienter even when Congress does not specify any scienter in the statutory text." Id. at 2195. This is because the presumption is that "Congress intends to require a defendant to possess a culpable mental state regarding each of the 'statutory elements that criminalize otherwise innocent conduct.'" Id. (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 72 (1994)).

Courts have interpreted Rehaif – and applied it to § 922(g) – to mean that, although a defendant must have knowledge of his status, it remains true that he "need not specifically know that it is illegal for him to possess a firearm under federal law." United States v. Bryant, 976 F.3d 165, 172 (2d Cir. 2020). Therefore, although knowledge of one's status is necessary, it is not necessary to know that there is a law regulating certain conduct for those with that status.

Despite Section 951's silence on *mens rea*, the Government still alleged in the superseding indictment that defendants "knowingly and intentionally act[ed]" as agents. So, in line with Rehaif, the Government properly construed the statute to require that defendants have knowledge of their status, even though the statutory text did not necessitate this. But as the Second Circuit found in Bryant, Section 951 does not also require that defendants "specifically know that it is illegal" for them to act as agents without registering under federal law. Id.; United States v. Merrett, 9 F.4th 713, 717 (8th Cir. 2021) ("There was no plain error in failing to require the government to prove that Merrett knew the law.").

Grimes asserts that, even if Section 951 can be interpreted to not require such knowledge, such an interpretation violates due process. Importantly, in arriving at the conclusion that Section 951 did not require actual notice or knowledge of the notification requirement, the Court in Duran distinguished a case in which the Second Circuit held that a similar statute did violate

due process. Duran, 596 F.3d at 1293 (discussing United States v. Mancuso, 420 F.2d 556 (2d Cir. 1970)). Mancuso considered a statute that required that any citizen convicted of narcotics or marijuana offenses, as well as those who are addicted to, or use narcotic drugs, register with customs officials on leaving and entering the country. Duran observed that "the Second Circuit held that knowledge or probability of knowledge of the registration requirement is an element that must be established in order to be convicted under the statute because finding that the defendant's conduct was nonfeasance would render the statute unconstitutional, but requiring probability of knowledge of the registration requirement would save it." Duran, 596 F.3d at 1293 (citing Mancuso, 420 F.2d at 557-58).

In reaching its conclusion, the Second Circuit found that "[w]hen there is no knowledge of the law's provisions, and no reasonable probability that knowledge might be obtained, no useful end is served by prosecuting the 'violators.' Since they could not know better, we can hardly expect that they should have been deterred." Mancuso, 420 F.2d at 559. However, the Second Circuit also noted that the Supreme Court had distinguished prior cases in which there existed "circumstances which might move one to inquire as to the necessity of registration," including those "involving licensing of business activity." Id. at 557.

Unlike the law at issue in Mancuso, the circumstances here should have prompted defendants to inquire as to the necessity of registration, as the statute here similarly "involve[es] licensing of" what defendants allege to be "business activity." Id. Moreover, as they engaged in conduct in an area replete with similar registration requirements, see FARA, they were provided with at least some "reasonable probability that knowledge might be obtained". Mancuso, 420 F.2d at 559. This is especially true concerning Barrack, a trained lawyer and businessman who

claims to have worked in international political, legal, and business capacities throughout his career.

    *ii.    Vagueness*

Both defendants contend that Counts One and Two must be dismissed because Section 951 is vague both facially and as applied. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." United States v. Halloran, 821 F.3d 321, 337 (2d Cir. 2016).

Grimes argues that Section 951 is unconstitutionally vague on its face because it fails to sufficiently define a variety of terms, including who qualifies as a "foreign . . . official," and what it means to "agree[]" and operate "subject to" their "direction or control." Likewise, Barrack reasserts his argument concerning the necessity of alleging a duty. We easily reject defendants' facial vagueness challenge. Where, as here, First Amendment rights are not implicated, the Court assesses the defendants' challenge as applied, *i.e.*, "in light of the specific facts of the case at hand and not with regard to the statute's facial validity." United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (quoting United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993)).

Courts examine as-applied vagueness challenges in two steps: "a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." Rubin v. Garvin, 544 F.3d 461, 468 (2d Cir. 2008) (internal quotations omitted). "Under the 'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's

conduct was criminal.'" United States v. Napout, 963 F.3d 163, 181 (2d Cir. 2020) (quoting

Halloran, 821 F.3d at 338); Copeland v. Vance, 893 F.3d 101, 110 (2d Cir. 2018).

However, "the more important aspect of [the] vagueness doctrine is not actual notice, but

[the arbitrary enforcement prong]," Kolender v. Lawson, 461 U.S. 352, 358 (1983) (internal

citations omitted), which "requires that a statute give 'minimal guidelines' to law enforcement

authorities, so as not to 'permit a standardless sweep that allows policemen, prosecutors, and

juries to pursue their personal predilections.'" Mannix v. Phillips, 619 F.3d 187, 197 (2d Cir.

2010) (quoting Kolender, 461 U.S. at 358).  Courts may uphold the statute where the "conduct at

issue falls within the core of the statute's prohibition, so that the enforcement before the court

was not the result of the unfettered latitude that law enforcement officers and factfinders might

have in other, hypothetical applications of the statute." United States v. Houtar, 980 F.3d 268,

277 (2d Cir. 2020).

"The vagueness issue on an as-applied challenge is not whether the statute's reach is clear

in every application, but whether it is clear as applied to the defendant's conduct." Id. at 276.

This is because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot

complain of the vagueness of the law as applied to the conduct of others." Hoffman Estates v.

Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982).

Defendants' challenge is premature.  In general, a defendant "must wait to bring an as-

applied vagueness challenge until the facts have been established by evidence introduced at trial

and the fact-finder has had an opportunity to weigh in." United States v. Raniere, 384 F. Supp.

3d 282, 320 (E.D.N.Y. 2019); see also United States v. Avenatti, 432 F. Supp. 3d 354, 366

(S.D.N.Y. 2020) ("[R]esolution of a defendant's void for vagueness challenge ordinarily requires

a more expansive factual record to be developed at trial."); United States v. Tairod Nathan

Webster Pugh, No. 15-cr-116, 2015 WL 9450598, at *16 (E.D.N.Y. Dec. 21, 2015) ("[O]n a pre-trial motion to dismiss an indictment, the court must assume the prosecution's allegations will be proven at trial and draw all reasonable inferences from those allegations. The court then asks whether any jury could convict.").  At this stage, as the Court must assume that all the facts alleged in the superseding indictment are true, then "the conduct at issue falls within the core of the statute's prohibition."  Thibodeau v. Portuondo, 486 F.3d 61, 67-68 (2d Cir. 2007) (citation omitted).

Barrack and Grimes both argue that their conduct as alleged does not fall within the core prohibitions of Section 951 as they did not engage in "espionage-related activities."  However, Section 951's purpose is not only related to espionage, and prosecutors have pursued charges under it in circumstances similar to those alleged here.  "A review of indictments and plea agreements in other cases in which the DOJ charged violations of Section 951 in roughly the first ten years of this century reveals that most fall into one of two categories: information-gathering and procurement or sanctions evasion."  David Aaron, 18 U.S.C. Section 951 and the Non-Traditional Intelligence Actor Threat from the First World War to the Present Day, 45 SETON HALL LEGIS. J. 1, 28-29 (2021).  And "[o]f the information-gathering and procurement cases, four also involved other activities such as perception management," including publishing newspaper articles.  Id.; see also Dumeisi, 424 F.3d at 579 (publishing newspaper articles at the direction of Iraqi intelligence).  Information-gathering and perception management are exactly the activities in which defendants are alleged to have engaged here.  Therefore, defendants cannot fairly argue that their conduct is not the sort plainly targeted by Section 951, or that they lacked notice.

