RCH/SPN/HDM/CRH/MJM
F. #2018R01309

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

RASHID SULTAN RASHID AL MALIK
ALSHAHHI,
       also known as "Rashid Al Malik"
       and "Rashid Al-Malik,"
THOMAS JOSEPH BARRACK and
MATTHEW GRIMES

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

No. 21-CR-371 (S-1) (BMC)

MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANTS' MOTION IN LIMINE TO PRECLUDE
TESTIMONY OF GOVERNMENT EXPERT WITNESSES

BREON PEACE
United States Attorney
Eastern District of New York

Ryan C. Harris
Samuel P. Nitze
Hiral D. Mehta
Craig R. Heeren
Assistant United States Attorneys

Matthew J. McKenzie
Trial Attorney
National Security Division
(Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ............................................................................................................... 2

ARGUMENT ..................................................................................................................... 5

I.  Legal Standard ........................................................................................................ 5

II.  Discussion ............................................................................................................... 7

    A. The Expert Testimony of Michael Higgins is Relevant and Admissible at Trial ........ 7

    B. The Expert Testimony of Dr. Christopher Davidson is Relevant and Admissible
      at Trial ................................................................................................................. 16

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

Alexander v. Hanson,
   566 F.Supp.3d 162 (N.D.N.Y. 2021) ................................................................. 14
Gill v. Arab Bank, PLC,
   893 F. Supp. 2d 523, (E.D.N.Y. 2012) ............................................................ 10
Nimely v. City of New York,
   414 F.3d 381 (2d Cir. 2005) .............................................................................. 6
Old Chief v. United States,
   519 U.S. 172 (1997) ......................................................................................... 12
Restivo v. Hesseman,
   846 F.3d 547 (2d Cir. 2017) .............................................................................. 6
United States v. Abarca,
   No. 19-CR-3751, 2021 WL 6803226 (2d Cir. Dec. 15, 2021) ......................... 24
United States v. Amuso,
   21 F.3d 1251 (2d Cir. 1994) ............................................................................ 12
United States v. Angelilli,
   660 F.2d 23 (2d Cir. 1981) .............................................................................. 14
United States v. Antoine,
   No. 10-CR-229, 2012 WL 3929205 (W.D.Pa. Sept. 7, 2012) ......................... 15
United States v. Armstrong,
   436 Fed. App'x 501 (6th Cir. 2011) ................................................................ 14
United States v. Atilla,
   15 Cr. 867 (RMB), (S.D.N.Y. Nov. 22, 2017) ................................................ 10
United States v. Banki,
   No. S1 10 CR. 08 (JFK), 2010 WL 2076770, (S.D.N.Y. May 25, 2010) .......... 10
United States v. Boles,
   914 F.3d 95 (2d Cir. 2019) ................................................................................ 6
United States v. Bourne,
   No. 08-CR-888 (NGG), 2011 WL 4458846, (E.D.N.Y. Sept. 23, 2011) ........... 8
United States v. Brettschneider,
   832 F. App'x 14 (2d Cir. 2020) ...................................................................... 13
United States v. Delaney,
   No. 18-1919, 2022 WL 356731 (7th Cir. Feb. 7, 2022) .................................. 15
United States v. Dukagjini,
   326 F.3d 45 (2d Cir. 2003) .............................................................................. 12
United States v. Elfgeeh,
   515 F.3d 100 (2d Cir. 2008) ............................................................................ 23
United States v. Farhane,
   634 F.3d 127 (2nd Cir. 2011) .......................................................................... 12
United States v. Gentile,
   233 F. App'x 86 (2d Cir. 2007) ........................................................................ 5
United States v. Gonzalez,
   110 F.3d 936 (2d Cir. 1997) .............................................................................. 9
United States v. Huezo,

546 F.3d 174 (2d Cir. 2008)............................................................................... 8, 11

United States v. Kadir,
  718 F.3d 115 (2d Cir. 2013) .......................................................................... 13

United States v. Kampiles,
  609 F.2d 1233 (7th Cir. 1979) ...................................................................... 10

United States v. Locascio,
  6 F.3d 924 (2d Cir.1993)............................................................................. 5, 6

United States v. Lopez,
  547 F.3d 364 (2d Cir. 2008)......................................................................... 6, 8

United States v. Mulder,
  273 F.3d 91 (2d Cir. 2001) ........................................................................... 13

United States v. Nektalov,
  No. 03 CR 828 (PKL), 2004 WL 1469487, (S.D.N.Y. June 30, 2004) ..................... 9

United States v. Taylor,
  18 F.3d 55 (2d Cir. 1994).............................................................................. 12

United States v. You,
  534 F. Supp. 3d 880 (E.D. Tenn. 2021) ........................................................ 10

Untied States v. Ekiyor,
  89 F. Supp. 3d 928 (E.D. Mich. 2015)........................................................... 14

**Statutes**
18 U.S.C. § 951 ...................................................................................... 2, 4, 5

**Other Authorities**
28 Pages of the 2002 Congressional Inquiry into the Sept. 11 Attacks,
  WASH. POST, July 15, 2016, https://www.nytimes.com/interactive/2016/07/15/us/document-
  september-11-28-pages.html ........................................................................ 22

**Rules**
Federal Rule of Evidence 16(a)(1)(G) ................................................................. 1
Federal Rule of Evidence 404(b) .......................................................... 1, 13, 14
Federal Rule of Evidence 702................................................................................. 1
Federal Rule of Evidence 702(a) ............................................................. 5, 18, 21
Federal Rule of Evidence 704................................................................... 6, 13

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in opposition to defendants Thomas J. Barrack and Matthew Grimes's (the "Defendants") joint motion <u>in limine</u> to preclude testimony by three expert witnesses noticed by the government pursuant to its obligations under Federal Rule of Evidence 16(a)(1)(G).[1] <u>See</u> Defs. Mot. <u>in Limine</u> (Dkt. No. 164) ("Defs. Mot."). Specifically, the Defendants seek to preclude (1) any testimony by Mr. Michael Higgins, a former member of the United States intelligence community with expertise in intelligence gathering and counterintelligence operations, (2) portions of proposed expert testimony by Dr. Christopher Davidson, an academic and author whose scholarship focuses on the Middle East, including the politics and history of the United Arab Emirates ("UAE") and other Gulf states, and (3) portions of proposed testimony by Dr. Eliot Kalter, an expert in global capital markets, with a particular focus on sovereign wealth funds, including in the Middle East. The Defendants contend that the challenged testimony is irrelevant and unduly prejudicial. They argue further that Mr. Higgins's testimony regarding the work of foreign intelligence services is inadmissible propensity evidence that runs afoul of limits imposed by Federal Rule of Evidence 404(b). Defs. Mot. at 5-9.

