RCH/SPN/HDM/CRH/MJM
F. #2018R01309

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -                      No. 21-CR-371 (S-1) (BMC)

RASHID SULTAN RASHID AL MALIK
ALSHAHHI,
          also known as "Rashid Al Malik"
          and "Rashid Al-Malik,"
THOMAS JOSEPH BARRACK and
MATTHEW GRIMES

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT'S MEMORANDUM OF LAW IN
OPPOSITION TO ALISON MARCKSTADT'S MOTION TO QUASH

                        BREON PEACE
                        United States Attorney
                        Eastern District of New York

Ryan C. Harris
Samuel P. Nitze
Hiral D. Mehta
Craig R. Heeren
Assistant United States Attorneys

Matthew J. McKenzie
Trial Attorney
National Security Division
(Of Counsel)

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

RELEVANT BACKGROUND .................................................................................................. 1

    I.    The Defendants' UAE Influence Activities at the Trump Inauguration and Efforts to Conceal Illicit Relationships with UAE Officials................................................................. 1

    II.   Marckstadt's Relevance to the Charged Criminal Conduct................................................ 2

    III.  Marckstadt's Possession of Relevant Documents.............................................................. 5

    IV.  Marckstadt's Retention by Barrack's Legal Defense Team After She Was Identified as a Fact Witness With Personal Knowledge of Events Charged in the Indictment ................. 6

    V.   The Trial Subpoena to Marckstadt...................................................................................... 9

LEGAL STANDARD............................................................................................................... 10

ARGUMENT ........................................................................................................................... 10

    I.    Marckstadt's Possession of Materials Relevant to the Charged Criminal Offenses (Request Nos. 1-6) ........................................................................................................... 10

    II.   Marckstadt's Possession of Additional Communications with Defendant Barrack About the Charged Conduct (Request Nos. 7 and 8) ................................................................... 16

        A.   Communications Between Marckstadt and Barrack About Events Related to the Indictment Should Be Produced As Admissible Evidence ................................... 16

        B.   Claims Of Privilege or Work Product Protection Over Some Portion of the Communications Are Not a Valid Basis to Quash ............................................... 18

    III.  Marckstadt's Possession of Materials Relevant to Bias (Request Nos. 9-12) ................. 20

    IV.  Marckstadt's Misrepresentations About the Government ................................................. 21

CONCLUSION......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

State of N.Y. v. Solvent Chemical Co., Inc.,
   166 F.R.D. 284 (W.D.N.Y. 1996) ........................................................................... 18

United States v. Abel,
   469 U.S. 45 (1984) ............................................................................................... 21

United States v. Carollo,
   No. 10-CR-654 (HB), 2012 WL 1195194 (S.D.N.Y. Apr. 9, 2012) ....................... 20

United States v. Gel Spice Co., Inc.,
   601 F. Supp. 1214 (E.D.N.Y. 1985) ...................................................................... 11

United States v. James,
   609 F.2d 36 (2d Cir. 1979) ................................................................................... 21

United States v. Lindemann,
   85 F.3d 1232 (7th Cir. 1996) ............................................................................... 21

United States v. Nixon,
   418 U.S. 683 (1974) ............................................................................... 10, 14, 18

United States v. Percoco,
   No. 16-CR-776 (VEC), 2018 WL 9539131 (S.D.N.Y. June 14, 2018) ................... 21

United States v. RW Professional Leasing Servs. Corp.,
   228 F.R.D. 158 (E.D.N.Y. 2005) ..................................................................... 14, 15

United States v. Skelos,
   No. 15-CR-317 (KMW), 2018 WL 2254538 (S.D.N.Y. May 17, 2018) ............ 14, 18

United States v. Weisberg,
   No. 08-CR-347 (NGG), 2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ........... 13, 14, 18

United States v. Yudong Zhu,
   No. 13-CR-761 (VM), 2014 WL 5366107 (S.D.N.Y. Oct. 14, 2014) ..................... 19

**Statutes**

18 U.S.C. § 951 ........................................................................................................ 1

**Rules**

Fed. R. Evid. 608(b) ............................................................................................... 21

Fed. R. Evid. 801(d)(2)(A) ...................................................................................... 17

Fed. R. Evid. 801(d)(2)(D) ...................................................................................... 12

Fed. R. Evid. 803(6) ............................................................................................... 12

**Other Authorities**

Weinstein's Federal Evidence, § 801.11 ................................................................. 12

The government writes in opposition to third-party Alison Marckstadt's ("Marckstadt") Motion to Quash the government's subpoena. See Dkt. No. 186 (the "Motion" or "Mot."). The government's subpoena requests (1) documents that are directly relevant to events and entities that form the basis of the charged offenses; (2) communications between Marckstadt and defendant Thomas J. Barrack about the charged offenses; and (3) evidence of Marckstadt's bias due to the unusual circumstances of her being a fact witness in the case who was retained and paid by Barrack and his attorneys after the charges became public. The Court should deny the Motion insofar as it seeks to quash the request for documents and communications relating to the charged conduct (the first two of the above-referenced categories) because the subpoena seeks information that is relevant, admissible, and identified with reasonable specificity. The government respectfully requests that, in the interest of efficiency, the Court defer ruling on the request for evidence of Marckstadt's bias until such time as the government or defense makes a final determination as to whether to call Marckstadt to testify. The government also writes, separately, to respond to the irrelevant and frivolous attacks on the character of counsel for the government.

## RELEVANT BACKGROUND

I.    The Defendants' UAE Influence Activities at the Trump Inauguration and Efforts to Conceal Illicit Relationships with UAE Officials

Barrack, Matthew Grimes (together, the "Defendants"), and Rashid Sultan Rashid Al Malik Al Shahhi ("Al Malik") are charged in a superseding indictment with operating as illegal foreign agents of the UAE, and conspiring to do the same. See 18 U.S.C. §§ 951, 371. Between approximately April 2016 and April 2018, the conspirators made contact with senior UAE national security officials and, at their direction, agreed to influence U.S. public opinion and the foreign

1

policy positions of the Trump Campaign, relay non-public information about the U.S. government back to the UAE, develop backchannel lines of communication for the UAE government, and design plans to increase the UAE's political influence in the United States.

