# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

October 10, 2022

***VIA ECF***

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: *United States v. Rashid Sultan Rashid Al Malik Alshahhi*, et al., 1:2l-cr-371 (BMC) (S-1)**

Dear Judge Cogan:

      We respectfully submit this letter on behalf of Mr. Barrack and his co-defendant, Matthew Grimes, to respond to the Government's letter of September 28, 2022 ("Gov. Ltr."), which seeks "supplements" to its proposed jury instructions on two points: first, the law concerning which allegedly false statements Mr. Barrack uttered in violation of 18 U.S.C. § 1001; and second, the law concerning the applicability of Section 951's "legal commercial transaction" exception, which the Government erroneously construes so narrowly as to eviscerate the entire exception, in direct contravention to the Congressional intent behind the exception.[1]

    **I.    The Government Is Permitted To Seek a Guilty Verdict On Counts Four Through Nine Only Through Proof of the False Statements Alleged By the Grand Jury And Any Attempt to Prove Mr. Barrack's Guilt Through Different Statements Will Work An Impermissible Amendment of the Indictment.**

      The Government contends that the jury should be instructed that the Government "does not have to prove that [Mr. Barrack] uttered the exact statement charged in the indictment." (Gov. Ltr. at 1.) As an initial matter, it is not clear whether the Government is suggesting that it can prove wholly *different* "false statements" than those alleged in the Superseding Indictment, on the basis that "any" false statement made during Mr. Barrack's interview with law enforcement would suffice for a violation of Section 1001, *see* Gov. Ltr. at 2, or alternatively, whether the Government is suggesting that, although it must prove the "false statements" alleged in the Superseding Indictment, it does not need to prove that the statements were made exactly as alleged. Either way,

---

[1] In addition to its September 28th letter, the Government also submitted last week a 30-page single-spaced letter objecting to the majority of Defendants' Proposed Jury Instructions, *see* Dkt. 288. Defendants intend to respond to that filing and lodge objections of their own to the Government's Proposed Instructions, but are submitting this letter, regarding the law concerning which false statements the Government is required to prove, and the applicability of the "legal commercial transaction" exception now, as these issues may affect the evidence admitted in the near future.

the Government is wrong. Unless the Government proves the precise false statements alleged in Counts 4-9, the Superseding Indictment will have been constructively amended and reversal of any guilty verdict will be mandatory.

The law here is settled: a "court cannot permit a defendant to be tried on charges that are not made in the indictment against him," because doing so is a *per se* violation of the grand jury clause of the Fifth Amendment. *Stirone v. United States*, 361 U.S. 212, 217 (1960). An impermissible constructive amendment occurs when "the charging terms of the indictment are altered, either literally or in effect, by [a] prosecutor or court after the grand jury has last passed upon them." *United States v. Mollica*, 849 F.2d 723, 728 (2d Cir. 1988). As courts have recognized, the "extent or range by which proof may vary from indictment before prejudice arises is much narrower in a false statement case than in many other prosecutions," *see, e.g., United States v. Lambert*, 501 F. 2d 943, 948 (5th Cir. 1974), and here, where the Superseding Indictment alleges violations of Section 1001 based on the precise statements set forth in Counts 4-9, the Government is obligated to prove the charges as returned by the grand jury. *United States v. Miller*, 891 F. 3d 1220, 1235 (10th Cir. 2018) ("it is settled law in this circuit, as elsewhere, that the language employed by the government in its indictments becomes an essential and delimiting part of the charge itself, such that if an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars.").

As the Fifth Circuit has explained, in a false statement case in particular, "the starting point for everything is the statement. Once the defendant is informed what it is he is claimed to have said, then he can marshal his evidence tending to show that he did not make the utterance charged, or that it is true, or that it was not material." *Lambert*, 501 F. 2d at 948. But if the "threshold information given" to the defendant, via the indictment's charging language, "is not correct" or is not the language that the Government attempts to obtain a conviction upon, "the defendant is hampered in defending [himself] on all three grounds," and any conviction cannot stand. *Id.*

