# EXHIBIT 1

**WILLKIE FARR & GALLAGHER** LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

September 2, 2022

*VIA EMAIL*

Ryan C. Harris, Esq.
Samuel P. Nitze, Esq.
Hiral D. Mehta, Esq.
Craig R. Heeren, Esq.
Matthew J. McKenzie, Esq.
U.S. Attorney's Office for the Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

**Re: United States v. Thomas J. Barrack, Jr., et al., 1:2l-cr-371 (BMC) (S-1)**

Dear Counsel:

On August 5, 2022, the government provided a letter purporting to disclose its expert witnesses' "opinions [and] the bases and reasons for those opinions." Since that disclosure, the defense has been engaged in the process of identifying the scope of expert testimony that it is considering in order to counter the government's proffered expert testimony. On August 19, 2022, Mr. Barrack provided the government with a preliminary expert disclosure. We now write to provide you with this supplemental disclosure. The defense is still reviewing the government's disclosures of its witness list, witness statements, and exhibits, and reserves the right to call substitute expert witnesses, as well as to call additional expert witnesses, in order to address the government's evidence, and will timely advise the government of any changes or additional disclosures.

As you are aware, Mr. Barrack and Mr. Grimes have filed a joint motion *in limine* to exclude or limit the scope of the government's expert witnesses, Michael Higgins, Christopher Davidson, and Eliot Kalter (the "Expert MIL"). To the extent that there is overlap between the proffered testimony described below and the proffered testimony of the government's experts that is the subject of the Expert MIL, this disclosure is not intended to, and expressly does not, concede the relevance or admissibility of such testimony. Mr. Barrack would only be offering such testimony to counter the expert testimony of the government's expert witnesses in the event that the Expert MIL is unsuccessful.

1. Dr. Bernard Haykel

Dr. Haykel is expected to testify concerning the following: (a) the structure of the government of the United Arab Emirates ("UAE") and the Kingdom of Saudi Arabia ("KSA"); (b) the key officials and royal family members in those governments and their roles, responsibilities

57037300.6

and relationships, including their dual role as both government officials and business leaders; (c) the relationship between the United States and the UAE, including the significant cooperation between the two countries on issues related to defense, security, intelligence, counterterrorism, and trade; (d) the foreign policy objectives of the UAE and KSA between 2016 and 2018; (e) the foreign policy issues relevant to the UAE and KSA between 2016 and 2018; (f) lobbying efforts by the UAE in the United States; (g) the blockade and embargo of Qatar imposed by the UAE and others in June 2017; (h) sovereign wealth funds, both generally and specifically those in the United Arab Emirates and the Kingdom of Saudi Arabia; (i) the fact that it is extremely common for business leaders in the West to meet with foreign leaders such as Mohamed bin Zayed Al Nahyan ("MBZ") and Mohammed bin Salman Al Saud ("MBS"), and the reasons why such meetings are beneficial, both from the perspective of the business leaders in the West as well as the foreign leaders with whom they meet; and (j) Mr. Barrack's proposed Marshall Plan for the Middle East.

More specifically, Mr. Barrack anticipates that Dr. Haykel will provide, among other things, opinions and related testimony, in response to the testimony presented at trial by government's witnesses, including Dr. Davidson, along the following lines:

1. A description for the jury of the political organization of the UAE and KSA, as well as the history of the relationship between the UAE and KSA and how it has evolved over time;

2. A description for the jury of the business interests, both private and public, held by various officials in the UAE and KSA, including but not limited to MBZ, MBS, and Sheikh Tahnoun bin Zayed Al Nahyan ("Sheikh Tahnoun");

3. A description for the jury of the regular interactions between Western business leaders and various officials in the UAE and SA, including but not limited to, MBZ, MBS, and Sheikh Tahnoun;

4. A description for the jury of the policy preferences of the UAE, including the US policies that it supports or doesn't support;

5. A description for the jury of the historical alliance between the UAE and the US, including bilateral cooperation with respect to defense, anti-terrorism measures, trade, energy policy and economic initiatives.

6. An analysis of the statements made by Mr. Barrack in the interviews referenced in Paragraph 27 of the Superseding Indictment, as reflected in the Government's marked exhibits, regarding (i) the alliance between the US and the UAE and/or KSA; (ii) the leadership of MBZ and/or MBS; and (iii) the stance of the UAE and KSA regarding terrorism and fundamentalist radical Islam – including the Professor's opinion that Mr. Barrack's statements were (A) factually accurate; and (B) consistent with the public position taken by the US government and US government officials.

7. A description for the jury of the history of the animosity between Qatar and other countries in the Middle East, including the UAE and KSA, including the events that

57037300.6

    led up to the blockade and embargo of Qatar and the policy positions held by the UAE and KSA toward Qatar and the Muslim Brotherhood during that period, as well as a summary of (A) the position the UAE and/or KSA preferred the United States to take with respect to the blockade; and (B) the position Qatar preferred the United States to take with respect to the blockade.

