UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MALIK ALSHAHHI, et al.

        Defendants.

Case No.: 1:21-cr-00371-BMC-TAM

**DEFENDANT THOMAS J. BARRACK'S MOTION FOR JUDGMENT OF ACQUITTAL
<u>UNDER RULE 29</u>**

WILLKIE FARR & GALLAGHER LLP

Michael Steven Schachter
Randall Wade Jackson
Casey E. Donnelly
Steven J. Ballew
Jordan D. Reisch
787 Seventh Avenue
New York, NY 10019-6099
mschachter@willkie.com
(212) 728-8000 (ph)
(212) 728-8111 (fax)

O'MELVENY & MYERS LLP

James A. Bowman (admitted *pro hac vice*)
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
jbowman@omm.com
(213) 430-6000 (ph)
(213) 430-6407 (fax)

*Counsel for Thomas J. Barrack, Jr.*

# TABLE OF CONTENTS

LEGAL STANDARD.............................................................................................................1

ARGUMENT ...................................................................................................................3

I. THE GOVERNMENT FAILED TO PROVE COUNT ONE BECAUSE IT FAILED TO PROVE THAT MR. BARRACK ACTED AS AN AGENT OF THE UAE WITHOUT PRIOR NOTIFICATION TO THE ATTORNEY GENERAL.......................3

A. The Government Failed To Prove That Any Agreement Was Made Between The UAE And Mr. Barrack In Which Mr. Barrack Agreed to Serve At The UAE's Direction or Control.......................................................................4

1. The Government Failed To Demonstrate That Any Agency Agreement Was Entered Into During Mr. Barrack's May 1, 2016 Visit With Sheikh Tahnoun. ...............................................................................4

2. The Government Failed To Demonstrate That Any Agency Agreement Was Entered Into During Mr. Barrack's August 2016 Visit With Sheikh Tahnoun. ...............................................................................7

B. The Government Failed To Prove That Mr. Barrack Ever "Acted" Subject To The Control Or Direction Of The UAE. .............................................................8

1. Mr. Barrack Spoke His Mind During His Media Appearances. ..................9

2. Mr. Barrack Rejected Mr. Al Malik's "Feedback" To The Energy Speech. ..................................................................................11

3. The Change To The Republican National Platform Was Public Information. ...............................................................................12

4. Mr. Barrack Rejected Mr. Al Malik's "Feedback" To The Fortune OpEd. ..................................................................................14

5. The UAE "Strategy" Deck Was Not Prepared Subject To The UAE's Direction Or Control. ..................................................................15

6. Mr. Barrack Did Not Advocate For Congressman Stockman To Be Appointed As The UAE Ambassador Because He Was Operating Subject To The UAE's Direction Or Control. ..................................................16

7. The Government Introduced No Evidence that Mr. Barrack Arranged A Phone Call Between MBZ And The President-Elect Upon Direction from the UAE. ..................................................................................18

8. Mr. Barrack Never Saw, And Had No Role In Preparing, Any 100-Day Plan For The UAE To "Align With" The Trump Administration. ............18

9. The October 2017 "Notes" on Mr. Al Malik's Phone Reflect Mr. Barrack's Personal Views Based On Publicly Available Information. .....19

10. Mr. Barrack Voluntarily Withdrew Himself From Consideration For Special Envoy To The Middle East. .........................................................20

C.    The Government Failed To Prove That Mr. Barrack Was Not Engaged In A Legal Commercial Transaction. .............................................................21

D.    The Government Failed To Prove Venue. ............................................22

II.   THE GOVERNMENT FAILED TO PROVE COUNT TWO BECAUSE IT FAILED TO PROVE THAT MR. BARRACK CONSPIRED TO VIOLATE SECTION 951 .......23

III.  THE GOVERNMENT FAILED TO PROVE COUNT THREE BECAUSE IT FAILED TO PROVE THAT MR. BARRACK COMMITTED OBSTRUCTION OF JUSTICE .............................................................................................................23

IV.   THE GOVERNMENT FAILED TO PROVE COUNTS FOUR THROUGH NINE BECAUSE IT FAILED TO PROVE THAT MR. BARRACK MADE ANY MATERIAL FALSE STATEMENT ..................................................................26

A.    The Government Failed To Prove That Any Of The Alleged Statements, Even If Made, Were Material. ................................................................27

B.    The Government Failed To Prove That Any Of The Alleged Statements, Even If Made, Were Made Knowingly, Intentionally, And Willfully. .................28

C.    The Government Failed To Prove Venue For Counts Four Through Nine. ..........28

D.    The Government Failed To Prove That Mr. Barrack Made The Statement Alleged In Count Four. ........................................................................31

E.    The Government Failed To Prove That The Statement Alleged In Count Five Was False, Because, Even If Made as Agent Mergen Testified, It Is Fundamentally Ambiguous. .................................................................33

F.    The Government Failed to Prove That The Statement Alleged in Count Six Was False, Because, Even If Made as Agent Mergen Testified, It Is Literally True. .......................................................................................................35

G.    The Government Failed to Prove That The Statement Alleged In Count Seven Was Made, Or That It Was False. .......................................................36

H.    The Government Failed To Prove That The Statement Alleged in Count Eight Was Made, Or If Made, That It Was Anything Other Than a Failure of Recollection. ...............................................................................................38

I.    The Government Failed To Prove That The Statement Alleged in Count Nine Was False, Because, Even If Made as Agent Mergen Testified, It Is Fundamentally Ambiguous. ...................................................................40

CONCLUSION .............................................................................................................41

# TABLE OF AUTHORITIES

**Cases**                                                                    Page(s)

*Bronston v. United States,*
   409 U.S. 352 (1973)...............................................................................35

*Jackson v. Virginia,*
   443 U.S. 307 (1979).................................................................................1

*United States v. Aguilar,*
   515 U.S. 593 (1995)...............................................................................24

*United States v. Bin Laden,*
   146 F. Supp. 2d 373 (S.D.N.Y. 2001)..............................................29, 30

*United States v. Cabrera,*
   13 F.4th 140 (2d Cir. 2021) ...................................................................21

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005).......................................................................1

*United States v. Coplan,*
   703 F.3d 46 (2d Cir. 2012).................................................................29, 30

*United States v. D'Amato,*
   39 F.3d 1249 (2d Cir. 1994).....................................................................1

*United States v. Diogo,*
   320 F.2d 898 (2d Cir. 1963)...................................................................34

*United States v. Durrani,*
   835 F.2d 410 (2d Cir. 1987)...................................................................21

*United States v. Fortenberry,*
   No. 2:21-cr-491 (C.D. Cal. Mar. 24, 2022) ...........................................26

*United States v. Grace,*
   367 F.3d 29 (1st Cir. 2004).......................................................................1

*United States v. Hoskins,*
   44 F. 4th 140 (2d Cir. 2022) .....................................................................3

*United States v. Lambert,*
   501 F. 2d 943 (5th Cir. 1974) ............................................................32, 33

*United States v. Lighte,*
   782 F.2d 367 (2d Cir. 1986)...................................................................34

*United States v. Litvak,*
  808 F.3d 160 (2d Cir. 2015) ................................................................27

*United States v. Mangano,*
  2022 WL 65775 (E.D.N.Y. Jan. 6, 2022) ....................................34, 41

*United States v. Melekh,*
  193 F. Supp. 586 (N.D. Ill. 1961) .......................................................22

*United States v. Moses,*
  94 F.3d 182 (5th Cir. 1996) .................................................................34

*United States v. Newman,*
  773 F.3d 438 (2d Cir. 2014) ..................................................................1

*United States v. Nukida,*
  8 F.3d 665 (9th Cir. 1993) .....................................................................1

*United States v. Poutre,*
  646 F.2d 685 (1st Cir. 1980) ...............................................................34

*United States v. Rafiekian,*
  991 F.3d 529 (4th Cir. 2021) .............................................................3, 6

*United States v. Reich,*
  479 F.3d 179 (2d Cir. 2007) ..........................................................25, 26

*United States v. Rigas,*
  490 F.3d 208 (2d Cir. 2007) ................................................................27

*United States v. Sampson,*
  898 F.3d 287 (2d Cir. 2018) ................................................................34

*United States v. Schwartz,*
  283 F.3d 76 (2d. Cir. 2002) ...........................................................25, 26

*United States v. Smith,*
  641 F.3d 1200 (10th Cir. 2011) ...........................................................30

*United States v. Stephenson,*
  895 F.2d 867 (2d Cir. 1990) ..........................................................28, 29

**Statutes**

18 U.S.C. § 951 ....................................................................... *passim*

18 U.S.C. § 1001 ..................................................................... *passim*

18 U.S.C. § 1503 ....................................................................24, 25

18 U.S.C. §1512(c)(2)..................................................................................................23, 24, 25

**Other Authorities**

Fed. R. Crim. P. 18 ..........................................................................................................31

Rule 29(a)......................................................................................................................1, 2

U.S. Const. Art. III, §2 cl. 3 ............................................................................................31

Defendant Thomas J. Barrack respectfully submits this memorandum of law in support of his motion for a judgment of acquittal under Rule 29.

## LEGAL STANDARD

Pursuant to Rule 29(a), a district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The standard under Rule 29, as articulated by the Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Rule 29 is "an important safeguard to the defendant," in that "[i]t tests the sufficiency of the evidence against him, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of his guilt." *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993) (quoting 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 461, at 637–38 (2d ed. 1982)); *see United States v. Grace*, 367 F.3d 29, 34 (1st Cir. 2004) ("Rule 29 protects a defendant against an improper or irrational verdict of the jury").

"Where the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Newman*, 773 F.3d 438, 455 (2d Cir. 2014) (citing *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)); *see also United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) ("At the end of the day, 'if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'") (quoting *Glenn*, 312 F.3d at 70); *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("A conviction based on speculation and surmise alone cannot stand.").

Here, even viewed in the light most favorable to the Government, no rational factfinder could conclude, based on the evidence presented in the Government's case in chief, that Mr. Barrack acted, or conspired to act, as an agent of the United Arab Emirates (the "UAE"), that he corruptly obstructed a grand jury proceeding in the Eastern District of New York, or that he knowingly and intentionally made any material false statement during his June 20, 2019 interview with the FBI. Rather than tolerate a jury verdict that would necessarily be based on speculation instead of actual evidence, the Court should exercise its Rule 29 authority to end this prosecution now.