Grimes further argues that because he was a "junior employee," he was not provided fair notice, and that the statute is therefore being enforced arbitrarily and in a manner that is novel as to him specially. However, the "novelty" of a prosecution does not bolster a vagueness challenge, for the lack of a prior "litigated fact pattern" that is "precisely" on point is "immaterial." United States v. Kinzler, 55 F.3d 70, 74 (2d Cir. 1995). More importantly, the superseding indictment does not allege that Grimes was a mere junior employee. If Grimes wishes to challenge the law on this basis, that challenge will have to wait.[9]

### E. Self-Incrimination

Grimes argues that Section 951 violates his Fifth Amendment privilege against self-incrimination because notifying the Attorney General would necessarily incriminate him. Other courts have previously rejected this argument, and this Court joins them.

"In order to invoke the privilege [against self-incrimination,] it is necessary to show that the compelled disclosures will themselves confront the claimant with 'substantial hazards of self-incrimination.'" California v. Byers, 402 U.S. 424, 429 (1971). However,

> [w]hile an individual's right to avoid self-incrimination must not be treated lightly, the societal interest in establishing certain disclosure requirements also must not be ignored. Since many forms of compelled disclosure statutes present the potential for self-incrimination some more acutely than others a balance must be struck between the competing interest of the state and the individual when evaluating the constitutionality of a disclosure requirement.

---

[9] Grimes' other arguments concerning fair notice are similarly rejected. See United States v. Lanier, 520 U.S. 259, 266 (1997) ("due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."). Additionally, his reliance on various DOJ Advisory Opinions under FARA is also misplaced. Nonbinding advice on a different statute is irrelevant and confers no substantive or procedural rights on a defendant. Sullivan v. United States, 348 U.S. 170, 173 (1954) (rejecting defendant's reliance on a policy embodied in DOJ Circular Letter because it "was never promulgated as a regulation of the Department and published in the Federal Register.").

United States v. Dichne, 612 F.2d 632, 638 (2d Cir. 1979) (upholding the Bank Secrecy Act's reporting requirement mandating the disclosure of amounts exceeding $5,000 being brought into or out of the United States).

Other courts that have considered the issue with respect to Section 951 have rejected Grimes' argument, noting that "[a] registration provision violates the Fifth Amendment, however, only if it is directed at a class of persons who are inherently suspect[ed] of illegal activities. A neutral registration requirement, such as this one directed at representatives of foreign nations, does not offend the Fifth Amendment." Hung, 629 F.2d at 919.

Grimes points out that following Hung, Section 951's reach was narrowed by the addition of the legal commercial transaction exception. Therefore, the class of persons to whom it is now directed are those "inherently suspect[ed] of illegal activities." However, merely because Section 951 now excludes those involved in "legal commercial transaction[s]", it does not follow that the statute only regulates those "inherently suspect[ed] of illegal activities." This contention is supported by the fact that Grimes and Barrack have not been charged with anything other than failing to register under Section 951. That is because, even following the addition of the legal commercial transaction exception, the type of activity Section 951 seeks to regulate is not activity that is inherently, or necessarily, illegal. Duran, 596 F.3d at 1293 ("the activities that fall within § 951's purview have never been expressly or by judicial interpretation limited to those bearing upon national security or even those which by their nature are criminal or inherently wrongful").

The cases that Grimes cites in support of his argument are distinguishable, as they all consider statutes that required registration of those engaging in conduct that was necessarily illegal at that time, such as gambling, see Marchetti v. United States, 390 U.S. 39, 42 (1968), or

being a member of the Communist party, see Albertson v. Subversive Activities Control Board, 382 U.S. 70 (1965) (registration of Communist party members when Communist party membership was itself illegal). Acting as an agent of a foreign government does not trigger prosecution; only failing to register does. Therefore, the statute does not infringe on Grimes' privilege against self-incrimination.

### F. Pre-Indictment Delay

"As the Supreme Court stated in United States v. Marion, the statute of limitations is 'the primary guarantee against bringing overly stale criminal charges.'" United States v. Cornielle, 171 F.3d 748, 751 (2d Cir. 1999) (cleaned up) (quoting Marion, 404 U.S. at 322). Accordingly, "[t]here is a strong presumption that an indictment filed within the statute of limitations is valid." United States v. Maxwell, 534 F. Supp. 3d 299, 316 (S.D.N.Y. 2021); see also DeMichele v. Greenburgh Cent. Sch. Dist. No. 7, 167 F.3d 784, 790-91 (2d Cir. 1999) ("while the [Supreme] Court may not have shut the door firmly on a contention that at some point the Due Process Clause forecloses prosecution of a claim because it is too old, at most the door is barely ajar.").

"[I]n order to prevail on a claim of unconstitutional pre-indictment delay, a petitioner must show that he suffered actual prejudice as the result of the delay and that the delay was an intentional device to gain a tactical advantage." Denis v. Upstate Corr. Facility, 361 F.3d 759, 760 (2d Cir. 2004) (citing Marion, 404 U.S. at 324). The burden of proving both prongs of the standard rests on the defendant. United States v. Scarpa, 913 F.3d 993, 1014 (2d Cir. 1990).

Despite Barrack's insinuations, the Court can make out no evidence that the Government's delay in bringing these charges was designed to thwart his ability to prepare a defense. However, even if Barrack had met his burden to show intentionality, he fails to make the strong showing of prejudice required to support this sort of claim. Barrack argues that he was prejudiced because of the purported delay, as he is unable to obtain (1) "critical proof to

establish what he was asked and how he answered" questions when he was interviewed in 2019; and that (2) evidence of records of communications allegedly exonerating him have been lost.[10]

However, the sorts of difficulties that Barrack relies on are inherent in any case where there is extended delay in bringing a prosecution, and they do not justify dismissing an indictment. United States v. Elsbery, 602 F.2d 1054, 1059 (2d Cir. 1979) ("dimming of witnesses' memories does not amount to prejudice."). "To merit dismissal, a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself." United States v. Long, 697 F. Supp. 651, 657 (S.D.N.Y. 1988) ("perceived prejudice is speculative" where there was "no way of knowing what [the unavailable witness's] testimony would have been").

Barrack does not provide a single concrete example of attempts that he has made to obtain documents, nor does he offer examples about how these attempts have been frustrated by the passage of time. See United States v. Dornau, 356 F. Supp. 1091, 1094 (S.D.N.Y. 1973) ("A bare allegation that records have been lost or destroyed, which might relate to the instant prosecution, is insufficient to show actual prejudice. The fact that evidence may be lost or destroyed during the pre-indictment stage is inherent in any delay, no matter what the duration. Furthermore, there has been no allegation in this case that the destruction of the records was deliberate on the part of either the government or trustee.") (internal citations omitted). Moreover, the generalized type of communications that Barrack suggests *may* be "no longer reasonably available" would be unlikely to affect the outcome of the case. Barrack claims that he was in "phone and text communication" with United States governmental officials about his

---

[10] Barrack also argues that the prejudicial effect of the delay was amplified as to the false statement charges due to the Government's decision to not make a verbatim record of his FBI interview. However, as discussed *infra* in Section IV.A, the Government was not required to make such a recording and the Court cannot make out any reason why a lack of a verbatim recording would create any additional prejudice – there was no recording then and there is still no recording.

"activities in the Middle East", and he has "no doubt those individuals communicated with others about [his] role." Had he been able to obtain them, these "communications would disprove the government's theory that Mr. Barrack acted as a secret agent of the UAE to betray the United States and instead demonstrate his activities were undertaken with the knowledge" of United States governmental officials. But obtaining a conviction under Section 951 does not require that Barrack have acted in secret, and compliance with the statute mandates notification to the Attorney General, not to other governmental officials.