The Defendants' arguments as to Mr. Higgins and Dr. Davidson are meritless. Mr. Higgins and Dr. Davidson's proposed testimony satisfies the standard set by Federal Rule of Evidence 702, is highly relevant, and poses minimal risk of unfair prejudice, particularly when set in context by an appropriate jury instruction at the close of the case. As to Dr. Kalter, the government hereby revises its expert notice to remove the challenged portions of his proposed

---

[1] <u>See</u> Gov't August 5, 2022 Letter to Defs. Providing Expert Notice (attached as Exhibit A).

1

testimony on the benefits, harms, and risks presented by sovereign wealth funds as investment vehicles. The government does so chiefly in the interest of trial efficiency, and without conceding the merit of the Defendants' objections. Accordingly, and for the reasons discussed further below, the Court should (1) deny the Defendants' motion to exclude portions of Dr. Kalter's testimony as moot, (2) deny the Defendants' motions regarding Mr. Higgins and Dr. Davidson on the merits, and (3) permit the government's expert witnesses to testify as proposed in the government's notice, as amended herein with respect to Dr. Kalter.

## BACKGROUND

The Defendants are charged with acting as agents of the UAE without prior notice to the Attorney General, in violation of Title 18, United States Code, Section 951 ("Section 951"), and with conspiring to do the same, among other offenses. The evidence will show that, at the direction of the UAE government, the Defendants made contact with senior UAE national security officials, attempted to influence public opinion and the foreign policy positions of the Trump Campaign and Administration, relayed non-public information about the foreign policy positions and internal deliberations of the U.S. government back to the UAE, developed plans to increase the UAE's political influence, pushed for UAE-favored policies, and agreed to promote UAE-favored individuals for U.S. government positions. Among other things, the UAE officials directed the Defendants to take actions that benefitted the Kingdom of Saudi Arabia ("KSA"), one of the UAE's closest allies, and, in fact, many of the taskings that were given to the Defendants by UAE government officials involved the promotion of both UAE and KSA interests. After the Defendants acted as foreign agents in the United States, two UAE sovereign wealth funds, both of which are controlled by the UAE government, invested approximately $374 million with the Defendants' company.

The Defendants' conduct occurred over the course of approximately two years. It involved travel around the world, including between and among New York, Washington D.C., Los Angeles, the UAE, and the KSA. The Defendants' conduct involved the upper echelons of both the UAE and U.S. governments, and included significant interactions with UAE, KSA, and U.S. officials involved in national security, intelligence gathering, and foreign policy decision-making. Much of the Defendants' conduct was carried out through a surreptitious network of intermediaries and staffers for senior UAE officials and included the Defendants' procurement of an encrypted application and a secret phone to communicate with UAE officials, at the UAE's direction.

The government's theory of the case, as reflected by these allegations, is that the Defendants operated as agents of the UAE government. They engaged in numerous actions at the direction of the UAE government in the United States and did so without providing prior notification to the Attorney General. While the government is not required to prove motive, the government expects that it will argue that one reason why the Defendants and UAE officials engaged in this scheme was so that the UAE could obtain sensitive information about the U.S. government, influence the U.S. government and American public in a manner consistent with UAE foreign policy interests, and exert leverage to obtain U.S. government policies favorable to UAE interests (including policies that favored their most important ally, the KSA). The Defendants and their co-conspirators also engaged in this conduct because the UAE controlled billions of dollars through sovereign wealth funds, and the Defendants hoped that they would secure investments from these funds for their company if they worked towards achieving the UAE's desired political outcomes.

By contrast, the Defendants have argued throughout the pendency of the case that their actions were innocent, consistent with ordinary business activities, and inconsistent with

foreign intelligence activities. The Defendants have consistently sought to contrast the allegations against them with what they argue is more serious espionage, espionage-like, or otherwise clandestine activity associated with spies or spying that, in the Defendants' view, falls within the statute's core prohibition. See generally, e.g., Barrack Mot. to Dismiss (ECF No. 67-1); Grimes Mot. to Dismiss (ECF No. 71). Barrack has previously argued that the government has not alleged that he was involved in "espionage or subversive conduct against the United States." Barrack Mot. to Dismiss at 23. He has claimed that "the core of Section 951's usefulness" is reserved for "espionage prosecutions, where its violation [was] often used as a secondary offense and as an investigative predicate for the FBI." Id. at 22. He has objected to the charges because, he has claimed, "every reported Section 951 decision in this circuit involved espionage-related activities on behalf of foreign intelligence agents or assets." Id. Barrack has gone so far as to state that his conduct was not only different from "espionage-like" activity, but that his conduct was affirmatively good for the United States. See id. at 23 (asserting that there are "no allegations that he ever engaged in any activity against the interests of United States" and that he was acting to "to assist in carrying out the interests of the United States"). Barrack also has more generally argued that his conduct was ordinary and innocent. See id. at 1 (arguing that Barrack "stands accused of crimes for voicing long-held views about the Middle East and communicating with its leaders"), 14 (suggesting that it was improper to allege that "public speeches and published statements; meetings and communications with government officials and business colleagues; and advice to the President" could constitute criminal activity).