The Defendants' work for the UAE included actions taken at the inauguration of President Trump. Barrack was the chairman of the Presidential Inauguration Committee for President-Elect Trump. After Barrack received this position, Grimes, Al Malik, and Barrack discussed how Al Malik should be involved to "take care of ME [the Middle East] side" and that it would "position us well." See Superseding Indictment ¶ 57. Subsequently, Barrack organized an inaugural event in Washington, D.C. called the Chairman's Global Dinner. See id. ¶ 68. President-Elect Trump and numerous other high-level government officials were in attendance. Al Malik attended the event as a personal guest of Barrack and met President-Elect Trump. Id.

The Defendants' actions on behalf of the UAE continued into the early years of the Trump Administration. At the same time that the Defendants were pushing UAE-favored policies (such as those that elevated their close ally, the Kingdom of Saudi Arabia ("KSA")), seeking to elevate UAE-favored persons for U.S. political appointments, and seeking to curry favor for the UAE in an international dispute with Qatar, the Defendants were also taking steps to conceal from the government the fact that they were operating as illegal agents of a foreign government. In June 2017, Barrack completed and submitted a National Security Questionnaire, commonly called an "SF-86" application, as part of an effort to become the U.S. Ambassador to Argentina. Barrack repeatedly misrepresented or omitted facts related to his assistance to the UAE and Al Malik in this application.

II.     Marckstadt's Relevance to the Charged Criminal Conduct

Alison Marckstadt was an employee who worked directly with the Defendants and played important roles in the above-described events.

2

During the relevant time period, Marckstadt was as an executive assistant for Barrack at Colony Capital. Among other things, Marckstadt assisted with drafting and sending Barrack's email communications, scheduled his business and personal appointments, planned business and personal meetings and events for Barrack, managed several properties for Barrack, and handled many other tasks that Barrack specifically assigned to her. Marckstadt, as well as a also handled "special projects" identified by Barrack as particularly important. She grew so significant to Barrack that she was promoted to Vice President, and became Barrack's "Chief of Staff." Marckstadt worked closely alongside defendant Grimes and was also familiar with co-defendant Al Malik, whom she met on multiple occasions. Marckstadt worked directly with the Defendants on political events related to the Trump presidential campaign. For example, Marckstadt participated in a fundraiser for Candidate Trump that was held at Barrack's home, and responded to media inquiries about Barrack's relationship with Candidate Trump.

In January 2017, Marckstadt played a substantial role in the planning and execution of the Presidential Inauguration of President-Elect Trump. Marckstadt worked on a daily basis for a month alongside Barrack and Rick Gates, Barrack's deputy for the Presidential Inauguration and a person identified by Barrack as a defense witness at trial.[1] Marckstadt was responsible for assisting with the logistics of planning all of the inauguration events. In particular, Marckstadt was involved in planning the Chairman's Global Dinner and was familiar with the process by which people (such as Al Malik) were invited to the event. Marckstadt also attended the Chairman's Global Dinner.

---

[1] On or about February 23, 2018 (during the period of the conspiracy), Gates pled guilty to, among other things, conspiring to engage in lobbying and public relations work on behalf of the Ukrainian government without registering under the Foreign Agents Registration Act ("FARA") and to making material false statements to federal agents. See United States v. Gates, No. 17-CR-201 (D.D.C.) (ECF Nos. 205, 206).

In May and June of 2017, Marckstadt assisted Barrack in completing the National Security Questionnaire for his potential ambassadorial appointment. Marckstadt played a key role in the process, including by identifying foreign nationals, as well as the dates and locations of meetings with foreign nationals, because that information needed to be submitted as part of the security clearance process. Marckstadt was familiar with the process by which Barrack reviewed the application and met with Barrack as part of the drafting process. Marckstadt was a main point of contact for the project, and answered follow-up questions from an official with the U.S. Department of State. Marckstadt herself was interviewed as part of the security clearance process.

On or about November 30, 2017, Marckstadt gathered records for, and communicated with, Barrack related to his activity on behalf of the UAE. This is notable because she took these actions one day after a grand jury subpoena was issued to Colony Capital by the Special Counsel's Office (the "SCO"), and two weeks before Barrack's personal interview with the SCO where he discussed, among other things, his knowledge of registration requirements for foreign agents under FARA, and his relationship with foreign officials. Thus, Marckstadt can testify about Barrack's awareness of an ongoing grand jury investigation, and can provide evidence that Barrack knew that this criminal investigation could implicate his own misconduct.

Marckstadt left Colony Capital in around 2019, and has run her own financial services company since 2020. Marckstadt has stated that she continues to work for "Tobar" as a consultant, a corporate entity that manages certain personal items for Barrack. As discussed further below, Marckstadt was hired as a "litigation consultant" in 2021 by Barrack's attorneys.[2]

---

[2] The Motion states that Marckstadt "has never worked for Mr. Grimes . . . or [his] lawyers." Mot. at 14. This is not accurate. Marckstadt was retained by the same attorney, Matthew Herrington, Esq., who also represented defendant Matthew Grimes during certain parts of this investigation.

Marckstadt has a publicly accessible LinkedIn page that lists her career at Colony and the business she started, but omits any reference to her ongoing work for Barrack at Tobar, or her work for Barrack's lawyers, as part of her employment history.