While it does not appear that the Second Circuit has had occasion to consider a case in which prosecutors sought to prove a Section 1001 violation based on statements different from those set forth in the indictment, numerous other Circuits have considered the issue and determined that under those circumstances, the indictment has been constructively amended. *United States v. Miller* is representative. *See* 891 F.3d 1220. In *Miller*, the grand jury charged the defendant, a doctor, with making a false statement on an application submitted to the Drug Enforcement Agency ("DEA"). *Id.* at 1232. The indictment alleged that the defendant answered in the negative ("N") to the question, "Has the applicant ever…had a state professional license…revoked, suspended, denied, restricted or placed on probation," when "in truth and fact, the defendant's professional license to practice medicine had been previously suspended by the State of Colorado." (*Id.*) At trial, however, the Government introduced evidence of a *different* false statement that prosecutors contended the defendant had made on the same DEA application. (*Id.*) The Government then argued to the jury that both of the statements were falsehoods sufficient to sustain a conviction and the jury instructions did not specify, as they should have, that the jury could *only* convict the defendant if the jurors found that he had provided a false statement relating to his previously suspended Colorado license and that they could *not* convict on the basis of any other statement made to the DEA, if even they determined the other statement was false. *Id.* at 1233. The Tenth Circuit reversed the defendant's conviction, finding that the Government's evidence, its closing statement to the jury, and the erroneous jury instructions raised "a real possibility that

the jury based its finding of guilt on a different false statement than the false statement that was specified in the indictment, thus broadening the possible bases for conviction from that which appeared in the indictment" and violating the grand jury clause of the Fifth Amendment. *Id.* at 1236; *see also United States v. Hoover*, 467 F.3d 496, 502 (5th Cir. 2006) ("[W]e conclude that because the indictment charged Hoover with making one false statement and the jury instructions allowed the jury to convict him for making a different false statement, the trial court constructively amended Hoover's indictment."); *United States v. Adams*, 778 F.2d 1117, 1124 (5th Cir. 1985) (finding constructive amendment where indictment charged that defendant had made a false statement on his driver's license application with respect to his name, but Government introduced evidence at trial that defendant also made false statement regarding his address, and jury instructions permitted jury to convict without specifying that the jury could only convict on the basis of the statement as to the defendant's name, not his address.)

The Government did not bring any of these cases to the Court's attention. Instead, the Government simply asserts that the Second Circuit has "upheld cases in which the jury has been instructed that it may convict a person of making false statements even if those statements are not identical to those charged in the indictment." (*See* Gov. Ltr. at 2.) This is incorrect. The Government cites only *fraud* cases, not false statement cases, and in fraud cases, the "core of criminality" is the "scheme to defraud," not the false statements, which are only the means by which the criminal "scheme" is effectuated. *See United States v. Salmonese*, 352 F.3d 608, 621(2d Cir. 2003) (in fraud cases, the "core criminality" pleaded in the indictment is the "fraud scheme"); *United States v. Dupre*, 462 F.3d 131, 140 (2d Cir. 2006) (describing "core of criminality" in wire fraud case as the "scheme to defraud investors" rather than the wires and thus upholding conviction even though none of the wire transfers presented in the trial had been alleged in the indictment); *United States v. Rigas*, 490 F.3d 208, 230 (2d Cir. 2007) (in bank fraud case, where government alleged that "scheme to defraud" included "false and misleading entries in its books and records," government was permitted to introduce evidence about sham "agreements that resulted in an artificial increase in revenue"). In *false statement* cases, however, the "core of criminality" is the *specific false statement* itself. *See United States v. Banki*, 685 F.3d 99, 119 (2d Cir. 2011) (defining the "core of criminality" in Section 1001 case as the defendant's statement where he "falsely identified his cousin as the source of wire transfers into his account" in response to an OFAC subpoena). Because the false statements alleged in the indictment are the "core of criminality" in a Section 1001 case, the Government is required to prove and seek conviction only on those precise statements, not different statements or somewhat "similar" statements.[2]

---

[2] *United States v. D'Amelio*, cited by the Government, makes this principle plain. *D'Amelio* explains that "the 'core of criminality' of an offense involves the essence of a crime, in general terms; the particulars of how a defendant *effected* the crime falls outside that purview." 683 F.3d 412, 418 (2d Cir. 2012) (emphasis added). *D'Amelio* was a child enticement case, where the only question was whether the Indictment's specified "facility of interstate commerce," the internet, permitted proof of "D'Amelio's use of the internet *and* the telephone in committing the crime." *Id.* at 413. The core of criminality principle set out in that case explains why, in a *fraud* case, the Government has more leeway with respect to proving the precise statements that it claims are false or fraudulent, because those statements are merely the mechanism by which the criminal "scheme to defraud" is carried out. In a false statement case, however, the "essence" of