8. A description for the jury of the efforts of the UAE to influence US policy, through legal means, including a description of the US policies that are most important to the UAE and the role played by UAE Ambassador Otaiba as well as a host of lobbying firms in those efforts;

9. A description for the jury of the history of the 28 declassified pages of the December 2002 report of the Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2011, conducted by the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence, including their classification status over several US presidential administrations, the Republican Party's position on declassification, and a description of the view held by the KSA and UAE governments regarding the declassification of those pages.

10. An analysis of Mr. Barrack's proposed Marshall Plan for the Middle East (GX 24) including Dr. Haykel's opinion that it does not reflect the policy preferences of the UAE.

11. Any other expert testimony determined to be necessary to rebut the testimony the government elicits from its expert witnesses, including Dr. Davidson.

    Since 2007, Dr. Haykel has served as Professor of Near Eastern Studies and the Director of the Institute for the Transregional Study of the Contemporary Middle East at Princeton University. Prior to his tenure at Princeton, Dr. Haykel was an Associate Professor with tenure in Middle Eastern and Islamic Studies at New York University. Dr. Haykel graduated from Georgetown University's School of Foreign Service with a Bachelor's of Science in Politics in 1989; University of Oxford, St. Antony's College with a Masters of Philosophy in Middle East Studies in 1991; and the University of Oxford, Magdalen College with a Doctors of Philosophy in 1998. Dr. Haykel has testified in multiple U.S. federal courts, testified before the U.S. Senate Committee on Foreign Relations and U.S. Senate Judiciary Committee. Dr. Haykel is also a board member of The Arab Gulf States Institute in Washington; a member of the Organizing Committee of the Yale Law School's Middle East Legal Studies Seminar; a Member, Advisory Committee of the Center for the Study of Islamic Law and Civilization at the Yale Law School; and the chair of the Visiting Committee of the Department of Near Eastern Languages and Civilizations (NELC) at Harvard University.

    Mr. Barrack has previously provided you with Dr. Haykel's resume. Dr. Haykel's testimony is expected to be based on his twenty-year career of academic research and study of the Middle East, including through standard academic research methods such as: (a) study of the relevant peer-reviewed academic literature; (b) interviews of relevant stakeholders, including academics, diplomats, government officials, former government officials, and journalists, among

57037300.6

others; (c) in-country surveys of Gulf State citizens; and (d) study of archival materials, such as publicly available government records, reports, publications, and historical newspaper archives.

2. Dr. William Megginson

Dr. Megginson is expected to testify concerning the following: (a) the history and evolution of sovereign wealth funds and their role in global capital markets; (b) the governance structures of sovereign wealth funds; (c) the role of government officials in strategic goal-setting and management of sovereign wealth funds; (d) the use of sovereign wealth funds to advance non-commercial goals and/or goals prioritizing interests beyond investment returns, including goals relating to domestic and foreign relations agendas; (e) the approximate total values of assets under management by sovereign wealth funds, both in the aggregate and specifically with regard to ADIA and Mubadala Investment Company; (f) the comparative value of ADIA and Mubadala's total AUM to the investments at issue in this case; (g) the fact that foreign government leaders are perceived in the business community to have influence over the ability to attract investment funds from sovereign wealth funds in that country and, as a result, it is not uncommon for foreign government leaders meet with members of the business community.

More specifically, Mr. Barrack anticipates that Dr. Megginson will provide, among other things, opinions and related testimony, in response to the testimony presented at trial by government's witnesses, including Dr. Kalter and Dr. Davidson, along the following lines:

1. A description for the jury of the history and governance of ADIA and Mubadala.

2. A description for the jury of the assets under management of ADIA and Mubadala during the relevant time period.

3. A description for the jury of the amount of funds of ADIA and Mubadala had available to invest during the relevant time period.

4. A description for the jury of the amount of funds ADIA and Mubadala invested with US investors other than Colony Capital / DigitalBridge during the relevant time period.

5. A description for the jury of examples of investments made by sovereign wealth funds to, at least in part, advance non-commercial goals and/or goals prioritizing interests beyond investment returns, including goals relating to domestic and foreign relations agendas.

6. A description for the jury of the regular interactions between Western business leaders and various officials in the UAE and SA, including but not limited to, MBZ, MBS, and Sheikh Tahnoun.

7. Any other expert testimony determined to be necessary to rebut the testimony the government elicits from its expert witnesses, including Dr. Kalter and Dr. Davidson.