The Government argues that the Court should not rule on Mr. Barrack's Rule 29 Motion until after the jury has reached its verdict. That is not the law. Rule 29 explicitly permits, and in fact requires, the Court to enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction "after the government closes its evidence." Fed. R. Crim. P. 29(a). Rule 29 is structured this way for a reason. Submitting a case to the jury when it is clear that the Government has not met its burden exposes a defendant to significant harm: a public (but erroneous) finding by a jury that he is guilty. That very real, tangible, reputational harm is exacerbated in cases such as this one, where the erroneous public finding of guilt will be covered in every newspaper from the Eastern District to the UAE. For these reasons, Mr. Barrack respectfully requests that the Court carefully consider this Rule 29 motion and enter a judgment of acquittal on all counts for which the Court concludes the evidence is insufficient to sustain a conviction, before the case goes to the jury.

**ARGUMENT**

**I.     THE GOVERNMENT FAILED TO PROVE COUNT ONE BECAUSE IT FAILED TO PROVE THAT MR. BARRACK ACTED AS AN AGENT OF THE UAE WITHOUT PRIOR NOTIFICATION TO THE ATTORNEY GENERAL**

To survive a Rule 29 motion on Count One, the Government was required to prove that Mr. Barrack knowingly and intentionally acted in the United States as an agent of the UAE, meaning that he "agree[d] to operate within the United States subject to the direction or control" of the UAE, without giving prior notice to the Attorney General, and was not engaged in a legal commercial transaction. 18 U.S.C. § 951. The Government failed to satisfy this burden.

As the Fourth Circuit in *United States v. Rafiekian*, 991 F.3d 529, 539 (4th Cir. 2021) has explained, "to be an 'agent of a foreign government'" within the meaning of Section 951, the Government must prove that there was "mutual assent" between the defendant and the foreign government, here the UAE, that the defendant would operate subject to the direction and/or control of a foreign government. *Id.* If the Government proves only that the defendant was "willing to do something" that the foreign government asked, the Government has failed to meet its burden.

Nor can the Government sustain its burden by demonstrating only that the defendant and the foreign power "collaborated and supported" one another; more is required to show agency. *See United States v. Hoskins*, 44 F. 4th 140, 150-51 (2d Cir. 2022) ("There is, of course, some evidence of direction from Pierucci and API to Hoskins. Pierucci asked Hoskins to execute certain tasks, such as revising agreements and sending them to API. Hoskins asked for approval from API before moving forward with Aulia, indicating that he looked to API for instruction. And the record shows Hoskins located and hired consultants at the behest of API and that these consultant contracts required Hoskin's approval. **But the fact that Hoskins collaborated with and supported API and Pierucci does not mean he was under their control within the meaning of the FCPA**.") (*emphasis added*). In its case in chief, the Government failed to show that Mr.

3

Barrack ever entered into an agreement to serve under the direction or control of the UAE. Even viewed in the light most favorable to the Government, the evidence shows only that the "UAE" sometimes asked Mr. Barrack to do something, or to consider doing something, and Mr. Barrack then decided for himself whether he would do it or not. The Government's showing is insufficient, as a matter of law, to sustain a conviction under Section 951.

**A.**   **The Government Failed To Prove That Any Agreement Was Made Between The UAE And Mr. Barrack In Which Mr. Barrack Agreed to Serve At The UAE's Direction or Control.**

There are two types of evidence: direct evidence and circumstantial evidence. The Government offered no evidence of either kind sufficient to demonstrate an "agreement" mutually entered into by Mr. Barrack and the UAE. Clearly, no direct evidence of any agreement was admitted, but there was also no circumstantial evidence admitted that demonstrated that Mr. Barrack agreed to operate as an agent of the UAE in the United States.

1.   <u>The Government Failed To Demonstrate That Any Agency Agreement Was Entered Into During Mr. Barrack's May 1, 2016 Visit With Sheikh Tahnoun.</u>

The Government contends that it proved that Mr. Barrack entered into an "agreement" to become an agent of the UAE when he met with Sheikh Tahnoun on May 1, 2016. (Tr. 3695). Any such conclusion would be based upon complete speculation, as the Government presented no evidence regarding the discussion between Mr. Barrack and Sheikh Tahnoun on May 1, 2016. Moreover, beyond being entirely speculative, any such conclusion would require dismissal of the actual evidentiary record, which strongly suggests that the meeting on May 1, 2016 was between two prominent businessmen who might, at some point, seek to do business together.

For example, the Government offered evidence that prior to the May 1, 2016 meeting, Mr. Grimes, at Mr. Barrack's direction, prepared a presentation for Rashid Al Malik to share with a

contact at Sheikh Tahnoun's office. (*See* **GX 202; GX 111; GX 6; GX 2**).[1] The presentation was an overview of Colony Capital and describes Colony's investment business. After the meeting with Sheikh Tahnoun was set up, Mr. Barrack and Mr. Al Malik had a conversation on April 24, 2016. (**GX 206; GX 207**). Mr. Barrack told Mr. Al Malik that he was excited to meet with Sheikh Tahnoun and asked Mr. Al Malik for background, including questions about Sheikh Tahnoun's hobbies. Mr. Al Malik described Sheikh Tahnoun's interests to Mr. Barrack adding, "We need an investment company between [Sheikh Tahnoun], Prince Mohammed and us to manage investments in US." It is clear from the full context of this conversation that Mr. Al Malik and Mr. Barrack were talking about a potential business opportunity.

It would be reasonable to expect that if Mr. Barrack, during the May 1, 2016 meeting, had entered into an unlawful agreement to betray his country and serve as an agent of a foreign power, he might take steps to ensure that the May 1, 2016 meeting was kept under wraps. Yet, the Government presented evidence that Mr. Barrack told at least two of Donald Trump's campaign advisors, Paul Manafort and Jared Kushner, about his meeting with Sheikh Tahnoun. (**GX 69**). Mr. Barrack also did not conceal his meetings with Sheikh Tahnoun from his employees at Colony. His assistant placed the calendar entry for the May 1, 2016 meeting with Sheikh Tahnoon in his calendar and labeled it "Meeting with HH Sheikh Tahnoun Bin Zayed Al Nahyan Deputy National Security Advisor." (**GX 214**). Justin Chang, the Government's only witness from Colony, also testified that Mr. Barrack shared with him that he was in contact with Sheikh Tahnoun. (Tr. 3030). Indeed, years later, Mr. Barrack disclosed his May 1, 2016 meeting—as well as all of his other meetings with Sheikh Tahnoun—in a form SF-86 to the State Department. (**GX 1020**). Special

---

[1] Defense counsel stands ready to file all trial exhibits cited in this motion on the docket or provide electronic or hard copies to the Court, subject to any preferences the Court may have in this regard.

Agent Mergen also testified that Mr. Barrack disclosed his meeting with Sheikh Tahnoun during his June 2019 interview, disclosed that he knew Sheikh Tahnoun was deputy crown prince of internal security in the UAE and understood Sheikh Tahnoun to be an investor. (Tr. 2555:16-2556:9). The failure to take any steps to conceal the meeting is starkly inconsistent with the Government's contention that it was at this meeting that Mr. Barrack agreed to enter into an agreement to break the law and serve a foreign power.

The Government also failed to show any assent by the **UAE** as to the purported arrangement it had with Mr. Barrack. *Rafiekian*, 991 F.3d at 539 (Section 951 requires "mutual assent."). Indeed, there is little evidence that anyone who worked in the UAE government and exercised any actual authority had any interest in Mr. Barrack's activities at all.[2]

As the Court pointed out during the Rule 29 Conference, there is a distinction between an agreement to operate subject to the direction or control of a foreign power and a situation where there is "mutual meeting of the minds where no one is directing or controlling anyone, it's just

---

[2] The Government relies almost exclusively on communications between Mr. Al Malik and Khalifa Al Ghafli to suggest that the "UAE" was controlling and directing Mr. Barrack. Because of the standard at issue in a Rule 29 motion, Mr. Barrack largely accepts, for the purpose of this motion only, the Government's claim that Mr. Al Malik and Mr. Al Ghafli were serving as representatives of the UAE, even though—in fact—neither individual appears to have any power or authority to act on behalf of the UAE. While the Government has demonstrated that Mr. Al Ghafli had an email address associated with the UAE's Supreme Council of National Security, the majority of the evidence that it has presented regarding Mr. Al Ghafli's job suggests that he was nothing more than an administrative clerk, with no actual authority or control over the functions of the UAE Government. *See* Tr. 562:2-9 (Q So you mentioned that he is the Deputy Secretary General Supreme Council For National Security. What is the UAE's Supreme Council for National Security? A It has a very broad remit. According to official UAE documentation, it is responsible, for example, for managing natural disasters -- earthquakes, floods, COVID-19 pandemic, and so on -- and also answering to the National Security Advisor."); Tr. 1019:5-1020:13 (2015 email from Khalifa Al Ghafli to employee of US Department of State, setting up car transportation for US officials visiting UAE); Tr. 724: 2-22 (testimony from Government witness Mr. McGuire that Mr. Al Ghafli has a "regular" passport, *see* **GX 1041** which is how the U.S. State Department defines any "passport issued to any citizen of a country other than official employees, [like] a diplomat" and which is equivalent to the "passport that anybody who is a citizen of a country would get.").

overlapping similar interests." (Tr. 3695). During the Government's case in chief, there was significant evidence that "building long-line relationships" was a long-standing principle of Mr. Barrack's and no rational juror could conclude beyond a reasonable doubt that, when Mr. Barrack met with Sheikh Tahnoun in May 2016, the two men entered into an agreement that Mr. Barrack would be subject to the direction or control of the UAE, as opposed to Mr. Barrack engaging in the same kind of long-term relationship building he had done for decades. (*See e.g.* Tr. 3015 (Justin Chang: "[Mr. Barrack] would use the term long-line relationships to refer to relationships built over years and sometimes decades with different people we were doing business with. . . . [Y]ou have to nurture relationships over a long period of time and go to see people just to meet them and listen to them even when you didn't need anything from them.").

2.  The Government Failed To Demonstrate That Any Agency Agreement Was Entered Into During Mr. Barrack's August 2016 Visit With Sheikh Tahnoun.

In early August 2016, Mr. Barrack travelled to Morocco meet with Sheihk Tahnoun, which included a bike ride in the searing Moroccan heat. (**GX 1020 at 122; GX 535**). A close look at the circumstances surrounding this meeting makes clear that: (1) like the May 1, 2016 meeting, the purpose of the meeting was business; and (2) Mr. Barrack had clearly *not* agreed to become an agent of the UAE during the (prior) May 1, 2016 meeting.