The Court thus concludes that Barrack has failed to establish actual prejudice from the Government's delay in bringing charges.

## IV. Motion to Dismiss Counts Three through Nine

### A. Lack of a Verbatim Record

Barrack argues that Counts Three through Nine[11] should be dismissed due to the Government's failure to make a verbatim recording of the June 20, 2019 interview. He asserts three principal arguments why such a drastic remedy is warranted: (1) as the Government had ample notice of the interview, and there were no circumstances that precluded making a recording, it should have done so; (2) failing to record the statements has impeded his ability to defend himself by arguing he was responding to ambiguous questions or telling the literal truth; and (3) the delay in bringing these charges has especially impeded his ability to mount a defense.

At the outset, case law is clear that the Government had no obligation to create a transcript or make a recording as a predicate for charging these offenses, regardless of the circumstances involved. See United States v. Khan, No. 18-cr-00195, 2020 WL 7767890, at *2

---

[11] Barrack originally argued that Counts Three through Seven should be dismissed; the Court construes his arguments to apply to the additional two false statement charges alleged in the superseding indictment as well.

(D. Conn. Dec. 30, 2020) (The "case law makes clear that a false statement charge does not depend on the existence of a transcript or other formal recording of the statement that is alleged to be false, and it is for a jury to decide whether the lack of such corroboration undermines a finding that any false statement was made.") (collecting cases). And as this interview was not custodial, DOJ policy does not mandate making such a recording either. See U.S. Dep't of Justice, Justice Manual § 9-13.001. Barrack himself acknowledges that there is "no *per se* rule [that] requires a verbatim transcript or written statement." Therefore, it is irrelevant whether the government had "ample notice" of the interview or that no extenuating circumstances impeded the making of such a record.

As to his second point, the Court acknowledges that "a lack of corroboration is of some concern . . . [because of] the effect that a lack of corroboration has on the ability of the defendant to defend [himself] against the accusation of lying." United States v. Ricard, 922 F.3d 639, 651 (5th Cir. 2019). As Barrack points out, two of the few available defenses to a false statement charge are that the defendant was responding to a fundamentally ambiguous question or that his answer was literally true. See Bronston v. United States, 409 U.S. 352 (1973) (the perjury statute does not apply to literally true but unresponsive answers). Other courts have also acknowledged the difficulties inherent in prosecution without a verbatim record. See United States v. Clifford, 426 F. Supp. 696, 701 (E.D.N.Y. 1976) ("The absence of a verbatim record of the interview raises serious difficulties in light of the Supreme Court's decision in Bronston."); United States v. Ehrlichman, 379 F. Supp. 291, 292 (D.D.C. 1974) ("[T]he absence of a transcript would make application of [the Bronston literal-truth] test nearly impossible.").

However, "no corroboration is necessary to sustain a conviction for making a false statement under § 1001," United States v. Fern, 696 F.2d 1269, 1275 (11th Cir. 1983), and

whether a statement was literally true is generally an issue for the jury to decide. See United States v. Lighte, 782 F.2d 367, 372, 374 (2d Cir. 1986). The lack of a record, and corroboration, does not go to the propriety of the charges, but to the sufficiency and persuasiveness of the Government's evidence, which will be determined at trial by the jury. This helps explain why almost all cases that Barrack relies on involved challenges based on a lack of a verbatim record *after* a jury verdict. See, e.g., Ricard, 922 F.3d 639; Ehrlichman, 379 F. Supp. 291;[12] Clifford, 426 F. Supp. 696.[13]

In some rare circumstances, courts have dismissed false statement charges prior to a jury trial. In United States v. Kerik, 615 F. Supp. 2d 256, 274 (S.D.N.Y. 2009), the Court determined that two questions asked were fundamentally ambiguous and could not "serve as predicates for the false statement charges in the Superseding Indictment." There, the defendant was asked "whether there was anything embarrassing that he would not want the public to know about." Id. at 273-4. At such a high level of abstraction, the Court determined that these questions were not "sufficiently clear to be placed before a jury." Id. at 273.

Barrack attempts to argue that some of the questions asked may have been similarly ambiguous, which may render his answers literally true. However, the sorts of "nuances" that Barrack raises are different from the fundamental ambiguity of the questions asked in Kerik. Whether there is "anything embarrassing" is a highly ambiguous and subjective question, far from the fact-based inquiries alleged to have been made of Barrack in this case. Like most

---

[12] Ehrlichman is also further distinguishable. There, the Court determined that § 1001 was improperly invoked. Additionally, the interview notes in question were described as "sketchy" and not shown to the defendant until shortly before trial. 379 F. Supp. at 291. This is not true here. The Government's handwritten notes are extensive, and Barrack has already had access to them. As to Barrack's arguments that the Government's notes were inadequate, that argument, again, is for the jury.

[13] Barrack is also welcome to argue to the jury that the pre-indictment delay has impeded his ability to defend himself based on the effect of the length of time on the witness' memories by impeaching witnesses at trial.

defendants who make this argument, he too will have to wait until after the Government's case at trial.

### B. Failure to State an Offense for Count Six

Barrack also contends that Count Six must be dismissed as it fails to allege a necessary element of Section 1001, namely his knowledge of the statement's falsity.[14]

"[I]n order to secure a conviction under [18 U.S.C.] § 1001(a)(2), the Government must prove that a defendant (1) knowingly and willfully, (2) made a materially false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent." United States v. Coplan, 703 F.3d 46, 78 (2d Cir. 2012).

Count Six alleges that Barrack "did knowingly and willfully make one or more materially false, fictitious and fraudulent statements" when he

> falsely stated and represented to FBI special agents that other than Gmail, iMessage and WhatsApp, [he] never used any messaging application with anyone associated with the Middle East, and that [he] was never asked to download any messaging application by anyone associated with the Middle East, when in fact, as he then and there well knew and believed, [he] was asked by Emirati Official 4 and AL MALIK to download a messaging application to communicate directly with Emirati Official 1 and Emirati Official 2 and used that messaging application to communicate with United Arab Emirates officials.

Elsewhere in the indictment, the Government alleges that Barrack "acquired a dedicated cellular telephone and installed a sfecure [sic] messaging application to facilitate [his] communications with senior United Arab Emirates officials."

In the face of this clear language, Barrack argues that, because the superseding indictment specifies certain additional details in support of Count Six, the Court is required to

---

[14] Originally, this Count was Count Five in the indictment.

assess whether those facts, if true, are sufficient to establish that Barrack committed the offense. This is incorrect. As the Government correctly notes, "[a]t the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." United States v. Dawkins, 999 F.3d 767, 780 (2d Cir. 2021). The only exception to this general rule is when the Government has made "a full proffer of the evidence it intends to present at trial." Wedd, 993 F.3d at 121 (quoting United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998)). The Government has clearly stated that the superseding indictment is not its full proffer, and indeed, that it "expects to introduce significant additional evidence at trial." Accordingly, there is no merit in Barrack's argument that the Court must look beyond the four corners of the superseding indictment to evaluate the adequacy of its pleading. By tracking the statutory language, the four corners of the superseding indictment adequately allege the required elements.

The Court also notes that, in its view, the facts alleged in the superseding indictment, although somewhat thin, adequately allege Barack's knowledge of the falsity of the statement.

## MOTION TO UNSEAL

### I. Background

Last July, this Court endorsed the parties' proposed protective order pursuant to Federal Rule of Criminal Procedure Rule 16(d). The protective order provided, in relevant part, that "[a]bsent prior agreement of the government or permission of the Court," materials produced by the Government to Barrack "shall not be included in any public filing with the Court, and instead shall be submitted under seal."[15]

---

[15] On or about October 13, 2021, upon substitution of counsel for Barrack, current counsel signed an acknowledgment form affirming their understanding of the terms of the Protective Order.