  Similarly, Grimes has argued that, in its entire history, Section 951 has "never before been used against a person in Mr. Grimes' position" and instead is reserved for "spies and others engaged in criminal activity." Grimes Mot. to Dismiss at 1. Grimes has claimed that

"innocent activities" like helping to "draft speeches, presentations, and articles" and "prepar[ing] a strategy proposal" cannot be "in furtherance of espionage or any other criminal activity." Id. at 10. Like Barrack, Grimes has contrasted his own conduct with the "clandestine, espionage-like behavior, information gathering, and procurement of technology on behalf of foreign governments or officials" that falls within the core prohibition of the statute. Id. at 19 (internal quotation marks omitted). In sum, the Defendants have repeatedly argued that they should not have been prosecuted because their conduct was not "clandestine" or "espionage-like" behavior of the sort Section 951 was meant to combat.

Although the Court rejected these arguments in its order denying the motions to dismiss, the government fully anticipates that the Defendants will make these arguments, in various forms, to the jury at trial, suggesting that the Defendants' conduct was not serious, did not implicate national security concerns, and constituted typical business or networking activities.

ARGUMENT

The proposed expert testimony of Mr. Higgins and Dr. Davidson is relevant, will help the jury understand important facts and related context in a specialized area beyond their everyday understanding, and will present minimal, if any, risk of unfair prejudice. Accordingly, the testimony is admissible at trial. The Defendants' arguments to the contrary are meritless.

I.    Legal Standard

An expert witness may testify in the form of an opinion or otherwise if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert testimony should be limited to situations in which the subject matter is beyond the ken of the average juror. See United States v. Locascio, 6 F.3d 924, 936 (2d Cir.1993). "[E]xpert testimony about the structure and workings of a group engaged in criminal activities is permissible either as background for an

offense or to assist in proving one or more elements of the offense." United States v. Gentile, 233 F. App'x 86, 88 (2d Cir. 2007) (internal quotation marks and alteration omitted).

Although the Court serves a "gatekeeping" function for expert testimony, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005). Expert testimony should be excluded "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Restivo v. Hesseman, 846 F.3d 547, 577 (2d Cir. 2017) (internal quotation marks omitted). Absent this degree of unreliability, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Id. (internal quotation marks omitted).

"A district court has broad discretion in deciding whether to admit expert testimony, and the exercise of that discretion will not be disturbed unless it is manifestly erroneous." United States v. Boles, 914 F.3d 95, 110 (2d Cir. 2019) (internal quotation marks omitted). Ultimately, the Court should make a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Locascio, 6 F.3d at 936. Under Rule 704 of the Federal Rules of Evidence, "an opinion is not objectionable because it embraces an ultimate issue," but an expert witness must not "state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704; see also United States v. Lopez, 547 F.3d 364, 373 (2d Cir. 2008) (same).

II.    <u>Discussion</u>

    A.    <u>The Expert Testimony of Michael Higgins is Relevant and Admissible at Trial</u>

       1.    <u>Scope of and Bases for Proposed Testimony of Michael Higgins</u>

Michael Higgins is expected to testify about (1) the existence of foreign intelligence services and their objectives; (2) methods used by foreign intelligence services; (3) intelligence gathering and foreign interest in unclassified information; (4) communications methods with foreign intelligence; (5) the interest of foreign governments in activities designed to influence the U.S. media, the U.S. government, and the U.S. public; and (6) counterintelligence responses, including the use of defensive briefings and threat briefings in response to foreign intelligence actions.   Mr. Higgins will not testify specifically about the UAE or KSA or about the conduct of the Defendants or their co-conspirators or about their respective mental states.

Mr. Higgins' testimony is based upon substantial, practical, real-world experience with these topics.  ███████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████  A more
detailed summary of Mr. Higgins' expected testimony and the basis of his expertise is set out in Exhibit A.

### 2. Michael Higgins' Proposed Expert Testimony is Admissible at Trial

Mr. Higgins's testimony satisfies the requirements of Rule 702 and is relevant for at least two reasons. First, this case is about an international conspiracy to influence the U.S. government and secure sensitive information by members of the UAE government and their agents, Barrack, Grimes, and their fugitive co-defendant Rashid Al Malik ("Al Malik"). Mr. Higgins' testimony about how the national security and intelligence apparatuses of foreign governments operate will provide jurors with important background and context that is directly relevant to a case where the Defendants are alleged to have engaged in conduct at the direction of foreign officials involved in national security, intelligence gathering, and foreign influence. Just as expert testimony regarding money-laundering techniques is admissible in cases involving money laundering offenses, see, e.g., United States v. Huezo, 546 F.3d 174, 181 (2d Cir. 2008), and expert testimony about "the practices of drug dealers and users" is admissible in a case involving drug trafficking offenses, United States v. Lopez, 547 at 368, so, too, expert testimony regarding foreign intelligence techniques is relevant and admissible in a case involving an alleged foreign intelligence gathering and influence campaign. See also United States v. Bourne, No. 08-CR-888 (NGG), 2011 WL 4458846, at *8 (E.D.N.Y. Sept. 23, 2011) (observing that "courts in this circuit have repeatedly approved of the use of expert testimony to assist jurors in understanding money laundering techniques" and collecting cases).

Second, Mr. Higgins's testimony is relevant to help jurors understand that the conduct at issue in this case presented serious national security risks. The Defendants, as discussed above, have gone to great pains to argue that their conduct is far removed from "espionage-like" activity, and, therefore, that their conduct does not fall within the reach of the statute. While the pernicious nature of the type of conduct the Defendants engaged in is readily apparent to the government and national security professionals, the Defendants have until this

point suggested that the alleged conduct is no cause for concern even if it were found to violate the statute as a technical matter (not that they have conceded even a technical violation).  If sophisticated defense counsel do not see how the Defendants' alleged actions at the direction of a foreign government present a substantial national security risk, then jurors likewise may not know or understand this important background fact.   In such circumstances, "the trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.   Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."   United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997) (internal quotation marks omitted).