## III. Marckstadt's Possession of Relevant Documents

During the pendency of the government's investigation, Matthew Herrington, who was simultaneously representing Barrack, Grimes, and Colony Capital, advised the government that he also represented Marckstadt and several other fact witnesses.[3] On or about February 27, 2019, the government served a grand jury subpoena, through Mr. Herrington, to Marckstadt in her personal capacity, for testimony and records related to "(i) the 2016 United States Presidential Campaign; (ii) the 58th Presidential Inaugural Committee; (iii) communications with any United States federal agency or federal official; (iv) official and unofficial representatives of the United Arab Emirates, the Kingdom of Saudi Arabia or the State of Qatar; and (v) businesses, sovereign wealth funds and individuals associated with the United Arab Emirates, the Kingdom of Saudi Arabia or the State of Qatar." Subsequently, Mr. Herrington requested the opportunity to voluntarily provide the requested materials rather than via subpoena, which the government agreed to accommodate. On or about April 25, 2019, Mr. Herrington produced approximately 13 pages of records to the government on behalf of Marckstadt, characterizing it as a voluntary production. See Exhibit 1. On or about May 2, 2019, Mr. Herrington produced approximately 75 additional pages of records on behalf of Marckstadt. See Exhibit 2. At the same time, on or about March 19, 2019, the government requested a voluntary production of documents from Colony Capital. See Exhibit 3. On or about June 12, 2019, the same attorney, Mr. Herrington, this time acting as

---

[3] Herrington has also been identified as trial witness by defendant Barrack.

counsel for Colony Capital, voluntarily produced documents, which included emails belonging to Marckstadt and other employees.  See Exhibit 4.

Records and communications related to Marckstadt, which arose out of these voluntary productions, are relevant and have been marked as exhibits by the government for use at trial.  See, e.g., Exhibit 5 (Government Exhibits 318, 420, 421, 429).  Notably, a number of those relevant documents were sent or received from Marckstadt's personal Gmail account.  See, e.g., Exhibit 6 (Government Exhibits 27, 61, 96, 97).

During an interview in April 2022, Marckstadt indicated that she was in possession of additional materials that the government has a basis to believe are relevant and admissible in this case.  Specifically, Marckstadt confirmed that she used her personal Gmail account to communicate with Barrack and others about the events at issue in this case.  Additionally, Marckstadt advised that she continued to maintain contact with Barrack after he was indicted. She indicated that she has communicated with Mr. Barrack by telephone, by email, and by encrypted chat platforms, such as WhatsApp and Signal.  Marckstadt also indicated that at least some of those discussions were related to the facts of this criminal case.

IV.    Marckstadt's Retention by Barrack's Legal Defense Team After She Was Identified as a Fact Witness With Personal Knowledge of Events Charged in the Indictment

On July 16, 2021, a grand jury sitting in the Eastern District of New York returned an indictment charging Barrack, Grimes, and Al Malik for the above-discussed crimes. See Indictment, Dkt. No. 5.  The indictment was unsealed on July 20, 2021.

After the first indictment was unsealed, Marckstadt and Barrack spoke and discussed the fact that he had been charged with a federal crime.  Marckstadt then traveled to Aspen, Colorado and met with Barrack and his attorneys—which at that time included Mr. Herrington, the same attorney who represented Marckstadt in an individual capacity in response

6

to the government's request for records related to this matter, and the same attorney who represented Colony Capital and produced Marckstadt's work emails in response to government requests. Barrack's attorneys decided to retain Marckstadt "as a consultant for the legal defense team,"[4] see Mot. at 3, and did so despite the fact that (i) Marckstadt was a fact witness; (ii) the government had sought to subpoena her personally for records, and she in fact produced relevant records, and (iii) the indictment specifically referenced conduct Marckstadt had personal knowledge about and involvement in.

Despite the potential issues caused by such an unusual arrangement, neither Barrack's nor Marckstadt's counsel notified the government of this arrangement for more than eight months. In or around January 10, 2022, the government sought to interview Marckstadt, and was advised that she was represented by new counsel. During the course of these communications, at no point did Marckstadt's prior counsel—the same attorney who had represented Barrack and retained Marckstadt—tell the government that Marckstadt was working for Barrack's legal defense team.

The government attempted to engage with Marckstadt's new counsel beginning in January 2022 for the purpose of interviewing Marckstadt. Counsel delayed responding until February 2022, and at that time declined to schedule a voluntary interview. The government then issued a grand jury subpoena to secure Marckstadt's testimony in contemplation of a superseding

---

[4] The Motion states that Marckstadt produced records "through prior counsel," and in the next paragraph states, "[Barrack's] counsel retained Ms. Marckstadt as a consultant for the legal defense team," (Mot. at 3), which suggests these are different lawyers. The Motion fails to explain that the same attorney was involved in both actions. The Motion also states that this retention took place "six months before any outreach" (id.) by the government to Marckstadt for an interview, but does not address the fact that the government had sought records from Marckstadt personally more than two years before Barrack decided to hire her onto his defense team.

indictment against the Defendants.[5] Counsel changed course, and requested a voluntary interview, which the government accepted, though the government specifically advised that it viewed the grand jury process as a separate consideration from trial preparation. See Exhibit 7. After further negotiations, Marckstadt was scheduled to appear for a voluntary interview on April 7, 2022. At no point during these multiple months of discussion did Marckstadt's new counsel notify the government that Marckstadt was operating as both a fact witness and a purported member of Barrack's legal defense team.

On March 31, 2022, approximately a week prior to the scheduled interview, counsel for Barrack contacted the government and, for the first time, told the government that Barrack had retained Marckstadt as a "litigation consultant." Barrack's counsel noted that they were aware that the government was scheduled to interview Marckstadt the following week, indicating that Barrack and Marckstadt's attorneys were in communication with each other. Thus, Barrack's counsel decided to wait till the eve of an interview with the government to provide notice of this arrangement, and Marckstadt's counsel never provided such notice.