The Government cites to a 2012 opinion, *United States v. Jara-Favela*, in support of its claim that it need not prove that Mr. Barrack "uttered the exact statement charged in the indictment." *See* 686 F.3d 289 (5th Cir. 2012). The holding of *Jara-Favela*, however, does not do the work that the Government imputes to it. *Jara-Favela* involved a defendant who was questioned on "the bridge" at the Gateway to Americas Port of Entry, "located on United States/Mexico border, between Laredo, Texas and Nuevo Laredo, Mexico." *Id*. at 293. As the Fifth Circuit explained, when a person is standing on the bridge, the location directly to the "north" is Laredo, Texas and the location directly to the "south" is Nuevo Laredo, Mexico. In *Jara-Favela,* the grand jury returned an indictment alleging that the defendant had falsely told law enforcement, while he was questioned on the bridge, that he was "coming from Laredo, Texas." *Id.* at 295. At trial, however, the evidence demonstrated that the defendant had actually told law enforcement that he was coming from "el norte"—the north. *Id*. After the jury convicted the defendant of making a false statement, he appealed, arguing that the indictment had been constructively amended when the prosecutors sought a conviction on the basis of his statement that he was coming from "el norte," as opposed to the statement alleged in the indictment, which alleged that he stated that he was "coming from Laredo, Texas." *Id*. at 300. The defendant's appeal was denied by the Fifth Circuit. *Id*.

While the Government claims that *Jara-Favela* stands for the proposition that it may seek Mr. Barrack's conviction on the basis of statements other than those alleged in the Superseding Indictment, in fact, the Fifth Circuit, in *Jara Favela*, found that the Government *had* worked a "variance" upon the charges and only upheld the defendant's conviction because it found that the defendant had not been "severely prejudiced" by the variance. *Id*. at 300. The Fifth Circuit's holding was narrow and fact-specific, finding that two terms that diverged between the indictment and the evidence produced at trial were "synonymous within the context of the port of entry." *Id.* But, the Fifth Circuit cautioned, "had the evidence presented at trial" concerning the defendant's statements "diverged further from the facts alleged in the indictment," the court's analysis could be different. 686 F.3d at 300, n.6. In the instant case, three weeks into trial, the Government's motion vaguely refers to "similar" statements made by Mr. Barrack which the Government intends to prove at trial in lieu of the statements alleged in Counts 4 through 9 without further specificity. Even if it had specified the statements, a variance like the one in *Jara-Favela* would be prejudicial to Mr. Barrack, particularly where the prosecution recently superseded the indictment but declined to add new substantive false statement allegations. Here, unlike the narrow situation in *Jara-Favela*, an instruction advising the jury that the Government may prove its case via statements other than those alleged by the grand jury would invite reversible error. Regardless, it is obvious that the instant case does not present the type of simple word vs. location statement that was at issue in *Jara-Favela*.

Indeed, it is another Fifth Circuit case—*United States v. Lambert*—that is particularly instructive here. *See* 501 F.2d 943 (5th Cir. 1974). In *Lambert*, the indictment alleged that the defendant "stated and represented that he had been severely beaten and subjected to illegal and unnecessary punishment by two members of the Tampa Police Department, Tampa, Florida, in violation of his Civil Rights," when "in truth and in fact, as [defendant] then knew, he had not been severely beaten and he had not been subjected to illegal and unnecessary punishment and his Civil

---

the crime is the false statement, *see Banki*, 685 F.3d at 119, and the Government is afforded no such leeway.