57037300.6

Dr. Megginson is currently Professor and Price Chair in Finance at the University of Oklahoma's Michael F. Price College of Business, where he has served on the faculty since 1998. Dr. Megginson holds a B.S. degree in chemistry from Mississippi College (1976), an MBA from Louisiana State University (1982), and a PhD in finance from Florida State University (1986). Dr. Megginson has published extensively on the issues of sovereign wealth fund investments, the privatization of state-owned enterprises, energy finance, and investment banking principles and practices. His writings have been published in several top academic journals, including the Journal of Economic Literature, the Journal of Finance, the Journal of Financial Economics, the Review of Financial Studies, the Journal of Law and Economics, the Journal of Financial and Quantitative Analysis, and Foreign Policy. Dr. Megginson's articles have been downloaded over 66,000 times from the Social Sciences Research Network, and his books and articles have been cited over 23,000 times. Currently, Dr. Megginson in the process of publishing an article commissioned by the World Bank Group entitled "The Rise of Sovereign Wealth Funds As Global Investors."

Mr. Barrack has previously provided you with Dr. Megginson's resume. Dr. Megginson's testimony is expected to be based upon his previously-described qualifications and experience related to these topics.

3. <u>Dr. Harry Broadman</u>

Dr. Broadman is expected to testify concerning the following: (a) the relationship between sovereign wealth funds and private equity firms; and (b) the reasons private equity firms engage in government relations activities, such as meeting with the leaders of foreign countries.

More specifically, Mr. Barrack anticipates that Dr. Broadman will provide, among other things, opinions and related testimony, in response to the testimony presented at trial by government's witnesses, including Dr. Kalter and Dr. Davidson, along the following lines:

1. An explanation to the jury of why sovereign wealth funds utilize investment managers, including private equity funds, to invest their wealth, rather than exclusively making direct investments;

2. An explanation to the jury of why sovereign wealth funds expect their investment managers to be well versed in policy, especially with respect to policy that may affect the financial markets where the sovereign wealth fund has investments;

3. An explanation of why investment managers, including private equity firms, often hire individuals with political or policy-making backgrounds, including how these individuals assist in recruiting investors.

4. Any other expert testimony determined to be necessary to rebut the testimony the government elicits from its expert witnesses, including Dr. Kalter and Dr. Davidson.

Dr. Broadman is currently a Partner and Chair of the Emerging Markets Practice and the CFIUS Practice at Berkeley Research Group LLC, where he counsels some of the very largest U.S. and non-U.S. global corporations, private equity firms, banks, institutional investors, and sovereign wealth funds on negotiating and structuring cross-border transactions; reforming

corporate governance and compliance practices; and instituting company-wide sustainability strategies. Concurrent with his post at BRG, Dr. Broadman is a Faculty Member at Johns Hopkins University and a National Association of Corporate Directors (NACD) Commissioned Faculty Member for its Board Advisory Services. Previously, Dr. Broadman was Senior Managing Director at PricewaterhouseCoopers, where he founded and led PwC's Global Business Growth Strategy Practice, and also served as PwC's first Chief Economist. Prior to PwC, Dr. Broadman was Managing Director at The Albright Group and the Chief Economist at Albright Capital Management, the international private equity firm chaired by Madeleine Albright. Earlier, Dr. Broadman was a senior executive at The World Bank Group, where he led negotiations and then the supervision of the Bank's largest (at the time) enterprise restructuring and sovereign loan operations. Dr. Broadman also served in the White House during the administration of George H.W. Bush, first as Chief of Staff of the President's Council of Economic Advisers, and then as United States Assistant Trade Representative. In the latter position, he led U.S. negotiations for the establishment of the WTO and NAFTA; U.S. Bilateral Investment Treaties; and U.S. International Science and Technology Agreements. Dr. Broadman also served as a Member of the Committee on Foreign Investment in the U.S. (CFIUS) and on the Board of the Overseas Private Investment Corporation (OPIC). Before his time in the White House, he was Chief Economist of the U.S. Senate Homeland Security and Governmental Affairs Committee. Dr. Broadman graduated from Brown University in 1977 with an A.B. *magna cum laude* in economics and history, and from the University of Michigan with a PhD in economics in 1981.

Mr. Barrack has previously provided you with Dr. Broadman's resume. Dr. Broadman's testimony is expected to be based upon his previously-described qualifications and experience related to these topics.

4. Daniel N. Hoffman

We have identified Daniel N. Hoffman as a potential rebuttal witness, given the Government's stated intention to call Mr. Higgins in its case in chief. We have not determined, as of yet, any specific areas of expected testimony but we will supplement this disclosure once we have made that determination. Mr. Hoffman's resume is attached as Ex. A to this letter.

Sincerely,

/s/ Michael S. Schachter

Michael S. Schachter


Cc:
Abbe David Lowell
Christopher D. Man
Sofia R. Arguello
Johanna Rae Hudgens