On August 3, 2016, Mr. Grimes sent Mr. Barrack some background materials on MBZ, Sheikh Tahnoun, and the UAE. (**GX 415 at 8** (Background on MBZ); *id.* at 9-14 (Background on Sheikh Tahnoun and First Gulf Bank, owned by Sheikh Tahnoun)). On August 4, Mr. Barrack openly discussed his planned meeting with Sheikh Tahnoun with employees of Colony Capital who were preparing a "deck" for Mr. Barrack's meeting with Sheikh Tahnoun. (**GX 269** (Mr. Barrack instructing Mr. Chang to "send me Dole Deck for sheikh Taknoun," and upon learning that the "Dole deck" was not yet finished, instructing him to send the "company investor deck"

instead); **GX 271** (Barrack forwarding Colony "investor deck" to Al Malik); (**GX 42** (Al Malik forwarding the "investor deck" to Sheikh Tahnoun's Chief of Staff, cc'ing Khalifa Al Ghafli, with cover memo, "Per the discussion between HH [Sheikh Tahnoun] and Tom today." ).

Tellingly, *after* the meeting with Sheikh Tahnoun, Mr. Barrack asked Mr. Grimes for Sheikh Tahnoun's email address.  (**GX 77**).  Combined with the "background materials" Mr. Grimes sent to Mr. Barrack before the meeting, it is abundantly clear that Mr. Barrack was **not** in contact with Sheikh Tahnoun between May and August 2016 and had not been working with Sheikh Thanoun or the UAE "to influence our political system and manipulate the American public," as the Government alleges.  (Tr. 371:4-5 (Government Opening Statement)).

Several weeks after the August 2016 meeting, Mr. Barrack wrote direct**ly** to Sheikh Tahnoun:

> Your Highness, I'm still pumping endorphins and dopamine from are in amazing bike ride. Thank you so much for your gracious hospitality and I'm sorry u did not receive my previous thank you note! We are on track on all counts and I have updated your team. I'm going to be in Greece until August 30 and if you're somewhere in the region I would love to come and see you for a couple hours and update you. . . More importantly my ranch is awaiting you in Santa Ynez whenever you have the opportunity. I hope to see you soon and once again many thanks for your generosity and kindness.

(**GX 80**).  There is no evidence in the record of any response by Sheikh Tahnoun and the two men never met in Greece or at Mr. Barrack's California ranch.

**B.     The Government Failed To Prove That Mr. Barrack Ever "Acted" Subject To The Control Or Direction Of The UAE.**

In addition to failing to prove when Mr. Barrack entered into the supposed criminal agreement to act as the UAE's agent, the Government has also failed to prove the terms of the supposed criminal agreement.  What is it, exactly, that Mr. Barrack and the UAE mutually agreed that Mr. Barrack would do "at the direction or control" of the UAE?  The Government's argument

that Mr. Barrack was subject to the direction or control of the UAE is belied by the fact that Mr. Barrack routinely ignored the UAE or acted contrary to its interests. In order to assess the Government's charges, one must consider the record evidence of what Mr. Barrack did and what Mr. Barrack said, as described below.

1. <u>Mr. Barrack Spoke His Mind During His Media Appearances.</u>

The Superseding Indictment alleges that beginning in May 2016, Mr. Barrack "repeatedly promoted the [UAE] and its foreign policy interests during media appearances **after soliciting direction** from" Mr. Al Malik and UAE officials. (Sup. Ind. ¶ 27) (emphasis added). In its Opening Statement to the jury, the Government argued that Mr. Barrack "tried to . . . manipulate the American public" (Tr. 371:4-5) and that "[t]he UAE and the defendants decided to use the media to promote the UAE's agenda." (Tr. 374:29-21).

During trial, the Government played for the jury a number of Mr. Barrack's televised media appearances. (*See* **GX 901-A, 903-A, 904-A, 905-A, 905-B, 906-A, 907, 908**). The Government claims that Mr. Barrack "promoted" the UAE in these media appearances, when he stated:

- May 31, 2016: "Look, the **United Arab Emirates** and Saudi Arabia and Israel, **in my opinion will align as allies very quickly here**. And the world could change for the better and they -- all three of them, I guarantee you, want terrorism to go away. They're dealing with their own unbelievable stuff and they've been the best **allies to America**."

- July 1, 2016: "**Most of those countries, our allies,** our greatest allies, Saudi Arabia, **United Arab Emirates**, Qatar, are all saying give us some direct U.S. foreign policy and help us with fundamentalism."

- July 18, 2016: "**[O]ur friends, our best allies** -- Saudi Arabia, the **United Arab Emirates**, um, Qatar -- are also the subject of this fundamentalist terror that's going on inside of them. They don't like it, they don't want it, they want to stamp it out."

- July 21, 2016: "So **our friends - Abu Dhabi, Dubai,** Qatar, Saudi Arabia - are already trying to align a position saying I need your help to do this and then I can start winnowing away at fundamentalism."

- September 2, 2016: "**our Arab allies** are dying for a bright line."

- September 27, 2016: "**you have allies that have been our allies *for 40 years*.** You have Israel, Saudi Arabia, Qatar, **the Emirates,** with great young leaders who are all saying help us, give us a direct foreign policy, and we will help you eliminate these fundamentalist, radical groups."

The problem, for the Government, is that there is **no evidence** that when Mr. Barrack, referred to the UAE as an "ally" on television, in passing, he did so because the UAE directed him to do so. Tellingly, Mr. Barrack also sings the praises of many other countries for whom he is not alleged to be acting as an agent of, including Qatar, **often in the very same sentence**.

In addition to the media appearances themselves, the Government points to two additional pieces of evidence in support of its allegation that Mr. Barrack "promoted" the UAE "**after soliciting direction** from" Mr. Al Malik and UAE officials. (Sup. Ind. ¶ 27) First, the Government points to a set of "Facts" about the UAE that: (1) Khalifa Al Ghafli sent to Mr. Al Malik on August 2, 2016; (2) Mr. Al Malik sent to Mr. Barrack on August 2, 2016**;** and (3) Khalifa al Ghafli sent to Ali al Neyadi on August 3, 2016. (**GX 12; 40; 264**). However, the Government offered no evidence at trial that Mr. Barrack then repeated *any* of the "Facts" contained therein during any of his television appearances. In fact, Mr. Barrack does not even **receive** the "Facts" until **after** his television appearances on May 31, 2016, July 1, 2016, July 18, 2016, and July 21, 2016. Second, the Government points to a set of "talking points" that Mr. Barrack sent to Erin Burnett on **April 19, 2017 (GX 89**), **months after the date of the television appearances** introduced into evidence by the Government. Notably, the Government did not offer a single television appearance by Mr. Barrack post-dating his receipt of these so called "talking points" – let alone any evidence that Mr. Barrack made statements reflecting the substance of these "talking points" in any media interview after April 19, 2017.

2.      Mr. Barrack Rejected Mr. Al Malik's "Feedback" To The Energy Speech.

The Superseding Indictment alleges that (1) "on or about May 12, 2016" Mr. Barrack sent Mr. Al Malik a draft speech to be delivered by Donald Trump about United States energy policy (the "Energy Speech") and "**asked for feedback**;" (2) Mr. Al Malik then emailed the draft speech to Khalifa al Ghafli; (3) Mr. Al Malik then sent a text message to Mr. Barrack proposing language for the draft speech that praised MBZ by name; and (4) later that day, Mr. Barrack emailed Mr. Al Malik a revised draft of the Energy Speech that praised MBZ by name.  (Sup. Ind. ¶¶ 19, 20) (emphasis added).

At trial, the evidence demonstrated not only that the suggestion to add MBZ's name did *not* originally come from Mr. Al Malik, but that Mr. Barrack **explicitly rejected** all but one of the edits proposed by Mr. Al Malik (to correct a factual inaccuracy).  Specifically, on May 12, 2016, Mr. Barrack was asked by Donald Trump's then campaign advisor, Paul Manafort, whether Mr. Barrack would "run[ ] the speech by" "our friends" in the Middle East, to which Mr. Barrack responded that he would.  (**GX 229**).  Mr. Barrack then sent a draft (version 4.1) of the speech to Mr. Al Malik, at 6:43 PM UTC, writing "**What do you think** of [Trump's] energy speech . . . for u and Saeed[3] to review **for me** quickly. **I need** a few pro Middle East aspects."  (**GX 502-A** (emphasis added)).  Approximately one hour later, at 7:51 PM UTC, Mr. Grimes sent version 4.2 of the speech to Mr. Barrack, proposing that the speech reference MBZ by name.  (**BX 155**).  Mr. Barrack did not receive Mr. Al Malik's proposed edits until nearly forty minutes after that, at 8:32 PM UTC, and these edits also—independently from Mr. Grimes—proposed a reference to MBZ by name.  (**BX 156**).  In other words, MBZ's name was added to the draft not because it was proposed by Mr. Al Malik but because it was independently proposed by *Mr. Grimes*.  Even if it

---

[3] Saeed is Saeed al Hajeri, the head of an oil company named Taqa in Abu Dhabi.

had been proposed by Mr. Al Malik, it would have been just that, a proposal, in response to Mr. Barrack's solicitation of "feedback" from Mr. Al Malik—not a change made at the "direction or control" of the UAE Government, but rather at the request of the campaign manager of a presidential candidate, who sought feedback from people in the Middle East.

In fact, the only change to the Energy Speech that Mr. Barrack actually made based on Mr. Al Malik's comments was to change MBS's title from Crown Prince to Deputy Crown Prince, which was his correct title at that time.[4] (**GX 121**).

On May 14, 2016, Mr. Al Malik wrote to Mr. Barrack, "This was an add to the first draft you sent me. **You'll notice[] it's not mentioning MBZ but we should include it** as your second draft." (**GX 406**). After Mr. Barrack ignores Mr. Al Malik's email for an hour and half, Mr. Al Malik re-sends his email to Mr. Grimes, which Mr. Grimes forwards to Mr. Barrack. (**GX 236**). Within 3 minutes, Mr. Barrack responds to Mr. Grimes, "**Do not include any of their other comments please**." Several days later, Mr. Al Malik again asked Mr. Barrack "So no mention of names?" and Mr. Barrack again declined to add any names. (**GX 72**).

Then when Mr. Manafort asked for an insert into a substantially revised energy speech, Mr. Barrack asked Mr. Grimes to draft one. Mr. Grimes's draft included MBZ's name and a reference to the UAE. (**GX 407**). Mr. Barrack then **removed the references to MBZ and the UAE** from the insert he sends to Manafort, without asking anyone in UAE for permission **(GX 71).**

3.    The Change To The Republican National Platform Was Public Information.

The Government has repeatedly argued that Mr. Barrack provided "inside" and "nonpublic" information concerning the Republican National Platform to UAE officials. *See e.g.*

_____

[4] MBS was the Deputy Crown Prince of the Kingdom of Saudi Arabia; he is not a UAE Government official.