Subsequently, when Barrack moved to dismiss the indictment, he attached as exhibits under seal four documents produced by the Government pursuant to the Protective Order. These exhibits contain summaries of statements made by two third-party witnesses, handwritten notes memorializing Barrack's statements to the FBI during the June 20, 2019 interview, and a heavily redacted cover page to an FBI memorandum memorializing the same interview. Barrack now seeks permission to unseal these materials and any reference to their contents in his memorandum of law in support of his motion to dismiss.

Barrack's motivation to unseal these documents is readily apparent. It is not that he is championing the First Amendment. Rather, he is seeking to counter potential prejudice from the publicity surrounding the release and description of the indictment by publicizing certain key documents that raise questions about the Government's case. Although there is nothing wrong with that motivation, the fact remains that these documents are subject to a protective order, which Barrack freely entered, and which he has not argued was improvidently granted. See S.E.C. v. TheStreet.com, 273 F.3d 222, 230 (2d Cir. 2001) (there is a "general and strong presumption against access to documents sealed under protective order when there was reasonable reliance upon such an order."). Moreover, the two summaries of the third-party witness statements he seeks to unseal were entirely irrelevant to this Court's determination of the motion to dismiss, advancing inappropriate and frivolous arguments. It is under these unique circumstances that the Court must determine which of these exhibits must be unsealed under Second Circuit precedent concerning the right of public access.

## II.    Applicable Law

"The law of sealing and unsealing is extensive and largely well-settled. Succinctly stated: the public has a qualified right to access judicial documents under the common law and

the First Amendment." <u>United States v. Caicedo Velandia</u>, No. 10-cr-00288, 2019 WL 6913524, at *2 (E.D.N.Y. Dec. 19, 2019); <u>see also</u> <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 119 (2d Cir. 2006) ("The common law right of public access to judicial documents is firmly rooted in our nation's history."); <u>Hartford Courant Co. v. Pellegrino</u>, 380 F.3d 83, 93 (2d Cir. 2004) (recognizing a qualified First Amendment right).

The Second Circuit has counseled that in determining whether a right exists, "[courts] first look to the common law, for [they] need not, and should not, reach the First Amendment issue if judgment can be rendered on some other basis." <u>Application of Newsday, Inc.</u>, 895 F.2d 74, 78 (2d Cir. 1990).

## A. Common Law Right of Access

The Second Circuit has established a three-part test to determine whether the common law right of access applies to court documents. <u>See</u> <u>Lugosch</u>, 435 F.3d at 119. First, the court must determine whether the documents are "judicial documents"; second, the court must determine what weight to assign to the presumption of access; and third, the court must balance countervailing interests against the presumption to determine whether they outweigh the presumption of access. <u>Id</u>. Ultimately though, "the decision as to access [under the common law] is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589, 599 (1978).

The presumption of access only applies to "judicial documents." A judicial document is one that is "relevant to the performance of the judicial function and useful in the judicial process." <u>United States v. Amodeo</u>, 44 F.3d 141, 145 (2d Cir. 1995) ("<u>Amodeo I</u>"). Whether a document is a "judicial document" depends on its role in the judicial process, <u>United States v.</u>

Erie Cnty., 763 F.3d 235, 239 (2d Cir. 2014), not simply whether it was filed with the court, see Amodeo I, 44 F.3d at 145. Although "documents exchanged during discovery are not judicial documents", United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995) ("Amodeo II"), the Second Circuit has "consistently held that documents filed in criminal cases used to determine a litigant's substantive legal rights are judicial documents." United States v. Donato, 714 F. App'x 75, 76 (2d Cir. 2018); United States v. Wolfson, 55 F.3d 58, 61 (2d Cir. 1995) ("the public's common-law right . . . extend[s] to documents considered by the court in orders disposing of substantive pretrial motions."). Even where "discovery materials may be [otherwise] subject to a protective" order, the documents will become "presumptively accessible under the First Amendment and/or the common law if they later become judicial documents." United States v. Smith, 985 F. Supp. 2d 506, 525-26 (S.D.N.Y. 2013) (citations omitted); see also Newsday LLC v. Cnty. of Nassau, 730 F.3d 156, 166 (2d Cir. 2013) ("[T]he facts necessary to show good cause for a protective order applicable to discovery documents that are not yet implicated in judicial proceedings will not necessarily meet the higher threshold imposed by the First Amendment with respect to judicial documents.").

Under the applicable precedent, all four exhibits to the motion to dismiss – as well as the memorandum in support of the motion to dismiss itself – might in the typical case properly be considered judicial documents under the common law right of access. This is because the exhibits were attached to a motion to dismiss the indictment, which generally would necessarily involve the determination of a defendant's substantive legal rights.

However, in recently explaining that documents submitted to a court for its consideration in a summary judgment motion constitute judicial documents as a matter of law, the Second Circuit stated that this conclusion "relies on the general principle that parties may be assumed to

have supported their papers with admissible evidence and non-frivolous arguments. Insofar as a district court has, through striking a filing, specifically found that assumption inapplicable, the categorical rule . . . may not apply." Brown v. Maxwell, 929 F.3d 41, 47 n.12 (2d Cir. 2019) (quoting Lugosch, 435 F.3d at 121). This suggests that when a party posits clearly losing arguments, thereby engaging in gamesmanship to publicize documents subject to a protective order, the Court is not required to reflexively find that these documents are judicial. This should be especially true when it is the defendant who made these non-viable arguments, and who agreed to the protective order, bringing the motion to unseal.

This motion presents exactly the kind of instance contemplated by the Circuit where a court may find the "assumption inapplicable" since the two witness statements were, in fact, entirely irrelevant. The witness statements were used to advance arguments regarding the sufficiency of the evidence, an issue not properly determined upon a motion to dismiss. See States v. Lemay, No. 20-cr-235, 2022 WL 125743, at *2 (E.D.N.Y. Jan. 13, 2022) ("the sufficiency of the [Government's] evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.") (citing Alfonso, 143 F.3d at 776-77). As the two witness statements at issue were of no materiality to the motion to dismiss, supporting only meritless arguments that were inappropriately offered, these are not judicial documents.[16]

This conclusion makes sense as any decision otherwise would render protective agreements largely meaningless. To get around an agreement, a defendant could merely append

---

[16] Even if these two exhibits were judicial documents under the common law right of access, that they ultimately were used only to support meritless arguments factors into the weight accorded to the presumption at the second step. Cf. Eagle Star Ins. Co. Ltd. v. Arrowood Indem. Co., No. 13-cv-3410, 2013 WL 5322573, at *2 (S.D.N.Y. Sept. 23, 2013) (where a document goes to "the heart of what the Court is asked to act upon . . . the weight of the presumption of access [to the information] . . . is correspondingly high."). By contrast, the two witness statements did not "play a significant role" in determining the motion, did not "directly affect" its adjudication, and were, in fact, entirely irrelevant.

any document subject to such an agreement that he wishes to publicize – no matter how irrelevant – to any dispositive motion, and then bring a motion to unseal. This obviously would defeat the purpose of such protective orders, and if the Government cannot guarantee that discovery information will be kept confidential.

This is not to say that this Court would necessarily have reached the same conclusion had this motion to unseal been brought by anyone other than Barrack. As "[d]efendant[s] [have] no constitutional right to use the media to influence public opinion concerning [t]his case so as to gain an advantage at trial," it follows that the considerations should be different where a defendant, who already has access to the information, brings the motion to unseal himself. Smith, 985 F. Supp. 2d at 540 (alterations in original). This tactical advantage is not what the rights of access were envisioned to protected.