The proffered testimony is even more important if, as the Defendants have indicated, they intend to urge the jury to find the Defendants not guilty based, in part, on the purported insignificance of the steps they are alleged to have taken on behalf of the UAE.   As the Defendants' own arguments demonstrate, it is necessary that the jury understand that national security and intelligence activities are not always carried out by the likes of fictional spies Jack Ryan and George Smiley.   As Mr. Higgins will testify, foreign intelligence services gather information and seek to exert influence in a variety of ways, some of them mundane, often based on the available opportunities, the goals of the operation, and the risks of detection.   Given the relatively complex network of relationships between the Defendants and UAE government officials, and the broad array of actions taken by the Defendants at UAE direction, it will be important for a jury to understand how networks engaged in intelligence gathering and influence operations work.   See United States v. Nektalov, No. 03 CR 828 (PKL), 2004 WL 1469487, at *2 (S.D.N.Y. June 30, 2004) ("The Second Circuit has routinely upheld the admission of expert

testimony offered by the government to explain the workings of criminal transactions and enterprises—such as narcotics trafficking, organized crime, and money laundering—that, without explanation, would be esoteric or otherwise beyond the understanding of the average juror." ).

Mr. Higgins's proposed expert testimony is neither controversial nor unusual. Indeed, courts in this Circuit and across the country have repeatedly approved the admission of expert testimony to explain the methods and means employed by groups and organizations, including foreign governments, where such information falls outside the knowledge of the average juror. See, e.g., United States v. Kampiles, 609 F.2d 1233, 1247 (7th Cir. 1979) (affirming admission of expert testimony by counter-intelligence expert regarding Soviet intelligence recruiting practices where defendant was charged with gathering and transmitting defense information to a foreign government); United States v. You, 534 F. Supp. 3d 880, 884 (E.D. Tenn. 2021) (admitting expert testimony regarding PRC Government talent recruitment programs, the PRC's "strategics of foreign technology acquisition," and the "inner workings" of aspects of "the PRC's governmental system" because the subjects "encompass specialized international economic and global policy knowledge that is outside the typical American lay juror's experience"); United States v. Atilla, 15 Cr. 867 (RMB), Dkt. No. 357 (S.D.N.Y. Nov. 22, 2017) (admitting expert testimony regarding "the role of certain sanctioned entities and individuals in the Iranian government and economy"); Gill v. Arab Bank, PLC, 893 F. Supp. 2d 523, 532 (E.D.N.Y. 2012) (admitting expert testimony regarding strategies and methods of Middle Eastern terrorist groups and relationships between these groups, as well as on historical origins and contemporary practice of form of charity used by groups to obtain funding); United States v. Banki, No. S1 10 CR. 08 (JFK), 2010 WL 2076770, at *2 (S.D.N.Y. May 25, 2010) (in Iranian sanctions prosecution, admitting expert testimony regarding "the operation of the alleged hawala").

The Defendants here are alleged to have engaged with national security figures in the UAE over a period of two years in support of the UAE's efforts to gather information and exert influence, and the Defendants' conduct and that of their co-conspirators in the UAE had many of the characteristics of a typical intelligence gathering and foreign influence operation. At least that will be the government's argument at trial. Cf. Huezo, 546 F.3d at 181 (rejecting sufficiency challenge based in part on witness testimony describing "in detail, generally consistent with the expert testimony, the techniques and individual steps" involved in money laundering operation). The Defendants, by contrast, not only argue that they did not engage in the alleged conduct on behalf of the UAE, but further claim that the conduct at issue is innocent and distinct from "espionage-like" activity. In this context, it is entirely appropriate for the government to introduce expert testimony to give the jurors the context they need, including basic background concepts and information about the national security and intelligence methods and means of foreign governments, to assess the evidence and the parties' arguments. See Fed. R. Evid. 702 advisory committee's note ("The rule [ ] recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts.").

The Defendants argue that the challenged testimony is so general as to be obvious to all jurors and otherwise uncontroverted. See Defs. Mot. at 10. But the Defendants' own arguments demonstrate why this claim is without merit, as they themselves have repeatedly argued that their own conduct cannot possibly be a national security issue, or a potential source of intelligence for a foreign government. In any event, even if the jury were sophisticated enough to know that foreign government national security and intelligence activities extend beyond James

Bond-type figures, that would not be a valid basis to preclude Mr. Higgins' testimony.   The

Second Circuit has rejected just this sort of argument in the context of the Italian mafia:

> [d]espite the prevalence of organized crime stories in the news and popular media, these topics remain proper subjects for expert testimony.   Aside from the probability that the depiction of organized crime in movies and television is misleading, the fact remains that the operational methods of organized crime families are still beyond the knowledge of the average citizen.

Farhane, 634 F.3d at 159 (quoting United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994)).

Although obviously this case does not involve organized crime, the same principle applies.   There

is no reason to presume that any (let alone all) of the jurors will be properly informed about the

nature of national security and intelligence activity by foreign governments and may even be

misinformed by popular television.   An expert like Mr. Higgins will help clarify misconceptions

and ensure that all jurors operate on the same footing, with accurate background knowledge they

can use to understand the facts of this case.   Cf. United States v. Taylor, 18 F.3d 55, 59 (2d Cir.

1994) ("Expert testimony may be used on some occasions to explain even non-esoteric matters,

when the defense seeks to discredit the government's version of events as improbable criminal

behavior."); United States v. Dukagjini, 326 F.3d 45, 52 (2d Cir. 2003) (rejecting "contention that,

because the conversations were readily understandable, the expert testimony should have been

excluded altogether" and observing that the "Rules of Evidence provide a liberal standard for the

admissibility of expert testimony").