The government interviewed Marckstadt as scheduled the following week, on April 7, 2022. As discussed above, during that interview, Marckstadt confirmed her firsthand knowledge of, and participation in, events central to the government's prosecution, and made statements to indicate she was still in possession of documents that are relevant and admissible in

---

[5] The Motion states that the government "raised the prospect of serving a grand jury subpoena on [Marckstadt] if she would not meet with them," to imply some inappropriate pressure by the government. See Mot. at 3. This is wrong. The government in fact issued a subpoena to Marckstadt, and was prepared to have her answer questions before a grand jury. See Exhibit 8. Notably, at that time, the government was unaware that Marckstadt was working for Barrack's defense team. Had the government known that fact at that time or that she would oppose the disclosure of relevant and admissible evidence, the government would have continued to pursue compulsory process through the grand jury and likely resolved this dispute months ago.

this case.   Marckstadt also provided details about her retention as a purported litigation consultant for Barrack, including:

- Marckstadt was hired to provide public relations services and conduct fact gathering activities related to this criminal matter.

- Marckstadt was specifically hired to work on this matter, and does not work on any other matters or for any other clients for any of the law firms that represent Barrack.

- Marckstadt is paid $15,000 per month for her services, and she signed documents to formalize this relationship.

- Marckstadt communicates with Barrack's counsel through an encrypted chat application that permits users to set automatically delete messages.

- Marckstadt has no legal training or experience, has not gone to law school, and has never been a litigation consultant in any prior capacity for anyone else.

On May 13, 2022, the government advised the Court, pursuant to its obligations under United States v. Curcio, that Marckstadt's retention as a member of Barrack's legal defense team presented a potential conflict.   See Dkt. No. 104.   On May 24, 2022, the Court accepted Barrack's waiver of the conflict.   The government notes that, in addition to the government's current intent to call Marckstadt as a witness, counsel for defendant Barrack has also indicated that they may call Marckstadt as a witness at trial in Barrack's defense.

V.    The Trial Subpoena to Marckstadt

After the April 2022 interview, the government sought to obtain further information from Marckstadt, but was advised by counsel that Marckstadt declined to provide any further information on a voluntary basis.   On August 1, 2022, the government issued a trial subpoena to Marckstadt for her testimony, and for certain documents and records.   After discussions with counsel, the government agreed to revise the subpoena and issued a new subpoena on August 30, 2022 (the "Marckstadt Subpoena") for a narrower set of records.   See Mot., Ex. A.

<u>LEGAL STANDARD</u>

The government respectfully refers the Court to its discussion of the legal standard for a motion to quash in its response to the Defendants' motions for trial subpoenas.  <u>See</u> Dkt. No. 152, 153.  In summary, the government is required to demonstrate that the requested records are (1) relevant, (2) admissible, and (3) identified with reasonable specificity.  <u>See</u> <u>United States v. Nixon</u>, 418 U.S. 683, 699-700 (1974).

<u>ARGUMENT</u>

I.  <u>Marckstadt's Possession of Materials Relevant to the Charged Criminal Offenses (Request Nos. 1-6)</u>

The first category of materials requested from Marckstadt are documents in her possession related to the facts of the case.  The government has a good faith basis to believe such records exist because (1) Marckstadt was personally involved in the events and conduct at issue; (2) Marckstadt previously produced records responsive to these requests on a voluntary basis; and (3) some of those records came from Marckstadt's personal email account.  Thus the government has requested the following:

1.  Documents responsive to the subpoena served on You, through counsel Mathew Herrington, on or about February 27, 2019 [which were not previously produced].[6]

2.  Documents related to any Form SF-86 application, or background check, related to Thomas J. Barrack's appointment as a United States Special Envoy or United States Ambassador.

3.  Documents related to the Presidential Inauguration of President-elect Donald J. Trump and the Presidential Inaugural Committee.

4.  Documents related to "special projects" that You were assigned to work on by Thomas J. Barrack relating in any way to the UAE Government, [Kingdom of Saudi Arabia ("KSA")] Government, or United States government, between April 1, 2016 and April 31, 2018;

---

[6] As discussed further below, the Subpoena specifically instructs Marckstadt that she is under no obligation to produce records that were previously produced in 2019.

5.      Documents related to media appearances by Thomas Barrack, relating in any way to the UAE Government, KSA Government, or United States government, between April 1, 2016 and April 31, 2018;

6.      Documents related to Thomas J. Barrack's relationship to the UAE Government, KSA Government, or United States government, which are located in any Google account that is in your possession, custody or control.

These requests meet the <u>Nixon</u> standard.   The records are relevant because they are directed to a narrow set of specific events and entities that are directly related to the charged offenses.   For example, documents related to Barrack's drafting and submission of his SF-86 national security application (Request No. 2), which required disclosure of relationships to foreign individuals, entities and governments, will be relevant to show Barrack's knowledge and intent to conceal his illicit relationships with certain individuals associated with the UAE.   Similarly, because the government alleges that Barrack and his co-conspirators engaged in a public influence operation on behalf of the UAE government, which included making favorable statements about the UAE in television interviews, records related to Barrack's media appearances where he discusses the UAE government or its close ally, the KSA government (Request No. 5), will be directly relevant to proving this claim.   See <u>United States v. Gel Spice Co., Inc.</u>, 601 F. Supp. 1214, 1225 (E.D.N.Y. 1985) (finding that "[t]here is no doubt that the documents in question are relevant since they relate to the charges in the Information.").