- 4 -

Rights had not been violated by the two members of the Tampa Police Department." *Id*. at 947. In fact, however, the defendant had not told the FBI that he had been "severely beaten," but rather had described being struck on the head, face and arms. *Id.* The phrase "severely beaten" was the gloss that the prosecutors had put on Lambert's actual statements. *Id*. at 948. As the Fifth Circuit explained, "the phrases 'severe beating' and 'subjected to illegal and unnecessary punishment' were prosecutorial efforts to summarize and restate either the overall tenor of the entire statement signed by defendant, or the gist of selected, but unidentified portions extracted from it" but did not reflect the actual language used by the defendant. *Id.* at 948-49 (noting that "'severe beating' was the grand jury's term, not appellant's."). At trial, law enforcement officers described the actual statements made by the defendant—namely his description of having been struck on the head, face and arms—and the jury convicted. On appeal, the Fifth Circuit reversed, finding that where the indictment "use[d] facially specific terms"—*i.e.*, that the defendant "stated" that he had been "severely beaten"—the Government was required to prove that the defendant used the words alleged in the charges. *Id*. at 948. The Government opposed the appeal, arguing that the statements actually made by the defendant, that is, his description of having been struck on the head, face and arms, were also false and thus, it did not matter that he did not use the exact phrase "severely beaten." The Fifth Circuit disagreed, explaining that just because the jurors might have "reasonably agree[d] with the recharacterization of the actual statement"—that is, finding that the phrase "severely beaten" accurately summarized the physical acts that defendant had falsely described—that fact did not "cure the prejudicial impact upon the defendant of an indictment, which as it turns out, did not sufficiently apprise him of what evidence he must marshal and present." *Id*. at 949. As in *Lambert,* the Government here is obligated to prove that Mr. Barrack made the precise statements that are alleged in the Superseding Indictment and the Government may not seek conviction on the basis of statements that are merely "similar" to what the grand jury alleged.

Given the applicable law, the Government's request for a jury instruction informing the jurors that "the Government is not required to prove that the defendant made the exact statement or used the precise language charged in the Indictment; the Government need only prove beyond a reasonable doubt that the defendant made a statement substantially similar to the one alleged," should be denied.

## II. The Court Should Not Instruct the Jury On The "Supplemental" Jury Instruction Proposed by the Government Concerning Section 951's Legal Commercial Transaction Exception.

The Government's September 28 Letter makes two arguments with respect to the Section 951 charges and, in particular, the "legal commercial transaction" exception, which serves as an affirmative defense to a Section 951 charge. First, the Government argues that Defendants have not "established facts warranting such a defense," *see* Gov. Ltr. at 4, an argument which is plainly incorrect, even at this early stage of the trial, where the Government still has at least 10 witnesses left to call, including numerous witnesses from Colony Capital, and where Defendants have not yet put on any defense case. Second, the Government argues that even if Defendants were engaged in commercial activity, their failure to register under FARA renders that commercial activity "unlawful" and thus, the Court should refuse to instruct the jury on Section 951's "lawful commercial transaction" exception. The Government is wrong on both counts.

*A. Defendants Will Easily Satisfy the "Slight Burden" of Production That Is Necessary To Raise the Legal Commercial Transaction Defense.*

Even at this early stage in the trial, there is already adequate evidence in the record to permit the jury to be instructed on the legal commercial transaction exception. That is because the amount of evidence that Defendants are required to produce in order to raise the affirmative defense of a "legal commercial transaction" is not significant. *See United States v. Cabrera*, 13 F.4th 140, 144 (2d Cir. 2021) (noting the "slight burden" required to present an affirmative defense to the jury). All that is required is that Defendants satisfy their burden of producing "some evidence" showing that they were involved in commercial activity. Having done so, the Government is then obligated to disprove the defense. *See United States v. Durrani*, 835 F.2d 410, 420 (2d Cir. 1987) ("An affirmative defense requires a defendant to produce 'some evidence' placing the [statutory] exception in issue; if he does so, the government would be required to prove its inapplicability beyond a reasonable doubt. The minimal burden placed on the defendant does not impinge upon his constitutional rights because the government ultimately bears the burden of disproving the applicability of the exception once it is properly raised.") (citations omitted). Defendants have only a burden of production, not the burden of persuasion, with respect to the legal commercial transaction defense. As the Supreme Court has explained, the Government "is foreclosed from shifting the burden of proof to the defendant only when an affirmative defense does negate an element of the crime." *Smith v. United States*, 133 S. Ct. 714, 719 (2013). Here, the statutory exception for those engaged in legal commercial transactions under Section 951(d)(4) negates the "agency" element of Section 951 and as such, the Government may not shift the burden of proof to Defendants, but instead holds the burden to disprove the existence of the exception, once Defendants have produced evidence sufficient to raise the defense.[3] Although the Government has yet to call a single fact witness—except, perhaps, Secretary Tillerson—the record already includes ample evidence that Mr. Barrack's meetings with Sheik Tahnoon and MBZ were premised on the hope of soliciting new investors for Colony. *See e.g.*, GX-111 (email from Mr. Barrack after first meeting with Sheik Taknoon, enclosing marketing presentation for Colony Capital investors); GX-269 (Mr. Barrack asking an employee to send him the "Dole Deck for sheikh Taknoon" after meeting with Sheik Taknoon); GX-42 (al Malik forwarding the Dole Deck in an email to Khalifa al Ghafli and the Chief of Staff for Sheikh Tahnoun with subject line "Dole Presentation for HH" and body "Per the discussion between HH and Tom today."). Indeed, even the Government's own expert witness, Professor Davidson, conceded that the type of "soft power" he described would be "commercial transactions." such as those between sovereign wealth funds and companies like Colony Capital. *See* Tr. 618:20-25; 703: 6-15.