Gov't Opp. to Expert MIL, Dkt. 182 at 22-23 ("the government expects to introduce evidence at trial that one of the actions that Barrack undertook as an agent of the UAE *was to disclose nonpublic information* to Al Malik and other UAE Government officials indicating that language had been removed from the Republican National Convention party platform that had called for the declassification of the Declassified Pages."); *id.* at 23 ("Barrack's decision to *funnel non-public and sensitive information* about the position being articulated in the party platform of the Republican National Convention on this issue to UAE government officials . . . Ultimately, it was Barrack's decision, not the government's, to interject himself in this foreign policy issue and *funnel inside information* regarding that issue to a foreign government.") (emphasis added).

At trial, the evidence proved precisely the opposite. The Government introduced two emails from Mr. Barrack on July 13, 2016 forwarding an email Mr. Barrack received from Paul Manafort about the removal of certain language from the Republic National Platform to Mr. Al Malik and UAE Ambassador Otaiba. (**GX 11; GX 75**). In these emails, Mr. Barrack referred to the decision to remove language from the platform as "very confidential" and "really confidential." In truth, however, the information was not confidential at all. In fact, the meeting of the Republican Party's Platform Committee concerning the declassification of the so-called "28 Pages," aired on CSPAN on July 12, 2016 at 9:10 EDT, and was publicly made available to anyone who wished to view it on CSPAN's public website as of July 13, 2016 at 3:55AM EDT, meaning that by the time Mr. Barrack was informed of the change to the platform, much less emailed about it, the change was a matter of public record. (**BX 806; BX 806-A**). Further, there is no evidence that the reason why Mr. Barrack forwarded Mr. Manafort's email to Ambassador Otaiba or Mr. Al Malik is because he was operating subject to the direction or control of the UAE.

4.    Mr. Barrack Rejected Mr. Al Malik's "Feedback" To The Fortune OpEd.

The Government has also elicited evidence concerning Mr. Barrack's Op-Ed in Fortune Magazine (the "Op-Ed").  (**GX 603**).  As even the Government acknowledges, in the Superseding Indictment, there is no evidence that the UAE "directed" Mr. Barrack to write the Op-Ed.  Instead, the Government contends that Defendants "solicited and received input" from the UAE in connection with the Op-Ed.  *See* Sup. Ind. ¶ 46.  At trial, the evidence was as follows.

On August 15, 2016, Mr. Grimes sent Mr. Al Malik a draft of the Op-Ed.  (**GX 276**).  Later that day, Mr. Al Malik wrote to Mr. Grimes: "In our opinion the article highlights important issues in a different and untraditional way. Most ideas are great; nevertheless, some are that could be controversial. for instance, promoting a new partnership (normalization) between Israel and KSA sounds a pragmatic approach to face Iranian threats. However, Iran today is questioning Saudis leadership of the Islamic world after allegations regarding signs of openness between Saudis toward Israel. One should be careful not to aggregate such issues as our enemies use it to feed sectarian divisions in the region and attempt to undermine The Saudi role and position as a powerful Sunni -Muslim state allied with the US." (**GX 501-U**).  Mr. Al Malik first describes this as "feedback from our friends" and then explicitly describes his comments as "just a thought" and "not necessarily a change." (*Id.*).  ***Mr. Barrack ignores the feedback***.  Mr. Barrack's recommendation that the Gulf countries partner with Israel—which the "UAE" found to be a "controversial" suggestion that Mr. Barrack should be "careful" about—remains in the final version of the Op-Ed, published on October 22, 2016.  **(GX 603).**

On October 16, 2016 at 5:27 AM UTC, Mr. Grimes sent Rashid Al Malik a draft of the Op-Ed asking him, "What do you think? I am submitting tonight. If you have time!"  (**GX 501-OO**).  Nine minutes later, at 5:36 AM UTC Mr. Al Malik responded "They didn't like Dictatorships word. . . . If you can say some of the government's or regimes. Because they don't

want to also be labelled as dictators. Which is true." (*Id.*). There are no communications between Mr. Al Malik and anyone in the UAE's government suggesting that, in the 9 minutes between when he received Mr. Grimes's draft of the Op-Ed, and the time when he provided his comments, that Al Malik actually spoke to anyone in UAE's government about the draft.

Regardless, these exchanges do not constitute proof that Defendants were acting at the direction or control of the UAE. There is a stark and meaningful difference between acting at another's "direction or control" and "soliciting feedback" from someone. Mr. Al Malik does not instruct Mr. Grimes what to include. His feedback is of the "take it or leave it" variety. With regard to the second exchange, there is no evidence that Mr. Al Malik in fact spoke to anyone in the UAE in the nine minutes it took him to respond. And, even if Mr. Al Malik's messages to Mr. Grimes could be construed as a "direction," the direction was *ignored*. The Op-Ed that was published (i) still used the word "dictators" and (ii) included the suggestion of a partnership between the Gulf states and Israel that Mr. Al Malik had criticized. (**GX 603 at 7**).

5.     The UAE "Strategy" Deck Was Not Prepared Subject To The UAE's Direction Or Control.

The Superseding Indictment alleges that Defendants "acting at the direction of UAE officials, drafted materials proposing a strategy for the [UAE] to promote its foreign policy interests and increase its political influence in the United States." (Sup. Ind. ¶ 28). At trial, the Government introduced evidence of the so called "UAE Strategy Deck" but the evidence demonstrates that Mr. Barrack had nothing to do with this "deck" or its drafting. (**GX 31**). Specifically, on July 27, 2016 at 5:50 UTC, Mr. Grimes sent Mr. Al Malik a deck entitled, "Crafting a Stronger Alliance and Integration for the UAE, Saudi Arabia and USA" with a notation, "Presented by Tom Barrack and Rashid Al Malik" and a date of August 2016 (still a month to the future). The deck recommended "crafting an integration strategy which leverages

the resources of the Gulf to advance the alliance between the USA, Saudi Arabia, and the UAE, and strengthen the influence, education, development, success and prosperity of the UAE, Saudi Arabia, and their people." (*Id.* at 3). The Government introduced communications between Mr. Grimes and Mr. Al Malik about the deck. (**GX 501-J; 501-L; 501-O**). On July 26, 2016, Mr. Grimes told Mr. Al Malik that Mr. Barrack was "reviewing" the presentation, but there is no evidence that Mr. Barrack actually did so—the Government did not introduce a single email or text message in which Mr. Barrack refers to the deck in any way. (**GX 501-P at 3**).

In addition, there is no evidence that this presentation ever went anywhere. There is certainly no evidence that it was ever in fact presented to UAE Government officials or that it was prepared subject to the "direction or control" of the UAE. There is also no evidence that Mr. Barrack ever agreed to carry out the strategy described in the deck on behalf of the UAE or that the UAE directed Mr. Barrack to carry out such a strategy.

6.  Mr. Barrack Did Not Advocate For Congressman Stockman To Be Appointed As The UAE Ambassador Because He Was Operating Subject To The UAE's Direction Or Control.

The Superseding Indictment, in a section entitled "Assistance to the United Arab Emirates with Appointments in the New Presidential Administration," alleges that "Defendants as part of their actions on behalf of the United Arab Emirates, agreed to advocate for the appointment of individuals favored by the United Arab Emirates in the new United States Government administration." (ECF 105 at ¶ 75). Nowhere does the Superseding Indictment allege that Defendants actually took any steps to recommend Mr. Stockman for the position of UAE ambassador, because Defendants did no such thing.

The evidence presented at trial was as follows:

*   On February 3, 2017, Mr. Al Malik sent Mr. Grimes the Wikipedia page for Stephen Stockman. (**GX 508-J**). Mr. Grimes did not respond.

- On February 7, 2017, Mr. Grimes asks Mr. Al Malik "who is the recommendation?" Mr. Al Malik again sent Mr. Grimes the Wikipedia page for Stephen Stockman. Mr. Grimes did not respond. (**GX 508-K**).

- On February 9, 2017, Mr. Al Malik sent Mr. Grimes the resume of Stephen Stockman. Mr. Grimes did not respond. (**GX 511-M**).

- On March 13, 2017, over a month later, Mr. Al Malik again sent Mr. Grimes the resume of Stephen Stockman, writing "They like him plz. . . The above is important for our friends. Because ur guys are about to change the current one." Mr. Grimes responded, "okay I'll ask Tom." (**GX 511-P**).

- On March 15, 2017, Stephen Stockman was arrested. (Tr. 3219:3-5).

- On March 15, 2017, Mr. Al Malik sent a text message to Mr. Barrack stating "They r very keen on the ambassador they suggested to help the relationship. Your help will go a long way." (**GX-502-I at 1**). Mr. Barrack responded "Yes – Give me name again." Mr. Al Malik then sent Mr. Barrack the resume for Stephen Stockman. (*Id.*).

- On March 20, 2017, Mr. Al Malik sent a text message to Mr. Grimes, "our friends want Tom to Interview Stephen Stockman?" Grimes responded, "Tom is happy to meet with him. When?" Mr. Al Malik replies, "Let me check, and does Tom have any other trusted people he wants." (**GX 511-R**).

There is simply no evidence that Mr. Barrack and Mr. Grimes actually took any steps to recommend Mr. Stockman for the position.[5] That is likely why Rex Tillerson, who was then the Secretary of State, testified that he has no recollection of Mr. Barrack ever advocating for anyone to be the ambassador to the UAE, including Mr. Stockman. (Tr. 1558:2-11).

---

[5] The Government seeks to have the jury infer that the only reason that Defendants did not recommend Congressman Stockman for the position of UAE ambassador is because he was arrested shortly after Al Malik provided Mr. Barrack with his information. But the Government is well aware that this inference is not supported by the evidence since it cannot even prove that Defendants were aware of Congressman Stockman's arrest. Instead, the evidence points to the opposite conclusion. It is clear that Defendants were not aware of Mr. Stockman's arrest, given that five days *after* Congressman Stockman's arrest, Al Malik and Mr. Grimes discussed setting up a meeting between Congressman Stockman and Mr. Barrack, which never actually happened. (**GX 511-R**).

7.     <u>The Government Introduced No Evidence that Mr. Barrack Arranged A Phone Call Between MBZ And The President-Elect Upon Direction from the UAE.</u>

On November 10, 2016, two days after President Trump was elected, Mr. Barrack's assistant, Jessica Gibbs, sent President-Elect Trump's assistant the contact information for MBZ's Chief of Staff so that the UAE could congratulate the President-Elect via a phone call. (**GX 463**). The call subsequently took place. (**GX 45; 46; 617**). Mr. Barrack told UAE Ambassador Otabia that he "arranged" the call between MBZ and the President-Elect. (**GX 84**). However, there is no evidence that Mr. Barrack caused Ms. Gibbs to facilitate this call because he was operating under the "direction or control" of the UAE.