However, as the other two documents, the handwritten notes and the FBI memorandum cover page, were used in support of at least colorable arguments, they are judicial documents.

Once a document is deemed to be a "judicial document," a court must then determine what weight to assign to the presumption of access. "[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." Amodeo II, 71 F.3d at 1049. "[D]ocuments that directly affect an adjudication and play a significant role in determining litigants' substantive rights receive the benefit of a relatively strong presumption." United States v. Graham, 257 F.3d 143, 153 (2d Cir. 2001) (internal quotation marks and citation omitted). On the other hand, the presumption is weak for those documents in which the public interest "is not as pressing." Id. (internal quotation marks and

citations omitted).  If a document falls in the middle of the continuum, the court looks to

"whether such documents are usually filed with the court and are generally available."  Id.

The handwritten notes and the FBI memorandum cover page may be accorded the

standard "relatively strong presumption."  Graham, 257 F.3d at 153.  These documents both

"directly affect[ed] [the] adjudication" and the public interest in them is strong.

"[A]fter determining the weight of the presumption of access, the court must balance

competing considerations against [disclosure]."  Erie Cty., 763 F.3d at 239 (internal quotation

marks and citations omitted).  The Second Circuit has identified two countervailing factors that

can balance against even a strong presumption of access: "(i) the danger of impairing law

enforcement or judicial efficiency and (ii) the privacy interests of those resisting disclosure."

Amodeo II, 71 F.3d at 1050.  The Second Circuit has "recognized the law enforcement privilege

as an interest worthy of protection," Amodeo I, 44 F.3d at 147, and one designed to "prevent

disclosure of law enforcement techniques and procedures, to preserve the confidentiality of

sources . . . [and] to safeguard the privacy of individuals involved in an investigation," In re

Dep't. of Investigation, 856 F.2d 481, 484 (2d Cir. 1988).

Although these considerations would balance against disclosure for the witness

statements, the same cannot be said for Exhibit 4 or 5 to the motion to dismiss.  Exhibit 4

contains approximately four partially redacted pages of handwritten notes, summarizing a few of

Barrack's statements to the FBI during his interview.  Most of these notes merely repeat or

support the allegations already contained in the superseding indictment.  For example, the notes

document that Barrack said that he "did not feel he was asked to do anything for UAE by

Rashid" and that he "never was asked to get specific phone or dedicated phone for comm."  To

the extent these notes reveal limited new information, including the names of some public

figures, the Court cannot find that withholding of this information will impair law enforcement or judicial efficiency, or harm the privacy interests of these already public figures.

Exhibit 5 is a heavily redacted cover page to the FBI's memorandum of his June 2019 interview. The only information to be gleaned from it is the date on which the interview took place, and when the memorandum was drafted and finalized. The Court can discern no protectable interest here.

Given the lack of any countervailing interests, and the attendant strong presumption of access, the Court directs unsealing of these two documents, and any references to them in the memorandum.

### B. First Amendment

That leaves the question of whether the other two exhibits, as well as the memorandum itself, must be unsealed pursuant to the more expansive First Amendment right of access. However, the First Amendment only "protects the public's right to have access *to judicial documents*." Erie Cty., 763 F.3d at 239 (emphasis added). The Second Circuit has instructed that the First Amendment applies when "'experience and logic' support making the document available to the public." Id. (quoting Lugosch, 435 F.3d at 120). Under this so-called "experience and logic" approach, a court must consider "(a) whether the documents have historically been open to the press and general public (experience) and (b) whether public access plays a significant positive role in the functioning of the particular process in question (logic)." Id. (internal quotation marks and citation omitted). Additionally, the Circuit has held that the First Amendment protects access to judicial documents that are "derived from or a necessary corollary of the capacity to attend the relevant proceedings." Hartford Courant Co., 380 F.3d at 93.

The Second Circuit has found that for "documents submitted to a court for its consideration in a . . . motion . . . a strong presumption of access attaches, under . . . the First Amendment." Lugosch, 435 F.3d at 121, 126. "Access to written documents filed in connection with pretrial motions is particularly important . . . where no hearing is held and the court's ruling is based solely upon the motion papers." In re N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987).

However, even where the First Amendment applies, "[d]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Id. (quoting In re N.Y. Times Co., 828 F.2d at 116). "Courts must balance the right [of access] against other important values, like the Sixth Amendment right of the accused to a fair trial . . . and the defendant's privacy interests." United States v. Rajaratnam, 708 F. Supp. 2d 371, 374-75 (S.D.N.Y. 2010).

Although the Court has previously determined that the remaining exhibits are not judicial documents, Barrack's memorandum itself is clearly judicial. However, the redactions concerning these exhibits remain appropriate based on the considerations discussed above.

## GRAND JURY MATERIALS

### I.  Background

Defendants have moved to obtain access to three categories of materials: (i) the prosecution's legal instructions to the grand jury; (ii) access to detailed empanelment records; and (iii) the voir dire questions presented to potential grand jurors. For the reasons discussed below, the motion is DENIED.

## II.     Discovery of Grand Jury Materials Under the Federal Rules

"Rule 16 is ... the sole authorized vehicle under the Federal Rules of Criminal Procedure for pre-trial discovery in criminal cases." United States v. Louis, No. 04-cr-203, 2005 WL 180885, at *2 (S.D.N.Y. Jan. 27, 2005); see also United States v. Sampson, 898 F.3d 270, 280 (2d Cir. 2018) ("[U]nlike their civil counterparts, criminal proceedings have no extensive discovery . . . procedures requiring both sides to lay their evidentiary cards on the table before trial.") (internal quotations omitted).  This rule obligates that the government provide, among other things: "certain statements made by the defendant; the defendant's criminal record; access to certain physical evidence; and reports related to expert, scientific, and medical evidence." United States v. Tucker, 249 F.R.D. 58, 61 (S.D.N.Y. 2008).

Explicitly exempted from Rule 16 is the discovery or inspection of a grand jury's recorded proceedings, except as allowed by certain other rules, including Rule 6.  See Fed. R. Crim. P. 16(a)(3).  Under Rule 6, the government is typically required to keep "matter[s] occurring before the grand jury" secret.  See Fed. R. Crim. P. 6(e)(2).  Courts in the Second Circuit interpret this rule's requirements expansively, finding that "[t]he particularized need standard applies to both substantive matters before the grand jury and more ministerial functions, such as grand jury instructions." United States v. Smith, 105 F. Supp. 3d 255, 260 (W.D.N.Y. 2015).[17]  This is because "no clear line can be drawn distinguishing the ministerial from the substantive." United States v. Larson, No. 07-cr-304, 2012 WL 4112026, (W.D.N.Y. Sept. 18, 2012).

---

[17] As defendants note, this approach differs from that taken by some other Circuits, including the Ninth and Seventh. See, e.g., In re Cudahy, 294 F.3d 947, 951 (7th Cir. 2002); United States v. Belton, No. 14–cr–30, 2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015).

Disclosure otherwise prohibited by Rule 6(e)(2) may be made when so ordered by a court in a judicial proceeding.  See Fed. R. Crim. P. 6(e)(3)(C)(i).  A party seeking disclosure of federal grand jury material must demonstrate a particularized need.  See Douglas Oil v. Petrol Stops Northwest, 441 U.S. 211, 217 (1979).  This requires a movant to demonstrate that "(a) the material sought is needed to avoid a possible injustice, (b) the need for disclosure is greater than the need for secrecy, and (c) the request is structured to cover only material so needed."  Cullen v. Margiotta, 811 F.2d 698, 715 (2d Cir. 1987).