The scope of Mr. Higgins's testimony has also been carefully calibrated by the

government to avoid any undue prejudice.   As a general matter, expert testimony that explains

terms, concepts, and relationships that appear in the evidence and are relevant to the

co-conspirators' acts in furtherance of the conspiracy and their states of mind is not "unfairly"

prejudicial.   See Old Chief v. United States, 519 U.S. 172, 180 (1997); United States v. Kadir,

718 F.3d 115, 122 (2d Cir. 2013); <u>United States v. Brettschneider</u>, 832 F. App'x 14, 19 (2d Cir. 2020) (noting that the Rule 403 balancing test is satisfied if the evidence is not "any more sensational or disturbing than the alleged crime").   Although it would be entirely permissible, Mr. Higgins is not expected to testify specifically about the conduct of the UAE or KSA governments in this case, nor about the specifics of either country's national security or historical intelligence operations.   Mr. Higgins also will not be testifying about whether the Defendants' conduct or that of their co-conspirators was consistent with that of foreign agents, and the government will not be urging the jury to find that "because criminals of a certain type classically engage in a certain kind of behavior, the [D]efendant[s] engaged in that behavior."   <u>United States v. Mulder</u>, 273 F.3d 91, 102 (2d Cir. 2001).   Finally, consistent with Rule 704, the government will not elicit any testimony about the state of mind of any person involved in this case.   Accordingly, the Defendants cannot seriously contend that such general, background testimony will create a meaningful risk of unfair prejudice.

       3.     <u>Michael Higgins' Testimony is Not Excludable Under Rule 404(b)</u>

Given the clear relevance and appropriateness of Mr. Higgins's testimony, the Defendants raise the novel claim that expert testimony must be excluded as "prior bad acts" evidence pursuant to Rule 404(b) of the Federal Rules of Evidence.   The argument is meritless.

The Defendants' argument rests primarily on a misunderstanding of the challenged testimony.   Mr. Higgins is not going to testify about "any other crime, wrong or act" by a person (or even a particular foreign government) involved in this case, and his testimony is not offered to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   <u>See</u> Fed R. Evid. 404(b).   His testimony simply does not involve any prior bad act.

It is difficult to understand how expert testimony that does not address the conduct of any defendant or co-conspirator or even any particular foreign government could come within the ambit of Rule 404(b), which is designed to regulate "specific acts of uncharged misconduct" used against a person on trial.   See Note to Subdivision (b), 2000 Amendments to Fed R. Evid. 404.   The Defendants do not cite a single case in which an expert's testimony has been treated as prior bad acts evidence under Rule 404(b), let alone any case where such evidence was excluded. The cases cited by the defendant involve uncontroversial rulings about Rule 404(b) evidence that is nothing like the expert testimony at issue here.[2]   The Defendants devote an entire page to a First Circuit decision that involved the exclusion of irrelevant fact evidence—materials from the defendants' business that the government alleged were associated with the defendants' involvement in a scheme to violate U.S. export laws—and said nothing about expert testimony. See United States v. Lachman, 48 F. 3d 586 (1st Cir. 1995).   Lachman held that the district court did not abuse its discretion in excluding evidence that had little relevance, but substantial risk that the jury would be prejudiced by substantial discussion of a foreign government's nuclear missile program.   Id. at 594.   No such issue exists here.

The Defendants have failed to identify a single instance where background expert testimony of the type proposed here has been excluded pursuant to Rule 404(b).   The one case the government could find (and which was not cited by the Defendants) rejected just this sort of claim.

---

[2]   See Alexander v. Hanson, 566 F. Supp. 3d 162 (N.D.N.Y. 2021) (excluding testimony of fact witnesses about treatment of other inmates in Section 1983 civil action for excessive force); United States v. Armstrong, 436 Fed. App'x 501 (6th Cir. 2011) (affirming exclusion of certified convictions of prior drug convictions against passenger in vehicle with defendant); Untied States v. Ekiyor, 89 F. Supp. 3d 928 (E.D. Mich. 2015) (excluding evidence of drug trafficking activities by other specific baggage handlers); United States v. Angelilli, 660 F.2d 23 (2d Cir. 1981) (affirming admission of fact testimony of individuals involved in large-scale racketeering scheme as custom and practice relevant to the scheme).

In <u>United States v. Williams</u>, the Seventh Circuit rejected a claim by a defendant that expert testimony about human trafficking was improper "prior bad acts" evidence under Rule 404(b). <u>See</u> 900 F.3d 486, 490 (7th Cir. 2018).   As the Circuit explained, this is simply not the purpose of such expert testimony:

> [The expert] could not have testified about the character of sex traffickers to raise the forbidden inference that [the defendant's] similar character made him likely to engage in sex trafficking . . . Nor could the government have used [the expert's] testimony to make the same point indirectly by relying on the acts of both sex traffickers and [the defendant] to raise the forbidden inference about how people with a certain character trait are likely to behave. . . .
>
> But that is not what the government did. . . . The government used [the expert's] testimony about the acts of sex traffickers to illustrate their modus operandi, not their character; it suggested that because [the defendant] employed similar techniques, his behavior was evidence that he too was engaged in a sex-trafficking operation. <u>Rule 404's prohibition on character evidence is inapplicable, because there were no arguments about character at play.</u>

<u>Id.</u> (emphasis added); <u>see also</u> <u>United States v. Delaney</u>, No. 18-1919, 2022 WL 356731, at *3 (7th Cir. Feb. 7, 2022) (observing that "the law distinguishes between evidence of common tactics or techniques, which is permissible, and evidence of character, which is not").[3]   Similarly, here, there is no character evidence at play.   The expert will provide background information about the structures, organization, and techniques of foreign national intelligence organizations, not character evidence about the Defendants or any of their associates.

For the foregoing reasons, Mr. Higgins's proposed expert testimony should be admitted in its entirety.

---

[3] <u>See also</u> <u>United States v. Antoine</u>, No. 10-CR-229, 2012 WL 3929205, at *1 (W.D.Pa. Sept. 7, 2012) (denying motion to preclude expert testimony under Rule 404(b)).