Marckstadt contends that the government "has not explained" how records related to Qatar and the KSA are relevant to its case-in-chief.   Mot. at 15.   This is a puzzling assertion. The government has repeatedly explained the relevance of Qatar and Saudi Arabia to this case, including in the Indictment, Superseding Indictment, and in multiple motions.   See, e.g., Superseding Indictment (Dkt. No. 105) ¶ 72 (Barrack "forced" the White House to treat a senior KSA official, who was a close ally to the UAE, at higher level of protocol, "programmed" White House officials regarding the importance of the senior KSA official and arranged for another White

House official to speak on a telephone call with a senior UAE official, all during a White House visit by the senior KSA official); ¶¶ 84-92 ("The Qatari Blockade and Continuing Efforts to Assist the United Arab Emirates"); Resp. in Opp. to Mot. to Preclude Expert Witnesses at 17 (Dkt. No. 183) (discussing evidence expected to show "the efforts of UAE officials to further a UAE/KSA-aligned foreign policy strategy through the Defendants that included the promotion and elevation of [a KSA official]").   These explanations are accessible on the public docket, and could have been reviewed by Marckstadt's counsel before filing the pending Motion.

The records are also likely to contain admissible evidence.   Documents and communications that were sent and received by Marckstadt while she was employed by Barrack are admissible for several reasons.   First, statements made by Marckstadt in these documents are admissible non-hearsay against Barrack as an opposing party's statement, because they are "made by the party's . . . employee on a matter within the scope of that relationship and while it existed." See Fed. R. Evid. 801(d)(2)(D).   Second, any additional documents attached to these communications or otherwise held by Marckstadt are likely to constitute either business records admissible pursuant to Rule 803(6), or will otherwise be admissible for a non-hearsay purpose, such as showing Barrack's knowledge, motive, intent, or plan related to the charged crimes.   See generally Weinstein's Federal Evidence, § 801.11 (discussing various non-hearsay uses, including showing state of mind to prove knowledge, notice, intent, motive, beliefs, thoughts, and acquaintance).   Because Marckstadt has previously provided relevant and admissible documents that have been marked as exhibits for trial, there is ample reason to believe similarly responsive records will likewise be relevant and admissible.   Finally, as the Court explained when granting, in part, the Defendants' subpoena for records, a party seeking compliance with a trial subpoena need not demonstrate that all responsive records will in fact be admissible, only that "there's a

reasonable theory of admissibility if the documents exist." <u>See</u> Exhibit 9 at 11:4-16 (Aug. 29, 2022 Pretrial Hearing Transcript).

Finally, the documents are identified with reasonable specificity. The requests are limited by time period in a manner consistent with this Court's order (<u>i.e.</u> only records that pertain to the period charged in the indictment, <u>see</u> Exhibit 9 at 10:24-11:3), to subjects and entities that are directly relevant to the charged offenses (<u>i.e.</u> conduct by Barrack related to the UAE and KSA governments), to materials that Marckstadt herself has admitted to having firsthand involvement in (the Chairman's Global Dinner and Barrack's SF-86 application), and to items that Marckstadt demonstrated the existence and possession of (<u>i.e.</u> records responsive to the 2019 voluntary production). The requested records are relevant, because they relate to the particular events or about particularly entities that are central to the scheme alleged in this case. <u>See</u>, <u>e.g.</u>, <u>United States v. Weisberg</u>, No. 08-CR-347 (NGG), 2011 WL 1327689, at *7 (E.D.N.Y. Apr. 5, 2011) (permitting request for "all billing records, time entries and invoices" because the "request is sufficient narrowly focused on a group of records likely to contain helpful documents").[7]

This request is at least as, if not more, narrowly tailored as the Defendants' subpoena for due diligence documents and communications among and between fifteen different people, occurring over several years, about two different investments. <u>See</u> Dkt. No. 143, Ex. A (DigitalBridge subpoena); Exhibit 9 at 11:20-13:1 (permitting Request Numbers 1, 2 and 7, limited to documents that pertain to time period of the indictment). Indeed, even the case most relied upon by Marckstadt in support of the Motion permitted discovery of far broader categories of materials because they "appear reasonable and sufficiently tailored so as not to be too burdensome

---

[7] Marckstadt complains that phrase "special projects" in Request No. 4 is undefined (Mot. at 11) yet it is a term Marckstadt used at an interview to describe some of her work for Barrack. She cannot now claim not to understand what this means.

on [the third-party]."  See United States v. RW Professional Leasing Servs. Corp., 228 F.R.D. 158, 165 (E.D.N.Y. 2005) (denying motion to quash requests for, among others, "[a]ll documents reflecting, relating to, or referring to [the third party's] knowledge of [the defendant's] making of payment on behalf of customers, including without limitation, all correspondence, letters, notes, emails, memos, telephone messages, and notes of meetings").

The Motion argues that these requests should be quashed because the government does not identify the exact documents at issue.  See Mot. at 11, 13.  But that is not what the law requires.  The Supreme Court in Nixon, and many decisions that have followed, held that the specificity requirement requires only reasonable specificity, and does not mean that the subpoena must identify the exact document or contents therein.  See, e.g., Nixon, 418 U.S. at 701 (request for audio recordings of conversation was sufficiently specific because "the identity of the participants and the time and place of the conversations . . . permit a rational inference that at least part of the conversations relate to the offenses charged in the indictment"); United States v. Skelos, No. 15-CR-317 (KMW), 2018 WL 2254538, at *7 (S.D.N.Y. May 17, 2018) (request for documents and communications regarding the two defendants "meets the specificity requirement of Nixon in that it specifies communications with a particular person on a particular subject matter"); Weisberg, 2011 WL 1327689, at *7 (explaining that specificity requirement does not require "knowledge of specific documents" nor "the exact content of the material") (internal citations and quotations omitted).

Marckstadt's claims that the government has not "articulated any basis to believe such documents exist" and "has no idea whether such documents exist" (Mot. at 11, 12) are also incorrect.  The basis to believe documents exist is that Marckstadt was directly involved in the

events at issue, previously produced similar documents, and indicated that she continued to discuss the criminal case with Barrack. The government thus has ample basis for its request.