The Government cites to two cases—*United States v. Abouammo* and *United States v. Ji Chaoqun*—and argues that courts do not always instruct the jury on the commercial transaction exception. *See* Gov. Ltr. at 4. But, of course, neither *Abouammo* or *Ji Chaoqun* involved a defendant who has been a prominent businessman for the last fifty years, who founded and operated a $40 billion investment business, with 12 offices located across the world, and which had investors in every almost every continent on Earth. *Abouammo*, for example, involved a Twitter employee who accessed the confidential information of certain Twitter users who had

---

[3] *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975) ("We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the *absence of the heat of passion on sudden provocation* when the issue is properly presented in a homicide case").

criticized the Kingdom of Saudi Arabia—stealing their names, birthdays, phone numbers, device identifiers, IP addresses and session histories—and then provided that information to Saudi Arabia. *See United States v. Abouammo*, Case No. 19-cr-00621-EMC, 2021 WL 718842, at *1, n.2. Because there is no dispute that stealing consumer data is not a "lawful" activity, it is not surprising that the court declined to instruct the jury in *Abouammo* on the "legal commercial transaction" defense. Likewise, *Ji Chaoqun* involves a Chinese citizen, living in the United States, who is alleged to have acted as an agent of the People's Republic of China (the "PRC") when, among other activities, he purchased background reports on multiple ethnic Chinese or Taiwanese individuals who worked in the science and technology sector in the United States and then sent those reports to officials in the PRC. While the defendant in *Ji Chaoqun* has argued that the purchase of background reports was a "legal commercial transaction," the district court has disagreed, finding that just because *one* of the defendant's alleged activities might qualify as a "commercial transaction," that was not enough to merit an instruction on the "legal commercial transaction" affirmative defense, especially where the defendant had not raised any argument that his other alleged activities constituted "legal commercial activities" and where those other activities involved various means of "spying." *See United States v. Ji Chaoqun,* No. 18-cr-00611, Dkt. 368 (N.D. Ill. Sept. 22, 2022).

In contrast to both of these cases, Defendants' actions clearly reflect commercial activity. As Executive Chairman of Colony Capital, Mr. Barrack was responsible for developing relationships with wealthy investors, and members of Middle Eastern royal families are among the wealthiest investors in the world. Indeed, the Middle Eastern officials that Mr. Barrack is alleged to have met with *routinely* meet with Western businessmen. *See, e.g.,* Tr, 676:5-679:17; BX-1049; BX-917; BX-925. Mr. Barrack also built Colony's brand by going on television and writing articles to demonstrate his knowledge about a wide array of subject matters that may be of interest to potential investors. In addition, as Mr. Barrack's assistant and junior analyst, Mr. Grimes was responsible for helping Mr. Barrack do his job by, among other things, arranging calls and meetings and developing investment presentations. *See* GX-529 (resume of M. Grimes). Although Defendants expect that additional evidence of their commercial motivations will be introduced as the trial proceeds, Defendants respectfully contend that the record contains enough, even at this early stage, to find that Defendants have satisfied their burden of production and to require the Government to prove that Mr. Barrack and Mr. Grimes were *not* engaged in legal commercial activities.

> B. The Court Should Not Give The Government's Proposed Instruction No. 26 Regarding the Requirements of FARA Because This Is Not a FARA Case and Defendants Have Not Been Charged With Violating FARA.