8.     <u>Mr. Barrack Never Saw, And Had No Role In Preparing, Any 100-Day Plan For The UAE To "Align With" The Trump Administration.</u>

The Government claims that the Defendants "discussed a plan to influence U.S. foreign policy in the first 100 days, first six months, year, and the entire four years of the incoming Trump administration." (Dkt. at 168 (Gov 8/25 MIL Br. at 3-4)). In support of this claim, the Government points to the following events that occurred on December 2-3, 2016:

- On December 2, 2016, Mr. Barrack met with MBZ and Sheikh Tahnoun. (**GX 1020 at 122**).

- On December 2, 2016 Mr. Al Malik sent a text message to Grimes stating "Btw try to think about what Tom said regarding the 100 days plan/6 months/year/4 years." Grimes responded, "Yes." Al Malik then sent a message stating, "And me and u will work with the guys here and Saudi," to which Grimes responded, "Yes. I'm 110% percent committed in anyway I can. To help you." (**GX 508-F at 17**).

- On December 3, 2016, Mr. Al Malik posted a picture of himself and Mr. Barrack on his public Instagram page of with the caption "Mission Accomplished." (**GX 733-E**).
- On December 3, 2016, Mr. Al Malik sent a text message to Khalifa Al Ghafli "he [Ali Al Shamsi] wants you to work on a 100-day, six-month, one year and four year plan that **aligns with Trump**." (**GX-504-II-t at 14).**

- Mr. Al Malik created a note in his cell phone titled "100 days" that goes on to list certain topics such as "Trade relationships," "Investments," and "Security relationship." (**GX-509-A at 14-15**).

Of these five pieces of "evidence," the only one that even relates to Mr. Barrack is the text message on December 2, 2016 from Mr. Al Malik to Mr. Grimes in which he says "think about what Tom said regarding the 100 days." There is nothing else. There is no evidence that the substance of Mr. Al Malik's note was ever communicated to anyone in the UAE. There is also no evidence that Mr. Barrack saw it or that it reflects anything Mr. Barrack actually said as opposed to Mr. Al Malik's own ideas after talking to Mr. Barrack. Moreover, as the Government's own translation of the text message from Mr. Al Malik to Khalifa Al Ghafli makes clear, the ideas in the "100 Day Plan" were meant to "align with Trump," showing that any "plan" was more about making the UAE accommodate President Trump and the United States than vice versa.

Moreover, there is no evidence that Mr. Barrack ever discussed a "100 day plan" with anyone in UAE Government—the Government has introduced no evidence of what was said during Mr. Barrack's meeting with MBZ and Sheikh Tahnoun on December 2, 2016.

9. <u>The October 2017 "Notes" on Mr. Al Malik's Phone Reflect Mr. Barrack's Personal Views Based On Publicly Available Information.</u>

The Government has also admitted into evidence a October 13, 2017 "Note" on Mr. Al Malik's cell phone which reads:

> Sir, Hope all is well. I had dinner last night with Tom and it was long conversation about the situation in US/Saudi/UAE and GCC. On Qatar : There is a big change on the views within the Administration lead by a pressure from Ti/M/M to persuade Tr that Qatar is a victim ! And that all of the other countries (Saudi, UAE) are also funding groups !!! The only person who is fighting this currently is Jared he is with us. Frustrations that We are not trying to make a deal Q is pushing all the tactics to isolate us from DC support.

(**GX 509-A at 5-6**). The Government has argued that this note "document[s] information provided by Barrack regarding a range of issues, including his understanding of current thinking within the Trump Administration, and fragmentary notes whose meaning is not entirely clear but that denote

topics related to U.S. government officials and issues related to the Middle East." (Dkt. 168 (Gov. 8/25 MIL at 13)). So what? Even if one assumes that the information contained in the note Mr. Al Malik's cell phone was non-public information (which it wasn't) and further assumes that this information came from Mr. Barrack, there is nothing inappropriate about Mr. Barrack—a private citizen—sharing his views with Mr. Al Malik about how people in the Trump administration feel about the Qatar blockade.

10. <u>Mr. Barrack Voluntarily Withdrew Himself From Consideration For Special Envoy To The Middle East.</u>

On April 12, 2017, Mr. Barrack sent a text message to Mr. Al Malik stating that President Trump had discussed appointing Mr. Barrack as either an Ambassador to the UAE or as Special Envoy to the Middle East. (**GX 502-K**). Mr. Al Malik replied, "Interesting ! As long that it's not gonna limit your work as special envoy." Mr. Barrack responded "Yes-- KT would give Abu Dhabi more power! Right now focus of course is the kingdom." Mr. Al Malik replied "This will be great for us. And makes you deliver more. Very effective operation." (*Id.*).

There are two things that are important about this exchange. First, there is no direction from Mr. Al Malik to Mr. Barrack: "make sure you become special envoy to the UAE." Second, Mr. Barrack **withdrew** from consideration for Special Envoy to Middle East to be considered for Latin America. So to the extent this was a direction (or even a request), it was defied by Mr. Barrack.

It defies logic that a supposed covert operative working under the direction and control of a foreign power to funnel inside information from within the highest levels of the U.S. government to the foreign power would voluntarily decline a position within the U.S. government that would provide him with top secret, classified, and sensitive information that the foreign power would consider extremely valuable. *See* Tr. 2252:22-2253:8.

**C.**    **The Government Failed To Prove That Mr. Barrack Was Not Engaged In A Legal Commercial Transaction.**

Even if the Court concludes that the Government has introduced evidence that Mr. Barrack was acting pursuant to the "control or direction" of the UAE (which he was not), the Court must then consider whether the Government has introduced sufficient evidence to demonstrate that Mr. Barrack was not acting pursuant to the control or direction of the UAE as part of a legal commercial transaction. If the Government has failed to make this showing, an acquittal on Count One is required, because Section 951(d)(4) excludes from the definition of "agent of a foreign government" any "person engaged in a *legal commercial transaction*." *See* Section 951(d)(4) (emphasis added).

The burden to demonstrate that Mr. Barrack was not engaged in a legal commercial transaction rests with the Government once Mr. Barrack has raised "some evidence" showing that TJB was involved in commercial activity. *See United States v. Cabrera*, 13 F.4th 140, 144 (2d Cir. 2021) (noting the "slight burden" required to present an affirmative defense to the jury); *see United States v. Durrani*, 835 F.2d 410, 420 (2d Cir. 1987) ("An affirmative defense requires a defendant to produce 'some evidence' placing the [statutory] exception in issue; if he does so, the government would be required to prove its inapplicability beyond a reasonable doubt. The minimal burden placed on the defendant does not impinge upon his constitutional rights because the government ultimately bears the burden of disproving the applicability of the exception once it is properly raised.")

Here, Defendants' actions clearly reflect commercial activity. As Executive Chairman of Colony Capital, Mr. Barrack was responsible for developing relationships with wealthy investors, and members of Middle Eastern royal families are among the wealthiest investors in the world. Indeed, the Middle Eastern officials that Mr. Barrack is alleged to have met with *routinely* meet

with Western businessmen.  *See, e.g.,* Tr, 676:5-679:17; **BX-1049; BX-917; BX-925**.  Mr. Barrack also built Colony's brand by going on television and writing articles to demonstrate his knowledge about a wide array of subject matters that may be of interest to potential investors.  As such, the Government must demonstrate that Mr. Barrack's actions, if taken pursuant to the control or direction of the UAE, were *not* in furtherance of a "commercial transaction."  The Government has failed to make that showing via the evidence introduced in the Government's case in chief.

**D.       The Government Failed To Prove Venue.**

In order to prove Count One, the Government was required to prove that that Mr. Barrack "acted as an agent" of the UAE within the Eastern District, without having given prior notification to the Attorney General.  *See United States v. Melekh,* 193 F. Supp. 586, 588 (N.D. Ill. 1961) ("The proper venue to try a violator of [section 951] is in the district where he acted as agent without having given prior notification to the Secretary of State"); *see* Order, Dkt. 120, at 15 (explaining that to prove venue, the Government must show that "*criminal conduct* occurred within the venue" of the Eastern District).  Because, the Government has wholly failed to prove that Mr. Barrack "acted as an agent" of the UAE within the Eastern District, Mr. Barrack's Rule 29 motion should be granted.[6]

---

[6] As articulated during argument, defense counsel has "not the slightest idea what the Government's venue theory is."  (Tr. 3684:23-25).  Accordingly, Mr. Barrack respectfully requests an opportunity to respond to whatever theory of venue the Government articulates in its opposition to Mr. Barrack's Rule 29 motion.

## II. THE GOVERNMENT FAILED TO PROVE COUNT TWO BECAUSE IT FAILED TO PROVE THAT MR. BARRACK CONSPIRED TO VIOLATE SECTION 951

For the reasons discussed in Section I, the Government also failed to prove Count Two, which alleges that Mr. Barrack conspired to act as an unregistered agent of the UAE. Additionally, the Government failed to prove venue for the conspiracy charge because no "overt act" was committed in the Eastern District of New York.

## III. THE GOVERNMENT FAILED TO PROVE COUNT THREE BECAUSE IT FAILED TO PROVE THAT MR. BARRACK COMMITTED OBSTRUCTION OF JUSTICE

The Superseding Indictment charges Mr. Barrack with violating 18 U.S.C. §1512(c)(2) and specifically alleges that on "June 20, 2019, within the Eastern District of New York and elsewhere, the defendant THOMAS JOSEPH BARRACK, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede, and attempt to obstruct, influence and impede, an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York," hereafter, the "EDNY Grand Jury Proceeding." *See* S.I. (Dkt 105) at ¶ 119. The date alleged in the Superseding Indictment, June 20, 2019, is the date that Mr. Barrack was interviewed by the Government at the law firm offices of Paul Hastings LLP in Washington D.C. (hereafter, the "Interview").

In order to sustain its burden of proving that Mr. Barrack violated Section 1512(c)(2), the Government needed to present evidence beyond a reasonable doubt to establish each of the following elements: (1) that Mr. Barrack, during the Interview, "obstructed, influenced, or impeded" the EDNY Grand Jury Proceeding; (2) that the "natural and probable effect" of Mr. Barrack's conduct during the Interview was to interfere with the EDNY Grand Jury Proceeding, such that the interference was "foreseeable" to Mr. Barrack; and (3) that Mr. Barrack, during the Interview, took the actions he took for an improper purpose and knowingly engaged in dishonest

conduct with the intent of obstructing, impeding, or influencing the EDNY Grand Jury Proceeding, *i.e.*, that he acted "corruptly."