These requirements are not easily met as "[g]rand jury proceedings are afforded a 'presumption of regularity' that is dispelled 'only upon particularized proof of irregularities' in the process."  United States v. Davis, No. 06-cr-911, 2009 WL 637164, at *15 (S.D.N.Y. Mar. 11, 2009) (quoting United States v. Mechanik, 475 U.S. 66, 75 (1986)).  There is "a baseline presumption against disclosure of grand jury proceedings, and the trial court has broad discretion to decide whether disclosure is appropriate."  United States v. Faltine, No. 13-cr-315, 2014 WL 4370811, at *5 (E.D.N.Y. Sept. 2, 2014).  "A defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the grand jury's substantial interest in secrecy.  United States v. Gibson, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001); see also United States v. Sells Eng'g, Inc., 463 U.S. 418 (1983).  Accordingly, "unspecific allegations of need or mere speculation are not adequate," Anilao v. Spota, 918 F. Supp. 2d 157, 174 (E.D.N.Y. 2013), and "requests for wholesale disclosures are generally denied."  See, e.g., United States v. Procter & Gamble, 356 U.S. 677, 683 (1958); Baker v. United States Steel Corp., 492 F.2d 1074, 1079 (2d Cir. 1974).

A.     **Applicability to Requested Materials**

Defendants argue that "because Rule 6(e) does not apply to the narrow set of grand jury materials being requested here, the Court should order their disclosure."  The argument is wrong for two reasons.

First, Rule 6(e) does apply to the materials requested.[18]  See <u>Smith</u>, 105 F. Supp. 3d at 260; <u>see also</u> <u>United States v. Chambers</u>, No. 18-cr-00079, 2019 WL 1014850, at *2 (D. Conn. Mar. 4, 2019) ("courts within the Second Circuit Court of Appeals have consistently held that obtaining grand jury instructions requires a showing of particularized need.") (internal quotations omitted).  Second, even if Rule 6(e) did not apply, defendants are not automatically entitled to this material.  See <u>United States v. Loera</u>, No. 09-cr-466, 2017 WL 2821546, at *8 (explaining that "grand jury material" and other requested items "are already not discoverable by virtue of Rule 16" and further protected from disclosure by Rule 6 and the Jencks Act).  "Particularized need" is the applicable standard here.

Grimes argues that he has a particularized need for the grand jury instructions given "the obscurity of Section 951's registration requirement" and its "unprecedented application to someone in" his position.  However, as discussed *supra*, its application to him is not unprecedented.  Nor can Section 951 fairly be described as obscure.  Moreover, "a 'defendant is not routinely entitled to grand jury . . . instructions in order to engage in a fishing expedition in hopes of uncovering an impropriety or defect in the proceeding where he has no basis to conclude that an impropriety or defect exists.'"  <u>Faltine</u>, 2014 WL 4370811, at *5 (quoting

---

[18] The empanelment records are analyzed under the JSSA below.  But even if Rule 6(e) applied to these records, Grimes has not shown a particularized need for them, nor is he otherwise entitled to them under Rule 16.

<u>United States v. Abounnajah</u>, No. 91-cr–00146, 1991 WL 42895, at *2 (E.D.N.Y. Mar. 26, 1991)).

Grimes points to the alleged "facial omissions of essential elements from the indictment" as evidence that the government may have improperly instructed the jury. However, as discussed above, this Court has already found that the superseding indictment fairly informed defendants of the charges against them, and is not otherwise deficient in a way that would raise any inference that the grand jury instructions were incorrect. <u>See</u> <u>United States v. Santeramo</u>, 45 F.3d 622, 624 (2d Cir. 1995) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly . . . set forth all the elements necessary to constitute the offence intended to be punished.") (internal quotations omitted).

Defendants also note that "as the government has recognized, even the courts have at times been confused about the proper application of Section 951." This too is merely speculative. <u>See Spota</u>, 918 F. Supp. 2d at 174. The sources that Grimes cites to support his argument surrounding this confusion are several years old. <u>See</u> <u>United States v. Amirnazmi</u>, No. 08-cr-0429, 2009 WL 32481, at *1 (E.D. Pa. Jan. 5, 2009); <u>Audit of the National Security Division's Enforcement of the Foreign Agent's Registration Act</u> at 24 (Sept. 2016). Nothing suggests any confusion remains, and Grimes has not proffered any evidence or arguments to suggest that there has been any actual confusion in the prosecution of this case.

The Court also rejects Grimes' arguments that the infrequency of the statute's use, or its supposedly novel application to him, meet the particularized need standard. The Government has demonstrated that the first contention is not factually correct. And even if the Court agreed

that the Government was applying this statute in a novel way, this would not suggest any issue with the government's legal instructions.

**B.** **Voir Dire**

Similarly, defendants have failed to meet the particularized need standard for the voir dire questions presented to potential grand jurors. Because these such questions are asked to jurors before the court, records of such questions are necessarily subject to Rule 6(e)(2). See Fed. R. Crim. P. Rule 16(a)(3) ("recorded proceedings"); see also Fed. R. Crim. P. Rule 6(e)(1)-(2) (proving that "all proceedings must be recorded").

Defendants suggest that there may have been "actual bias" because this is a "high profile, politically charged case." However, "conclusory or speculative allegations of misconduct do not outweigh the presumption of regularity of grand jury proceedings." United States v. Santoro, 647 F. Supp. 153, 173 (E.D.N.Y. 1986).

**III.** **Jury Selection and Service Act**

The Jury Selection and Service Act ("JSSA") provides that criminal defendants "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. Section 1867(f) provides, in pertinent part:

> The contents of records or papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except . . . as may be necessary in the preparation or presentation of a motion under subsection (a), (b), or (c) of this section . . . .The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion.

The Supreme Court has held that

> [t]his provision makes clear that a litigant has essentially an unqualified right to inspect jury lists. It grants access in order to aid parties in the 'preparation' of motions challenging jury-selection procedures. Indeed, without inspection, a party

almost invariably would be unable to determine whether he has a potentially
meritorious challenge.

Test v. United States, 420 U.S. 28, 30 (1975).  "Moreover, '[b]ecause the right of access to jury

selection records is 'unqualified,' a district court may not premise the grant or denial of a motion

to inspect upon a showing of probable success on the merits of a challenge to the jury selection

provisions.'"  United States v. Pirk, 281 F. Supp. 3d 342, 343 (W.D.N.Y. 2017) (internal

quotations omitted).

However, although the right to access is expansive, it is not without limits.  See Davis,

2009 WL 637164, at *16 ("[T]here is no absolute right of access to all materials relating to grand

jury selection.").  "[T]he JSSA is not a license for litigants to rummage at will through all jury-

related records maintained by the Clerk of Court."  Pirk, 281 F. Supp. 3d at 344.  Rather, a

defendant's unqualified right under the JSSA encompasses "only such data as [a defendant]

needs to challenge the jury selection process."  Id.  Courts in this Circuit have found that "[t]he

Master List is sufficient to comply with the Supreme Court's decision in Test because [i]t is not

the actual selection of the grand jury which would constitute the violation but whether the jury

was selected at random from a fair cross section of the community."  United States v. Gotti, No.

02-cr-743, 2004 WL 32858, at *11 (S.D.N.Y. 2004) (internal quotations omitted).

The Government has already consented to allow defendants to inspect a limited set of

data – namely, the county of residence, zip code, and, to the extent available, the race and age of

the individuals listed in the Master Jury Wheel from which the grand jury was selected.

Defendants seek two additional categories of information under the JSSA: (i) the list for the

grand jury that returned the indictment, including attendance record and reasons for absence of

each grand juror from any sitting of the grand jury during which evidence regarding this case

was presented; and (ii) the record of any grand jurors who were summoned but excused from service.

As to the first category, the JSSA only allows a challenge with respect to the *selection* of a grand jury.  See 28 U.S.C.A. § 1867(a).  Therefore, under the JSSA, Grimes is not entitled to any attendance records, which are not relevant to the selection of the grand jurors.