B. **The Expert Testimony of Dr. Christopher Davidson is Relevant and Admissible at Trial**

1. Scope of and Bases for Proposed Testimony of Dr. Davidson

Dr. Davidson is expected to testify about (1) the structure of the governments of the UAE and the KSA; (2) the key officials and royal family members in those governments and their roles, responsibilities, and relationships; (3) the foreign policy objectives of the UAE and the KSA between 2016 and 2018; (4) the foreign policy issues relevant to the UAE and the KSA between 2016 and 2018; (5) the role of sovereign wealth funds in the UAE and the KSA; (6) the governance structures of those sovereign wealth funds and their relationships with their respective sovereign states; (7) the role of government officials in strategic goal-setting and management of those sovereign wealth funds; and (8) the role of public policy and other non-commercial objectives in shaping investment priorities and decisions of such sovereign wealth funds. Dr. Davidson is not expected to provide testimony about the conduct of the Defendants in this case, nor will he comment on any defendant's state of mind.

Dr. Davidson's testimony will be based upon his twenty-year career of academic research and study of the Gulf States, with a specific focus on the UAE and the KSA, including through standard academic research methods such as study of the relevant peer-reviewed academic literature, interviews of relevant stakeholders, in-country surveys of Gulf State citizens, and study of archival materials. Dr. Davidson has taught courses and lectured at numerous universities and institutes regarding his research on the Middle East, including Australian National University, Oxford University, the Swedish Institute for International Affairs, and the University of Southern Denmark. Dr. Davidson has also authored seven books on the Middle East with a particular focus on the United Arab Emirates, as well as numerous journal articles and other publications. In addition, Dr. Davidson has consulted with and briefed various governmental entities, including in

the United Kingdom and the United States, on topics related to his expertise. A more detailed summary of Dr. Davidson's expected testimony and the basis of his expertise is set out in Exhibit A.

2.    Dr. Davidson's Proposed Expert Testimony is Admissible at Trial

The Defendants object to any testimony by Dr. Davidson regarding the KSA, feigning bewilderment as to why such testimony could possibly be relevant in this case. However, as is self-evident from the Superseding Indictment (the "Indictment") and as will become further evident during trial, testimony regarding the KSA, its foreign policy concerns and objectives, and the role of the KSA Crown Prince is highly relevant in this case.

The government expects that Dr. Davidson will testify that, during the relevant time period, then-Crown Prince of the UAE Mohamed bin Zayed Al Nahyan ("MBZ") and Crown Prince of the KSA Mohammed bin Salman Al Saud ("MBS"), and by extension the UAE and the KSA, were closely aligned and coordinated in their foreign policy objectives. He will also testify that one of the UAE's foreign policy goals was the promotion of MBS, who for part of the relevant time was Deputy Crown Prince, in the international community. The government anticipates that this testimony will be amply corroborated by numerous communications presented at trial reflecting the efforts of UAE officials to further a UAE/KSA-aligned foreign policy strategy through the Defendants that included the promotion and elevation of MBS as a de facto head of state for the KSA. Some of those communications are in the Indictment, including: (a) communications reflecting Barrack's disclosure to Al Malik and UAE officials of non-public information about the removal of language in the party platform at the 2016 Republican National Convention that would have called for the declassification of 28 pages of the December 2002 report of the Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2001 (the "Declassified Pages"), which contained negative information

17

about the KSA, see Dkt. No. 105 ¶ 26; (b) communications reflecting that Al Malik and UAE officials tasked Barrack and Grimes with designing a "Saudi/UAE/USA strategy" to increase the influence of the UAE and the KSA in the United States, id. ¶ 32; (c) communications reflecting that Al Malik discussed working with UAE and KSA officials to design a plan to influence United States foreign policy in the first 100 days, six months, year, and four years of the Trump Administration, see id. ¶¶ 65-66; and (d) communications reflecting that Barrack advised Al Malik of his efforts to force the White House to elevate its treatment of MBS and program senior United States government officials regarding MBS, see id. ¶ 72.

However, the communications referenced in the Indictment represent just a fraction of the communications that the government anticipates presenting at trial regarding the alignment and coordination of the UAE and the KSA and the UAE's efforts to increase their collective influence in the United States, as well as the efforts of the UAE to promote and elevate MBS, through the direct efforts of the Defendants and their co-conspirators.[4]  Under these circumstances, testimony by Dr. Davidson that addresses, among other things, the structure of the government of the KSA, the role of MBS in that government, the relationship between MBZ and MBS during the relevant time period, and the foreign policy priorities of the KSA and its relationship with the United States are all highly relevant to the facts that will be presented to the jury at trial and will clearly "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).[5]

---

[4] The government anticipates, for example, introducing evidence at trial that will demonstrate that senior UAE government officials arranged for Barrack to meet directly with MBS on multiple occasions during the relevant time period.

[5] In claiming that testimony regarding the KSA is irrelevant, the Defendants also

### 3. Dr. Davidson's Anticipated Testimony Is Not Unduly Prejudicial

The Defendants also claim that the government intends to use the testimony of Dr. Davidson to present inflammatory and prejudicial "bad acts" of the UAE and the KSA to the jury, inaccurately describing Dr. Davidson as a "longtime vocal critical [sic] of the UAE government." Defs. Mot. at 12. These concerns are wholly unfounded. As an initial matter, Dr. Davidson is a highly-credentialed professor who has spent the past twenty years applying widely-accepted methods of academic research to his study of the UAE and the KSA. His findings, regularly published in peer-reviewed academic journals, are not based in opinion, but in these widely-accepted academic research and methods. Second, Dr. Davidson's anticipated testimony will not needlessly focus on the "bad acts" of the UAE and the KSA or attempt to "convince the jury that the UAE and the KSA are 'bad' countries, run by 'bad' people, who do 'bad' things," nor will it require a "mini-trial on whether the KSA or UAE are 'good' countries or 'bad countries.'" Defs. Mot. at 16. Dr. Davidson will simply provide an overview of, among other things, the structure and operations of the UAE and KSA governments, the relative roles, powers, and