Marckstadt claims these requests are duplicative, but later concedes that the government instructed her not to re-produce documents. Mot. at 16. Marckstadt suggests this is improper "covering," but limiting the subpoena is part of the narrow tailoring required by Nixon, and reduces any burden on Marckstadt. Indeed, if Marckstadt has no additional documents, then her burden is nothing. If she has additional relevant documents that were not produced, this is self-evidently not duplicative. Marckstadt argues that the subpoena should be quashed because different records were previously produced in 2019, but the case they cite does not stand for any such proposition. In RW Prof. Leasing Servs. Corp., the court held that making a third party determine what documents were not previously produced (in a case involving voluminous discovery between two business entities in an entirely separate civil suit) was unduly burdensome, and the requestor should identify what was already produced. See 228 F.R.D. at 163. Here, since Marckstadt only produced 88 pages of documents, she cannot be heard to claim any similar burden. To ease any theoretical burden, the government is prepared to provide Marckstadt with copies of the documents she previously produced.

Finally, Marckstadt quotes the government's brief in opposition to the defense's request for Rule 17(c) subpoenas to argue that the requests "would likely result in the production of voluminous and irrelevant documents requiring significant time to review." Mot. at 13-14. The idea that the government's request to Marckstadt would generate thousands of pages of documents is demonstrably untrue. Marckstadt is an individual witness, not a large business like the target of the Defendants' subpoena. The government has good reason to believe that the request would not generate a large number of records for review, because Marckstadt previously

produced a small amount of responsive documents. The requests are also limited to facts pertaining to the time period of the indictment and the events that occurred during that time period (all of which occurred before the 2019 voluntary production). Unless Marckstadt failed to disclose a large trove of additional materials at the time she made the 2019 productions, or gathered up thousands of relevant records since that time period, it is highly unlikely that the requests would require the review and disclosure of a burdensome amount of materials. Notably, counsel for Marckstadt does not make any affirmative representations about the volume of records in her possession. Marckstadt's counsel could, of course, render these requests moot by representing that no such records exist (or say that they have already been turned over), but counsel does not do either. The only fair inference is that Marckstadt has records responsive to this request, they have not been turned over, and it is not unduly burdensome. Those records should be disclosed.

II.    Marckstadt's Possession of Additional Communications with Defendant Barrack About the Charged Conduct (Request Nos. 7 and 8)

A.    Communications Between Marckstadt and Barrack About Events Related to the Indictment Should Be Produced As Admissible Evidence

As discussed above, Marckstadt admitted in her April 2022 interview that she communicated with Barrack after he was indicted, and spoke with him about the facts of this case. She also stated that she spoke with Barrack using multiple means of communication, including encrypted communication applications, like WhatsApp and Signal. Accordingly, Request Numbers 7 and 8 in the government's trial subpoena are for:

7.    Documents reflecting any communications between or among You, Barrack, Grimes, and/or Al-Malik from February 27, 2019 through the present, relating to (i) the 2016 United States Presidential Campaign; (ii) the 58th Presidential Inaugural Committee; (iii) communications with any United States federal agency or federal official; (iv) official and unofficial representatives of the United Arab Emirates, the Kingdom of Saudi Arabia or the State of Qatar; and (v) businesses, sovereign wealth funds and individuals associated with the United Arab Emirates, the Kingdom of Saudi Arabia or the State of Qatar.

8. Documents reflecting any communications about the use of encrypted communication systems for the purpose of communicating about any of the individuals, entities or topics described in this Rider;

These requests meet the Nixon standard. First, the communications are relevant. Statements by Barrack about the facts of the case go to the core of the prosecution, because they relate to Barrack's knowledge and intent as it relates to the alleged criminal conduct. That these statements were made to Marckstadt by Barrack after he was indicted does not alter this analysis, because they are statements about the charged conduct that occurred during the relevant time period. Marckstadt claims that the "Court has made clear…that it will not allow requests seeking documents from after the time period alleged in the indictment." Mot. at 7. But that is not what the Court said. The Court said that it would limit the Defendants' subpoena to requests that "pertained to" the period in the indictment. See Exhibit 9 at 10:24-11:3. Limiting records to those that pertain to the time period of the indictment makes sense, and is what the government requests: communications between Marckstadt and Barrack that pertain to the time period and issues identified in the indictment.

Communications between Marckstadt and Barrack are also likely to be admissible as non-hearsay evidence because they contain statements by a party-opponent. See Fed. R. Evid. 801(d)(2)(A); see also Nixon, 318 U.S. at 701 n.13 (holding that tape recordings that contain "conversations to which one or more of the defendants…were party" were not barred because they are contained party-opponent statements).

Finally, the communications are identified with reasonable specificity. The government has identified a narrow set of communications (statements between two persons) from a narrow time frame (communications between February 2019 and the present) about specific events (Request No. 7 identifies five specific subjects relevant to the charges in this case). This type of specificity has been held to be sufficient in particular with regard to requests for

communications.  See Nixon, 418 U.S. at 701 (request for audio recordings of conversation was sufficiently specific because "the identity of the participants and the time and place of the conversations . . . permit a rational inference that at least part of the conversations relate to the offenses charged in the indictment"); Skelos, 2018 WL 2554538, at *7 (request "meets the specificity requirement of Nixon in that it specifies communications with a particular person on a particular subject matter"); Weisberg, 2011 WL 1327689, at *7 (explaining that specificity requirement does not require "knowledge of specific documents" nor "the exact content of the material") (internal citations and quotations omitted).

B.    Claims Of Privilege or Work Product Protection Over Some Portion of the Communications Are Not a Valid Basis to Quash

Marckstadt claims that she should be shielded from producing documents because some of those communications may reflect privileged communications or attorney work-product. See Mot. at 16-18.  Marckstadt does not represent that all of her communications with Barrack are privileged, only that some unspecified number may be privileged, and therefore the government should receive none of her post-indictment communications with Barrack.   Id.   This is both an invalid legal basis for moving to quash a subpoena, and highlights why the decision by Barrack and Marckstadt to enter into "legal consultant" arrangement after she was identified as a witness should be viewed skeptically by the Court.