After incorrectly claiming that Defendants will not meet the minimal burden of production that is required to raise Section 951's "legal commercial transaction" exception as a defense, the Government proceeds to request that the Court provide an instruction that imparts a reading of Section 951 which, if adopted, would read Section 951's legal commercial transaction exception entirely out of existence, and for that reason alone, cannot be right. *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is, however, a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute."). For the reasons described below, the Court should not give the Section 951 instruction sought by the Government but instead should

instruct the jury on the legal commercial transaction using the instruction proposed by Defendants. *See* Dkt. 273 at Defense Instruction No. 31 (page 51-53).

Section 951(d)(4) excludes from the definition of "agent of a foreign government" any "person engaged in a *legal commercial transaction*." *See* Section 951(d)(4) (emphasis added). According to DOJ regulations, the term "legal commercial transaction" means "any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations." 28 C.F.R. § 73.1(f).

As described more fully below, Congress never intended for Section 951 or its notification requirement to serve as a burden on American businesspeople. Rather, the statute was narrowed with the intent to address those engaged in espionage, as its prior overbreadth had rendered the statute largely unworkable. For that reason, beginning in 1984, Section 951 specifically exempted anyone engaged in a "legal commercial transaction" from the statute's auspices, including any notification obligation to the Attorney General. Despite the clear legislative intent, the Government now contends that any person seeking to utilize Section 951's "legal commercial transaction" exception is, in effect, admitting to serving as an agent of a foreign government and, as an admitted agent of a foreign power, the individual must "register" under FARA before he or she can engage in the "commercial transaction." Where such a person has not registered under FARA, the commercial transaction that he or she is has engaged in is rendered "illegal," asserts the Government, and thus, the "legal commercial transaction" exception to Section 951 becomes inapplicable. In short, according to the Government's theory, in order for a person to avail himself of an exception from having to provide notice to the Government regarding his conduct, he must first provide the Government with that very notice of his conduct by registering under FARA, which constitutes notice under Section 951. *See* 28 C.F.R. § 23.3(e). Given the circularity of the Government's argument, in which someone must give the very notice required in order to be exempt from giving notice at all, the exemption itself does nothing. It is non-existent. This is precisely the type of absurd statutory reading that the Supreme Court has long cautioned against. *See Nixon v. Mo. Municipal League*, 541 U.S. 125, 138 (2004) ("Court will not construe a statute in a manner that leads to absurd or futile results."); *Bostock v. Clayton Cty.*, 140 S. Ct 1731, *Holy Trinity Church v. United States*, 143 U.S. 457, 460 (1892) ("If a literal construction of the words of a statute be absurd, the act must be so construes as to avoid the absurdity. The court must restrain the words.").

The Court should decline to give the Government's supplemental instruction—Government Proposed Instruction No. 26—because it is contrary to the text of Section 951, the legislative history of Section 951, and has never once been given in a Section 951 case.

1. <u>The Legislative History of Section 951's Commercial Exception Is Inconsistent with the Government's Tortured Interpretation.</u>

The Government's claim that the "commercial transaction" exception to Section 951 can be utilized only by those individuals who register under FARA finds no support in Section 951's legislative history.

Congress first enacted Section 951's predecessor in the Espionage Act of 1917. *See* Pub. L. No. 65-24, tit. VIII, sec. 3, 40 Stat. 217, 226 (codified at 22 U.S.C. § 233). In 1938, Congress passed FARA and codified it alongside the provisions of the Espionage Act. *See* Act of June 8, 1938, ch. 327, 52 Stat. 631 (codified at 22 U.S.C. §§ 233a–233g). Subsequently, Congress transferred these statutes, eventually separating Section 951 and FARA into separate titles. *See, e.g., United States v. Duran*, 596 F.3d 1283, 1294–95 & n. 7 (11th Cir. 2010) (citing legislative history). As currently enacted, Section 951 makes it unlawful to act as an "agent of a foreign government" within the United States without first notifying the U.S. Attorney General. *See* Section 951(a). Likewise, FARA requires individuals acting as agents of a foreign principal to file regular registration statements (22 U.S.C. § 612) and to disclose the foreign principal's identity on informational materials (*id.* § 614).