The Government cannot sustain its burden of proof on Count Three based on the evidence introduced during its case in chief—because it failed to introduce any evidence demonstrating that the "natural and probable" effect of Mr. Barrack's statements during the interview was to obstruct the EDNY Grand Jury Proceeding. While the Government introduced, through Agent Mergen, testimony concerning certain statements that Agent Mergen contends that Mr. Barrack made during the Interview, as well as testimony that Mr. Barrack was purportedly advised at the start of the Interview that there was a grand jury investigation in the Eastern District of New York, *see* Tr. 2692 -2698, controlling Supreme Court precedent makes clear that such evidence is insufficient, as a matter of law, to satisfy the Government's obligation to prove that the "natural and probable" effect of Mr. Barrack's (allegedly) false statements was obstruction of the EDNY Grand Jury proceeding.

In *United States v. Aguilar*, the Supreme Court considered whether 18 U.S.C. § 1503, which has nearly identical requirements to Section 1512(c)(2), was violated by a defendant who made false statements to FBI agents, during an interview with the FBI, in which the defendant was advised that there was a pending "grand jury" proceeding. *See* 515 U.S. 593, 599-601 (1995) (explaining that the defendant—a federal judge—who had made false statements to the FBI, specifically asked during his FBI interview whether he was a "target" of the grand jury investigation, and the FBI agent responded, "there is a grand jury meeting…some evidence will be heard, I'm sure, on this issue."). The Supreme Court held that no "rational trier of fact" could have concluded, on the basis of that evidence, that the "natural and probable effect" of the defendant's false statements was obstruction of the grand jury investigation. *Id.* The Supreme

24

Court explained that because the interviewing FBI agent "might or might not testify before a grand jury," the defendant's false statements could not "be said to have the natural and probable effect" of obstructing the grand jury proceeding and thus, the defendant could not be found guilty of violating Section 1503. *Id.*

*Aguilar*'s holding—that the Government must demonstrate more than (i) the fact that the defendant knew about a grand jury proceeding and (ii) made false statements to an FBI agent to sustain a conviction for obstruction of a grand jury investigation—was reaffirmed by the Second Circuit in *United States v. Schwartz*, 283 F.3d 76, 107-110 (2d. Cir. 2002). *Schwartz* involved a defendant who voluntarily reached out to the FBI and "initiated a meeting with federal investigators and prosecutors" after he was served, by those same Government officials, with a "federal grand jury subpoena for his documents." *Id.* at 109. The Government contended that the defendant had conspired to "corruptly" obstruct the grand jury proceeding, in violation of Section 1503, when he lied to the Government agents during his voluntary interview. *Id.* The Second Circuit, citing *Aguilar*, reversed the defendant's conviction and explained that "there was insufficient evidence to enable a rational trier of fact to conclude that [the defendant] knew" that his false statements would be conveyed to the federal grand jury. *Id.* The Government had introduced "no evidence that the investigators gave [the defendant] any indication that they would repeat his statements to the grand jury" and the Government had failed to otherwise demonstrate that the defendant "entertained any expectations" that his false statements would be repeated to the grand jury. *Id.* at 110.

The Second Circuit has made clear that *Aguilar* and *Schwartz* are binding in cases under Section 1512(c)(2) for obstruction of a grand jury investigation. *See United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007) (holding that *Aguilar* and *Schwartz* are controlling in a Section

1512(c)(2) case but finding the facts at issue in *Reich* different than those "found insufficient in *Aguilar* or *Schwartz*, where the defendants merely made false statements to agents who might or might not later testify before a grand jury"). Here, application of *Aguilar* and *Schwartz* to the evidence introduced by the Government in its case in chief demands a conclusion that the Government has failed to sustain its burden of proof on Count Three. As in *Schwartz*, the Government has introduced no evidence that Mr. Barrack was informed that the investigators "would repeat his statements to the grand jury" or that Mr. Barrack "entertained any expectations" that his false statements would be repeated to the grand jury. As such, the Court should dismiss Count Three pursuant to Rule 29.

## IV. THE GOVERNMENT FAILED TO PROVE COUNTS FOUR THROUGH NINE BECAUSE IT FAILED TO PROVE THAT MR. BARRACK MADE ANY MATERIAL FALSE STATEMENT

Counts Four through Nine of the Superseding Indictment charge Mr. Barrack with knowingly, intentionally and willfully making materially false, fictitious or fraudulent statements or representations to the FBI. To sustain a conviction under § 1001, the Government was required to prove beyond a reasonable doubt: (1) that on or about the date specified in the indictment, the defendant made the statement that he is alleged to have made; (2) the statement was material; (3) the statement was false; (4) the false statement was made knowingly, intentionally and willfully; (5) the statement was made in a matter within the jurisdiction of the government of the United States; and (6) the statement was made or received in EDNY (*by a preponderance of the evidence*). Sand, Instruction 36-9; Final Jury Instructions (ECF No. 183), Instruction 18, *United States v. Fortenberry*, No. 2:21-cr-491 (C.D. Cal. Mar. 24, 2022) (modified). Unless the Government introduced evidence in its case in chief to satisfy each of these elements, for each of the false statement counts, the Court should dismiss the Section 1001 charges. As described below, the Government failed to sustain its burden.

**A.    The Government Failed To Prove That Any Of The Alleged Statements, Even If Made, Were Material.**

Proving that Mr. Barrack violated Section 1001 requires the Government to prove that each of the allegedly false statements that he made was "material" to a decision of the Government, separate and apart from the decision to charge Mr. Barrack with a Section 1001 violation. *United States v. Litvak*, 808 F.3d 160, 173 (2d Cir. 2015) ("the materiality element would be rendered meaningless if it were sufficient for the government merely to establish the capability of the false statement to influence an agency staffer's, investigator's, or prosecutor's 'decision' to refer for investigation, investigate, or prosecute the defendant for the very statement at issue."); *United States v. Rigas*, 490 F.3d 208, 234-235 (2d Cir. 2007) ("But 'relevance' and 'materiality' are not synonymous. . . . In the context of an objective decisionmaking process, whether a misrepresentation is 'material' requires examination of the factors the decisionmaker would employ, and the degree to which a misrepresentation would be 'capable of influencing[ ] the decision of the decisionmaking body.'") (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)).

The record contains not a single shred of evidence to suggest that the false statements that Mr. Barrack made were material to the Government.  SA Mergen *could* have walked the jury through each alleged false statement, and explained how that false statement was material to a decision that the FBI made, or could have made.  But she didn't.  She didn't mention anything about the impact, or even the potential impact, that the allegedly "false statements" had upon a decision that the Government was going to make.  On this record, a rational fact-finder can only wonder:  did anything Mr. Barrack said that the FBI claims was false actually matter?  How were Mr. Barrack's supposed statements that that he did not "**feel**" that Rashid Al Malik ever asked him to do anything for the UAE Government or that Mr. Barrack had "no role in facilitating communications" between the President-Elect and officials from the United Arab Emirates

**capable of influencing** the FBI?  What investigative steps might the FBI had taken if they knew that Mr. Barrack, in fact, **felt** the opposite or if they knew that Mr. Barrack's assistant provided the President-Elect's assistant with the contact information for officials in the UAE, among countless others?  The answers to these question would be nothing more than pure speculation, since **no Government witness** testified to the materiality of the alleged false statements.  Because the Government failed to introduce any evidence that Mr. Barrack's statement were capable of influencing a decision of the Government, the Court should dismiss Counts Four through Nine.

**B.     The Government Failed To Prove That Any Of The Alleged Statements, Even If Made, Were Made Knowingly, Intentionally, And Willfully.**

Second, the Government failed to prove that any of the "false statements" were made "knowingly, intentionally, and willfully."  The Government was required to prove that Mr. Barrack didn't just misspeak and that he wasn't mistaken.  It had to prove that he *deliberately lied* to the FBI.  There is no such evidence in the record.  To the contrary, the record is replete with evidence regarding Mr. Barrack's busy schedule, about his many travels, meetings, and calls and as well as his rolodex of contacts.  Mr. Barrack's interview occurred when he was 73 years old, years after the events that he was speaking about took place.  The Government introduced no evidence to prove that Mr. Barrack deliberately lied to the FBI.

**C.     The Government Failed To Prove Venue For Counts Four Through Nine.**

Finally, the Government failed to show that any of the "false statements" alleged in Counts Four through Nine were "made" or "received "in the Eastern District of New York.  In *United States v. Stephenson*, the Second Circuit held that venue under 18 U.S.C. § 1001 was proper in the district where the false statement was "made" by the defendant, as well as in the district where the false statement was "received" by the government official.  895 F.2d 867, 875 (2d Cir. 1990).  Thus, in *Stephenson,* when the defendant, located in Washington D.C., made false statements over

the telephone to a federal agent in Manhattan, the Second Circuit found that venue was proper in the Southern District of New York. *Id*. Ten years later, Judge Sand of the Southern District of New York (and author of the closest thing to "pattern" jury instructions that exists in the Second Circuit) explained that the rule set forth in *Stephenson* remained alive and well: venue could lie in a district other than the one where the defendant made the false statement if there existed a "geographic discontinuity between the defendant's physical making of the disputed statement, whether oral or written, and the actual receipt of that statement by the relevant federal authority." *See United States v. Bin Laden*, 146 F. Supp. 2d 373, 376 (S.D.N.Y. 2001) (citing cases). For that reason, Judge Sand held, when a defendant makes a false statement to a federal agent, during an in-person interview, venue lies solely in the district where the interview took place. *Id*. at 377. In Mr. Barrack's case, each allegedly false statement was "made" and "received" in the same place: in Washington, D.C., 230 miles away from this courthouse, at the office building where Mr. Barrack's lawyers worked. (Tr. 2545:23-2546:1).