As to the second category, defendants have already had access to all the materials required under the JSSA and Test.  Defendants argue that they require this additional data "to determine the demographic effect of the current pandemic on the operation of the grand jury."  However, by imposing these requirements for the composition of a master jury wheel, Congress did "not [mean to] require that at any stage beyond the initial source list[,] the selection process shall produce groups that accurately mirror community makeup."  House Report, reprinted in 1968 U.S.C.C.A.N. at 1794.

The Court recognizes that some judges in this district have cast doubt on the proposition that the Master Jury Wheel is sufficient and have also permitted defendants access to additional information.  See, e.g., United States v. Corbett, No. 20-cr-213, 2020 WL 5803243, at *3 (E.D.N.Y. Aug. 21, 2020).  However, Corbett, at least, involved an expert supplying particularized allegations showing potential irregularities.  Those are absent here.  And most decisions in this district have gone the other way.  See Dkt. No. 79 at 9 n.7.

## MOTION TO COMPEL

### I.  Background

Finally, Barrack seeks certain discovery materials that he claims the Government has failed to turn over to him, either not at all, or not as promptly as he desires.  In particular, he seeks disclosure under Rule 16, Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, of: (1)

"[a]ll communications between [himself] and the Trump Campaign and Administration regarding the Middle East; (2) "[a]ll interview memoranda, related notes, and grand jury transcripts in the possession, custody, or control of the government"; and (3) certain allegedly exculpatory materials pertaining to the charges under Section 951[19] and the false statement charges.[20]

## II. Legal Standard

The obligations of the Government to disclose information in this case are governed by Federal Rule of Criminal Procedure Rule 16, Brady v. Maryland, and Giglio v. United States.

Rule 16 of the Federal Rules of Criminal Procedure governs pre-trial discovery in criminal cases and provides, in pertinent part, that a defendant is entitled to obtain from the Government documents and objects that are "within the government's possession, custody, or control" if "(i) the item is material to preparing the defense; (ii) the government intends to use

---

[19] These include all materials showing that: Barrack disclosed his contacts with the UAE to U.S. government officials; Barrack acted with the encouragement and approval from the Trump Campaign or U.S. government, rather than in response to directions from UAE officials; Barrack disclosed his contacts with the UAE to federal investigators and State Department; Barrack acted contrary to the UAE's interests, such as in supporting Qatar during its conflict with the UAE; Barrack did not take any steps to advance the UAE's primary foreign policy goals, unlike the UAE's actual agents; Barrack was not included in, and was not aware of, high level contacts and secret meetings between the UAE and the U.S. government; Barrack had limited contacts with UAE leaders during the relevant time period; Emirati Official 4 was a low-level government protocol employee; Barrack received no compensation or other consideration from the UAE; in 2017, Barrack was interested in and was recruited for foreign policy positions in the U.S. government entirely unrelated to the Middle East; Barrack had long advanced the views on the Middle East and the UAE well before he was allegedly a foreign agent; the requests Barrack allegedly received from the UAE are common requests and were made to other members of the transition or administration from individuals with no connection to the UAE, as well as evidence or information reflecting that Barrack did not follow up on such requests from the UAE; the steps Barrack is alleged to have taken related to the UAE were trivial or unremarkable; and that federal intelligence agencies were aware of Barrack's contacts with the UAE and, unlike the prosecutors on this case, did not conclude that he was a national security threat or foreign agent.

[20] These include: all drafts of the Government memorandum of Barrack's June 2019 interview; the identity of the agent or agents who took contemporaneous notes of the interview and who drafted the interview memorandum; the identity of any agent, prosecutor, or other individual who commented on, revised, or otherwise edited the interview memorandum; the identity of the individual who approved the final version of the memorandum; notes taken by other Government attendees at the interview, including the prosecutors; information or metadata reflecting when the interview memorandum began to be drafted, each time it was edited, when those revisions were made, and the identity of any person who made those edits; whether any notes or drafts of the memorandum of the interview that previously were created have not been preserved or are no longer available, and if so, why those materials are no longer available; and all communications about the decision or directive not to record the interview.

the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. Rule 16(a)(1)(E).

The Government's obligation to disclose certain evidence also arises from the Constitution. Under Brady, the Government must disclose favorable material evidence to a criminal defendant. See Brady, 373 U.S. at 86 (1963); see also United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004). Evidence is "favorable" to the defendant if it undermines the Government's proof or supports a valid defense, a universe that includes both "exculpatory information" and "information that could be used to impeach government witnesses, so-called Giglio material." United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)).

### III. Possession, Custody, or Control

Regardless of whether the Government's particular disclosure obligation stems from statutory or constitutional authority, it is only obligated to provide information that is within its possession, custody, or control. Nevertheless, Barrack argues that he is entitled to "records from the agencies that [he] interacted with during the time period alleged" and not just the "narrow group of prosecutors and agents in the EDNY or the files of the DOJ trial attorney from the National Security Division."

Barrack is correct that the "prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to [ ] others acting on the government's behalf in the case.'" United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (quoting Kyles v. Whitley, 514 U.S. 419, 437-38 (1995)). But such a duty to learn of favorable evidence is not limitless. See United States v. Hutcher, 622 F.2d 1083, 1088 (2d Cir. 1980) ("Clearly the government cannot be required to produce that which it does not control and never has possessed or inspected."); see

also Raniere, 384 F. Supp. 3d at 325 ("Brady does not require the government to search for exculpatory material not within its possession or control.").

Under Second Circuit law, whether the Government's disclosure duty extends to evidence maintained by another federal agency depends on whether the agency is "an arm of the prosecutor" or "part of the 'prosecution team.'" United States v. Meregildo, 920 F. Supp. 2d 434, 440-41 (S.D.N.Y. 2013) (quoting United States v. Gil, 297 F.3d 93, 106 (2d Cir. 2002)). There is no clear test, and inquiries are generally heavily fact dependent. Id.; see also United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (reports made by FBI agents during its investigations apparently unrelated to the defendants' prosecutions should not be imputed). At the two clear extremes, "investigating case agents are part of the prosecution team but agents of a separate organization or sovereign who are uninvolved in the investigation are not." Id. at 441.

Other than the Special Prosecutor's Office, the Government has represented that no other federal agencies participated in the prosecution of this case. Barrack does not assert otherwise. That this is a "national security case" does not alter the Government's legal obligations and it is under no requirement to search for materials in the possession or control of other agencies. See, e.g., Loera, 2017 WL 2821546, at *7 (denying request for materials in possession of U.S. Department of State ("State") and Department of Justice's Office of International Affairs ("OIA") because "State and OIA are not part of the prosecution team and therefore not subject to Rule 16"). However, the Government has represented that it would voluntarily search the files of some other agencies. When it does that, it is held to the same standard that applies to information found in its own files.

## IV.     Discovery Under Rule 16

In making his "wish list," Barrack specifically requests that the Government produce "[a]ll communications between [himself] and the Trump Campaign and Administration regarding the Middle East."

Under Rule 16(a)(1)(E), he is entitled to any such statements if they are material.  A document is material under Rule 16 if its "pretrial disclosure will enable a defendant to alter significantly the quantum of proof in his favor."  United States v. Giffen, 379 F.Supp.2d 337, 342 (S.D.N.Y.2004) (citations omitted).  "Conclusory allegations are insufficient, however, to establish materiality . . . and the burden is on the defendants to make a *prima facie* showing that the documents sought are material to preparation of the defense.'"  United States v. Finnerty, 411 F. Supp. 2d 428, 431 (S.D.N.Y. 2006).