_____

argue that testimony by Dr. Davidson about the Trump Administration's consideration of designating the Muslim Brotherhood as a foreign terrorist organization is not pertinent because that development was "announced by the White House in May 2019 more than two years after the conspiracy alleged in the indictment." Putting aside that the evidence at trial will demonstrate that the designation of the Muslim Brotherhood was a significant foreign policy priority for the UAE (and not just the KSA) that was discussed by the Defendants, Al Malik, and UAE government officials, this claim fails for several additional reasons. First, the Defendants continue to operate under the misconception that the Section 951 conspiracy alleged in the Indictment ended in 2017 (hence their inaccurate claim that events occurring in May 2019 occurred more than two years after the conspiracy alleged in the Indictment). To be clear, the Defendants are charged with participating in a Section 951 conspiracy from April 2016 to April 2018. See Dkt. No. 105 ¶ 116. Second, the Defendants ignore the allegations explicitly set forth in the Indictment on this topic, which place this particular issue squarely within the timeframe of the charged conduct. Specifically, the Indictment states that Grimes and Al Malik discussed the possibility of the Trump Administration designating the Muslim Brotherhood as a foreign terrorist organization in January 2017 and that they exchanged a news article in February 2017 reporting that the Trump Administration was considering designating the Muslim Brotherhood as a foreign terrorist organization, the precise topic on which Dr. Davidson is expected to testify. See id. ¶ 70.

responsibilities of MBZ and MBS and their trusted lieutenants, and the foreign policy issues and developments of significance to the UAE and KSA governments during the relevant time period that are explicitly at issue in this case based on the conduct of the Defendants and their co-conspirators.

Although that testimony may, in part, cover sensitive or controversial foreign policy issues and the autocratic and authoritarian nature of the UAE and KSA governments, it is simply not possible (nor appropriate) to whitewash those facts from this case. In acting as agents of the UAE, the defendants acted to further its interests and the interests of its close ally, the KSA, on sensitive and, at times, controversial foreign policy issues. The jury is entitled to understand the context of that conduct and the nature of those particular foreign policy issues.[6]

The government addresses some of the specific "bad acts" that the defendants have raised concerns about below.

a. Description of the UAE and KSA Governments as Authoritarian or Autocratic

In a case where the Defendants are charged with acting at the direction of the UAE government, the Defendants' claim that testimony about the nature and structure of that government is "irrelevant and unduly prejudicial" is puzzling. Defs. Mot at 13. Understanding the structure of the government for which the Defendants are charged with acting as agents is relevant information for the jury, particularly as it relates to the relative roles, powers, and responsibilities of key UAE officials with whom the Defendants directly interacted as part of the charged conduct. Those key officials include, among others, ███████████████

---

[6] The Defendants also allege that Dr. Davidson's testimony will be prejudicial because "Mr. Barrack is of Middle Eastern descent and Mr. Grimes spent significant time in the Middle East with Mr. Barrack." Def. Mot. at 16, n.3. The Defendants do not even attempt to explain the wholly unwarranted inferential leaps embedded in that assertion.

██████████████████████████████████████████████

██████████████████████████████████████████████

████ Similarly, given the fact that, as previously discussed, the government anticipates that the evidence at trial will reflect the assistance of the Defendants in the efforts of UAE officials to further a UAE/KSA-aligned foreign policy strategy that included the promotion and elevation of MBS as a de facto head of state for the KSA, testimony regarding the structure of the KSA government, as well as the role, power, and responsibility of MBS, is highly relevant and will clearly "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

The Defendants object to testimony by Dr. Davidson opining that the UAE is an autocratic, authoritarian state and that the KSA is an absolute monarchy and authoritarian state.[7] This testimony is highly relevant and necessary to assist the jury in understanding why the interactions of the Defendants with those de facto heads of state and their lieutenants at the time were of such significance, given the respective abilities of these heads of state to, among other things, play decisive roles in the foreign policy of the UAE and the KSA, respectively. This testimony is not expected to focus on "bad acts," such as human rights abuses, by the UAE or the KSA within these governance structures. Rather, it will explain the significant power of MBZ and MBS in their respective countries and provide context for the exercise of that power. Testimony along these lines, which is the sort of uncontroversial information taught in an

---

[7] Ironically, the Defendants' efforts in their motion to preclude the government from accurately describing the governing structure of the UAE or the KSA mirrors some of the charged conduct in that they were directed by the UAE government to whitewash descriptions of those governments as "dictatorships." See Dkt. No. 105 ¶ 52. Given that the evidence in this case will include explicit discussions about the UAE government's sensitivity to being labeled a "dictatorship" or "autocracy," Dr. Davidson's testimony explaining the meaning of these terms and the fact that they accurately describe the UAE and KSA governments is even more relevant.

undergraduate international political science course, can hardly be characterized as unfairly prejudicial to the Defendants.

b. Testimony About the Declassified Pages

The Defendants object to testimony by Dr. Davidson that in 2016, the United States did not have a positive relationship with the UAE and the KSA, stemming from, among other things, the declassification of the Declassified Pages. [8]   Contrary to the Defendants' representations, this testimony is highly relevant in this case because, as part of the charged conduct, Mr. Barrack corresponded with UAE officials and Al Malik about this precise issue.   The Defendants cannot preclude the government from introducing evidence and testimony about a foreign policy issue that they were corresponding about with UAE government officials as part of the conduct charged in the Indictment.

Specifically, the government expects to introduce evidence at trial that one of the actions that Barrack undertook as an agent of the UAE was to disclose non-public information to Al Malik and other UAE government officials indicating that language had been removed from the Republican National Convention party platform that had called for the declassification of the Declassified Pages.   In disclosing this information to Al Malik and other UAE government officials, Barrack advised them that this undisclosed information about the foreign policy positions of the Republican Party was "[v]ery confidential" and "very sensitive," but invited them to

---

[8] The defendants mischaracterize the Declassified Pages to imply that they allege ties between the UAE and the terrorist attacks on September 11, 2001.   They do not.   See 28 Pages of the 2002 Congressional Inquiry into the Sept. 11 Attacks, WASH. POST, July 15, 2016, https://www.nytimes.com/interactive/2016/07/15/us/document-september-11-28-pages.html.   The jury will therefore not hear evidence that Barrack "was allegedly an agent of a country that assisted the horrific terrorist attacks on 9/11," eliminating any undue prejudice to Barrack.   Defs. Mot. at 15.

nonetheless share it with a senior UAE national security official.[9] Dr. Davidson's testimony will contextualize this charged conduct by Barrack by informing the jury about the basic nature of the Declassified Pages as a high priority foreign policy issue at the time for both the UAE, as a close ally of the KSA, and the KSA itself. See Fed. R. Evid. 702(a). Without this context, the jury may not understand the nature of the Declassified Pages as they are referenced in the evidence produced by the government or their relevance to the UAE government officials to whom Barrack disclosed this sensitive, non-public information. Dr. Davidson can provide limited testimony on this subject that will sufficiently educate the jury while not unfairly prejudicing the Defendants.