As an initial matter, Marckstadt's attempt to defeat this subpoena and shield communications between Marckstadt and Barrack underscores why Marckstadt's role as a legal consultant in this case and the decision to keep that retention secret for eight months is so problematic   Hiring a known fact witness as a purported litigation consultant is unusual, to say the least, and negative inferences are appropriately drawn from such a strategy.   See State of N.Y. v. Solvent Chemical Co., Inc., 166 F.R.D. 284, 290 (W.D.N.Y. 1996) (finding that decision to hire

a former employee and important fact witness as a litigation consultant "creates, in and of itself, an appearance of impropriety that serves to further undermine the [party's] claim of work product protection").

The appearance of impropriety undermines claims of privilege. Marckstadt and Barrack both knew that Marckstadt was a first-hand witness to many of the facts relevant to this case, including conduct specifically enumerated in the indictment. Marckstadt and Barrack also both likely knew – or at least their shared counsel did – that Marckstadt was in personal possession of records relevant to this case, and that the government had requested such records. With this knowledge, for Barrack's counsel (and Marckstadt's former counsel) to subsequently retain Marckstadt as a "legal consultant" creates an appearance of impropriety that counsels in favor of close review of any privilege claims. Barrack's counsel's creation of a questionable legal arrangement with a fact witness immediately after Barrack's indictment cannot serve as a means of shielding otherwise relevant materials under attorney-client or work product privileges.

However, the Court does not need to decide for the purposes of this motion whether particular items are privileged. Marckstadt's vague privilege claim over some unspecified portion of relevant documents is not a lawful basis to quash, and she does not cite a single case in support of such an argument. To the contrary, when faced with claims of privilege over certain documents responsive to a trial subpoena, courts have directed the party in possession of the records to turn over, in camera, any claimed privileged items for further review, or to comply with procedures set forth in the subpoena to deal with potentially privileged materials. See, e.g., United States v. Yudong Zhu, No. 13-CR-761 (VM), 2014 WL 5366107, at *4 (S.D.N.Y. Oct. 14, 2014) (noting that claims of privilege may not be "discharged by mere conclusory or ipse dixit assertions" and instead ordering parties to submit the potentially work-product privileged documents to the Court

for <u>in camera</u> review to determine "whether an alleged work product concern is real, or only speculative"); <u>United States v. Carollo</u>, No. 10-CR-654 (HB), 2012 WL 1195194, at *3 (S.D.N.Y. Apr. 9, 2012) ("To the extent there are responsive documents claimed to be privileged for any subsequent period still covered by the subpoena, [the third-party subpoena recipient] shall comply with the procedures set forth in the subpoena.").

The Court should follow the same process here. Consistent with the trial subpoena, Marckstadt should turn over non-privileged communications with Barrack about this case. To the extent she believes any materials are protected by a valid claim of privilege, she should prepare a privilege log of any documents that she asserts privilege over, and provide that log to the Government. If the parties dispute the privilege claim of any particular records, the Court can conduct an <u>in camera</u> review if necessary.

III. <u>Marckstadt's Possession of Materials Relevant to Bias (Request Nos. 9-12)</u>

After this case was charged, Barrack started paying Marckstadt $15,000 per month to be a part of the "legal defense team." The subpoena requests certain categories of documents relating to this arrangement, specified in requests numbered 9 to 12. Because the government has yet to make a final determination as to whether to call Marckstadt to testify, and given the number of issues raised by Marckstadt's last-minute, eve-of-trial filing, the government respectfully suggests that the Court defer ruling on the Motion to quash the subpoena's request for documents relating to Marckstadt's bias until she is confirmed as a testifying witness. The government proposes to revisit the question in the event it (or the Defendants) make a final determination to call Marckstadt.[8]

---

[8] The government notes that the cases cited by Marckstadt about the use of trial subpoenas to obtain impeachment material are inapposite. First, Marckstadt conflates the much broader concept of impeachment of witness credibility (which may be based on things such as

IV.     Marckstadt's Misrepresentations About the Government

Finally, the government is compelled to respond to Marckstadt's counsel's charges of a lack of professionalism.   Although not relevant to whether the government's subpoena is appropriate under the Nixon test, Marckstadt spends several pages discussing negotiations with the government about trial testimony of several unrelated witnesses who are also clients of Marckstadt's counsel.[9]   Mot. at 6.   The government rejects the allegations.   In addition to being irrelevant, they are false.

Counsel selectively quotes from correspondence with the government to argue that the government engaged in "unprofessional bullying," id.,   and relies heavily upon the generous use of ellipses and brackets to misrepresent the substance of the government's communications. For example, counsel omits the government's explanation that the reason why it cannot narrow its scheduling of witnesses is because of counsel's refusal to engage on the issue:

> Without any advance preparation, it will be next to impossible for
> us to determine whether one or more of your clients might be
> relieved of their obligation to be available for trial.   We have asked

_____

contradiction, misperception, mental capacity, general character for truthfulness, and prior inconsistent statements) with the much narrower concept of bias, which is "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party."   United States v. Abel, 469 U.S. 45, 52 (1984); see also United States v. Lindemann, 85 F.3d 1232, 1243 (7th Cir. 1996) ("Bias is one of the five acceptable methods of attacking the credibility of a witness's testimony . . . .").   Other forms of impeachment may not be admissible until cross examination, pursuant to Rule 608(b).   See Fed. R. Evid. 608(b) (limiting admission of specific instances of conduct related to witness's character for truthfulness/untruthfulness until cross-examination).   Evidence of Bias, however, is not limited to cross-examination, and is admissible on direct examination.   See United States v. James, 609 F.2d 36, 46 (2d Cir. 1979); Lindemann, 85 F.3d at 1243; 2003 Amendment to Fed. R. Evid. 608 (explaining that bias is specifically exempted from Rule 608(b) cross-examination limit).   As even cases cited by Marckstadt explain, Courts have held that more general impeachment materials must also be disclosed in response to a subpoena, but need not be disclosed until after a witness testifies.   See, e.g., United States v. Percoco, No. 16-CR-776 (VEC), 2018 WL 9539131, at *1 (S.D.N.Y. June 14, 2018).