In 1984, in response to overbreadth concerns expressed by both the Justice Department and the State Department, Congress added subsection (d)—the legal commercial transaction exception—to Section 951 in defining the phrase "agent of a foreign government" for the first time in the statute. *See* Pub. L. No. 98-473, § 1209, 98 Stat 1837, 2164 (1984); *see also* Dkt. 120 at 6 n.4. In announcing the hearings on the bill, Senator Denton explained that Section 951's "usefulness" was in "espionage prosecutions" (*see* 18 U.S.C. Ch. 37 (listing espionage-related criminal offenses)) and the purpose of the proposed legislation was explicitly "to impede espionage." *See* Communist Block Intelligence Gathering on Capitol Hill: Hearing on S. 1959 and S. 1963 Before the Subcomm. on Sec. & Terrorism of the S. Comm. on the Judiciary, 97th Cong., 2d Sess. at 4, 40 (May 12, 1982) (hereinafter "Judiciary Hr'g."). As such, the Justice Department recommended to Congress that it *narrow* the focus of the statute by excluding "legitimate activities" from the term "agent of a foreign government." Judiciary Hr'g. at 28; *see also id.* at 37. The State Department agreed and urged a narrower definition of the term "agent of a foreign government," noting that among those individuals who "need not, in our view, register with the Attorney General" are "people engaged in legitimate representation of foreign governments in commercial activities." *Id.* at 31.

Likewise, the Senate Report for the proposed bill emphasized that the amendment was intended to narrow the statute's reach to, among other things, no longer "*cover those individuals engaged in routine commercial matters*." S. Rep. No. 98-225, 98th Cong., 1st Sess., at 415 (1983) ("The Proposed Act is not intended to cover those individuals engaged in routine commercial matters . . . . By excluding from the notification requirement several classes of individuals who are presently covered, the proposal also limits the coverage of the statute by focusing only on those in whom the United States government has a necessary interest," such as "individuals who represent foreign governments in political activities[.]"). In turn, this narrowness was achieved through the "legal commercial transaction" exception, subsection 951(d), which then permitted the rest of the enactment to focus on espionage, rather than completely legal activities. S. Rep. 98-225 at 415.

In short, as this legislative history makes clear, it was Congress's intent to exempt commercial business from Section 951, because the notification obligations of Section 951 would only serve as an unnecessary burden on American businesspeople engaged in "routine commercial matters." The Government's reading of the statute is at odds with this Congressional intent: if Congress intended that any person engaged in "routine commercial matters" would nevertheless need to register under FARA in order for those "commercial matters" to be considered "legal"

under Section 951(d)(4), one would expect to see such an expectation discussed in the legislative history, if not the statutory text itself. Yet, neither the legislative history of the statute or the statutory text says anything of the sort. And, in the nearly 40 years since the "legal commercial transaction" exception was codified, Congress has taken no action that supports the Government's notion that such a requirement is subsumed within Section 951(d)(4). Where the Government's reading of a statute contradicts clear legislative intent, it should be viewed with deep skepticism. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").

2. The Text of Section 951's Commercial Exception Is Inconsistent with the Government's Tortured Interpretation.

The second problem with the Government's reading of the commercial transaction exception is that it cannot be squared with Section 951's text.

The "legal commercial transaction" defense is found in the portion of the statute defining the term "agent of a foreign government." Individuals with certain kinds of status, such as diplomats, consular officials, and sponsored officials are *not* considered agents of a foreign government for purposes of this statute. *See* 18 U.S.C. § 951(d). Similarly, persons with a certain status—those engaged in legal commercial transactions—are *not* considered agents of a foreign government. *See United States v. Duran*, No. 07-20999-CR, 2008 WL 11333989, *2 (S.D. Fla. Oct. 10, 2008) ("Section 951(d) sets forth four types of persons who do *not* constitute an 'agent of a foreign government'") (emphasis added). As such, the Government's contention that any person who relies on the legal commercial transaction exception is, as a matter of law, "act[ing] as an agent of a foreign principal" is incorrect. Section 951 says precisely the opposite: such persons are *not* "agents" of a foreign government. And because such persons are not "agents" of a foreign government, they have no obligation to "register" under FARA because FARA applies only to people who are "acting as an agent" of a foreign principal.