The Government contends that the appropriate venue standard is the one described in *United States v. Coplan*, 703 F.3d 46, 78-80 (2d Cir. 2012) where the Second Circuit found that even though the defendant had made the disputed statements during an in-person IRS deposition in Tennessee, venue in the Southern District was appropriate because the Government had introduced evidence at trial that IRS agents in Manhattan received the defendant's deposition transcript, discussed it during internal meetings, and thereafter made decisions regarding the IRS's "ongoing E&Y audit" based upon the defendant's disputed statements. *Id*. Because the Second Circuit found that a "material false statement" was the "essential element" of a Section 1001 charge, and the Government had introduced evidence that the disputed statement had affected the IRS's decision-making concerning the Ernest & Young audit in Manhattan, the Second Circuit

found that venue had been established in the Southern District. Thus, *Coplan* can be read to support the giving of a venue instruction that references the "effect" of the defendant's false statements, where there is evidence in the record concerning some sort of meaningful "effect" in a district other than the one where the false statements were made and received. *Id.*; *but see Bin Laden* (contrary conclusion reached by Judge Sand, who found that because the Government was not required to prove that the Government "was, in fact, misled" as a result of the defendant's false statements, venue should not be assessed on the basis of whether evidence was introduced at trial regarding the statement's "effect" in a given district). Here, where the Government has not introduced any evidence of any actions (or even potential actions) taken on the basis of Mr. Barrack's allegedly false statements, the venue instruction sought by the Government is improper. Furthermore, the facts of *Coplan* are materially different than those in the case at bar, because the false statements in *Coplan* were made in a "deposition" for an IRS proceeding that was operating out of the Southern District of New York, and thus, by its very nature, it was clear that the statements would be "received" in the secondary district, even if made in Tennessee. 703 F.3d at 78-80. As explained by the Tenth Circuit in *United States v. Smith*, that fact that a false statement is made in a deposition is meaningful for the venue analysis. 641 F.3d 1200, 1206-1209 (10th Cir. 2011). In *Smith*, the Government indicted the defendant in the Western District of Oklahoma for violating Section 1001, based on statements he made to a federal agent during an in-person interview in Minnesota. *Id.* At trial in Oklahoma, the agent did not introduce any notes she took during the interview, but rather used a FD-302, which she "compiled only after she had returned to Oklahoma" to refresh her memory. *Id.* The Tenth Circuit held that the Government had failed to establish venue on the Section 1001 charge, because the alleged "crime occurred during an interview in Mr. Smith's home in Minnesota." The Tenth Circuit noted that the "false

statements began, continued, and ended during the interview," and importantly, explained that the interview was not "recorded, transcribed or otherwise preserved for use in Oklahoma." *Id.* As such, concluded the Tenth Circuit, "venue lay in Minnesota, not Oklahoma." *Id*. Both Smith, and the Supreme Court's decision in *Aguilar*—which presents an almost identical set of facts to those present here and should apply with equal force to a Section 1001 charge—suggests that the Government needs to prove more than just the fact that false statements were used, in some fashion, by the Government in the district where the charges were brought in order to establish that the "crime" was committed in the district and thus, the venue is proper. *See* U.S. Const. Art. III, §2 cl. 3 (requiring that "the Trial of all crimes shall be held in the State where the said Crimes shall have been committed."); Fed. R. Crim. P. 18 (requiring the government to prosecute an "offense in a district where the offense was committed.") For this reason, the Court should find that the Government failed to demonstrate venue for Counts Four though Nine. But, even under the Government's proposed venue standard, the Court must dismiss Counts Four through Nine because the Government failed to show any "effect" from Mr. Barrack's statements in the Eastern District.

**D.    The Government Failed To Prove That Mr. Barrack Made The Statement Alleged In Count Four.**

In addition to the three fatal defects (failure to demonstrate materiality, *mens rea* and venue) described above, the Government also failed to sustain its burden to prove that the statement alleged in Count Four of the Superseding Indictment was even made.

Count Four alleges that: "BARRACK falsely stated and represented to FBI special agents that Rashid Al Malik did not ask BARRACK to do anything for the United Arab Emirates, when in fact, as he then and there well knew and believed, AL MALIK asked BARRACK to assist the United Arab Emirates on numerous occasions." (Sup. Ind. ¶ 121). But at trial, SA Mergen testified

that "Mr. Barrack stated that he did not <u>feel</u> that Rashid Al Malik ever asked him to do anything for the UAE government." (Tr. 2573:22-23 (emphasis added)). That testimony does not satisfy the Government's burden of proof with respect to Count Four.

As the Fifth Circuit has explained, in a false statement case in particular, "the starting point for everything is the statement. Once the defendant is informed what it is he is claimed to have said, then he can marshal his evidence tending to show that he did not make the utterance charged, or that it is true, or that it was not material." *United States v. Lambert*, 501 F. 2d 943, 948 (5th Cir. 1974). But if the "threshold information given" to the defendant, via the indictment's charging language, "is not correct" or is not the language that the Government attempts to obtain a conviction upon, "the defendant is hampered in defending [himself] on all three grounds," and any conviction cannot stand. *Id.*

In *Lambert*, the indictment alleged that the defendant "stated and represented that he had been severely beaten and subjected to illegal and unnecessary punishment by two members of the Tampa Police Department, Tampa, Florida, in violation of his Civil Rights," when "in truth and in fact, as [defendant] then knew, he had not been severely beaten and he had not been subjected to illegal and unnecessary punishment and his Civil Rights had not been violated by the two members of the Tampa Police Department." *Id*. at 947. In fact, however, the defendant had not told the FBI that he had been "severely beaten," but rather had described being struck on the head, face and arms. *Id.* The phrase "severely beaten" was the gloss that the prosecutors had put on Lambert's actual statements. *Id*. at 948. As the Fifth Circuit explained, "the phrases 'severe beating' and 'subjected to illegal and unnecessary punishment' were prosecutorial efforts to summarize and restate either the overall tenor of the entire statement signed by defendant, or the gist of selected, but unidentified portions extracted from it" but did not reflect the actual language used by the

defendant.  *Id.* at 948-49 (noting that "'severe beating' was the grand jury's term, not appellant's.").  At trial, law enforcement officers described the actual statements made by the defendant—namely his description of having been struck on the head, face and arms—and the jury convicted.  On appeal, the Fifth Circuit reversed, finding that where the indictment "use[d] facially specific terms"—*i.e.*, that the defendant "stated" that he had been "severely beaten"—the Government was required to prove that the defendant used the words alleged in the charges.  *Id.* at 948.  The Government opposed the appeal, arguing that the statements actually made by the defendant, that is, his description of having been struck on the head, face and arms, were also false and thus, it did not matter that he did not use the exact phrase "severely beaten."  The Fifth Circuit disagreed, explaining that just because the jurors might have "reasonably agree[d] with the recharacterization of the actual statement"—that is, finding that the phrase "severely beaten" accurately summarized the physical acts that defendant had falsely described—that fact did not "cure the prejudicial impact upon the defendant of an indictment, which as it turns out, did not sufficiently apprise him of what evidence he must marshal and present." *Id.* at 949.  As in *Lambert,* the Government here is obligated to prove that Mr. Barrack made the precise statements that are alleged in the Superseding Indictment and the Government may not seek conviction on the basis of statements that are merely "similar" to what the grand jury alleged, such Agent Mergen's claim that Mr. Barrack said that he "felt" that Mr. Al Malik had not ever asked him to do anything for the UAE Government.  Accordingly, Count Four should be dismissed.

E.      **The Government Failed To Prove That The Statement Alleged In Count Five Was False, Because, Even If Made as Agent Mergen Testified, It Is Fundamentally Ambiguous.**

In addition to the three fatal defects (failure to demonstrate materiality, *mens rea* and venue) described above, the Government also failed to sustain its burden to prove that the statement alleged in Count Five of the Superseding Indictment was false and/or that Mr. Barrack knowingly,

intentionally and willfully made a "false" statement. Count Five alleges that "BARRACK falsely stated and represented to FBI special agents that Al Malik never proffered any policies or requests to BARRACK, when in fact, as he then and there well knew and believed, MALIK proffered policies and requests to BARRACK on numerous occasions." (Sup. Ind. ¶ 123).

While SA Mergen did testify that this statement was made, and thus, for purposes of this Motion, we view her testimony in the light most favorable to the Government, the statement itself is so fundamentally ambiguous that it cannot serve as the basis of a perjury conviction. *See United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) (explaining that "fundamentally ambiguous" questions cannot serve as a basis for a perjury conviction, and defining "fundamentally ambiguous"); *United States v. Sampson*, 898 F.3d 287, 307 n.15 (2d Cir. 2018) (assuming without deciding that *Lighte* applies to Section 1001(a)(2)); *United States v. Diogo*, 320 F.2d 898, 906-09 (2d Cir. 1963) ("ambiguous" answers, as well as answers to ambiguous questions such as whether the defendant was a "follower of the Communist line," cannot support a Section 1001 conviction); *United States v. Mangano*, 2022 WL 65775, at *64-68 (E.D.N.Y. Jan. 6, 2022) ("ambiguous and equivocal answers in response to . . . questions that were themselves often imprecise" insufficient to support perjury charge); *United States v. Moses*, 94 F.3d 182, 189 (5th Cir. 1996) ("[A] prosecution for a false statement under § 1001 or under the perjury statutes cannot be based on an ambiguous question where the response may be literally and factually correct. . . . An indictment premised on a statement which on its face is not false cannot survive.") (citing *United States v. Vesaas*, 881 F.2d 1380, 1383 (6th Cir. 1989); *United States v. Vesaas*, 586 F.2d 101, 104 (8th Cir. 1978)); *United States v. Poutre*, 646 F.2d 685 (1st Cir. 1980) (similar). Accordingly, Count Five should be dismissed.

**F.**    **The Government Failed to Prove That The Statement Alleged in Count Six Was False, Because, Even If Made as Agent Mergen Testified, It Is Literally True.**

In addition to the three fatal defects (failure to demonstrate materiality, *mens rea* and venue) described above, the Government also failed to sustain its burden to prove that the statement alleged in Count Six of the Superseding Indictment was false.  Count Six alleges that "BARRACK falsely stated and represented to FBI special agents that other than Gmail, iMessage and WhatsApp, BARRACK never **used** any messaging application with anyone associated with the Middle East, and that BARRACK was never **asked to** download any messaging application by anyone associated with the Middle East, when in fact, as he then and there well knew and believed, **BARRACK was asked by Khalifa Al Ghafli** and AL MALIK to download a messaging application to communicate directly with MBZ and Sheik Tahnoun and used that messaging application to communicate with United Arab Emirates officials."  (Sup. Ind. ¶ 125) (emphasis added).

Count Six thus alleges two distinct false statements: (1) that Mr. Barrack never **used** any messaging application other than Gmail, iMessage and WhatsApp to communicate with anyone in the Middle East; (2) that Mr. Barrack was never **asked to** download any messaging application by anyone associated with the Middle East.  As to the first statement, the Government offered no proof that it was false (i.e. that Mr. Barrack did, in fact, **use** a **messaging application** other than Gmail, iMessage and WhatsApp to communicate with anyone in the Middle East).  As described below, the Government introduced evidence that Mr. Al Malik suggested to Mr. Grimes that Mr. Barrack download a secure "app" in order to make a "secure call" to Sheikh Tahnoun, but (i) a secure phone line—for voice calls—is not the same thing as a "messaging app," *see Bronston v. United States*, 409 U.S. 352, 362 (1973) ("Precise questioning is imperative as a predicate for the

offense of perjury."); and (ii) the Government did not introduce any evidence that any such "app"—whether for messaging or voice calls—was ever "used" by Mr. Barrack.