As with the grand materials, "Rule 16(a) is not and never was [ ] 'intended to provide the defendant with access to the entirety of the government's case against him.'"  United States v. Delacruz, No. 14-cr-815, 2015 WL 2211943, at *1 (S.D.N.Y. May 12, 2015) (quoting United States v. Percevault, 490 F.2d 126, 130 (2d Cir. 1974) (citation omitted)).  Rule 16 "does not entitle a criminal defendant to a broad and blind fishing expedition among [items] possessed by the Government on the chance that something impeaching might turn up."  United States v. Larranga Lopez, No. 05-cr-655, 2006 WL 1307963, at *8 (E.D.N.Y. May 11, 2006) (alteration in original) (citing Jencks v. United States, 353 U.S. 657, 667 (1957) (internal quotations omitted).

The Government represents that it has "already provided all communications between Barrack and the Trump Campaign and Administration about the Middle East that are currently in its possession, custody or control, including communications that fall outside the scope of Rule 16."  To the extent that Barrack requests additional materials, the Court is inclined to agree that

this is a classic fishing expedition, where the defendant "intends to review all of the materials and then determine what, if anything, supports a permissible argument."  See Loera, 2017 WL 2821546, at *7.  Without any more specific, non-conclusory allegations, the Court denies this request.

## V.     Exculpatory Materials

Barrack also contends that the Government has failed to promptly provide Brady and Giglio materials relating to both the Section 951 and the false statement charges.

"The basic rule of Brady is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (citing Brady, 373 U.S. at 87).  "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness."  Id.

At the outset, the Government here has pledged that it takes its obligations under Brady, Giglio, and their progeny seriously, and that it will continue to comply with those obligations. "The courts of this Circuit repeatedly have denied pretrial requests for discovery orders pursuant to Brady where the Government has made such good faith representations."  United States v. Shkreli, No. 15-cr-637, 2016 WL 8711065, at *2 (E.D.N.Y. Dec. 16, 2016) (collecting cases).

Barrack contends that the Court should disregard these representations, and the Circuit's practice of relying on them.  He notes that since Shkreli, "much has changed" and "several district courts in the Second Circuit have been forced to sanction the government in the face of repeated, belated disclosures of exculpatory evidence, including cases where the government did not give appropriate weight to the exculpatory nature of information acquired during prior witness interviews."  But cherry-picking isolated instances of misconduct, none of which were

committed by the U.S. Attorney's Office for the Eastern District of New York, is not a persuasive reason to depart from the usually practice. Courts in this Circuit continue to credit such pretrial representations in the absence of circumstantial evidence showing that they are false or mistaken. See, e.g., United States v. Gillier, No. 11-cr-409, 2022 WL 179204, at *2 (S.D.N.Y. Jan. 19, 2022); United States v. Elder, No. 18-cr-92, 2021 WL 4129153, at *6 (E.D.N.Y. Aug. 25, 2021); Raniere, 384 F. Supp. 3d at 325. Prosecutors in this district are well aware of the personal and professional consequences they will suffer if they take too narrow an approach to their production obligations. Absent some circumstantial evidence that they are acting in violation or neglect of their obligation, the Court is not going to presume that they are.

Although the Court accords deference to the representations of the Government, and may properly determine the motion on this basis, the Court will also briefly address Barrack's specific arguments in the alternative.

## A. Section 951

Barrack argues that, in his view, the Government must produce certain categories of allegedly exculpatory material relating to the charges under Section 951. The problem with this argument is that, as discussed *supra*, the Court disagrees with Barrack's interpretation of Section 951.

To be found guilty under Section 951, a person only must "act[] in the United States as an agent of a foreign government without prior notification to the Attorney General." 18 U.S.C. § 951(a) (emphasis added). However, again, Barrack argues that "the government must prove that the defendant was acting under a *duty* to the foreign government, such that he was *required* to follow its directions and orders, and that the foreign government in turn had the *power to direct* his actions." Therefore, Barrack requests several categories of material that he believes will tend to exculpate him. For example, these include any materials that suggest that he "acted contrary

52

to the UAE's interests" or "received no compensation or other consideration." Although case law has clarified that a certain level of mutuality and agreement are required to act as an agent, Rafiekian, 991 F.3d at 538, a duty is not such a requirement. Therefore, these materials are not material to guilt or punishment.

Barrack also argues that since "Section 951 is targeted only at punishing undisclosed or secret attempts to aid a foreign government," materials that suggest he disclosed his contacts to other U.S. governmental officials, or acted with their encouragement or approval, would exculpate him. But whether Barrack disclosed some of his activities to other governmental actors is immaterial. Section 951 is only concerned with whether he disclosed his activities to the Attorney General.

The Court agrees that, to the extent Barrack seeks "evidence or information reflecting that [he] did not follow up on such requests from the UAE," this would be exculpatory information that he is entitled to have. Not complying with a direct request from a foreign principal would suggest a lack of an agreement. But as the Government has averred that it has provided all these materials to Barrack currently in its possession, custody, or control, the Court can make out no failure on its part, and finds that there is nothing to compel.

### B. False Statement

Barrack also argues that he is entitled to additional categories of allegedly exculpatory evidence relating to the record of his FBI interview. This material includes "(1) drafts of the interview memorandum, (2) the agents or prosecutors who revised or influenced the content of the memorandum, (3) identification of any additional prosecutor or agent who took notes or otherwise summarized Mr. Barrack's statements at the interview, (4) data reflecting changes made to the interview memorandum and when those changes were made, and (5) whether any

notes or prior drafts of the interview memorandum were made, but not preserved, by the government."

The Government has already provided Barrack with the interview memorandum, contemporaneous handwritten notes, and has additionally identified the agents who interviewed him.  At this point, this is all the Government is required to provide, especially because Barrack and his attorneys were present for the interview and therefore know what happened.  See United States v. Grossman, 843 F.2d 78, 85 (2d Cir. 1988) ("Brady does not require the government to turn over exculpatory evidence if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence.").

The additional information that is sought by the Barrack, in the view of the Court, likely constitutes Giglio material.  The Government is directed to produce all such material when it produces its 3500 and Jencks Act material.

### C.  Other Materials

Finally, to the extent Barrack seeks witness statements and reports of witnesses, the Court notes that, there is no pre-trial right to statements and reports of witnesses in the Government's possession.  Under the Jencks Act, no witness statement or report in the possession of the Government shall be "the subject of subpoena, discovery, or inspection" until the witness has testified on direct examination at trial.  18 U.S.C. § 3500(a); see Coppa, 267 F.3d at 145-46 (district court exceeded its authority in ordering pre-trial disclosure of Jencks Act material because the Jencks Act constrained the court's power to issue any such order).

Moreover, as to the specific witnesses he identifies, the Second Circuit has made clear that disclosure of the names of potential exculpatory witnesses fully satisfies the Government's Brady obligations.  See United States v. Zagari, 111 F.3d 307, 320 (2d Cir. 1997); United States v. Reddy, 190 F. Supp. 2d 558, 575 (S.D.N.Y. 2002) ("In fulfilling its obligations under Brady,

the Government may direct the Defendants' attention to any witnesses who may have material exculpatory evidence").  The Government's therefore fulfilled any obligation to Barrack when it disclosed the names of the witnesses.

## CONCLUSION

To summarize, the Court holds:

1.      Defendants' motions for joinder are GRANTED.

2.      Defendants' motions to dismiss the indictment and for release of grand jury materials are DENIED.

3.      The motion to unseal is GRANTED in part, and DENIED in part.  Barrack is directed to file unsealed copies of Exhibits 4 and 5, as well as a memorandum with any redactions involving these exhibits removed.

4.      Defendants' motion to compel is DENIED, except that the Government must provide the additional information identified by the Court as Giglio material when it produces its 3500 and Jencks Act material.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
       June 22, 2022