Unlike the testimony at issue in the cases cited by the Defendants, the expected testimony elicited from Dr. Davidson will not "link[] a defendant to terrorism," indeed it will not reference the Defendants at all. United States v. Elfgeeh, 515 F.3d 100, 127 (2d Cir. 2008). The testimony will simply explain that the proposed release of the Declassified Pages was a significant foreign policy issue of concern to the UAE and the KSA at the time. With Dr. Davidson's limited testimony, jurors will be better equipped to understand the nature of the Declassified Pages being discussed by Barrack in his conversations with UAE government officials and the context and relevance of Barrack's decision to funnel non-public and sensitive information about the position being articulated in the party platform of the Republican National Convention on this issue to UAE government officials, as well as the significance of that information to those officials. Ultimately, it was Barrack's decision, not the government's, to interject himself in this foreign policy issue and funnel inside information regarding that issue to a foreign government. He cannot claim that he should be shielded from that decision or that the jury should be left in the dark about it. He is

---

[9] This conduct by Barrack is alleged in the Indictment, see Dkt. 105 ¶ 26, further undermining Barrack's claim that background information provided by Dr. Davidson about the Declassified Pages is not relevant.

charged with this conduct and the jury is entitled to understand the context of what he did.[10]  See

United States v. Abarca, No. 19-CR-3751, 2021 WL 6803226, at \*5 (2d Cir. Dec. 15, 2021)

(rejecting challenge to expert testimony on how drugs are broken down for sale in case involving

only wholesale quantities because, "[t]o be relevant, evidence need only tend to prove the

government's case, and background evidence may be admitted to show, for example, the

circumstances surrounding the events or to furnish an explanation of the understanding or intent

with which certain acts were performed" (internal quotation marks and alterations omitted)).

c.  Testimony ███████████████████████████
███

The Defendants also claim that testimony by Dr. Davidson regarding the role of ███

████████████████████████████████████████████████

███████████, in espionage, intelligence gathering, and foreign influence is "unbounded and

prejudicial" and should be excluded. This claim defies common sense.  The Defendants are

charged with acting at the direction of UAE government officials to, among other things, conduct

foreign influence operations in the United States and gather sensitive, non-public information

about the foreign policy positions of the Trump Campaign and the Trump Administration and relay

that information to the UAE government. The government further anticipates that the evidence

---

[10] The Defendants also appear to object to testimony by Dr. Davidson about the Justice Against Sponsors of Terrorism Act ("JASTA"), a law enacted on September 28, 2016, that permitted federal courts to exercise subject matter jurisdiction over a foreign state's support for acts of international terrorism against a U.S. national or property regardless of whether the state is designated as a state sponsor of terrorism, presumably on the basis that this law was publicly perceived as having the principal effect of allowing the families of victims of the attacks on September 11, 2011 to proceed with a longstanding civil lawsuit against the KSA for its involvement in the attacks.   The government anticipates the evidence at trial will demonstrate that UAE government officials provided Mr. Grimes with talking points regarding JASTA through Al Malik, rendering highly relevant Dr. Davidson's testimony explaining the nature of JASTA and its significance as a foreign policy issue to the UAE and the KSA.

introduced at trial will establish that █████ was one of the Defendants' principal points of contact within the UAE government and that, while they were in contact with █████, the Defendants were aware that █████ was a senior UAE national security official with intelligence-related responsibilities.   Under these circumstances, testimony by Dr. Davidson that █████ was, in fact, a senior UAE national security official with intelligence-related responsibilities is <u>highly</u> relevant.   The Defendants are once again seeking to whitewash their conduct by preventing the jury from fully understanding what they knowingly did: coordinate directly with a senior foreign intelligence official regarding the promotion of that foreign government's interests.   The Court should not sanction those efforts.

d. <u>Testimony About the Murder of Washington Post Journalist Jamal Khashoggi</u>

Finally, the Defendants object to any testimony by Dr. Davidson or any other witness in this case discussing the murder of Washington Post journalist Jamal Khashoggi at the Saudi Arabian consulate in Istanbul, Turkey on October 2, 2018.   The government does not intend to elicit in its case-in-chief any testimony from Dr. Davidson or any other witness about the murder of Mr. Khashoggi, so this concern is unfounded.[11]

<u>CONCLUSION</u>

For the reasons stated above, the government respectfully submits that the Defendants' joint motion <u>in limine</u> to preclude the government's proposed expert testimony should

---

[11] Here, again, the Defendants either misrepresent or misunderstand the time period with which they are charged with violating Section 951 and conspiring to do so.   The Defendants claim that the murder of Mr. Khashoggi on October 2, 2018, occurred "more than a year after the conspiracy alleged in the indictment concluded."   Defs. Mot. at 18.   The Indictment charges the Defendants with conspiring to violate Section 951 from April 2016 through April 2018.

be denied as moot with respect to challenged aspects of Dr. Kalter's testimony and otherwise denied in full.

Dated:      Brooklyn, New York
               August 31, 2022

BREON PEACE
United States Attorney
Eastern District of New York

By:       /s/
Ryan C. Harris
Samuel P. Nitze
Hiral D. Mehta
Craig R. Heeren
Assistant U.S. Attorneys
(718) 254-7000

MATTHEW G. OLSEN
Assistant Attorney General
Department of Justice
National Security Division

By:       /s/
Matthew J. McKenzie
Trial Attorney