[9] Counsel for Marckstadt also represents four other fact witnesses involved in this matter.

you to speak to your four clients and advise us of their particular
positions about meeting and preparing for trial with us. To date,
you have declined to answer that simple question directly.

<u>See</u> Mot., Ex. H at 4. Counsel decries "the human toll and callous approach" of the government

expecting witnesses to be available for trial, and block quotes a portion of an email from the

government. <u>See</u> Mot. at 5-6. But counsel omits the portion of the paragraph immediately

preceding the quoted text, which stated that the government was aware of the personal toll exerted

on witnesses required to be available for trial testimony, was willing to accommodate these

witnesses, and was best positioned to do so if those witnesses would meet in advance to prepare

for trial. <u>See</u> Mot., Ex H. at 4 (expressing the government's concern with a different witness's

personal circumstances, and the government's desire to accommodate that witness as best as

possible).[10] Because it does not fit their narrative, counsel also omits the additional instances, in

the same paragraph, of the government's expression of concern about a proposed witness's

personal issues, the government's desire to find "reasonable accommodations" for these issues,

and the final statement in the paragraph: "We remain willing to work with you on this." Counsel

may not be happy that the government wants his clients to be available for trial, but the request

hardly constitutes "bullying" or "threats."

Counsel also claims that the government stated that his clients would be required

to wait in the courthouse every day for a month, but that is not what the government said. Rather,

---

[10] Counsel implies that this discussion was primarily about Marckstadt, but as the correspondence indicates, it was actually about personal and medical issues related to a <u>different</u> client of counsel. <u>See</u> Mot., Ex. H at 4. It is unclear if Marckstadt's counsel obtained permission from this other client to publicly share deeply personal and sensitive issues, or whether that client agreed to the filing on the public docket of an exhibit with the client's name and detailed discussion of those confidential issues. If counsel did not get consent, then that is the only "callous" and "unprofessional" conduct at issue here. With or without consent, it is hard to see why public airing of a client's family medical issues was necessary or helpful.

counsel created that meaning himself in its submission to the Court by adding a bracketed word that did not exist in the original email.[11]   And when counsel responded that he understood the government to mean that his clients would "sit on a bench in the courthouse until you decide to call them," counsel for the government expressly advised him that was never said and that the government did not expect any such thing from his clients.   See Mot., Ex. H at 1 ("We are not asking anyone to wait on a bench in the courthouse.") (emphasis in original).

Counsel eventually admits in a footnote that the government did not say what counsel claimed was said (calling it a "clarification" and "walk back"), but in the process makes another misrepresentation, claiming that the government demanded his clients "fly across the country" and "leave their homes, family, and work for a month because the government refuses to coordinate schedules with them."   See Mot. at 6 n.2.   Yet the government also stated in the very next sentence of its correspondence that the witnesses could stay at or near their residence if they were willing to travel to New York on short notice, and also that the government was willing to provide assistance with any such travel scheduling, booking, or payment.   See Mot., Ex. H at 1 ("Your clients may even be able to stay at home, provided they are willing to book next-day travel.").

The government encourages the Court to review the entire correspondence if it has any question about the government's conduct, which was attached but only selectively quoted in the moving papers (and discussed for no apparent legitimate purpose other than to impugn

---

[11] Counsel quoted the government as saying "we will have to have [them] wait until each witness is called before making determinations" about whether they will be needed to testify. Mot. at 6.   The government actually wrote "we will expect your clients to show up for trial as required by law and we will have to have to wait until each witness is called…"   See Mot., Ex. H at 4.   As can be seen, the relevant sentence contains a typo ("we will have to have to"). Id. (emphasis added).   Any ambiguity caused by the typo was clarified by the government in the very next email.

government counsel).   <u>See</u> Mot., Ex. H.   As the full correspondence reflects, the government took the ordinary step of advising an attorney that his clients were needed as fact witnesses, that they needed to be available to be called when requested, and that the government would more easily be able to reduce (or even eliminate) this burden if those witnesses were willing to prepare in advance with the government.

Counsel's claims of "bullying" and "threats" are baseless.   The selective and misleading portrait of the correspondence in the Motion should be rejected, and serve as notice that the Court should carefully review the underlying record when Marckstadt's counsel makes factual representations.   At bottom, counsel has every right to vigorously represent his clients and is entitled to decline to make his clients available to prepare, to refuse to voluntarily disclose records, to delay in responding to requests for information weeks or months at a time, and even to refuse to notify the government of his client's retention by Barrack as a purported "legal consultant."   But none of those decisions preclude the government from taking the basic step of issuing a trial subpoena and expecting – and seeking enforcement of – compliance therewith.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny

Marckstadt's Motion to Quash the Subpoena, and order disclosure of the requested records by no

later than the first day of trial, September 19, 2022.

Dated:      Brooklyn, New York
             September 8, 2022

                                   BREON PEACE
                                   United States Attorney
                                   Eastern District of New York

By:         /s/
                                   Ryan C. Harris
                                   Samuel P. Nitze
                                   Hiral D. Mehta
                                   Craig R. Heeren
                                   Assistant U.S. Attorneys
                                   (718) 254-7000

                                   MATTHEW G. OLSEN
                                   Assistant Attorney General
                                   Department of Justice
                                   National Security Division

By:         /s/
                                   Matthew J. McKenzie
                                   Trial Attorney