Moreover, Section 951 applies to persons engaged in "legal commercial activities," meaning activities which do not violate the law, as opposed, for example, to persons engaged in *unlawful* commercial activities, like drug trafficking, money laundering, or trade secret theft. This reading reflects common sense and is consistent with the statutory text, and it avoids the circularity problem addressed above. The Government's reading, on the other hand, requires the adjective "legal" to move from where it actually sits—modifying the word "transaction"—to a different place in the statute, where it describes whether the person's *engagement* in the commercial transaction is "legal" or not, meaning, according to the Government, whether the person has appropriately filed FARA paperwork prior to engaging in the commercial activity. But if Congress intended the meaning that the Government suggests, it would have written Subsection (d)(4) to exempt from Section 951 "any person engaged legally in a commercial transaction." It did not. Rather, Section 941(d)(4) exempts from Section 951 "any person engaged in a legal commercial transaction." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (When "interpreting a statute, a court should always turn first to one, cardinal canon before all others,"

namely, that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there.")[4]

### C. The Government's Proposed Jury Instruction Concerning FARA Will Only Confuse the Jury And For That Reason Too, The Instruction Should Not Be Given.

Defendants have not been charged with violating FARA, a statute which contains a host of exceptions and exemptions that differ from those in Section 951. The Government provided no Rule 404(b)(3) notice of any intention to argue that Defendants violated FARA. And FARA involves a statutory scheme that is distinct and more complicated than Section 951. In addition to differences in exceptions and exemptions, a FARA violation requires the Government to prove willfulness—meaning knowledge of the registration requirement. *See also* 22 U.S.C. § 618 (a) (violation to "willfully violate" registration requirements and related provisions). Thus, to prove the FARA violation that the Government contends renders Section 951(d)(4) inapplicable, the Government must prove that Mr. Barrack and Mr. Grimes knew about the FARA registration requirement and yet, willfully failed to register. Yet, at the same time, the Government has consistently maintained that it need not prove willfulness with respect to Counts 1 or 2. As such, the issues involved in instructing the jury on a FARA violation are deeply confusing and likely to cause juror error. For this reason too, the Court should decline to give the Government's proposed instruction. *United States v. Rossomando*, 144 F.3d 197, 201-02 (2d Cir. 1998) (even under a "plain error" review, reversal of conviction was warranted, where district court's instruction was "seemingly contradicted" by a "subsequent instruction" in the charge and thus, the "task" that the jurors would have had to perform in order to "reconcile" the two instructions "was simply too ambiguous and obscure to inspire confidence."); *United States v. Birbal*, 62 F.3d 456, 460 (2d Cir. 1995) ("conflicting" instructions on the same element "left the jury uncertain of the standard it was charged with applying," and "[s]uch a jury, it goes without saying [is] insufficiently prepared to carry out its constitutional mandate to resolve all reasonable doubts before adjudging the defendants guilty.")

---

[4] As support for its reading of Section 951(d)(4), the Government cites to *Rafiekian* – a case which involved an alleged conspiracy to make a false FARA submission. But the Court in *Rafiekian* did not give the jury instruction on FARA that the Government asks for here and the Fourth Circuit did not hold that any such instruction is necessary whenever a defendant invokes the legal commercial transaction exception. Instead, the court in *Rafiekian* held only that the legal commercial transaction exception is not an element of a Section 951 case, but instead an affirmative defense. *Id.* After arriving at that conclusion, the Fourth Circuit noted that the Government below had tried to challenge defendant's assertion that his lobbying efforts were "legal commercial" activities by pointing out that he had failed to register as a lobbyist under FARA. *See id.* The Fourth Circuit, however, certainly did *not* hold that every defendant who invokes the commercial transaction exception must first prove that he registered with FARA before such a defense can go the jury, nor could the Fourth Circuit have come to that conclusion, for the reasons stated above.

**III. Conclusion.**

The "supplemental" instructions described by the Government in its September 28, 2022 Letter are improper and should not be given.

Sincerely,

| WILLKIE FARR & GALLAGHER LLP | WINSTON & STRAWN LLP |
|---|---|
| /s/ Michael S. Schachter | /s/ *Abbe David Lowell* |
| Michael S. Schachter | Abbe David Lowell |
| Randall W. Jackson | Christopher D. Man |
| Casey E. Donnelly | Sofia R. Arguello |
| Steven J. Ballew | Johanna Rae Hudgens |

O'MELVENY & MYERS LLP

James A. Bowman

*Counsel for Defendant*
*Thomas J. Barrack*, Jr.

*Counsel for Defendant*
*Matthew Grimes*

Cc (via ECF): Hiral D. Mehta
Nathan Daniel Reilly
Ryan C. Harris
Samuel P. Nitze
Craig R. Heeren
Matthew John McKenzie