Similarly, as to the second statement, the Government did not offer any proof that Mr. Barrack **was asked** to download any messaging application by anyone associated with the Middle East. Instead, the only evidence the Government offered to support the supposed falsity of this statement are communications to which Mr. Barrack is not a party. (*See e.g.* **GX 501-EE; GX 504-A-t**). Accordingly, Count Six should be dismissed.

## G. The Government Failed to Prove That The Statement Alleged In Count Seven Was Made, Or That It Was False.

In addition to the three fatal defects (failure to demonstrate materiality, *mens rea* and venue) described above, the Government also failed to sustain its burden to prove that the statement alleged in Count Seven of the Superseding Indictment was made, or that it was false. Count Seven alleges that "BARRACK falsely stated and represented to FBI special agents that BARRACK never **had** a dedicated telephone to communicate with anyone associated with the Middle East, was never **asked to** acquire a dedicated telephone to communicate with anyone associated with the Middle East and **has had only one telephone**, the telephone number of which is known to the Grand Jury, when in fact, as he then and there well knew and believed, BARRACK has had more than one telephone, AL MALIK asked BARRACK to acquire a dedicated telephone to communicate directly with MBZ and Sheik Tahnoon via a messaging application and BARRACK in fact acquired a dedicated telephone to communicate directly with MBZ and Sheik Tahnoon via the messaging application." (Sup. Ind. ¶ 127) (emphasis added).

Count Seven thus alleges three distinct false statements: (1) that Mr. Barrack never **had** a dedicated telephone to speak to anyone associated with the Middle East; (2) that Mr. Barrack was

never **asked to** acquire a dedicated telephone to communicate with anyone associated with the Middle East; and (3) that Mr. Barrack **has had only one telephone.**

As to the first statement, the Government did not offer any evidence that the statement was in fact made by Mr. Barrack. SA Mergen did **not** testify that Mr. Barrack stated that he never "had" a dedicated telephone. SA Mergen testified that Mr. Barrack stated that he "was never **asked** to acquire a dedicated telephone." (Tr. 2575:20-23 ("Q. What did Mr. Barrack say? A. Mr. Barrack stated that nobody from the Middle East ever asked him to obtain a specific or dedicated phone to communicate with them with."); Tr. 2753:14-18 ("Q. Does that reflect your recollection Special Agent Chiu documented contemporaneously that Mr. Barrack stated he was never asked to get a dedicated phone? A. Yes.")). So the Government did not even prove that the first statement was actually made. Even if the Government had proven this statement was made, it has not proven that this statement was false.

As to the second statement, the Government did not prove that Mr. Barrack's statement that he was never "asked to" acquire a dedicated telephone was false. Mr. Barrack's statement was literally true. Mr. Barrack was never "asked to" acquire a dedicated telephone. Tellingly, most evidence that the Government offered to demonstrate the falsity of this statement consisted of communications to which Mr. Barrack is not a party. (**GX 501-EE, GX 501-GG; GX 504-F-t**). It is clear from the evidence that Mr. Al Malik suggested to ***Mr. Grimes*** the possibility of using "an old phone or a new one without any data" to download an application after Mr. Grimes said that he didn't want to download an application on Mr. Barrack's phone for fear that the "we would give up the right to the app to have fully access to [Mr. Barrack's] phone[']s data." The suggestion to get a separate phone came from Mr. Al Malik, and was not a request from anyone in the UAE's government. Moreover, although the Government offered an exhibit suggesting that Mr. Grimes

37

told Mr. Barrack about the phone (GX 636), it has no proof that Mr. Grimes ever told Mr. Barrack that the suggestion to use a different phone came from Mr. Al Malik or anyone else in the Middle East.

As to the third statement, that Mr. Barrack "has had only one telephone" the Government has also failed to prove that this ambiguous statement was false. Special Agent Mergen's testimony on this subject is reflected below:

> Q. Was Mr. Barrack asked about the phones **that he had**. A. He was. Q. What did he say? A. **Mr. Barrack indicated that he had one cell phone**. Q. Did he provide any other information about that phone? A. Yes. He provided us the phone number to the phone. Q. Was Mr. Barrack asked about whether he had been asked – was Mr. Barrack questioned about whether he'd ever been asked to obtain any other phones by any other persons? A. He was questioned about that, yes. Q. What did Mr. Barrack say? A. Mr. Barrack stated that nobody from the Middle East ever asked him to obtain a specific or dedicated phone to communicate with them with.

(Tr. 2575:10-23). Special Agent Mergen's testimony is unclear whether Mr. Barrack was asked about the number of phones he had at the time of the interview in 2019 or whether he was asked about the number of phones he had at some other point in time. While the Government has offered into evidence emails showing multiple phone numbers for Mr. Barrack it has provided no evidence that (1) Mr. Barrack actually ever used those other phone or (2) Mr. Barrack still had those phones at the time of his interview in June 2019. For these reasons, Count Eight should be dismissed.

## H.      The Government Failed To Prove That The Statement Alleged in Count Eight Was Made, Or If Made, That It Was Anything Other Than a Failure of Recollection.

In addition to the three fatal defects (failure to demonstrate materiality, *mens rea* and venue) described above, the Government also failed to sustain its burden to prove that the statement alleged in Count Eight of the Superseding Indictment was made, or that it was false. Count Eight alleges that "BARRACK falsely stated and represented to FBI special agents that, after the 2016 United States Presidential Election, BARRACK had no role in facilitating communications, including arranging telephone calls, between the President-Elect and officials from the United

Arab Emirates, including MBZ and Sheik Tahnoon and that he had nothing to do with any phone calls between MBZ and Sheik Tahnoon with the President-Elect, when in fact, as he then and there well knew and believed, BARRACK facilitated communications between the President-Elect and MBZ and Sheik Tahnoon after the 2016 Presidential Election, including by arranging one or more telephone calls between the President-Elect and MBZ and Sheik Tahnoon and by providing contact information for MBZ and Sheik Tahnoon to the President-Elect's assistant."  (Sup. Ind. ¶ 129).

Again, Count Eight thus alleges two distinct false statements: (1) that Mr. Barrack had "no role" in facilitating communications between the President-Elect and officials from the United Arab Emirates; and (2) that Mr. Barrack "had nothing to do with any phone calls between MBZ and Sheik Tahnoon with the President-Elect."

As to the second statement, the Government did not even prove the statement was made. SA Mergen did **not** testify that Mr. Barrack said he had "nothing to do with" any phone calls between MBZ and Sheik Tahnoon with the President-Elect.  Instead, SA Mergen testified that Mr. Barrack stated that "post-election, he had no role in facilitating communications between Donald Trump and leaders in the Middle East," whether by telephone or otherwise.  (Tr. 2566:2-4).

As to both statements, even if made, the Government has failed to show that there were intentionally false, rather than just a failure of recollection.  Given that the Government possessed the report of Mr. Barrack's interview with the State Department in which he openly disclosed that he had facilitated introductions between Donald Trump or Jared Kushner and leaders in the Middle East, it defies logic to suggest that Mr. Barrack was intentionally trying to mislead the Government regarding his role in facilitating a call between President Trump and MBZ.  (*See* **3500-HP-2 at 48** ("During the interview, Barrack also noted that he has facilitated introductions between the following business associates of his and President Trump or Jared Kushner: 1. Mohammed Bin

Salman . . . 2. Mohammed Bin Zayed . . . Sheik Tahnoon bin Zayed . . .")).  For these reasons, Count Eight should be dismissed.

I.      **The Government Failed To Prove That The Statement Alleged in Count Nine Was False, Because, Even If Made as Agent Mergen Testified, It Is Fundamentally Ambiguous.**

In addition to the three fatal defects (failure to demonstrate materiality, *mens rea* and venue) described above, the Government also failed to sustain its burden to prove that the statement alleged in Count Four of the Superseding Indictment was false.  Count Nine alleges that "BARRACK falsely stated and represented to FBI special agents that BARRACK did not provide any guidance or input into Steve Bannon's meeting with MBZ in or about September 2017 and that BARRACK did not learn of Steve Bannon's meeting with MBZ until after the meeting, when in fact, as he then and there well knew and believed, BARRACK advised Steve Bannon to meet with MBZ in or about September 2017 and BARRACK had advance notice of Steve Bannon's meeting with MBZ in or about September 2017."  (Sup. Ind. ¶ 131).

As an initial matter, the alleged statement is so fundamentally ambiguous it cannot serve as the basis for a perjury conviction.  *See supra* Section IV(E).  It is unclear what it means to provide "guidance" to Mr. Bannon concerning his meeting with MBZ.  The meaning depends entirely upon what Mr. Barrack understood the question to be asking—it could refer to substantive and meaningful advice regarding the topics that Mr. Bannon planned to discuss with MBZ or it could mean something significantly less than that.  It is impossible to know and thus, this statement is inappropriate for a Section 1001 charge.  Apart from the ambiguity, the Government did not prove that this statement was false.  The only evidence that Government admitted into evidence regarding any communication between Mr. Bannon and Mr. Barrack regarding Mr. Bannon's meeting with MBZ was **GX 644**, which demonstrates that Mr. Barrack learned that Mr. Bannon "thought" he might be seeing MBZ later that week, but otherwise includes no "guidance or input"

concerning that meeting, thus demonstrating that Mr. Barrack did not have advance notice "of" what Mr. Bannon and MBZ were planning to discuss. *United States v. Mangano*, 2022 WL 65775, at *64-68 (E.D.N.Y. Jan. 6, 2022) ("ambiguous and equivocal answers in response to . . . questions that were themselves often imprecise" insufficient to support perjury charge). Accordingly, Count Nine should be dismissed.

## CONCLUSION

The Court should grant Mr. Barrack's motion for a judgment of acquittal under Rule 29.


Dated: October 24, 2022
       New York, New York

WILLKIE FARR & GALLAGHER LLP

/s/ Michael S. Schachter
Michael Steven Schachter
Randall Wade Jackson
Casey E. Donnelly
Steven J. Ballew
Jordan D. Reisch
787 Seventh Avenue
New York, NY 10019-6099
mschachter@willkie.com
(212) 728-8000 (ph)
(212) 728-8111 (fax)

O'MELVENY & MYERS LLP

James A. Bowman (admitted *pro hac vice*)
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
jbowman@omm.com
(213) 430-6000 (ph)
(213) 430-6407 (fax)


*Counsel for Thomas J. Barrack, Jr.*